UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 15-81229-CIV-MARRA

ALEJANDRO ZENDEJAS,

    Plaintiff,

vs.

EUGENIE H. REDMAN, et al.,

    Defendants.

_____/

## OPINION AND ORDER ON MOTIONS TO DISMISS

This matter is before the Court on Defendant Eugenie H. Redman's Motion to Dismiss (DE 17) and Defendant Simon Nizri's Motion to Dismiss (DE 27). The motions are ripe for review. For the following reasons, both motions are granted in part.

### I. Background

This is an action arising out of the purchase of a horse. Plaintiff Alejandro Zendejas is the father of Juan Jose Zendejas ("Jose"), a champion horse rider who competes at the Grand Prix level of equestrian show jumping. (DE 5 ¶ 8.) The Grand Prix level is the highest class of competitive horse jumping, with multiple jumps set in difficult courses and combinations at heights of 1.4 meters and higher. (DE 5 ¶ 8.) Jose participates in competitive equestrian show jumping in the United States and internationally. (DE 5 ¶ 8.) Zendejas supports Jose's riding activity by acquiring specialized and unique sport horses. (DE 5 ¶ 8.)

In early 2014, Zendejas asked Defendant Simon Nizri to locate a horse capable of carrying Jose successfully in the Grand Prix classes and qualifying Jose for the Mexican Olympic Team. (DE

1

5 ¶ 20.) Nizri is a professional horse and rider trainer, and has been the trainer for Zendejas and Jose for several years. (DE 5 ¶ 11.) Over time, Zendejas came to trust Nizri and rely upon his professional judgment with respect to the purchase of horses suitable for Jose. (DE 5 ¶ 19.)

Shortly after Zendejas's request, Nizri offered Zendejas an opportunity to acquire a unique and highly competitive show jumper named Vorst. (DE 5 ¶ 20.) Relying upon Nizri's training and experience, Zendejas asked Nizri to investigate Vorst's health and qualifications to compete safely in the Grand Prix and in the Olympics. (DE 5 ¶ 21.) Vorst's owner was Defendant Eugenie Redman, who is in the business of selling horses for profit and who has an equine training and sales facility in Wellington, Florida. (DE 5 ¶¶ 3, 9.) Redman's asking price for Vorst was $250,000. (DE 5 ¶ 21.)

In March 2014, Nizri introduced Jose to Defendant Colin Syquia, who trains horses for Redman and acts as Redman's agent for the purchase and sale of horses. (DE 5 ¶¶ 10, 22.) The purpose of the meeting was for Jose to test ride Vorst. (DE 5 ¶ 22.) Zendejas was present when Jose test rode Vorst, and he repeated to Nizri and Syquia that he was only interested in purchasing Vorst if the horse was capable of safely and successfully competing at the Grand Prix level and was suitable for the Mexican Olympic Team. (DE 5 ¶ 22.)

When Jose test rode Vorst, Syquia represented to Zendejas that he was the agent for Redman, that Redman was the legal owner of Vorst, and that Vorst was suitable and medically fit for Jose's intended use as a Grand Prix jumper capable of clearing at least 1.4 meters in competition. (DE 5 ¶ 23.) Nizri also represented to Zendejas that the horse was suitable and medically fit for Jose's intended use as a Grand Prix jumper capable of clearing at least 1.4 meters in competition. (DE 5 ¶ 23.) Neither Nizri nor Syquia disclosed to Zendejas that Vorst had any physical ailment or permanent injury, or that Vorst had a history of refusing to jump in competition. (DE 5 ¶ 23.) Nizri

2

also did not disclose to Zendejas that he was also acting as Redman's agent in relation to the sale of Vorst. (DE 5 ¶ 25.)

