UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 15-81229-CIV-MARRA

ALEJANDRO ZENDEJAS,

    Plaintiff,

vs.

EUGENIE H. REDMAN, et al.,

    Defendants.
_____/

## OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Colin Syquia's Motion for Summary Judgment (DE 95). The motion is ripe for review. For the following reasons, the motion is denied.

### I. Undisputed Facts

This action arises out of Plaintiff Alejandro Zendejas's purchase of a horse named Vorst from Defendant Eugenie Redman. (DE 98 ¶¶ 2-3.) Vorst is a Grand Prix show jumping horse with United States Equestrian Federation registration number 5068133. Zendejas purchased Vorst for his son, Juan Jose Zendejas, who competes at the Grand Prix level of equestrian show jumping. (DE 98 ¶¶ 2, 9.)

Before purchasing Vorst, Zendejas hired Defendant Simon Nizri to act as his agent in finding him a horse to purchase for Juan Jose Zendejas. (DE 98 ¶ 7.) In January 2014, Nizri approached Defendant Colin Syquia about Vorst. (DE 98 ¶ 10.) Syquia had trained and rode Vorst in competition almost every month between September of 2012 and April 2014 (DE 93 ¶ 7.), and was authorized to act as Redman's agent in connection with Vorst's sale to Zendejas. (DE 98 ¶ 6.)

1

Redman approved, consented to, and ratified all of Syquia's acts and omissions in connection with Redman's sale of Vorst to Zendejas. (DE 98 ¶ 6.) And, as a disclosed agent, Syquia was paid a sales commission from Redman for his role in the sale of Vorst. (DE 98 ¶ 21.)

Prior to Vorst's sale, Syquia represented to Zendejas, Nizri, and Juan Jose Zendejas that Vorst was physically and behaviorally fit to compete at the Grand Prix level of show jumping, since that was the purpose of Zendejas's purchase. (DE 99 ¶¶ 15-18.) Redman and Syquia were each aware and had knowledge, however, that Vorst had previously stopped before attempting an obstacle in competitions before. (DE 92-1 at 6; DE 97-4 ¶ 20.) In equestrian parlance, this behavior is referred to as being a "dirty stopper," and it represents a danger to both Vorst and any rider. (DE 98 ¶ 26.) Zendejas asserts that he relied upon Syquia's material representations in connection with his decision to purchase Vorst from Redman, and the failure to mention anything about dirty stopping was material to that decision. (DE 98 ¶ 17; DE 99 ¶ 15.)

Vorst was also evaluated by Zendejas, Nizri, and Juan Jose Zendejas prior to their negotiation of his sale. (DE 99 ¶¶ 13-15.) During this period, Juan Jose Zendejas successfully test-rode Vorst. (DE 98 ¶ 11.) Zendejas then instructed Nizri to negotiate the purchase and arrange a pre-purchase examination of Vorst. (*Id.*; DE 99 ¶ 17.) The pre-purchase examination was conducted by Dr. Gomez of Palm Beach Equine Clinic, and Vorst was thereafter treated for lameness in his right front foot. (DE 95 ¶ 12; DE 98 ¶ 12.) The lameness was disclosed on the pre-purchase examination report, but Zendejas alleges that this report was not received prior to him sending payment to Redman for Vorst.[1] (DE 99 ¶ 17.)

---

[1] A true and correct copy of the pre-purchase examination was appended to Plaintiff's First Amended Complaint. (DE 98 ¶ 15.)

The Bill of Sale for Zendejas' purchase of Vorst from Redman was signed April 24, 2014. (DE 98 ¶ 18.) Syquia acted as Redman's agent and signed the Bill of Sale on behalf of Redman. (*Id.*) Syquia was not a party to any contract between Zendejas and Redman concerning the sale of Vorst. (DE 97 ¶¶ 3, 4, 9, 17.; DE 92-2 ¶¶ 3, 4, 13, 14.)

Zendejas wire-transferred at least $250,000.00 to Redman for Vorst.[2] (DE 98 ¶ 20.) Upon receipt of the purchase price, Redman instructed Syquia to deliver Vorst to Zendejas. (*Id.*) Zendejas took possession of Vorst on or after April 24, 2014 and then shipped Vorst to Mexico for his son. (DE 98 ¶ 22.) After this time, Vorst performed poorly in competition, refusing to jump obstacles ("dirty stops") during competitions in Mexico and Canada and then suffering a physical injury as a result of his refusal to jump during a competition in Canada. (DE 98 ¶¶ 22-25.)