Relying on Nizri and Syquia's representations, Zendejas agreed with Syquia, as Redman's agent, to purchase Vorst for $250,000. (DE 5 ¶ 24–25.) As part of the verbal agreement regarding the purchase of Vorst, Syquia arranged for a pre-purchase examination of Vorst prior to payment by Zendejas. (DE 5 ¶ 26.) The pre-purchase examination was performed by Jorge Gomez, D.V.M., of the Palm Beach Equine Clinic in Wellington, Florida. (DE 5 ¶ 26.) Dr. Gomez was selected by Nizri, Syquia, and Redman. (DE 5 ¶ 26.)

The pre-purchase examination was later memorialized in a written report, but Zendejas was not provided the report by Nizri, Syquia, or Redman. (DE 5 ¶ 27.) Zendejas relied on Nizri to convey all of the findings of the pre-purchase examination to him. (DE 5 ¶ 27.) In the "Seller's Statement" section of the report, Redman represented that Vorst did not have a history of recurring lameness and that there was no other pertinent medical history for the veterinarian to consider as part of the pre-purchase examination. (DE 5 ¶ 27.)

Zendejas wire transferred $260,000 to Redman to purchase Vorst. (DE 5 ¶ 28.) Zendejas accidentally transferred Redman $10,000 more than the asking price, which Redman has never refunded despite demand made by Zendejas. (DE 5 ¶ 28.) Zendejas later learned that Redman paid a $25,000 sales commission to Syquia and Nizri. (DE 5 ¶ 30.) No written bill of sale was presented by Redman, Syquia, or Nizri prior to the wire transfers. (DE 5 ¶ 29.)

After Zendejas successfully wired the $260,000 to Redman, Redman tendered a Bill of Sale for the purchase and sale of Vorst. (DE 5 ¶ 32.) The Bill of Sale, which is attached as an exhibit to the complaint, identifies Zendejas as the buyer and Redman as the seller of Vorst, and states that the

purchase price is $250,000. (DE 5 ¶ 32.) The Bill of Sale states that Zendejas agrees to purchase Vorst "as is," Zendejas is not relying on any representation ("either oral or written, express or implied") made by Redman with respect to Vorst's condition or ability, and Redman has not made any representations or warranties with respect to Vorst. (DE 5-2.) The Bill of Sale also states that it represents the parties' entire agreement and that "[n]o other agreements or promises, verbal or implied, are included unless specifically stated" in the Bill of Sale. (DE 5-2). The Bill of Sale was not executed by Zendejas, and Zendejas did not authorize Nizri to execute the Bill of Sale on his behalf. (DE 5 ¶ 24.)

Redman later instructed Syquia to transfer possession of Vorst to Zendejas. (DE 5 ¶ 35.) Zendejas then made arrangements for international transportation of Vorst from Miami, Florida to Mexico City, Mexico. (DE 5 ¶ 35.) Shortly after Vorst's arrival to Mexico, Zendejas entered Vorst in a competitive jumping event. (DE 5 ¶ 36.) Vorst performed poorly. (DE 5 ¶ 36.) Vorst was unable to clear several obstacles that a horse represented to be of Grand Prix caliber would normally clear with ease. (DE 5 ¶ 36.) Additionally, Vorst refused to jump in the competition. (DE 5 ¶ 36.)

To resolve Vorst's poor performance, Zendejas tried to train Vorst for Grand Prix competition. (DE 5 ¶ 37.) During this time, Zendejas asked Nizri about Vorst's prior history as a Grand Prix horse and whether Nizri was aware of any history of Vorst refusing to jump in competition. (DE 5 ¶ 37.) Nizri told Zendejas that he did not know of any history of Vorst having a propensity to refuse jumps in competition. (DE 5 ¶ 37.)

Relying on Nizri's statements, as well as Nizri and Syquia's prior representations, Zendejas continued to train Vorst for competition. (DE 5 ¶ 38.) Zendejas then placed Vorst in another competition. (DE 5 ¶ 38.) Again, Vorst refused to jump in the competition, and his refusal was so

4

severe that he suffered physical injury and placed Jose at risk of injury. (DE 5 ¶ 38.) Ultimately, Zendejas learned that Vorst had a history of refusing to jump in competitions and a reputation as a "dirty stopper." (DE 5 ¶ 39.) A "dirty stopper" is a horse that unexpectedly stops at jumps, placing both itself and the rider at risk of injury. (DE 5 ¶ 39.)