In this action, Zendejas alleges that Vorst has "dirty stopper" tendencies, that these tendencies were undisclosed prior to his sale, that the decision to purchase Vorst was made as a result of and with reliance on representations made to Zendejas as to Vorst's health and fitness for Grand Prix-level competition, and that these representations were made in the course of the transaction by Defendants Redman, Syquia, and Nizri.

On August 31, 2015, Zendejas filed suit against Defendants. On April 8, 2016, Zendejas filed his First Amended Complaint, seeking to recover economic damages based on alleged misrepresentations and non-disclosures as to Vorst's physical and mental abilities. Count I through Count V of the Amended Complaint are for breach of contract and warranty claims against Defendant Redman. Counts VI and VII are the only claims against Syquia, and allege negligent

---

[2] The parties do not dispute the purchase price of $250,000.00 but do dispute the amount of money Zendejas paid to Redman. Zendejas asserts that he paid Redman $260,000.00 due to an accidental overpayment. (*See* DE 98 ¶ 7.)

3

misrepresentation and fraud, respectively. On April 22, 2016, Syquia filed and served his Answers and Affirmative Defenses, including the Economic Loss Rule as the Fifth Affirmative Defense. (DE 60 at 9.)

## II. Legal Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It must do so by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*,

4

475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50.

### III. Discussion

Syquia moves for summary judgment on the grounds that the economic loss rule precludes the ability to bring tort claims against him, namely the counts of fraud and negligent misrepresentation alleged in the First Amended Complaint. Alternatively, Syquia challenges that the tort claims are barred "based on basic contract principals." (DE 95 at 17.)

**A. Economic Loss Rule**

Syquia argues that the economic loss rule bars Zendejas' tort claims against him. Under the economic loss rule, a party is not entitled to initiate an action in tort to recover an economic loss arising out of the purchase contract for a product where there is no claim for injury to persons or other property. *See Rubesa v. Bull Run Jumpers, LLC*, 2010 WL 376320 *3 (S.D. Fla. 2010).

5

In *Tiara Condominium Association, Inc. v. Marsh & McLennan Companies, Inc.*, the Florida Supreme Court explained that the economic loss rule is limited to cases involving a product which damages itself by reason of a defect in the product. *See Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So.3d 399, 406-07, & 410 (Fla. 2013) (citing *Moransais v. Heathman*, 744 So.2d 973 (Fla. 1999). Thus, after *Tiara*, application of the economic loss rule is limited to only product liability actions. *Tiara Condominium Ass'n, Inc.*, 110 So.3d at 406-07.

In determining the applicability of Florida's economic loss rule relative to the sale of a defective product, a court must evaluate the interplay among: the parties' contractual relationship, the conduct complained of, and the damage caused by the allegedly tortious conduct. *Premix-Marbletite Manufacturing Corp. V. SKW Chemicals, Inc.*, 145 F. Supp.2d 1348, 1358 (S.D. Fla. 2001). As Syquia notes, "[g]enerally speaking, this rule is based on the premise that parties to a contractual relationship have allocated their respective rights and remedies and, consequently, it is inappropriate to introduce tort remedies. (DE 95 at 11. (citing *Id.*))

In arguing for the applicability of the economic loss rule, Syquia asserts, first and foremost, that Vorst is a product and thus, post-*Tiara*, the economic loss rule may apply. Syquia argues that "[h]orses used in sport, like in racing or Grand Prix show jumping, are products that are bred for the purpose of the sport, trained, shaped and used by their handlers for competition with the hopes of making money, and typically traded throughout their lives as their physical and mental abilities peak and wane through the natural aging process." (DE 95- at 8-9.) As one potential avenue for finding that Vorst is a product, Syquia urges this Court to look to how a horse is defined under the UCC, pointing out that a "show pony bought for a child is generally a 'consumer good' since it is purchased for household and/or personal reasons." (Id. at 9.) And as another avenue, Syquia also

points out that "it is irrelevant how the subject Horse is further defined by the UCC (consumer good, equipment, etc.) because [Vorst] is, nonetheless, a 'product' used for show jumping purposes." (Id. at 9-10.)