Zendejas then demanded that Syquia and Nizri rescind the transaction for a full refund of the purchase price (including the $10,000 overpayment) in exchange for a return of Vorst to Redman. (DE 5 ¶ 40.) Syquia and Nizri later told Zendejas that Redman refused to rescind the transaction or return the $10,000 overpayment. (DE 5 ¶ 40.) Syquia and Nizri, however, paid Zendejas a partial refund of $25,000, which was the amount of the sales commission Redman paid them. (DE 5 ¶ 41.) Despite this payment, no settlement agreement was ever made between the parties. (DE 5 ¶ 41.)

Zendejas brought this action against Redman, Nizri, and Syquia. Zendejas asserts claims against Redman for breach of contract, breach of express warranties, breach of implied warranty for a particular purpose, breach of implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, respondeat superior, rescission, unjust enrichment, and strict liability for failure to provide a timely bill of sale as required under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201–501.213 (2015). Zendejas asserts claims for negligent misrepresentation and fraudulent misrepresentation against Syquia and Nizri. Finally, Zendejas asserts a claim for strict liability for dual agency under FDUTPA against Redman and Nizri.

Redman moved to dismiss the claims for breach of contract, breach of express warranties, breach of implied warranty for a particular purpose, breach of implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, and rescission. Nizri moved to dismiss all the claims against him.

## II. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the ground on which it rests. The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal citation and alteration omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. The Court must accept all of the plaintiff's factual allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## III. Discussion

**A. Claims Against Redman**

**1. Breach of Contract, Express Warranties, and Implied Warranty of Merchantability**

Redman's arguments as to the claims for breach of contract, breach of express warranties, and breach of the implied warranty of merchantability all rely on the Bill of Sale. Redman argues that

any prior verbal agreement that forms the basis of Zendejas's breach-of-contract claim is unenforceable because it is superseded by the Bill of Sale's integration clause. Similarly, Redman argues that the terms of the Bill of Sale foreclose any claims for breach of express warranties or breach of the implied warranty of merchantability.

Zendejas responds that the Bill of Sale is invalid because he never signed the Bill of Sale and did not authorize Nizri to sign the Bill of Sale on his behalf. If the Bill of Sale is invalid, it cannot supersede any prior agreements via its integration clause or nullify any express or implied warranties.

While Nizri's execution of the Bill of Sale on Zendejas's behalf may have been unauthorized, it is possible that Zendejas ratified this unauthorized act. Redman notes that Zendejas obtained possession of Vorst *after* Redman tendered the Bill of Sale and he waited at least several months before raising any objection to it. This conduct might indicate a ratification of Nizri's execution of the Bill of Sale on Zendejas's behalf.

"Ratification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority." *Deutsche Credit Corp. v. Peninger*, 603 So. 2d 57, 58 (Fla. Dist. Ct. App. 1992). "An agreement is deemed ratified where the principal has full knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification." *Id.* Whether a principal ratified an agent's act is a question of fact. *Id.*

Here, Zendejas alleges that he did not know that Nizri was acting as Redman's agent in addition to acting as Zendejas's own agent. (DE 5 ¶ 3.) If this was a material fact, then the Bill of Sale cannot be deemed ratified and is invalid. At this stage, the Court cannot find that Nizri's undisclosed agency relationship with Redman was immaterial. So even assuming that the terms of

the Bill of Sale would otherwise foreclose Zendejas's claims, the validity of the Bill of Sale is in question and all of Redman's arguments that are based on the Bill of Sale must be rejected. Therefore, Redman's motion to dismiss Zendejas's claims for breach of contract, breach of express warranties, and breach of the implied warranty of merchantability is denied.[1]

### 2. Breach of Implied Warranty of Fitness for a Particular Purpose

Redman argues that Zendejas's claim for breach of an implied warranty of fitness for a particular purpose fails because Zendejas failed to inspect to Vorst when given the opportunity and thus waived the implied warranty.[2]

Article 2 of Florida's version of the Uniform Commercial Code, which applies to "transactions in goods," governs this transaction. Fla. Stat. § 672.102. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 678) and things in action. 'Goods' also includes the unborn young of animals . . . ." Fla. Stat. § 672.105(1). This definition is broad enough to include horses. *See Key v. Bagen*, 136 Ga. App. 373, 373, 221 S.E.2d 234, 235 (1975).