Responding to Syquia's claim, Zendejas argues that horses are not "products" and therefore this is not a product liability action to which the economic loss rule applies. (DE 97 at 18.) First, Zendejas explains that "Syquia attempts to shoehorn the sentient, mutable horse Vorst into that constricted box of a doctrine meant for inanimate, manufactured products," noting that "Syquia himself equivocates . . . that a horse is 'a "Good" *or* a "Product" under Florida's Uniform Commercial Code,'" since "Syquia concedes that the UCC does not define 'product.'" (*Id.* (citing DE 95 at 8) (emphasis in original).) Beyond the UCC failing to support Syquia's claim that Vorst is a "product" (which is not the same as a "good"), Zendejas also asserts that Syquia's proposition that Vorst is a product wrongly "ignores the difference between the mutability of animals and the fixed nature of manufactured, inanimate objects." (*Id.* at 19.) Zendejas relies on cases from courts in other states which have considered whether animals may be considered in products liability cases, and argues based on these cases that "the mutability of animals removes them from the definition of 'products' because 'living creatures are by their nature engaged in a continuous process of internal development and growth' and because 'they are participants in a constant interaction with the environment around them by sheer virtue of their development.'" (*Id.*) *See Latham v. Wal-Mart Stores, Inc*., 818 S.W.2d 673, 676 (Mo. Ct. App. 1991) ("We tend to agree with the Illinois view, that due to their mutability and their tendency to be affected by the purchaser, animals should not be products under § 402A as a matter of law.") (citing *Anderson v. Farmers Hybrid Cos., Inc.*, 408 N.E.2d 1194, 1195-1200 (Ill. Ct. App. 1980) ("living creatures are not part of the extensive list of

7

products mentioned in the commentary to section 402A of the Restatement (Second) of Torts [products liability]")); *see also Whitmer v. Schneble*, 331 N.E.2d 115, 118 (Ill. Ct. App. 1975); *Kaplan v. C Lazy U Ranch*, 615 F.Supp 234 (D. Colo. 1985) ("[g]enerally, living things do not constitute 'products' within the scope of the strict tort liability doctrine which requires that a product's nature be fixed when it leaves the manufacturer's or seller's control."); *Blaha v. Stuard*, 640 N.W.2d 85, 89 (S.D. 2002) ("living creatures have no fixed nature and cannot be products as a matter of law"). Essentially, Zendejas argues that a "product" must have a fixed nature and that "[b]ecause living creatures have no fixed nature at the time they enter the stream of commerce, they are not products as contemplated by product liability law." (DE 97 at 20.)

This Court has been unable to find any case in which the Eleventh Circuit or any district court within this Circuit has definitively addressed whether a horse is a "product" such that the economic loss rule would apply.[3] While two decisions in this district have assumed without deciding that the economic loss rule may apply to cases involving the sale of a horse, in neither of those cases did the parties present the argument that a horse is not a product to the court. *See Rubesa v. Bull Run Jumpers, LLC*, No. 09-CV-81107, 2010 WL 376320, at *5 (S.D. Fla. Jan. 26, 2010) (holding in a pre-*Tiara* case the economic loss rule applies to bar claims regarding show jumping horse but not addressing any argument that the horse may not be a product);) *Smith v. Jackson*, No. 16-81454-CIV, 2017 WL 1047033, at *1 (S.D. Fla. Mar. 20, 2017). Accordingly, neither is determinative of the outcome of this issue.

---

[3] Syquia acknowledges that such no such case exists in his brief to this Court. (DE 102 at 2 ("Florida courts and the Eleventh Circuit Court of Appeals have not explicitly opined on the issue of whether a 'horse' is a 'product' . . . .").