Florida's UCC provides for an implied warranty of fitness for a particular purpose "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable

---

[1] Because the Court denies Redman's motion to dismiss on this basis, the Court need not address Zendejas's other attacks on the validity of the Bill of Sale.

[2] Redman makes additional arguments as to this claim that are based on the Bill of Sale, which the Court rejects because the validity of the Bill of Sale cannot be determined at this stage of the proceedings.

goods." Fla. Stat. § 672.315 (2015). The implied warranty of fitness for a particular purpose may, however, be excluded or modified in certain circumstances. *Id.* "When the buyer before entering into the contract has examined the goods . . . as fully as he or she desired or has refused to examine the goods," for example, "there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him or her." Fla. Stat. § 672.316(3)(b).

Here, even if Zendejas did have an opportunity to examine Vorst, it is unclear whether the defects he complains of "ought in this circumstances to have [been] revealed to him." *Id.* The pre-purchase examination report, which is attached as an exhibit to the complaint, does not reveal the complained of defects even though it was prepared by veterinarian who examined Vorst. Redman claims that Zendejas's failure to review the pre-purchase examination report personally constituted a waiver of the implied warranty of fitness for a particular purpose, but whether a waiver occurred is a factual question which cannot be resolved on a motion to dismiss. Moreover, resolving the question of whether a waiver occurred would require consideration of how a failure to review the pre-purchase examination report would matter when it did not reveal the alleged defects. Additionally, Zendejas watched his son test ride Vorst, which did not reveal any defects. It is also unclear whether certain defects would manifest only during a competition and whether Zendejas had an opportunity to examine Vorst in such circumstances. Accordingly, Redman's motion to dismiss this claim must be denied.[3]

### 3. Violation of the Magnuson-Moss Warranty Act

The Magnuson-Moss Warranty Act provides a cause of action to "a consumer who is

---

[3] Notably, the cases on which Redman relies were decided either on a motion for summary judgment or after a bench trial.

9

damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1) (2012). The term "consumer" means a "buyer (other than for purposes of resale) of any consumer product." *Id.* § 2301(3). A "consumer product" is "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Redman argues that the Magnuson-Moss Warranty Act is inapplicable here because Vorst is not a "consumer product" as defined by the Act.

The Court disagrees with Zendejas that it is inappropriate to determine whether something is consumer product at the pleading stage. Zendejas's allegation that Vorst is a "consumer product" because it is a mere legal conclusion. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Also, because the Act requires that the product in question be "normally" used for personal, family, or household purposes, the issue can be decided without regard to the particular facts of the case or Zendejas's intended use. *See Stoebner Motors, Inc. v. Automobili Lamborghini S.P.A.*, 459 F. Supp. 2d 1028, 1033 (D. Haw. 2006) ("Thus, the particular use to which a plaintiff puts the product is not determinative; it is the type of product that matters."); *Najran Co. for Gen. Contracting & Trading v. Fleetwood Enters., Inc.*, 659 F. Supp. 1081, 1099 (S.D. Ga. 1986) ("It is the 'normal use' of a product as a consumer product that renders coverage by the Act appropriate. That is, if a *type* of product is 'normally used' for consumer purposes, then that product in any given case is a consumer product within the meaning of the Act regardless of whether it was used for commercial purposes."); *Bus. Modeling Techniques, Inc. v. Gen. Motors Corp. (Pontiac Motor Div.)*, 474 N.Y.S.2d 258, 261 (Sup. Ct. 1984) ("[T]he use of the word 'normally' in the Magnuson-Moss Act involves a

determination of the product's common, ordinary or usual use and focuses on the class-wide use of the product. . . . An individual's deviation from the normal use of a particular-type product will not affect its classification for purposes of the Act.").