As Zendejas points out, though, several cases in other districts have addressed this issue directly, and many have come to the conclusion that animals such as horses are not products for the purpose of product liability actions based on the mutability and ever-changing nature of animals as living creatures. 818 S.W.2d 673, 675-76 (Mo. Ct. App. 1991). In *Latham v. Wal-Mart Stores, Inc.*, the Missouri Court of Appeals laid out the progression of cases discussing whether an animal fits into the Restatement's definition of a product at that time, and ultimately denied summary judgment to plaintiffs based on a finding that the subject parrot in that case did not constitute a "product" for purposes of their product liability claim. As *Latham* explained, an Illinois appellate court in *Whitmer v. Schneble,* 29 Ill.App.3d 659, 331 N.E.2d 115 (1975), was the first court to assess whether an animal fit the definition of a "product" in order to impose strict liability for alleged "defects." In *Whitmer*, a dog-bite case, the plaintiffs alleged that the defendants were strictly liable for selling them an unreasonably dangerous product—the dog. The *Whitmer* court disagreed, though, holding, among other things*,* that although a product under § 402A of the Restatement need not necessarily be "manufactured" in order to be a "product," and a product may indeed be a "viable thing," a product's "nature must be fixed when it leaves the manufacturer's or seller's control." *Whitmer,* 331 N.E.2d at 119. *Whitmer* also discussed the policy behind the imposition of strict liability in products cases—that "the costs of injuries resulting from defective products be borne by those who market such products rather than by the injured persons, who are powerless to protect themselves." *Id. Whitmer* reasoned that this purpose would be "defeated" if strict liability were applied to products whose character could be changed and shaped by the purchaser rather than the seller. *Id.* Thus, the Illinois court in *Whitmer* held, as a matter of law, that animals could not be "products" under the Restatement. *Id.*

Two years later in *Beyer v. Aquarium Supply Co.,* 94 Misc.2d 336, 404 N.Y.S.2d 778 (N.Y. Sup. Ct. 1977), however, a New York court reached a different result on the same issue, this time as it related to whether diseased hamsters were "products." In *Beyer*, in denying a motion to dismiss, the New York court noted that the reason for strict products liability is to equitably distribute the inevitable consequences of commercial enterprise and to promote the marketing of safe products. *Id*. at 779. Applying this policy to the facts in *Beyer,* the court found that there is no reason why a breeder, distributor, or vendor who places a diseased animal in the stream of commerce should be less accountable for his actions than one who markets a defective manufactured product. *Id.* "The risk presented to human well being by a diseased animal is as great and probably greater than that created by a defectively manufactured product," the *Beyer* court reasoned. *Id.* Thus, the New York court in *Beyer* held that the diseased hamsters were products within the meaning of the *Restatement.* Notably, however, the *Beyer* court did not take any notice of the existing *Whitmer* case law from Illinois, and did not wrestle with the reasoning from *Whitmer* in reaching its conclusion.

Revisiting and reconsidering the issue three years after *Beyer*, though, an Illinois appellate court in *Anderson v. Farmers Hybrid Cos., Inc.,* 87 Ill.App.3d 493, 42 Ill.Dec. 485, 408 N.E.2d 1194 (1980), once again held that animals (in that case, diseased gilts, which are unbred female pigs used for breeding purposes) were not products under the Restatement due to their mutability. *Anderson,* 42 Ill.Dec. at 490, 408 N.E.2d at 1199. The *Anderson* court reasoned that living creatures, such as the pigs in that case, are "by their nature in a constant process of internal development and growth and they are also participants in a constant interaction with the environment around them as part of their development. Thus, living creatures have no fixed nature," and the *Anderson* court found that they therefore cannot be products as a matter of law. *Id.* Recovery under a strict liability theory for

animals as "products" was therefore disallowed in *Anderson,* even after the New York court in *Breyer* had held otherwise.