Neither party, however, properly addresses the question before the Court. Both Redman and Zendejas focus on *Zendejas's* intended use of *this* show jumping horse. Neither party provides any authority or argument regarding whether a show jumper[4] in general is used for a personal, family, or household purpose. Zendejas also makes inapposite arguments based on UCC terms, which depend on the intended use of the particular product. *See Bus. Modeling Techniques*, 474 N.Y.S.2d at 261 (discussing differences between "consumer goods" under the UCC and "consumer products" under the Magnuson-Moss Warranty Act). Similarly, Redman relies on distinguishable cases applying state-law provisions that focus on the intended use of the horse rather than the "normal" use. *See Cohen v. N. Ridge Farms, Inc.*, 712 F. Supp. 1265, 1271 (E.D. Ky. 1989); *In re Bob Schwermer & Assocs., Inc.*, 27 B.R. 304, 308 (Bankr. N.D. Ill. 1983). The Court rejects both parties' arguments. Zendejas's intended use is irrelevant to this determination.

While the issue of whether something is a "consumer product" can be appropriate for resolution at the pleading stage, the parties' failure to address the issue properly leaves the Court unable to make that determination here. Even if show jumpers may normally be used for commercial purposes, it does not follow that show jumpers are not *also* normally used for personal purposes. Some products may have both personal and commercial "normal" uses and such dual-purpose products may still be "consumer products" under the Act. *See Stoebner Motors*, 459 F. Supp. 2d at

---

[4] Both parties appear to assume that the issue is whether a show jumper is a "consumer product" rather than whether a horse in general is a "consumer product." The Court expresses no opinion on whether this assumption is correct.

11

1033 n.1; *Bus. Modeling Techniques*, 474 N.Y.S.2d at 608. The Court cannot determine, as a matter of law, whether show jumpers or horses are normally, rather than occasionally, used for personal purposes on a motion to dismiss. Furthermore, the Court is unaware of any case in which such a determination has been made. Accordingly, the Court denies Redman's motion to dismiss this claim.[5]

### 4. Rescission

To state a cause of action for rescission under Florida law, a party must allege:

> (1) The character or relationship of the parties; (2) The making of the contract; (3) The existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) That the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission. (5) If the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; (6) Lastly, that the moving party has no adequate remedy at law.

*Billian v. Mobil Corp.*, 710 So. 2d 984, 991 (Fla. Dist. Ct. App. 1998) (quoting *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So.2d 614, 617 (Fla. Dist. Ct. App. 1965)). Redman correctly notes that Zendejas fails to allege that he has no adequate remedy at law, which is "a fundamental requirement necessary for rescission of a contract." *Collier v. Boney*, 525 So. 2d 971, 972 (Fla. Dist. Ct. App. 1988). Therefore, this claim must be dismissed. Because it is not clear that an amendment would be futile,[6] the Court will dismiss this claim without prejudice and allow Zendejas to amend his complaint. While the Court need not address Redman's other attacks on this

---

[5] For reasons already discussed, the Court also rejects Redman's alternative argument based on the Bill of Sale.

[6] The fact that Zendejas asserts legal claims does not foreclose his equitable rescission claim. A party is entitled to plead inconsistent claims. Fed. R. Civ. P. 8(d)(3).

claim at this time, Zendejas may of course address those alleged deficiencies if he chooses to amend his complaint.

### B. Claims Against Nizri

#### 1. Negligent and Fraudulent Misrepresentation

Nizri argues that Zendejas's claims for negligent misrepresentation and fraudulent misrepresentation fail because Zendejas cannot satisfy the element of justifiable reliance. As an initial matter, Nizri provides no authority for his assertion that justifiable reliance is an element of a fraudulent-misrepresentation claim, and the Court rejects this argument. In the context of fraudulent misrepresentation, "a recipient may rely on the truth of a representation, *even though its falsity could have been ascertained had he made an investigation*, unless he knows the representation to be false or its falsity is obvious to him." *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980) (emphasis added); *see also Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336–37 (Fla. 1997) (discussing differences between fraudulent and negligent misrepresentation claims).