In *Latham*, as mentioned previously, the Missouri Court of Appeals held that a parrot was not a "product." There, the court explained and considered the reasoning and holdings of both the Illinois and New York cases, and also added that "[s]ince Illinois's ruling in *Anderson,* only two other jurisdictions have been presented with the instant issue." *Latham*, 818 S.W.2d at 676. "In 1985," the *Latham* court explained, "Oregon adopted the New York view and specifically rejected Illinois's analysis" in a case regarding a skunk. *Id.* (citing *Sease v. Taylor's Pets, Inc.,* 74 Or. App. 110, 700 P.2d 1054, 1058 (1985). And, "[i]n that same year, the United States District Court of Colorado adopted the Illinois position." *Id.* (citing *Kaplan v. C Lazy U Ranch,* 615 F.Supp. 234, 238 (D. Colo. 1985). *Kaplan* specifically considered whether a horse constitutes a "product," acknowledging that "while a novel idea," the conclusion that a horse is a product "is rebutted by case law and the basic underlying policies of the doctrine of strict products liability" because, "[g]enerally, living things do not constitute 'products' within the scope of the strict tort liability doctrine which requires that a product's nature be fixed when it leaves the manufacturer's or seller's control." *Kaplan*, 615 F. Supp. at 238 (citing *Anderson* and *Whitmer*). *Latham*, considering all of these cases (including the opposing view in the New York decision in *Breyer*), ultimately decided to "agree with the Illinois view, that due to their mutability and their tendency to be affected by the purchaser, animals should not be products under § 402A as a matter of law." *Latham*, 818 S.W.2d at 676. The *Latham* court explained that "[i]t seems unreasonable for us to hold a seller liable for changes potentially wrought upon a 'product' by the purchaser, while the item was completely outside the seller's control." *Id*. "Also," the Latham court noted, "we question that § 402A was

11

intended to apply as broadly as appellants argue," considering the policies behind strict liability as discussed in *Whitmer*.

Since *Latham* was issued in 1991, several other courts have followed its reasoning and conclusions. In 1997, for example, the Court of Appeals of Ohio held in *Malicki v. Koci*, 121 Ohio App. 3d 723, 726–27, 700 N.E.2d 913, 915 (1997), that diseased parrots did not constitute "products" for purposes of imposing strict liability in a product liability action. In *Malicki*, the Ohio court cited to *Latham* and its reliance on the Illinois case law in *Anderson*, stating that it "agree[s] with the reasoning in *Latham* and in *Anderson,* and conclude[s] that a parrot is not a product for purposes of products liability. Imposing strict liability upon the defendants in this case would yield the harsh result of holding them responsible as absolute insurers of the health of a living organism whose health can be affected by many factors totally outside the defendant's control." *Malicki*, 700 N.E.2d at 915. The *Malicki* court added, though, that "[l]iability may [ ] still be imposed upon the defendants for the sale or distribution of animals under a theory of negligence." *Id*.

And in 2002 in *Blaha v. Stuard*, the Supreme Court of South Dakota considered both the New York and the Illinois views and ultimately sided with Illinois in holding that a dog is not a "product" for the purposes of product liability claims. 640 N.W.2d 85, 89 (S.D. 2002). The court in *Blaha* first explained its holding that dogs are "goods" but not "products." *Id*. at 88. "Courts that have considered this issue," *Blaha* stated, "align themselves in two different positions either with the position of the New York courts, holding animals are products, or the Illinois courts, holding animals are goods" but not products. *Id*. Ultimately rejecting New York's reasoning that "there is no reason why a breeder, distributor or vendor who places a diseased animal in the stream of

12

commerce should be less accountable for his actions than one who markets a defective manufactured product," *id*. (quoting *Breyer*, 404 N.Y.S.2d at 779), the South Dakota Supreme Court in *Blaha* "adopt[ed] the holding of the courts of Illinois, Colorado, and Missouri which have all held that animals cannot be 'products' under the Restatement of Torts." *Blaha,* 640 N.W.2d 88-89. *Blaha* further stated, "This Court adopts the Illinois position, which provides that: living creatures . . . are by their nature in a constant process of internal development and growth and they are also participants in a constant interaction with the environment around them as part of their development. Thus, living creatures have no fixed nature and cannot be products as a matter of law." *Id* at 89 (citing *Latham*, 818 S.W.2d at 676; *Anderson*, 408 N.E.2d at 1199).

Having considered the arguments from the parties in this case as well as the existing case law on the issue of whether a horse constitutes a product, this Court agrees with the Illinois, Colorado, Missouri, Ohio and South Dakota courts and holds that Vorst—a show jumping horse—is not a product, and thus that the economic loss rule, post-*Tiara*, cannot apply to bar the tort claims against Syquia. As emphasized *supra*, the Florida Supreme Court's decision in *Tiara* limited the economic loss rule only applies to those actions involving product liability actions. Vorst must therefore be considered a "product" such that strict liability applies to actions involving alleged "defects" with Vorst in order for the economic loss rule to apply here. As a show jumping horse, Syquia correctly notes that humans have bred and trained Vorst in order to be as good as he can be at Grand Prix level show jumping. In that way, he may be understood as, on some level, "manufactured." However, and critically, as a living, breathing, sentient creature that constantly grows, learns, experiences, and changes based on both external and internal factors that often cannot be controlled by the seller, Vorst will never have the sort of fixed nature at the time he enters the stream of commerce that a