Justifiable reliance is, however, an element of a claim for negligent misrepresentation. The Florida Supreme Court has adopted the Restatement's position on the elements of a claim for negligent misrepresentation, which includes a requirement that the plaintiff justifiably rely upon the misrepresentation. *Gilchrist Timber*, 696 So. 2d at 337 (quoting Restatement (Second) of Torts § 552(1) (1977)). Therefore, in the negligent misrepresentation context, the recipient of the information is held "responsible for investigating information that a reasonable person in the position of the recipient would be expected to investigate." *Id.* at 339. Nizri argues that Zendejas fails to, and cannot, plead justifiable reliance because he was Zendejas's agent.

Citing no authority for his proposition that a principal cannot sue its agent for negligent (or fraudulent) misrepresentations, Nizri relies on the rule "that knowledge of, or notice to, an agent is imputed to the principal when it is received by the agent while acting within the course and scope of his employment, and when it is in reference to matters over which the agent's authority extends." *Anderson v. Walthal*, 468 So. 2d 291, 294 (Fla. Dist. Ct. App. 1985). The purpose of this imputed-knowledge rule, however, is to protect *third parties* who deal with the principal through its agent. *Mut. Life Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622 (1916); *Schrader v. Prudential Ins. Co. of Am.*, 280 F.2d 355, 360 (5th Cir. 1960); *Hale v. Depaoli*, 201 P.2d 1, 4 (Cal. 1948); 2 *Fla. Jur 2d Agency and Employment* § 127. The rule is inapplicable to actions between the principal and agent. *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F. Supp. 3d 835, 849 (M.D. Tenn. 2015); *Redman v. Walters*, 88 Cal. App. 3d 448, 454 (Ct. App. 1979); Restatement (Third) of Agency § 5.03 cmt. (b) (2006) ("Notice is not imputed for purposes of determining rights and liabilities as between principal and agent. Thus, imputation does not furnish a basis on which an agent may defend against a claim by the principal."). It would be inappropriate to apply the imputed-knowledge rule to allow an agent to use it as a basis for escaping liability to its principal, and Nizri cites no case in which the rule has been applied in this context.

As further support for his argument that a principal cannot sue its agent for negligent misrepresentations, Nizri cites authority stating that mere negligence is insufficient to demonstrate a breach of fiduciary duty. Even if correct, this argument is inapposite because Zendejas has not sued Nizri for breach of fiduciary duty. The Court also rejects Nizri's argument that Zendejas would have discovered the defects if he conducted a reasonable investigation because it requires a factual determination that the Court cannot make at this stage of the proceedings. Nizri's argument that

Zendejas failed to meet the particularity requirements of Rule 9(b) is also rejected. Finally, the Court rejects Nizri's additional arguments that rely on the validity of the Bill of Sale for the same reasons it rejects Redman's similarly-based arguments.

### 2. Strict Liability for Dual Agency Under FDUTPA

Zendejas's FDUTPA claim is based on Rule 5H-26.003 of the Florida Administrative Code, which contains certain regulations relating to dual agents involved in the sale of horses. The rule states that a violation of any of its provisions resulting in actual damages to a person is deemed a violation of FDUTPA. *See* Fla. Admin. Code 5H-26.003(13).

While Nizri moves to dismiss Zendejas's FDUTPA claim against him, his argument addresses only specific requests for relief in Zendejas's *ad damnum* clause rather than the claim itself. As Nizri provides no basis for dismissing the claim itself, the Court denies Nizri's motion to the extent it seeks dismissal of the claim rather than specific requests for relief.