"product" must have in order to impose strict liability on manufacturers and sellers. As the Illinois court correctly explained in *Anderson*, 408 N.E.2d at 1195-1200, "living creatures are not part of the extensive list of products mentioned in the commentary to section 402A of the Restatement (Second) of Torts [products liability]." This is likely due to the inherent changes that make them "living" and thereby distinguish living creatures from the sorts of objects that are considered "products" under the Restatement. As even Syquia concedes, Vorst's "physical and mental abilities peak and wane through the natural aging process." (DE 95 at 8-9.) Accordingly, Vorst, as a show jumping horse, is not the kind of fixed "product" to which the economic loss rule applies post-*Tiara*. Because Vorst is not a product, this Court declines to apply the economic loss to bar the tort claims against Syquia. Accordingly, Syquia's Motion for Summary Judgment (DE 95) on economic loss rule grounds must be denied.

**B. Basic Contract Principals**

Citing *Tiara*, Syquia additionally argues that "[w]hen parties are in privity, contract principals, rather than those founded in tort, are the appropriate avenue for resolving disputes when the claims are intertwined." (DE 95 at 17.) Syquia asserts that "[i]t is undisputed that the Plaintiff and Syquia, as the authorized agent to his disclosed principal, Redman, are in contractual privity." (*Id.* at 95.) Arguing that the tort claims in Counts VI and VII "collapse into [Zendejas's] contract claims," Syquia asserts that he cannot be held liable for claims against Redman as a matter of law because "'[a]n agent who acted in the course of his employment for his disclosed principal cannot be held liable for the contractual obligations or debts of his principal.'" (*Id.* (quoting *Phillip Schwartz, Inc. v. Gold Coast Graphics, Inc.*, 623 So. 2d 819, 819 (Fla. 4th DCA 1993)).

It is far from undisputed that Zendejas and Syquia are in contractual privity based on Syquia's role as an authorized agent to Redman. "It is an elementary principle of English law — known as the doctrine of 'Privity of Contract' — that contractual rights and duties only affect the parties to a contract…." PRIVITY, Black's Law Dictionary (10th ed. 2014). Syquia was not a party to the contract. (DE 97 ¶¶ 3, 4, 9, 17.; DE 92-2 ¶¶ 3, 4, 13, 14.) Indeed, Syquia acknowledges as much, emphasizing that "even if the Plaintiff prevails on his contract and warranty claims against Redman, Syquia still cannot be held liable." (DE 95 at 18.) As such, based on the fundamental principles of contract law, Syquia cannot be in privity of contract with Zendejas and, absent a showing of privity, the condition precedent to invoking *Tiara* has not been fulfilled. Syquia's assertion that contract principles should bar the tort claims against him simply does not follow where he was not a party to the contract at issue.

Florida law recognizes that tort claims may exist independently from contractual claims. See *U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.*, 134 So.3d 477, 480 (Fla. 2d DCA 2013), reh'g denied (Jan. 22, 2014), review denied, 151 So.3d 1223 (Fla.2014) (citing *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla.1996); *Cowley v. Nero*, 693 So.2d 120, 121 (Fla. 2d DCA 1997)). To hold otherwise would leave a plaintiff without a means of seeking redress against torts perpetrated by a non-party to a contract, among them fraud and negligent misrepresentation, by virtue of the mere existence of a contract between others. As Syquia was not a party to the contract, and as the nature and extent of representations made by Syquia to Zendejas over the course of the transaction remain disputed issues of fact, the actions for negligent misrepresentation (Count VI) and fraud (Count VII) are not barred as a matter of law. Accordingly, Syquia's Motion for Summary Judgment (DE 95) must be denied.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Colin Sqyquia's Motion for Summary Judgment (DE 95) is **DENIED**.

**DONE AND ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 13th day of June, 2017.

KENNETH A. MARRA
United States District Judge