As to Nizri's motion to strike certain of Zendejas's requests for relief under his FDUTPA claim, Zendejas's remedies under FDUTPA are limited to prospective relief and "actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(1)–(2). Zendejas's request for consequential damages will be stricken because such damages are not recoverable under FDUTPA. *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999), *aff'd*, 235 F.3d 1344 (11th Cir. 2000). Indeed, Zendejas concedes that this request is improper. (DE 29 at 12.)

Zendejas's request for copies of certain financial documents related to the sale of Vorst is not properly asserted. The administrative code provision that forms the basis for this request for relief provides:

15

> Any person acting as an agent for a Purchaser or an Owner or acting as a dual agent in a transaction involving the sale or purchase of a horse or any interest therein shall, *upon request* by his or her principal or principals, furnish copies of all financial records and financial documents in the possession or control of the agent pertaining to the transaction to the principal or principals.

Fla. Admin. Code 5H-26.003(4) (emphasis added). The plain language of this provision is clear that it is violated only if the agent does not produce the documents "upon request" by the principal. *Id.* Even if enjoining compliance with this provision would otherwise be a proper remedy under FDUTPA, Zendejas fails to plead a violation of this provision because he fails to allege that he has made any request for the documents he seeks. Accordingly, this request for relief will also be stricken, but without prejudice to Zendejas alleging that a request had been made.

Finally, Zendejas's request for a civil penalty is improper. With respect to the imposition of a civil penalty, FDUTPA provides that civil penalties may be recovered in actions brought by the "enforcing authority," which is either the office of the state attorney or the department of legal affairs. Fla. Stat. §§ 501.203(2), 501.2075. Since this action is brought by a private individual and not the "enforcing authority," a civil penalty cannot be recovered in this case. Zendejas argues that a civil penalty is available because his claim is based on a regulation rather than FDUTPA. The regulation's explicit reference to FDUTPA, however, evinces an intent to limit causes of actions based on violations of the regulation to FDUTPA actions. *See generally Moonlit Waters Apartments, Inc. v. Cauley*, 666 So. 2d 898, 900 (Fla. 1996) ("Under the principle of statutory construction, expressio unius est exclusio alterius, the mention of one thing implies the exclusion of another."). Therefore, Zendejas's claim must be a FDUTPA claim rather than an independent claim based solely on the regulation. As FDUTPA is the only basis for Zendejas's claim, Zendejas is limited to the

remedies available under that statute.[7] The Court will accordingly strike Zendejas's request for a civil penalty.[8]

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Eugenie H. Redman's Motion to Dismiss (DE 17) and Defendant Simon Nizri's Motion to Dismiss (DE 27) are both **GRANTED IN PART**. Zendejas's rescission claim is **DISMISSED WITHOUT PREJUDICE**. The *ad damnum* clause of Count XII of the complaint is **STRICKEN** to the extent it seeks relief beyond actual damages, attorney's fees, and court costs. The motions are otherwise **DENIED**. Zendejas may file an amended complaint consistent this order within **ten days**.

**DONE AND ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of March, 2016.

_____
KENNETH A. MARRA
United States District Judge

---

[7] Zendejas's reliance on *Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254 (N.D. Fla. 2007), is misplaced. In *Buis*, the plaintiff was entitled to nominal damages *on its defamation claim*, and the Court used the civil penalty scheme of FDUTPA as guide for determining a just amount of such nominal damages because the defamatory statements also violated FDUTPA. *Id.* at 1263–64. As to FDUTPA claims themselves, the *Buis* court expressly "recognize[d] that the civil penalty in § 501.2075 is applicable only to actions commenced by the 'enforcing authority' and not to actions commenced by private parties." *Id.* at 1263.

[8] As Nizri notes, Zendejas's requests for a civil penalty and consequential damages are particularly unfounded given that Zendejas's counsel has asserted them in a prior case before this Court and the Court struck them as improper under FDUTPA. *See* Order, *Styslinger v. Ross*, No. 15-cv-80474 (S.D. Fla. July 6, 2015) (ECF No. 23). Zendejas's counsel should be mindful of his Rule 11 responsibilities.