1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

2

            Case No. 15-81229-CIV-KAM

3
ALEJANDRO ZENDEJAS,        )

4                   )
     PLAINTIFF,       )

5                   )
     -v-           )

6                   )
COLIN J. SYQUIA, ET AL.,  )

7                   )
     DEFENDANTS.      )   West Palm Beach, Florida

8                   )   August 7, 2017
_____)

9

10           VOLUME 1 - PAGES 1 - 257

11       TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12     BEFORE THE HONORABLE KENNETH A. MARRA

13         UNITED STATES DISTRICT JUDGE

14

15  Appearances:

16  (On Page 2.)

17

    Reporter                Stephen W. Franklin, RMR, CRR, CPE
18  (561)514-3768          Official Court Reporter
                        701 Clematis Street
19                     West Palm Beach, Florida  33401
                        E-mail:  SFranklinUSDC@aol.com
20
    ALSO PRESENT:     Ana Ugarte, Spanish Interpreter
21                  Susana Starosta, Spanish Interpreter

22

23

24

25

```
 1   Appearances:

 2   FOR THE PLAINTIFF          T. Randolph Catanes, ESQ.
                                Catanese & Wells
 3                              31255 Cedar Valley Drive
                                Suite 213
 4                              Westlake Village, CA 91362
     -and-
 5                              Avery S. Chapman, ESQ.
                                Chapman Law Group, PLC
 6                              12008 South Shore Boulevard
                                Suite 107
 7                              Wellington, FL 33414
     -and-
 8                              David Y. Yoshida, ESQ.
                                Catanese & Wells
 9                              31255 Cedar Valley Drive
                                Suite 213
10                              Westlake Village, CA 91362

11   FOR DEFENDANT REDMAN       John R. Hart, ESQ.
                                Carlton Fields Jorden Burt, P.A.
12                              525 Okeechobee Blvd.
                                Suite 1200
13                              West Palm Beach, FL 33401
     -and-
14                              Sarah Cortvriend, ESQ.
                                Carlton Fields Jorden Burt, P.A.
15                              525 Okeechobee Blvd.
                                Suite 1200
16                              West Palm Beach, FL 33401

17   FOR DEFENDANT SYQUIA       Patricia A. Leonard, ESQ.
                                Shutts & Bowen, LLP
18                              525 Okeechobee Blvd
                                Suite 1100
19                              West Palm Beach, FL 33401
     -and-
20                              Colleen L. Smeryage, ESQ.
                                Shutts & Bowen, LLP
21                              525 Okeechobee Boulevard
                                Suite 1100
22                              West Palm Beach, FL 33401

23                              * * * * *

24

25
```

```
 1        (Call to the order of the Court.)
 2            THE COURT:  Good morning, everyone.  Please be
 3   seated.
 4            VOICES:  Good morning, Your Honor.
 5            All right.  I assume the court reporter has
 6   everybody's appearances, so I don't need to have everyone
 7   announce their appearances again, after Friday's conference.
 8            Before we bring the jurors up, I wanted to follow up
 9   on some of the issues that were raised Friday.  I told you
10   that I would be thinking about some of my initial conclusions
11   and whether I want to make any modifications to those initial
12   indications that I gave on Friday.
13            So let me first talk about the issue of the
14   insurance -- the insurance declaration which showed some
15   exclusions, as I understand it, from the insurance policy, and
16   then also the text messages that Ms. Leonard wanted me to
17   allow the defense to use.  I think they kinda fall in the same
18   category.  So, hold on one second.
19            And, I'm sorry, we have our court reporter's here,
20   so let me have them announce their appearances for the record.
21   I'm sorry -- interpreters, I apologize.  Interpreters are
22   here.
23            THE INTERPRETER:  Good morning, Your Honor, Ana
24   Ugarte.
25            THE INTERPRETER:  Good morning.  Suzanna Starosta.
```

```
 1              THE COURT:  Good morning.

 2              So under Rule 26, subsection (a)(1)(A)(ii), there

 3   are required disclosures of documents in possession of a party

 4   that have to be exchanged during the discovery process, but

 5   you'll note at the very end of that paragraph it says:

 6   "Unless the use would be solely for impeachment."  So there's

 7   no requirement for disclosure of documents if they're going to

 8   be used solely for impeachment.

 9              So I don't know what the testimony's going to be,

10   but if there's testimony that's presented during the trial and

11   these documents would contradict or impeach the testimony of

12   the witness, then I think they can be used for impeachment

13   purposes only, but they can't be used affirmatively in support

14   of the -- any claim or defense, but they can be used for

15   impeachment.  So that, again, we're not going to allow a

16   witness to perpetrate a fraud on the Court by hiding behind

17   the fact that a document wasn't timely produced during

18   discovery, but if it, in fact, contradicts the witness'

19   testimony, it can be used to impeach that witness' testimony.

20              So that goes for both the insurance documents and

21   the -- it would also go for the veterinary records, if there's

22   anything that would, again, impeach a witness, or the text

23   messages that Ms. Leonard wanted to use.  Somebody's going to

24   get on the stand and say, no, I never had a conversation or

25   discussion about a subject matter, and there's a text message
```

1    that refutes it, it can be used to impeach.  Same with the

2    declaration about the insurance.  If a witness says, no, there

3    was no exclusions in the insurance policy, and there's a

4    document that refutes that, that can be used to impeach the

5    testimony.

6          So that's -- otherwise, except to that extent, I'm

7    sticking with my earlier ruling that neither of those

8    categories of documents can be used affirmatively in support

9    of a claim or defense.

10         Then on the issue of the respondeat superior slash

11   vicarious liability issue.  There were motions to dismiss

12   filed that did not seek to dismiss the respondeat superior,

13   what was labeled respondeat superior cause of action.  Even

14   though I've ruled that that's not the proper categorization,

15   it's really not respondeat superior, it should be vicarious

16   liability, if a motion to dismiss had been filed challenging

17   that categorization being respondeat superior is not a cause

18   of action, it's a theory of liability, I would have given the

19   point of leave to amend to correct that defect; but that

20   wasn't done.  The issue wasn't raised until summary judgment,

21   after the pleading times had elapsed or the time to amend

22   pleadings had expired.

23         So in my judgment, the defendants have been on

24   notice from the beginning of this case that there is a claim

25   of agency relationships which would, if proven, hold the --

1    some or one of the defendants responsible for the acts of what

2    plaintiffs claim is his or her agent.  I think that claim

3    should be allowed to go forward under a vicarious liability

4    theory of liability, even though it was maybe not labeled

5    properly in the complaint.  And I understand that's --

6    defendants are objecting to that, and, for the record, your

7    objection's noted.

8           I don't know if there are any other -- I know the

9    plaintiffs filed this brief last night, plaintiff filed a

10   trial brief last night reraising a lot of these issues.  I'm

11   not inclined to change my rulings that I made regarding the

12   veterinary records.  At least nothing at this point has been

13   proffered to me that indicates that these records of the

14   veterinarians would be admissions or statements of the agent

15   of Ms. Redman.  I don't think it's a jury question as to

16   whether there's an agency relationship for purposes of

17   admitting the statements as an admission of a party opponent.

18   I think that's a question for the Court.  And, again,

19   nothing's been proffered to me that would suggest that there

20   is that agency relationship.

21          Then I think there was an issue about experts being

22   able to rely upon either the veterinary records or the

23   insurance documents.  If -- the expert witnesses are going to

24   have to be limited to what they said in their expert report.

25   So if they didn't say they were relying upon veterinary

 1   records in their expert reports or in their depositions,

 2   they're not going to be able to now, on the stand, expand the

 3   opinions that they gave in their reports or in their

 4   depositions to include other grounds or bases for their

 5   opinions that weren't previously disclosed.  So I don't know

 6   if that addresses the issue or not, but that's my ruling on

 7   that.

 8          So are there any other outstanding issues we need to

 9   talk about before we bring the prospective jurors up?

10          MR. CATANESE:  Yes, Your Honor.

11          Regarding the veterinarian records, Dr. Vlahos,

12   which is the plaintiff's expert veterinarian, did specifically

13   discuss medical records from Dr. Steel.  He identified them by

14   date, he identified what they were, and he did discuss that in

15   his written opinion.

16          In my opening statement, Your Honor, I did intend on

17   discussing some of the opinions of Dr. Vlahos, and I did not

18   want to cross any boundaries that the Court is laying

19   regarding referring to the records of Dr. Steel or Mr. Redman.

20          My intention in the opening statement was simply to

21   refer to Dr. Vlahos, he's our expert, and he'll be discussing

22   with the jury some of the veterinary records that he reviewed

23   and looked at, and I wanted to be sure that I was going to be

24   able to do that, Your Honor, in opening statement.

25          THE COURT:  Well, again, you're telling me that

1   these records were things that he relied upon in formulating

2   his opinion, those opinions were disclosed during the

3   discovery, and the defendants had an opportunity to explore

4   those opinions, including his reliance upon the veterinary

5   records during his deposition?

6           MR. CATANESE:  All of that is correct, Your Honor.

7   The defendants chose not to depose Dr. Vlahos.  He was not

8   deposed in this case.

9           THE COURT:  All right.  But his opinion specifically

10  refers to and relies upon the veterinary records?

11          MR. CATANESE:  Yes, Your Honor, particularly

12  Dr. Steele.  He specifies the exact date of the records and

13  what he looked at.

14          THE COURT:  All right.  Let me hear from the

15  defendants.  Why shouldn't he be allowed to express an opinion

16  based upon his review of veterinary records if that opinion

17  was timely disclosed and it was clear that he was relying upon

18  those records?

19          MS. CORTVRIEND:  Your Honor, to the extent that the

20  records are hearsay, that is our main argument.  We don't know

21  that the records are complete.  We know that Dr. Vlahos didn't

22  speak with Dr. Steele.  There was no deposition of Dr. Steele.

23  The records aren't authenticated.  That is our argument.

24          THE COURT:  All right.  Well, they were produced by

25  you in discovery?

```
 1              MS. CORTVRIEND:  Yes, Your Honor.
 2              THE COURT:  As veterinary records relating to this
 3    horse that were obtained by your client in the care and
 4    treatment of the horse?
 5              MS. CORTVRIEND:  Yes, Your Honor.
 6              THE COURT:  All right.  Well, experts can rely upon
 7    hearsay if it's the type of information that an expert would
 8    ordinarily rely upon in formulating his or her opinion, so if
 9    the plaintiffs lay that predicate that he relied upon these
10    records, and it's the type of thing he would ordinarily rely
11    upon in formulating his opinion, then he can testify about his
12    opinion based upon those records.
13              That doesn't mean that he can actually tell us what
14    were in the records.  He could say I relied upon the
15    veterinary records, I looked at them, and based upon what I
16    saw, this is the opinion I have.  That doesn't mean he can
17    regurgitate the hearsay information to the jury, but he can
18    rely upon the hearsay if it's information he would ordinarily
19    rely upon.
20              MR. HART:  And I'd just add one point, Your Honor.
21    That would be fine with respect to Mr. Catanese's opening.  I
22    would just request that he doesn't inform the jury that
23    Dr. Steele's records will be coming in or going into details
24    until he's established with Dr. Vlahos that these are the type
25    of records that he would normally and customarily rely upon in
```

```
 1  providing his opinion.
 2          MR. CATANESE:  That's correct, Your Honor.  I
 3  didn't -- and this is why I'm doing this now, because I want
 4  to make sure it's smooth.  I wasn't going to be referencing
 5  Dr. Steele's name.  I wasn't even going to be talking about
 6  the date of the records.  But I was going to say that, in my
 7  opening, that Dr. Vlahos did form an opinion based on review
 8  of medical records, for example, that Vorst was lame in the
 9  month of April of 2014, general statements like that.
10          MR. HART:  That's fine, Your Honor.
11          MR. CATANESE:  May I address one other issue, Your
12  Honor?
13          THE COURT:  Yes.
14          MR. CATANESE:  One of the contentions by my client
15  and the plaintiff is that the bill of sale that's the subject
16  of this case should be found to be illegal as a matter of law.
17  We don't have to address it this morning.  I know we have the
18  jury outside.  But I just -- one of the reasons we filed our
19  papers this weekend, just to let the Court know one of the
20  issues we feel should be addressed before closing argument,
21  before the jury instructions be given to the jury, is we
22  believe that the Court should make a determination whether or
23  not the subject bill of sale is void, because that's
24  exclusively in the Court's province.
25          I just wanted to bring it to the Court's attention.
```

```
 1              THE COURT:  Well, we'll deal with that later.  We
 2    don't need to deal with that now.
 3              MR. CATANESE:  Thank you, Your Honor.
 4              THE COURT:  Is there anything else we need to talk
 5    about before we bring the jurors up, Ms. Leonard?
 6              MS. LEONARD:  One more quick thing, Your Honor.
 7              Witness order, my client, Mr. Syquia, we talked
 8    about him on Friday going first.  There was an agreement.
 9    This weekend, I think Sunday, the plaintiff sent us an e-mail
10    said they weren't going to do that, they were going to put Ms.
11    Redman first.  I'm concerned about Mr. Syquia being completed.
12    He has to be out of here no later than 5:00 o'clock on
13    Wednesday.  They said they needed him for four hours, we for
14    three, and I guess Mr. Hart for one.  If they don't put him
15    first, I'm worried, and that went contrary to what we talked
16    about on Friday.
17              THE COURT:  Okay.  You can go get the jurors.  Thank
18    you.
19              MR. CATANESE:  Your Honor, we would respectfully
20    request that we can start with Mrs. Redman as our first
21    witness.  If, for whatever reason, we run up against time
22    constraints, I'm totally willing to suspend her examination,
23    bring Mr. Syquia in out of order so we can get him completed
24    and out of here by the end of the day on Wednesday.
25              THE COURT:  All right.  We'll work it out so he can
```

```
 1   be finished by Wednesday.

 2            MS. LEONARD:  Thank you, Your Honor.

 3            THE COURT:  Okay.  Yes?

 4            MS. CORTVRIEND:  One more small issue, Your Honor.

 5   The motion for protective order directed to the subpoenas for

 6   trial as to Great American.  I don't think we ever got a

 7   definitive ruling on whether or not those subpoenas should be

 8   quashed or . . .

 9            THE COURT:  All right.  Well, here's what I'm going

10   to do on that, kind of consistent with my earlier statement

11   about using documents for impeachment purposes.  I guess if

12   there's something in those records that might contradict

13   someone's testimony, that could be used for impeachment but

14   otherwise not going to be used.

15            So I'll allow the documents to be produced, but not

16   to be used, again, affirmatively in support of any claim or

17   defense, but if there's something in there that would, again,

18   you know, could be solely for impeachment purposes, I guess

19   the fact that it was done late is not necessarily a

20   prohibition.

21            MS. CORTVRIEND:  Our concern, Your Honor, is that

22   the documents being sought are a completely new set of

23   documents.  It's the underwriting file, a number of documents

24   that we have never seen.  We may need to do some -- I don't

25   know if we're going to need to do additional discovery based
```

1    on what's produced.

2           THE COURT:  Again, as far as I'm concerned, it's

3    going to have to be very obvious that it's clearly

4    inconsistent with somebody's testimony, and if it's not, then

5    they're not going to be used.  But I'm just doing it as an

6    abundance of caution to prohibit some, again, fraud being

7    perpetrated on the Court that someone knows is not true, but

8    there's something in a record that -- and again, I'm not

9    saying this is the case, but let's say that Ms. Redman told

10   the insurance company that the horse had some conditions in

11   her application, and she says I never knew the horse had any

12   conditions, but it's in her submission to the insurance

13   company with her signature on it.

14          You know, again, that could be used for impeachment

15   if that's something -- and I'm just making up a hypothetical.

16   I'm not saying that's the case.

17          So in order to prevent that kind of thing happening,

18   I think we -- we should have the documents available, again,

19   only for impeachment and for no other reason.

20          So I guess I'll sign an order authorizing them to

21   release the documents, and we'll go from there.

22          MS. CORTVRIEND:  Thank you, Your Honor.

23          MR. CATANESE:  Your Honor, thank you.  That's

24   correct.  The insurance company, general counsel said we

25   needed an order.  We'll tender one to the Court.  Thank you,

```
 1    Your Honor.

 2             THE COURT:  Okay.

 3             MR. CATANESE:  Your Honor, just on this item, our

 4    intention is once we get the records, to immediately provide a

 5    copy to defense counsel.  Would the Court like to see a copy

 6    for in-camera review?

 7             THE COURT:  Sure.

 8             MR. CATANESE:  Thank you, Your Honor.

 9             THE COURT:  All right.  As far as the jury

10    selection, we're going to seat everyone down in the audience

11    section, so you can either turn your chairs around or move to

12    the other sides of the table, however you prefer.  And I will

13    conduct the -- most of the inquiry.  I generally let the

14    attorneys have 10 or 15 minutes follow-up each when I'm

15    finished.

16             We'll seat eight jurors.  We need six to complete

17    the case, but I pick two just to make sure we have eight at

18    the end, and there will be three strikes for plaintiff and

19    three strikes collectively for the defense.  No backstriking.

20             MR. HART:  Just one housekeeping matter.

21             On the insurance, I understand that will be

22    utilizable for impeachment purposes to make sure the truth's

23    coming out, but I assume not for substantive evidence, and

24    that Mr. Catanese will refrain, as we discussed Friday, from

25    bringing that issue in his opening statement.
```

1          MR. CATANESE:  Your Honor, of course.  You mentioned

2     on Friday no mention of the insurance records.  I will not be

3     talking about that in any way in my opening statement.

4          THE COURT:  Well, only -- you could mention the ones

5     that were timely produced.

6          MR. HART:  Yes, Your Honor.

7          THE COURT:  But nothing that's been in these

8     underwriting records from the insurance company.

9          For example, as I understand it, the declaration

10    showing the exclusion was produced during discovery, and that

11    one, you know, to the extent you can make use of it, you can

12    make use of it.

13         MR. HART:  I was going to say the only way he'd be

14    able to get that in would be through the expert saying it's

15    something he customarily relied on.  I don't believe you've

16    got a custodian or other basis for introducing that into

17    evidence.

18         MR. CATANESE:  On the insurance records, Your Honor,

19    the records of insurance, the policy with the exclusions were

20    produced by Mrs. Redman during the course of discovery.  I am

21    unclear right now whether or not I am able to reference those

22    in my opening statement or I cannot do so pending the use of

23    those documents for impeachment.

24         MR. HART:  I was going to say if Ms. Redman, if

25    that's something we produced in discovery, then that's fine.

```
 1              THE COURT:  Again, if it was a document produced
 2    from the defense, I think you can use it.
 3              MR. CATANESE:  Okay, I just wanted to be sure.
 4    Thank you, Your Honor.
 5              The voir dire, Your Honor.  We had filed our voir
 6    dire questions.  I believe Mr. Hart did, too.  Any
 7    restrictions on the use of those questions with the jury?
 8              THE COURT:  No.  I probably will go over most of
 9    those with the jury myself.
10              MR. CATANESE:  Very good.
11              THE COURT:  But if I don't, you can feel free to --
12    I didn't see anything in there that was problematic.
13              MR. CATANESE:  Thank you, Your Honor.
14              MR. HART:  The only question I had, the real issue
15    on his voir dire was there were some questions about
16    additional damages which would indicate punitives or something
17    that would be exemplary.  We just request in line with the
18    rulings on Friday that obviously those would not be
19    appropriate in the case.
20              THE COURT:  I just thought there was just a general
21    question if there was a damage -- if they proved their
22    damages, would you award damages.
23              MR. HART:  That's fine.
24              MR. CATANESE:  Yeah, Your Honor, our voir dire
25    didn't speak about punitive damages.
```

1           MR. HART:  There were one or two, but that's fine.

2           MR. CATANESE:  It was just regular damages, or just

3      the size, rather.

4           THE COURT:  I just see question nine from the

5      plaintiff:  "If the facts from the case warranted an award of

6      money, would you hesitate to award a large amount of money?"

7           MR. HART:  No problem with that, Your Honor, as long

8      as it's in keeping with the evidence.

9           THE COURT:  You're going to need to stay closer to a

10     microphone, because your voice tails off, and it's hard to

11     hear you.

12          MR. HART:  Will do, Your Honor.

13          THE COURT:  Okay.

14          MR. CATANESE:  Thank you, Your Honor.

15          THE COURT:  All right.  So, again, if you want to

16     move, it's up to you how you want seat yourselves.  You can

17     turn around your chairs or you can turn to the other side of

18     the table, and I'll leave it up to you to make that decision.

19          Do we have witness lists for both sides so I can ask

20     the jurors about knowing any of the witnesses?

21          MR. CATANESE:  Your Honor, when we had filed the

22     pretrial statement attached as exhibit A and I think B is a

23     joint witness list for the Court.

24          THE COURT:  All right.  I have page 37 through

25     page 39.

```
 1              MR. CATANESE:  And what happened, Your Honor,
 2    there's -- in the one exhibit A, there's the plaintiff's
 3    exhibit list, which I thought was joint, but the defense also
 4    filed a separate witness list, and I believe both lists have
 5    the same names on them.
 6              THE COURT:  Okay.
 7              MS. CORTVRIEND:  They do, Your Honor.
 8              THE COURT:  Okay.  I've got it.  All right.  Thank
 9    you.
10              One last thing.  I want to make sure I try and
11    pronounce the names of the parties correctly.  So it's
12    Zendejas; is that correct, Zendejas?
13              MR. CHAPMAN:  Yes, Your Honor.
14              THE COURT:  And it's Syquia?
15              MS. CORTVRIEND:  Syquia.
16              THE COURT:  Okay.  Thank you.
17              All right.  Let's bring the jury in.
18         (The venire enters the courtroom.)
19              THE COURT:  Good morning, everyone.  Please be
20    seated, ladies and gentlemen.
21              Good morning, ladies and gentlemen.  Thank you for
22    being here this morning.  On behalf of everyone involved in
23    this case, I want to welcome you and thank you for your
24    participation in this particular case.  My name's Kenneth
25    Marra, and I'm the judge that will be presiding over this
```

1    case, and I want to, again, thank you for your willingness to

2    be considered to act as jurors in this case.

3          We are going to ask some of you to perform a very

4    important civic responsibility, and that is to be selected to

5    act as jurors in this case, to listen to the evidence that's

6    presented during the course of the trial, to be instructed on

7    the applicable law that applies to this case, and then to make

8    a very important decision, and that is to determine whether,

9    in this case, which is a civil case -- this is not a criminal

10   case -- whether in this case the plaintiff, whose name is

11   Alejandro Zendejas -- and he'll be introduced to you

12   shortly -- can prove the claims he has brought against the

13   defendants in this case who are Eugenie Redman and Colin

14   Syquia.  They'll be introduced to you shortly.

15         And, again, this is a civil case, and I'll describe

16   the nature of the dispute that exists between these parties

17   shortly.  But, again, we're going to ask some of you to listen

18   to the evidence presented and decide who should be prevail in

19   this case.

20         In order for us to determine who among you should

21   act as jurors in this case, we need to learn a little bit

22   about each of you in order to determine whether you could be a

23   fair and impartial juror in this case, or whether there's

24   something about your background, experiences or views that

25   touch upon the issues in this case that would prevent you from

```
 1   being a fair and impartial juror.
 2           So we're going to go through a process of gathering
 3   some information about each of you in order to make that
 4   determination.
 5           Please understand when we go through this process
 6   we're not doing it to embarrass you, to harass you or to
 7   unduly pry into your personal lives.  We're doing it for the
 8   very important purpose of trying to obtain a fair and
 9   impartial jury.
10           If, at any time we ask you a question that you
11   feel's too personal and private and you do not want to discuss
12   it openly, please let us know, and we'll take it up during a
13   break when you can just discuss it among myself and the
14   attorneys and their clients.  But understand it's essential
15   that in answering any of the questions we ask you, it's
16   essential that you be truthful and honest with us, because if
17   you're not truthful and honest with us with respect to the
18   information you provide, we cannot make intelligent decisions
19   about whether or not you can be a fair and impartial juror.
20           Before we go any further, I'm going to have the
21   attorneys introduce themselves to you and have them introduce
22   their clients to you.
23           Mr. Catanese.
24           MR. CATANESE:  Thank you, Your Honor.
25           Good morning, everyone.  My name is T. Randolph
```

```
 1   Catanese.  I'm an attorney, and I'm going to be visiting with

 2   you -- everyone.

 3          Good morning, everyone.  My name is T. Randolph

 4   Catanese.  I'm going to be visiting with you during the trial

 5   of this matter, and I represent Mr. Zendejas.  He is with us

 6   here.  And I look forward to working with you.  Thank you.

 7          MR. CHAPMAN:  Good morning, ladies and gentlemen.

 8   Avery Chapman.  I'll be assisting Mr. Catanese.  I'm a local

 9   lawyer here in Wellington, Florida, horse capital of the

10   world.  And we look forward to speaking with each and every

11   one of you about this case.  Thank you very much for coming in

12   and assisting us with the process.

13          MR. YOSHIDA:  Good morning, ladies and gentlemen.

14   My name is David Yoshida.  I'll also be assisting Mr. Catanese

15   in representing plaintiff Alejandro Zendejas, and I thank you

16   all for being here.

17          THE COURT:  Mr. Hart?

18          MR. HART:  Good morning, ladies and gentlemen.  My

19   name's John Hart.  I work here in West Palm Beach at Carlton

20   Fields.  My client, Ms. Eugenie Redman is here, Eugenie

21   Redman, with us, and we do thank you in advance for your time

22   and your service.

23          MS. CORTVRIEND:  Good morning, everyone.  My name is

24   Sarah Cortvriend.  I work with Mr. Hart, and Eugenie Redman is

25   our client.  Again, thank you for being here.
```

```
 1              MS. LEONARD:  Good morning.  I'm Patricia Leonard.
 2   My client is the defendant, Colin Syquia.  We appreciate your
 3   being here today.  Thank you.
 4              MS. SMERYAGE:  Good morning, ladies and gentlemen.
 5   My name is Colleen Smeryage, and I also have the pleasure of
 6   representing Mr. Syquia in this case.  Thank you.
 7              THE COURT:  Thank you all.
 8              Now, ladies and gentlemen, you'll notice that
 9   Mr. Zendejas is using a headset, earphones, because he is a
10   Spanish-speaking individual, and we have two interpreters who
11   are seated over on the -- your left side of the courtroom, my
12   right, who are translating what's being said so he can
13   understand.  So just so you understand why he may be wearing
14   the headset.  And there may be times when we have to slow down
15   our discussion for the interpreters so they can catch up with
16   what's being said.  So we'll try and speak at a normal pace,
17   but sometimes we have to slow down so the interpreters can
18   keep up with us.  Again, so you have an understanding of why
19   they're here.
20              Now, before we go any further, I need to have all of
21   you sworn to tell the truth during this process, so I'm going
22   to ask you to please rise and face Ms. Ferrante up here, and
23   she will swear you in.
24              THE COURTROOM DEPUTY:  Please raise your right hand.
25       (A venire was duly sworn.)
```

```
 1                THE COURTROOM DEPUTY:  Please be seated.

 2                THE COURT:  Now, ladies and gentlemen, let me just

 3      ask you to follow a few rules when we go through this process

 4      of answering the questions.  I'll be asking most of the

 5      questions, and I'll be speaking to each of you individually.

 6      There's a sheet of questions that have been handed to you

 7      which I'm going to go through with each of you, and I'll

 8      probably follow up with additional questions based upon your

 9      answers.  Then the attorneys, when I'm finished speaking to

10      all of you, then the attorneys will have an opportunity to

11      follow up with some additional questions, after which we'll

12      then make our decisions about who's going to sit on this jury.

13                When we speak to you, if you would please use the

14      microphone that is going to be handed to you.  Again, in this

15      large courtroom, if you're not using the microphone, it will

16      be difficult to hear you.  So please try and speak right into

17      the microphone.

18                Please remember when we speak to one another,

19      verbalize your answers to the questions rather than nodding

20      your head or shrugging your shoulders or saying uh-huh or

21      huh-uh, because our court reporter, who's seated right in

22      front of me, is taking everything we say down, and in order

23      for him to get an accurate record of what's being said, you

24      need to verbalize your answers.  So if you please try to

25      remember to do that.  I may prompt you in saying, is that a
```

```
 1    "yes" or a "no" depending upon if you fall into normal

 2    speaking habits.  People just tend to shrug their shoulders,

 3    say uh-huh, huh-uh, things of that nature.  So if I prompt

 4    you, that's the reason.  I'm not trying to embarrass you, just

 5    so we can get an accurate record of what's being said.

 6            I'm going to ask you to stand when we speak to you,

 7    if you wouldn't mind.  Again, not to, you know, single you

 8    out, but so we can all see you.  Especially when we get into

 9    the second row there, it's hard to see people up there, hiding

10    behind people in front of them.  So if you would please stand.

11            I will try to wait for you to finish the answer to

12    my question before I ask you the next question, and I'll ask

13    you to please try and wait for me to finish the question

14    before you start answering, because if we're both speaking at

15    the same time, again, it's difficult for the court reporter to

16    keep track of what's being said.  So try and wait for me to

17    finish before you start answering the question.

18            Now, to give you just a very brief background about

19    what this case involves so you have an understanding of some

20    of the questions that will be asked of you, in this case,

21    Mr. Zendejas is suing the defendants based upon the sale of a

22    horse named Vorst, and he's claiming that when he purchased

23    the horse, it was -- there were misrepresentations and

24    material omissions about his condition and health, and

25    therefore he paid much more for the horse than he believes it
```

was worth, and he believes that there were misrepresentations made about the condition of the horse.

The defendants deny that they've made any material misrepresentations or omissions of material facts and deny any responsibility for not being truthful and honest in connection with the transaction, and, in fact, claim that the horse -- any conditions that the horse may have were the result of actions taken after the sale of the horse.

So that's, again, a very, very brief general description of what the claims are in the case, and we're going to need some of you to listen to the evidence and decide who's correct in this case.

We expect the case to last approximately six trial days. We will be in session in this case Monday through Thursday of this week. We would not be in session on Friday of this week. And we would finish the case next week, either Tuesday or Wednesday of -- Monday, Tuesday, and if necessary, Wednesday. Hopefully won't be necessary to go that long. We're going to try to streamline the case as much as possible and move it along as quickly as possible, but in the event it takes six or seven days, we need people who could be committed to being here for that period of time.

If you have a hardship that would prevent you from being with us for that period of time, when I speak to you let us know what your hardship is, and we'll take that into

```
 1    consideration in making our decision.  But I emphasize the
 2    word "hardship" as opposed to "inconvenience."  We know it's
 3    inconvenient for everyone to be here for one day, never mind
 4    six or seven days, but in our system of justice, we need to
 5    have members of the community make sacrifices of their time in
 6    order to resolve disputes, and it's a very important civic
 7    responsibility, and we're going to ask some of you to make
 8    that sacrifice as necessary in this case.  But if you do have
 9    what you believe is a true hardship let me know, and we'll
10    certainly consider that in making our decision.
11            So I'm going to start off by speaking to you
12    individually, and we're going to start with the gentleman in
13    the -- against the wall in the first row, and is it
14    Mr. Ozaltin?
15            PROSPECTIVE JUROR:  Yes.
16            THE COURT:  Good morning, sir.  How are you?
17            PROSPECTIVE JUROR:  Good morning, thank you.
18            THE COURT:  Why don't you, sir, if you would take
19    that list of questions that we gave you, and if you could just
20    run down that list of questions and tell us a little bit about
21    yourself, we'd appreciate it.
22            PROSPECTIVE JUROR:  My name is Mehmet Ozaltin.  I
23    born and raised in Turkey.
24            THE COURT:  I'm sorry, where?
25            PROSPECTIVE JUROR:  Turkey.
```

```
1               THE COURT:  Turkey?

2               PROSPECTIVE JUROR:  Yes.  Educational background is

3     high school, and I'm employed City of Boynton Beach.  I'm a

4     fleet technician.

5               THE COURT:  I'm sorry, what kind of a technician?

6               PROSPECTIVE JUROR:  Fleet, working fire trucks,

7     ambulance --

8               THE COURT:  A fleet technician?

9               Thank you.

10              PROSPECTIVE JUROR:  I'm married.  I lost my wife two

11    years ago.  I have two kids.  Two girls.  Oldest one, she

12    graduate tomorrow, and my youngest one, she works for the

13    House of Representative in the district 91.

14              And I never selected before jury duty, and I never

15    involved in any lawsuit.  I don't have any disability.

16              I have some problem, family problems, and other than

17    . . .

18              THE COURT:  All right.  Well, based upon the

19    description of the case I gave to you, do you have any

20    leanings or feelings one way or the other about the case?

21              PROSPECTIVE JUROR:  No, not really.

22              THE COURT:  You could be fair in listening to the

23    evidence?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Would you be able to follow the law that
```

```
 1    I tell you you have to apply in this case even if you don't
 2    agree with that law?
 3              PROSPECTIVE JUROR:  Yeah.  Yes.
 4              THE COURT:  All right.  So tell me, what are the
 5    family issues that you have that would prevent you from being
 6    with us?
 7              PROSPECTIVE JUROR:  I don't want to spoke over here,
 8    at the sidebar.
 9              THE COURT:  We'll talk to you later about it.
10              PROSPECTIVE JUROR:  Yes, thank you.
11              THE COURT:  Let me ask you this question, sir.  I
12    notice you speak with a slight accent.  Do you have any
13    trouble understanding English?
14              PROSPECTIVE JUROR:  Yeah, sometimes.
15              THE COURT:  Sometimes you do?
16              PROSPECTIVE JUROR:  Sometimes.
17              THE COURT:  All right.  And we'll talk to you later
18    about your family issues.
19              Did you say your daughter is graduating tomorrow?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Where is she graduating from?
22              PROSPECTIVE JUROR:  Florida Atlantic University.
23              THE COURT:  All right.  And were you planning on
24    going to her graduation ceremony?
25              PROSPECTIVE JUROR:  Yes, definitely.
```

```
 1              THE COURT:  Okay.  And you said that she -- one of
 2   your daughters works for a Representative?
 3              PROSPECTIVE JUROR:  Yeah, I don't know their last
 4   name.  She just had start month ago, Emily, the first name
 5   Emily, district 91.
 6              THE COURT:  And is that a State of Florida
 7   representative?
 8              PROSPECTIVE JUROR:  Yes, West Atlantic Boulevard,
 9   West Atlantic Avenue, all the way the turnpike.
10              THE COURT:  And that's down in Delray area?
11              PROSPECTIVE JUROR:  Delray, yes.
12              THE COURT:  All right, sir.  We'll speak to you
13   later about your other issues.  Okay?
14              PROSPECTIVE JUROR:  Thank you, sir.
15              THE COURT:  Thank you.
16              Mr. Zinmeister, good morning sir.
17              PROSPECTIVE JUROR:  My name's John Zinmeister.  I
18   live down in Lake Worth for the last year.  I have some
19   college.  Currently a professional corporate pilot.  I am
20   married.  I have no children.
21              I have never sat on a jury.  I've never been
22   involved in any lawsuits.  I have no disabilities that would
23   affect me.  I have no personal views in the case.  Would be
24   able to follow all the laws instructed, and just have no
25   reasons, I guess, not to sit on the case.
```

```
1              THE COURT:  All right.  Sir, how long have you been
2    a pilot?
3              PROSPECTIVE JUROR:  I've been a pilot now for 20
4    years.
5              THE COURT:  All right.  Have you done other work
6    besides being a pilot?
7              PROSPECTIVE JUROR:  No.
8              THE COURT:  All right.  And were you in the
9    military?  How'd you learn to be a pilot?
10             PROSPECTIVE JUROR:  No, I went to school up in
11   Daytona.
12             THE COURT:  Okay.  All right.  Thank you, sir.
13             Ms. Bradley, good morning.
14             PROSPECTIVE JUROR:  Good morning.
15             Diane Bradley.  I resided in West Palm Beach for the
16   past seven years.  I have a bachelor's degree.  I'm not
17   employed.  I'm married.  My husband is a part-time professor.
18   I have no adult children.  I did sit on a jury probably 30
19   years ago, and from what I can remember, there was a car
20   accident, and the lady switched seats with her husband who had
21   some legal issues.  That's all I can remember.
22             I've never been involved in a lawsuit.  I have no
23   disabilities.  I have no personal views or opinions that would
24   affect my ability to be fair, I would be able to follow the
25   law as instructed, and I cannot think of any reasons why I
```

```
 1   shouldn't sit as a juror.
 2           THE COURT:  Ma'am, have you worked outside the home
 3   in the past?
 4           PROSPECTIVE JUROR:  I have.  I worked.
 5           THE COURT:  What type of work?
 6           PROSPECTIVE JUROR:  The Walt Disney World company
 7   as -- in human resources.
 8           THE COURT:  How long did you work in human
 9   resources?
10           PROSPECTIVE JUROR:  Almost 25 years.
11           THE COURT:  All right.  Did you do anything else
12   besides that work?
13           PROSPECTIVE JUROR:  In college, but, yes, full-time.
14           THE COURT:  And you said your husband's a part-time
15   professor, in what field?
16           PROSPECTIVE JUROR:  Computer science.
17           THE COURT:  All right.  Did he work doing things
18   other than teaching?
19           PROSPECTIVE JUROR:  He did.
20           THE COURT:  What type of work?
21           PROSPECTIVE JUROR:  He had his own company in the
22   computer field.
23           THE COURT:  All right.  So you said you were on a
24   jury approximately 30 years ago.  Was that case about the
25   accident itself, or was it about the gentleman trying to --
```

```
 1            PROSPECTIVE JUROR:  It was about -- I'm sorry.

 2            THE COURT:  Go ahead.

 3            PROSPECTIVE JUROR:  It was the woman who had

 4   switched and said that she was responsible for the accident.

 5   She switched seats with her husband.

 6            THE COURT:  All right.  Was it -- do you remember if

 7   it was -- someone was being charged criminally with some kind

 8   of problem?

 9            PROSPECTIVE JUROR:  She was being charged.

10            THE COURT:  Okay.

11            PROSPECTIVE JUROR:  And found guilty.

12            THE COURT:  So it was a criminal case as opposed to

13   a civil case where someone was trying to get money as a result

14   of the accident?

15            PROSPECTIVE JUROR:  Right.

16            THE COURT:  All right.  And did you and the other

17   jurors reach a verdict in that case?

18            PROSPECTIVE JUROR:  She was found guilty, yes.

19            THE COURT:  Were you the foreperson of that jury?

20            PROSPECTIVE JUROR:  No.

21            THE COURT:  Is there anything about your experience

22   in that case that would affect your ability to be fair in this

23   case?

24            PROSPECTIVE JUROR:  No.

25            THE COURT:  All right.  Now, you said that the
```

1   person was charged criminally with switching seats and trying

2   to avoid showing who actually was involved in the accident?

3   That was the issue?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  All right.  I don't know if you recall

6   this, but I just want to reference in criminal cases when

7   jurors have to make a decision whether someone's guilty or not

8   guilty of a crime, the prosecuting authority has to present

9   evidence that is beyond a reasonable doubt.  Do you remember

10  hearing that term, beyond a reasonable doubt?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  This is a civil case, and in this case

13  the plaintiff, Mr. Zendejas, would not have to prove his case

14  beyond a reasonable doubt.  He would have to prove it what's

15  called by a preponderance of the evidence, meaning more likely

16  true than not true.  In you're on the jury, would you be able

17  to make that distinction and not expect the plaintiff here to

18  have to prove his case beyond a reasonable doubt like you

19  would in a criminal case?

20          PROSPECTIVE JUROR:  I would.

21          THE COURT:  Thank you, ma'am.

22          Ms. Kuck?  Good morning.

23          PROSPECTIVE JUROR:  Good morning.  I'm Shannon Kuck.

24  I've lived in Boca Raton for about 20 years.  I have two years

25  of college and a paralegal certificate from Florida

```
 1    International University.  I'm employed at a hospital as a
 2    patient advocate.  I'm not married.  I don't have any adult
 3    children.  Yeah, I have sat on two juries before, one in Dade
 4    county about 24 years ago.  It was a civil case where this
 5    woman was injured by some construction work, and we had to
 6    determine how much money we were going to give her.  She was
 7    cut by a box cutter.  Then the second jury I sat on was about
 8    four or five years ago in Palm Beach County.  I was the
 9    alternate juror.  It was a DUI case, so once they went to
10    deliberate they sent me home.
11            I've never been involved in a lawsuit.  I don't have
12    any disabilities, I could be fair, and I could follow the law,
13    and there's no reason why I can't sit on this case.
14            THE COURT:  Ma'am, you said that you had a paralegal
15    background?
16            PROSPECTIVE JUROR:  Yes, but I've never worked in
17    the legal --
18            THE COURT:  Field?
19            PROSPECTIVE JUROR:  Arena, no.
20            THE COURT:  So you did some studying in that area
21    but you never actually practiced in that area?
22            PROSPECTIVE JUROR:  Right, uh-huh.
23            THE COURT:  So did you study torts and things of
24    that nature?  Fraud claims?
25            PROSPECTIVE JUROR:  Yes, it was an 18-month program
```

```
 1   at FIU.  It was many, many years ago, I believe 1988.
 2             THE COURT:  So you studied civil torts and --
 3             PROSPECTIVE JUROR:  Correct.
 4             THE COURT:  -- things of that nature?
 5             PROSPECTIVE JUROR:  Yeah, we actually did a couple
 6   of case studies.
 7             THE COURT:  And do you -- you haven't practiced in
 8   that field, but would you, if you're on the jury, be able to
 9   set aside what you might have heard or learned in your
10   paralegal course work and follow the legal instructions I give
11   you and only follow the instructions I give you and not rely
12   upon what you might have remembered from your paralegal
13   studies?
14             PROSPECTIVE JUROR:  Yeah, I think so.
15             THE COURT:  Now, you said you were on two juries.
16   One you actually rendered a verdict with the other jurors, and
17   the other you were not allowed to deliberate?
18             PROSPECTIVE JUROR:  Right.
19             THE COURT:  In the civil case where you had to
20   decide whether someone was entitled to money damages, you and
21   the other jurors reached an agreement on that?
22             PROSPECTIVE JUROR:  Yes.
23             THE COURT:  Were you the foreperson of that jury?
24             PROSPECTIVE JUROR:  No, I was not.
25             THE COURT:  And the fact that you were excused as an
```

```
 1   alternate in that criminal DUI case, would that affect your
 2   ability to be fair in this case?
 3             PROSPECTIVE JUROR:  No, it wouldn't affect my
 4   ability.
 5             THE COURT:  And even though you didn't get to
 6   deliberate in that case, do you remember the judge telling you
 7   before you were excused that the State had to prove the DUI
 8   charge beyond a reasonable doubt?
 9             PROSPECTIVE JUROR:  Uh-huh.
10             THE COURT:  Do you remember that?
11             PROSPECTIVE JUROR:  Yeah, I do remember that, and he
12   thanked me and dismissed me.
13             THE COURT:  But do you understand the difference
14   between what has to be shown in a criminal case, as I
15   discussed with Ms. Bradley, and has to be shown in a civil
16   case like this?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  And you'll be able to make that
19   distinction and follow the instructions I give you in that
20   regard?
21             PROSPECTIVE JUROR:  Yes.
22             THE COURT:  Thank you, ma'am.
23             Ms. Macallister, good morning.
24             PROSPECTIVE JUROR:  Good morning.  My name is Irene
25   Macallister.  I live in Delray Beach for about 17 years.  I
```

```
 1   have a bachelor's degree.  I'm currently unemployed.  I'm not
 2   married.  I don't have any children.  I have never sat on a
 3   jury.  I haven't been involved in a lawsuit.  I don't have any
 4   disabilities.  I don't have any personal views or opinions
 5   about this case.  I'm able to follow the law as instructed,
 6   and there are no reasons that I can think of.
 7            THE COURT:  All right.  Ma'am, you said you're
 8   currently unemployed.  You have worked in the past?
 9            PROSPECTIVE JUROR:  Yes, I have.
10            THE COURT:  What type of work have you done?
11            PROSPECTIVE JUROR:  I'm a baker and a cheese maker.
12            THE COURT:  Have you done other work besides that?
13            PROSPECTIVE JUROR:  Before that, I had a business.
14            THE COURT:  What type of business?
15            PROSPECTIVE JUROR:  It was online marketing.
16            THE COURT:  All right.  What type of items did you
17   sell?
18            PROSPECTIVE JUROR:  It wasn't -- it was just a small
19   business magazine online, so it was advertising.
20            THE COURT:  All right.  Thank you, ma'am.
21            Ms. Hundley.
22            PROSPECTIVE JUROR:  Hi.  My name is Mary Hundley.  I
23   was born and raised in Palm Beach County, and I lived in Palm
24   Beach Gardens for 21 years.
25            I had one year in college.  I'm employed at an auto
```

```
 1   body shop.  I work in the accounting department.  I've been
 2   married for 28 years.  My husband owns a construction company.
 3   I have four children.  One is an adult, and she's a
 4   journalist.
 5           I sat on a jury 14 years ago.  It was a leaving the
 6   scene of an accident.
 7           I've never been involved in a lawsuit.  I don't have
 8   any disabilities.  I have no personal views on the case.  I
 9   would be able to follow the instructions, and there's no
10   reason that I can't sit on the jury.
11           THE COURT:  All right.  And, I'm sorry, I know you
12   told me what you did for a living but I forgot.
13           PROSPECTIVE JUROR:  I work for an auto body shop in
14   the accounting department.
15           THE COURT:  Have you done other work besides that?
16           PROSPECTIVE JUROR:  No, I was a stay-at-home mom.
17           THE COURT:  You said you were a juror in a case
18   involving a hit and run?
19           PROSPECTIVE JUROR:  Yes.
20           THE COURT:  Leaving the scene of an accident, which
21   is a criminal charge.
22           PROSPECTIVE JUROR:  Correct.
23           THE COURT:  And as I mentioned to some of the other
24   jurors, do you understand that in that criminal case, the
25   State had to prove guilt beyond a reasonable doubt?
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Do you remember hearing that term?

 3              PROSPECTIVE JUROR:  Yes I do.

 4              THE COURT:  You understand in this case, a civil

 5    case, the plaintiff doesn't have to prove his case to that

 6    extent, it's only preponderance of the evidence, more likely

 7    true than not true?

 8              PROSPECTIVE JUROR:  I didn't, but I heard you say

 9    that, yes.

10              THE COURT:  And would you be able to follow that

11    instructions if you're on the jury?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  All right.  And did you and the other

14    jurors reach a verdict in that case?

15              PROSPECTIVE JUROR:  We did.

16              THE COURT:  Were you the foreperson?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Anything about that case that would

19    affect you in this case in any way?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Thank you, ma'am.

22              Ms. Isaacs, good morning.

23              PROSPECTIVE JUROR:  Good morning.  My name is Terri

24    Issacs.  I live in Jupiter for 21 years.  I have a master's

25    degree.  I'm currently employed.  I'm a CPA.  I'm married.  My
```

```
1   husband's an attorney.  I have three adult children.  Two are

2   still in college.  My third son is volunteering now at the

3   clerk and comptroller's office.

4          I have been on a jury before, but it never got to

5   trial.  They settled.  I think it was a robbery case, but I

6   really don't remember the facts because they settled before it

7   ever went to trial.

8          I've never been involved in a lawsuit.  I don't have

9   any disabilities.  I don't have any personal views on this

10  case or opinions, I could follow the law, and there's no

11  reason I couldn't sit on this case.

12         THE COURT:  Ma'am, have you always worked as an

13  accountant?

14         PROSPECTIVE JUROR:  Yes, either home with my kids or

15  a CPA.

16         THE COURT:  All right.  And do you work for

17  yourself, or do you work for a firm?

18         PROSPECTIVE JUROR:  A firm.

19         THE COURT:  All right.  And your husband you said is

20  an attorney.  What type of law does he practice?

21         PROSPECTIVE JUROR:  Right now, for the last 20 years

22  or so it's been employment law.

23         THE COURT:  All right.  And does he represent people

24  that are suing generally, or does he represent people that are

25  being sued generally, if you know?
```

```
 1              PROSPECTIVE JUROR:  Either/or.

 2              THE COURT:  He represents both sides?

 3              PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  Do you discuss his cases with him?

 5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  Based upon his experience in being --

 7     he's a litigator.  He goes into court?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  And tries cases?

10              PROSPECTIVE JUROR:  Uh-huh.

11              THE COURT:  Yes?

12         Do you have any leanings about people who file

13     lawsuits or people that are sued that would cause you to have

14     any predisposition in this case based upon your discussions

15     with him in his cases?

16              PROSPECTIVE JUROR:  I don't think so.

17              THE COURT:  You can be fair to both sides in this

18     case?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  And you said he -- sometimes he

21     represents the person suing, and sometimes he represents the

22     person or the entity being sued?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  You said you were picked to sit on the

25     jury but you never got into the court proceedings?
```

```
 1              PROSPECTIVE JUROR:  They picked the jury really late

 2    in the day and sent us home and the next morning when we got

 3    there they said, hey, we settled overnight and they sent us

 4    home.

 5              THE COURT:  Anything about that experience that

 6    would affect your ability to be fair in this case?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Thank you, ma'am.

 9              PROSPECTIVE JUROR:  You're welcome.

10              THE COURT:  Mr. Duvall, good morning, sir.

11              PROSPECTIVE JUROR:  Good morning.

12              My name is Mareen Walker Duvall.  I reside in Boca

13    Raton and have for the past 28 years; prior to that in Miami,

14    Florida.  I have a master's in business administration.  I

15    work for Wells Fargo, and I'm currently a relationship manager

16    in the commercial lending area.

17              I'm married, have been for 38 years.  My spouse does

18    not work.  I have three adult children.  The oldest is in

19    marketing and software development.  My daughter's a

20    homemaker, and my youngest son is an entrepreneur/inventor.

21              I've sat on two juries before.  Both were criminal

22    cases.  One was a civil disobedience trial in Miami, the other

23    was a drug case here in Palm Beach County.  I was the foreman

24    on both of those, and we reached a decision in both of those

25    cases.
```

```
 1              I've been involved in a lawsuit both professionally
 2   and personally.  Professionally, a lawsuit involved attorneys
 3   that represented the bank.  And personally, we own real estate
 4   in Miami, and my tenant was sued, and consequently, they also
 5   sued us.
 6              I don't have any disabilities that would prevent me
 7   from sitting as a juror.  I don't have any personal views with
 8   regard to this case, and I can follow the law as instructed,
 9   and there's no reason I couldn't sit here.
10         THE COURT:  All right, sir.  Tell me a little bit
11   about your current position with Wells Fargo.  What does a
12   relationship manager do?
13         PROSPECTIVE JUROR:  I'm in charge of corporate
14   accounts, both in lending money to them and treasury
15   management.
16         THE COURT:  How long have you had that position?
17         PROSPECTIVE JUROR:  I've been in this position
18   probably about seven years right now.
19         THE COURT:  And what other type of positions have
20   you held at the bank?
21         PROSPECTIVE JUROR:  Prior to that I headed up wealth
22   management for Wachovia and First Union for about five years.
23   Prior to that, also with First Union, I was in investment
24   banking and corporate banking.  Prior to that, I was with
25   Southeast Bank as a relationship manager in the corporate
```

```
 1   area.
 2          THE COURT:  So you've pretty much been in banking
 3   your whole career?
 4          PROSPECTIVE JUROR:  My entire career.
 5          THE COURT:  All right.  The two juries that you sat
 6   on, it sounded like they were both criminal cases, correct?
 7          PROSPECTIVE JUROR:  Yes.
 8          THE COURT:  And you heard my discussion with some of
 9   the other jurors about the difference in the burden of proof
10   in a criminal case versus the civil case?
11          PROSPECTIVE JUROR:  Yes.
12          THE COURT:  You'd be able to make that distinction
13   if you're on the jury?
14          PROSPECTIVE JUROR:  Yes.
15          THE COURT:  Anything about your experience in those
16   two cases that would affect your ability to be a fair juror in
17   this case?
18          PROSPECTIVE JUROR:  No.
19          THE COURT:  All right.  So you said you were
20   involved in a lawsuit professionally where there was a suit
21   involving attorneys?
22          PROSPECTIVE JUROR:  Correct.
23          THE COURT:  All right.  So were you suing the
24   attorneys --
25          PROSPECTIVE JUROR:  Yes.
```

```
 1                 THE COURT:  -- on behalf of Wells Fargo?

 2                 PROSPECTIVE JUROR:  Yes, represented me.  I guess

 3      they did some malfeasance, and so the bank sued them.

 4                 THE COURT:  So the bank sued them based upon their

 5      representation of you personally, or you -- something that

 6      you --

 7                 PROSPECTIVE JUROR:  Not me personally, no.

 8                 THE COURT:  Something that you were doing for the

 9      bank?

10                 PROSPECTIVE JUROR:  Yes, my work-related stuff.

11                 THE COURT:  All right.  And did you have to testify

12      in that proceeding?

13                 PROSPECTIVE JUROR:  It was settled out of court.

14                 THE COURT:  All right.  Did you have to give a

15      deposition, what's called a deposition?

16                 PROSPECTIVE JUROR:  Yes.

17                 THE COURT:  And how that case was handled, were you

18      satisfied with the way that case was handled?

19                 PROSPECTIVE JUROR:  Yes.

20                 THE COURT:  Yes?

21                 PROSPECTIVE JUROR:  Yes.

22                 THE COURT:  Anything about that experience that

23      would affect your ability to be a fair juror in this case?

24                 PROSPECTIVE JUROR:  No.

25                 THE COURT:  Then the case where you were a landlord
```

```
 1    or an owner of property and your tenant got sued and then they

 2    sued you, as well, was that some type of a personal injury

 3    case?

 4            PROSPECTIVE JUROR:  Yes, that's what it was.

 5            THE COURT:  Somebody got injured on your property?

 6            PROSPECTIVE JUROR:  Well, actually it was a City of

 7    Miami property, but my building abutted that.  They were

 8    injured on the sidewalk.

 9            THE COURT:  How was that case resolved?

10            PROSPECTIVE JUROR:  It was settled out of court.

11            THE COURT:  Anything about that experience, the fact

12    you were sued, and I presume you didn't think you should have

13    been sued, I presume that was your view of the situation,

14    correct?

15            PROSPECTIVE JUROR:  That's correct.

16            THE COURT:  The fact that you were brought into this

17    lawsuit when you didn't think you should have been, would

18    that -- anything about that experience that might tend to

19    cause you to favor one side or the other in this case?

20            PROSPECTIVE JUROR:  No, not really.  It happens a

21    lot.

22            THE COURT:  All right.  So you are not going to come

23    in against the plaintiff because you got dragged into a

24    lawsuit you didn't think you should have been dragged into?

25            PROSPECTIVE JUROR:  No.
```

```
 1              THE COURT:  All right.  Thank you, sir.
 2              If we can hand that over to Mr. Kainec, is that how
 3   you say your name?  Good morning.
 4              PROSPECTIVE JUROR:  Good morning, yes.  Michael
 5   Kainec.
 6              THE COURT:  Good morning, sir.  How are you?
 7              PROSPECTIVE JUROR:  Doing well, thank you.
 8              I live in North Palm Beach the last 28 years.  High
 9   school.  I'm employed, Palm Beach County Board of County
10   Commissioners in the Traffic Engineering Department.  I'm
11   married.  My wife is an educator.  I have two adult children,
12   mechanical engineer, and my daughter works for the Clerk of
13   Courts.
14              I've never sat on a jury.  I've never been involved
15   in a lawsuit.  Have no disabilities.  I have no opinions on
16   this case.  I would be able to follow the law, and there's no
17   reason that I can't.
18              THE COURT:  Sir, what does your daughter do for the
19   Clerk of the Court?
20              PROSPECTIVE JUROR:  She's got a really long title.
21   She's been there about two months now.
22              THE COURT:  Okay.
23              PROSPECTIVE JUROR:  Gosh, I can't remember.
24              THE COURT:  Does she get involved in lawsuits?  Does
25   she sit in the court proceedings?
```

```
 1              PROSPECTIVE JUROR:  She's not in the court

 2    proceedings.  She's more in the records-keeping.

 3              THE COURT:  Anything about what she does that might

 4    influence your ability to be fair in this case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  And what have you done other than work

 7    in the traffic department for the county?  Any other type of

 8    work that you've done?

 9              PROSPECTIVE JUROR:  I've been with the traffic

10    department for the last 32 years.

11              THE COURT:  So pretty much it, yes?

12              PROSPECTIVE JUROR:  Well, yeah.

13              THE COURT:  Okay.  Thank you, sir.

14              Is it Mr. Stenglein?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Good morning, sir.

17              PROSPECTIVE JUROR:  My name is Steve Stenglein.

18    I've lived in Boca Raton for 18 years.  I've got some college.

19    I'm employed as a chief technology officer for an insurance

20    company.  I'm married.  My wife does not work.  No adult

21    children.  I've never been on a jury.  I've never been

22    involved in a lawsuit.

23              Reference number 9, a six-day trial would represent

24    a personal hurdle for me in that my job responsibilities will

25    not go away while I'm here, and I'll have to work in the
```

 1   evenings, et cetera.  On top of that I've got a heart

 2   condition, and I'm not really supposed to be burning the

 3   candle at both ends, if you will.

 4            In reference to number 10, I don't have any views on

 5   the case one way or another, I can follow the law, and as far

 6   as number 12, that sort of ties back to number 9.

 7            THE COURT:  All right.  Sir, so tell me a little bit

 8   more about your job.  What do you do?

 9            PROSPECTIVE JUROR:  I'm the technology director for

10   an insurance company.  I created some software that a couple

11   hundred people use years back.  I've got a staff of nine or

12   10, and we develop software and keep systems running,

13   et cetera.

14            THE COURT:  All right.  And what else have you done

15   besides that work?

16            PROSPECTIVE JUROR:  I've done that my whole life.

17            THE COURT:  Okay.  And you can't be away for a few

18   days from that position?

19            PROSPECTIVE JUROR:  Beyond a day or two things can

20   get a little chaotic, if there's system failures or issues,

21   et cetera.  I get phone calls all the time day or night.  So I

22   could certainly do a day or two, but beyond that it's gonna

23   create problems.

24            THE COURT:  Is it going to be problems for you

25   personally or is it going to be for your employer?

```
 1              PROSPECTIVE JUROR:  Problems for the business.

 2              THE COURT:  Okay.  And, again, there's no one that

 3    can step in and pick up -- you know, carry the ball if need be

 4    in your absence?

 5              PROSPECTIVE JUROR:  Not really, in that I created

 6    all of this software, and there's no documentation for the

 7    software.  So I'm sort of like the Shell Answer Man there as

 8    to what do we do about this, what do we do about that.

 9              THE COURT:  All right.  And you mentioned that

10    you're going to be burning the candle at both ends.  Does it

11    necessarily mean you're going to have to go to work in the

12    evenings, or it's only if called upon and needed?

13              PROSPECTIVE JUROR:  Well, I'm going to work from

14    home tonight, probably 'til 10 or 11:00 o'clock just to keep

15    my head above water, so to speak.  It's just the nature of the

16    job.  It just doesn't go away.

17              THE COURT:  All right.  So you think it's going to

18    be a hardship for you to be with us for the amount of time

19    necessary?

20              PROSPECTIVE JUROR:  Yes, sir.

21              THE COURT:  All right.  We'll take that into

22    consideration, sir.  Thank you.

23              PROSPECTIVE JUROR:  Thank you.

24              THE COURT:  Ms. Chen, good morning, ma'am.

25              PROSPECTIVE JUROR:  Hi.  Good morning.  Jennifer
```

```
 1    Chen.
 2              I've been in -- I live in Lake Worth, Florida, for
 3    about 17 years.  I have a bachelor's degree.  I am an
 4    accountant.  I am married.  My husband works for the post
 5    office.  He's a carrier.  I don't have any adult children.  I
 6    do have three young children.  Two -- one is nine, one is 12,
 7    and one is 10 months old.
 8              I've sat on a jury before about 10 years ago in Palm
 9    Beach County.  It involved a civil traffic case.
10              I have been involved in a personal lawsuit.  It
11    involves a foreclosure of a property.  I don't have any
12    disabilities.  I don't have any issues involving this case.
13    I'm okay with number 11.  I will be able to follow the law as
14    instructed by the Court.
15              Number 12, I don't have any hardships, but I just
16    want you to take in consideration I do have young kids, and
17    going and staying away for a couple days will be a challenge,
18    considering the fact that my mother-in-law just passed, and my
19    husband has been away doing -- taking care of some of the
20    issues, you know, personally and stuff, items involving my
21    mother-in-law.
22              THE COURT:  All right.  Well, did you tell me you
23    work as an accountant?
24              PROSPECTIVE JUROR:  Yes.
25              THE COURT:  Okay.  Do you work full-time?
```

```
 1                 PROSPECTIVE JUROR:  Yes.

 2                 THE COURT:  All right.  So if you're working

 3    full-time, who's taking care of your child?

 4                 PROSPECTIVE JUROR:  My mom has been helping out the

 5    summer.

 6                 THE COURT:  All right.  So if you weren't here,

 7    you'd be at work?

 8                 PROSPECTIVE JUROR:  Yes.  I'm allowed to work from

 9    home, so I've been helping with her assistance.

10                 THE COURT:  Okay.  So you don't always go to an

11    office, you sometimes work at home?

12                 PROSPECTIVE JUROR:  Yes, sir.

13                 THE COURT:  All right.  What's the breakdown?  How

14    often do you go to the office?  How often are you at home?

15                 PROSPECTIVE JUROR:  Usually about two days a week.

16                 THE COURT:  Which?

17                 PROSPECTIVE JUROR:  Work from home.

18                 THE COURT:  And the other three days you're --

19                 PROSPECTIVE JUROR:  At the office.

20                 THE COURT:  At the office?

21                 PROSPECTIVE JUROR:  Yes.

22                 THE COURT:  All right.  So when you're at the office

23    you have someone who's caring for your child?

24                 PROSPECTIVE JUROR:  My mom is helping out, yes.

25                 THE COURT:  So would she be able to help out for a
```

1  couple of extra days if need be?

2          PROSPECTIVE JUROR:  It's kinda hard to say, because,

3  you know, usually she's okay, you know, with couple -- you

4  know, she works and helps out three days, full days, but the

5  other two days I'm home, so I'm giving her a little break.

6  She is 70 years old.

7          THE COURT:  Okay.  We're not going to be in session

8  on Friday.  Would you be able to work at home on Friday if

9  need be and then be here the other days?  It would be just one

10  extra day that you might have to be away from home.

11          PROSPECTIVE JUROR:  Normally I would say yes, but

12  considering the fact that the girls are going to school on

13  Monday, they're starting Monday, so Monday's going to be --

14  next week's going to be a little hectic, because I've got an

15  elementary school and a middle school, so I'm going to have to

16  take Monday off to make sure they get on the bus and

17  everything goes smoothly.

18          THE COURT:  Okay.  So how long have you been an

19  accountant?

20          PROSPECTIVE JUROR:  For a very long time.  About 18

21  years.

22          THE COURT:  All right.  And you work for a firm or a

23  business?

24          PROSPECTIVE JUROR:  A business.

25          THE COURT:  Any other work history besides in the

```
 1  accounting field?
 2          PROSPECTIVE JUROR:  No.
 3          THE COURT:  And what does your husband do?
 4          PROSPECTIVE JUROR:  He's a carrier with the U.S.
 5  Post Office.
 6          THE COURT:  I'm sorry.  You told me that.  I
 7  apologize.
 8          So you said you were on a civil jury, and did you
 9  and the other jurors reach a verdict in that case?
10          PROSPECTIVE JUROR:  Yes, we did.
11          THE COURT:  Were you the foreperson of that jury?
12          PROSPECTIVE JUROR:  No, I'm not.
13          THE COURT:  Anything about that case that would
14  affect your ability to be fair in this case?
15          PROSPECTIVE JUROR:  No.
16          THE COURT:  Then you said you were involved in a
17  foreclosure lawsuit?
18          PROSPECTIVE JUROR:  Yes.
19          THE COURT:  How was that case resolved?
20          PROSPECTIVE JUROR:  It was settled.
21          THE COURT:  Anything about your experience in having
22  been sued in a foreclosure case that would prevent you from
23  being fair to both sides in this case?
24          PROSPECTIVE JUROR:  No, but I do have an issue if
25  people knowingly, you know, deceive other people and to get a
```

 1    benefit gain on their own.

 2            THE COURT:  Well, there's an allegation here that

 3    there were misrepresentations made, but that's an allegation

 4    that you would have to listen to the evidence and decide

 5    whether it was true or not.

 6            PROSPECTIVE JUROR:  Okay.

 7            THE COURT:  So coming into the case, just because

 8    there's been an allegation of that kind of conduct, does that

 9    cause you to think that there was something that was done

10    improper here?

11            PROSPECTIVE JUROR:  No, it shouldn't.

12            THE COURT:  It shouldn't, but does it?

13            PROSPECTIVE JUROR:  No, it doesn't.

14            THE COURT:  So the fact that there's an allegation

15    that's been made, you wouldn't necessarily conclude that it's

16    true just because the allegation's been made in this case?

17            PROSPECTIVE JUROR:  No, I would not conclude that's

18    true.

19            THE COURT:  And you'd be able to be fair in

20    listening to the evidence before you made a decision one way

21    or the other about whether the plaintiff was correct?

22            PROSPECTIVE JUROR:  Yes, I should, yes.

23            THE COURT:  Okay.  All right.  Thank you, ma'am.

24            PROSPECTIVE JUROR:  Thank you.

25            THE COURT:  Is it Mr. Mehallis?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Good morning.

 3              PROSPECTIVE JUROR:  Spero Mehallis.  I live

 4   currently in Boynton Beach, Florida, for four years.  Grew up

 5   in Plantation, Florida.  I have an MBA in sport management.  I

 6   work in corporate sponsorship and marketing.  I also am an

 7   adjunct professor at Florida Atlantic University.  I'm

 8   married.  My wife is a stay-at-home mom to our 10-month-old.

 9              Never sat on a jury before.  Never been involved in

10   a lawsuit.  No disabilities.  Based on the description of the

11   case, I teach sport management, and my uncle, Steve Mehallis,

12   worked very closely, was the CFO for Harry Mangurian, who

13   dealt heavily in thoroughbred racing, and he's come and spoken

14   to my sport administration course that I teach at Florida

15   Atlantic many times.

16              I should be able to follow the law, and other than

17   kinda my background in sport management and my history with my

18   uncle, I wouldn't see any other reason why I couldn't serve.

19              THE COURT:  All right.  Sir, how long have you been

20   involved in sports management?

21              PROSPECTIVE JUROR:  My entire career.  So, about 10

22   years.

23              THE COURT:  All right.  And what do you teach as an

24   adjunct professor?

25              PROSPECTIVE JUROR:  Sport administration.
```

```
1              THE COURT:  Do you personally get involved with the
2    horse-related sports activities?
3              PROSPECTIVE JUROR:  Other than giving assignments on
4    some of the horse races and stuff like that, I haven't outside
5    of that, but I've been around it I guess you could say.
6              THE COURT:  And when you -- to the extent that
7    you're involved with horse-related activities, is it racing,
8    horse racing?
9              PROSPECTIVE JUROR:  My uncle, with Harry Mangurian,
10   was heavily involved in syndicating horses and the
11   thoroughbred race horses.
12             THE COURT:  But it was racing?
13             PROSPECTIVE JUROR:  Yes.
14             THE COURT:  The horse involved in this case is a
15   show horse.  It's not a race horse.
16             PROSPECTIVE JUROR:  Understood.
17             THE COURT:  You have any experience in dealing with
18   horses that are used in competitions, dressage and that type
19   of -- do you have any experience in that?
20             PROSPECTIVE JUROR:  No.
21             THE COURT:  So you don't know anything about that?
22             PROSPECTIVE JUROR:  Not necessarily, no.
23             THE COURT:  And your uncle doesn't deal with horses
24   that are show horses --
25             PROSPECTIVE JUROR:  No.
```

```
 1              THE COURT:  -- and competing in dressage and that
 2    type of activity?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  Would the fact that your uncle's
 5    involved in thoroughbred racing, and you may have some
 6    knowledge about thoroughbred racing, would that affect your
 7    ability to be fair in a case dealing with --
 8              PROSPECTIVE JUROR:  I've heard various stories of
 9    them dealing with purchases and stuff of horses.
10              THE COURT:  Stories of whom?
11              PROSPECTIVE JUROR:  Of Harry Mangurian's purchase of
12    various thoroughbred horses.  He's now passed, but when -- I
13    heard stories of when they were heavily involved in the
14    business.
15              THE COURT:  Okay.  In terms of buying and selling
16    race horses?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  So you've heard stories about what
19    issues that came up with the purchases?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  All right.  So we'll talk to you later
22    about that situation separately, all right?
23              PROSPECTIVE JUROR:  Yes, sir.
24              THE COURT:  Thank you, sir.  We'll talk to you later
25    about what you may have heard about transactions with that
```

```
 1   gentleman.

 2           Mr. West, good morning, sir.

 3           PROSPECTIVE JUROR:  Good morning, sir.  My name's

 4   Patrick West.  I live in Jupiter Florida.  I've lived there

 5   going on 17 years now.  I have a high school diploma.  I am a

 6   small business owner and operator.  I am not married.  I do

 7   not have any adult children.  I've never been selected for

 8   jury duty before.  I have been sued before for a civil

 9   lawsuit.  I do not have any disabilities.  I have no problem

10   with the case, and I would be able to follow the instructions

11   of the Court, and my only difficulty is that I take care of my

12   74-year-old mother that has advanced Alzheimer's currently.

13           THE COURT:  All right, sir.  What type of business

14   do you own?

15           PROSPECTIVE JUROR:  It's called Jupiter Concierge

16   Services.  Everything from handyman to specialized errand

17   running, flying around the country to bring animals home,

18   whatever a customer would need.

19           THE COURT:  Do you do those activities yourself or

20   do you have employees who do that for you?

21           PROSPECTIVE JUROR:  I am the only employee of the

22   company.

23           THE COURT:  So if you need -- animals need to be

24   transported from one location to another, you're the one who

25   does that.
```

```
 1                PROSPECTIVE JUROR:  Absolutely, or take care of
 2   homes, whatever is needed.  I have a background in the private
 3   country club industry, so therefore I've done a lot of
 4   networking with former members.
 5                THE COURT:  How long have you had this business?
 6                PROSPECTIVE JUROR:  I've recently just started
 7   within the last month.
 8                THE COURT:  What did you do before this business?
 9                PROSPECTIVE JUROR:  I was a food and beverage
10   director in private country clubs.
11                THE COURT:  All right.  And you said you've been
12   sued before.  What type of a case?
13                PROSPECTIVE JUROR:  It was from a lender for a
14   credit card.
15                THE COURT:  How was that resolved?
16                PROSPECTIVE JUROR:  I lost.
17                THE COURT:  Any issues as a result of that lawsuit,
18   being sued, with the legal system, or the way that case was
19   handled?
20                PROSPECTIVE JUROR:  No, sir.
21                THE COURT:  Anything that would affect your ability
22   to be fair in this case?
23                PROSPECTIVE JUROR:  No, sir.
24                THE COURT:  Okay.  All right.  So you said that your
25   mother has Alzheimer's, and you care for her.  Where does she
```

```
 1   live?

 2            PROSPECTIVE JUROR:  I live with her in Jupiter.  So

 3   by having the flexibility of a small business, I'm able to

 4   keep tabs on her, stopping in throughout the day, as well as I

 5   do have a sibling in the area that also helps with the same.

 6            THE COURT:  All right.  So when you're delivering or

 7   transporting animals, you're not there?

 8            PROSPECTIVE JUROR:  I'm not there, and I'm making

 9   arrangements with my sister to make sure that we do have

10   someone constantly checking on her.

11            THE COURT:  All right.  So would you be able to have

12   your sister take care of those needs if you're called upon to

13   be in this case?

14            PROSPECTIVE JUROR:  To the best of her ability, but

15   she has her -- her and her husband have their own law firm, so

16   they have all their own responsibilities also.

17            THE COURT:  So your sister is an attorney?

18            PROSPECTIVE JUROR:  She is a paralegal, as well as a

19   stenographer, would that be correct, and my brother-in-law is

20   an attorney.

21            THE COURT:  All right.  So it's the only issue you

22   have is being -- needing someone to care for your -- or look

23   after your mother?

24            PROSPECTIVE JUROR:  That, and also, you know, not

25   being able to operate my business that I've just started.
```

```
 1    I -- to be honest with you, sir, I've worked every day except
 2    for one in the last month.  That's how quickly it's taken off.
 3              THE COURT:  Are you going -- is it going to be a
 4    financial hardship for you to be here as far as your business
 5    is concerned?
 6              PROSPECTIVE JUROR:  Well, it just started out and
 7    then already being putting clients off for possibly two weeks,
 8    where I already have work booked for the next two weeks is not
 9    necessarily the way I had hoped to start my business, as you
10    can expect.
11              THE COURT:  Thank you, sir.
12              PROSPECTIVE JUROR:  My pleasure.
13              THE COURT:  Is it Ms. Sort or Sorte?  Good morning.
14              PROSPECTIVE JUROR:  Good morning.
15              My name is Yasmin Sorte.  I currently reside in
16    Delray Beach, Florida, for the past seven or eight years.  I
17    am employed.  I work in healthcare.  I am married, and my
18    husband is actually an executive at the healthcare
19    not-for-profit organization I work at, as well.  We do not
20    have any adult children, but we do have one 15-month-old.
21              I've never sat on a jury before.  I've never been
22    involved in a lawsuit before.  I do not have any disabilities.
23    I do not have any personal views or opinions or attitudes.  I
24    do have some friends that are involved in the horse world in
25    Wellington, so I'm somewhat familiar with it, but not very
```

1    closely.  I would be able to follow the law as instructed by

2    the Court, and there is no reason that I would not be able to

3    sit on the jury, but I would like to take into consideration

4    the fact that my husband and I work at the same organization,

5    and my role right now is pretty much a one-man show.  So the

6    duties of our department would be put off for the week that I

7    am away.  That doesn't mean I can't do it, but it would create

8    some sort of difficulty in our family with our child.

9         Currently our daughter has childcare during the day,

10   but her hours are limited, as well, so we try to juggle that

11   already after 5:00 o'clock, so . . .

12        THE COURT:  All right.  So tell me a little bit more

13   about what you do in the healthcare field.

14        PROSPECTIVE JUROR:  My title is senior director of

15   development and community relations, but it's a multi-facetted

16   role where I'm responsible for raising and allocating

17   scholarship funds for people who need treatment.  I also help

18   assess whether a patient qualifies for treatment.  I do have

19   some patients that I see on a daily basis at our center, the

20   Karen Foundation, and we have three events coming up in

21   September that I'm solely responsible for fundraising up in

22   New York.  So that -- it's a bit of a busy time for me right

23   now.

24        THE COURT:  All right.  So if you're able to work on

25   Friday, go into the office and kinda catch up on things, would

```
 1   that --
 2            PROSPECTIVE JUROR:  Yeah, I'm in good health.  I can
 3   burn the candle at both ends.  I just felt like I would be
 4   remiss if I didn't mention.
 5            THE COURT:  All right.  So if called upon, you would
 6   be able to undertake the responsibility?
 7            PROSPECTIVE JUROR:  Yes.
 8            THE COURT:  Okay.  All right.  Now, when you say you
 9   know some people in the horse world in Wellington, what does
10   that mean?
11            PROSPECTIVE JUROR:  I have some friends that bought,
12   have horses, show horses, just childhood friends from growing
13   up in New York City.
14            THE COURT:  Do they keep their horses here in
15   Wellington?
16            PROSPECTIVE JUROR:  Yes.
17            THE COURT:  Do you know if they buy and sell horses?
18            PROSPECTIVE JUROR:  I know that one of my friends
19   just bought a horse, yes.
20            THE COURT:  Do you know what he or she intends to do
21   with the horse and what kind of activities they get involved
22   with with the horse?  Do they ride it personally?
23            PROSPECTIVE JUROR:  Yes, both of them ride them
24   personally.
25            THE COURT:  So did they buy the horses for their
```

```
 1   personal riding?
 2           PROSPECTIVE JUROR:  I know that they show, and I
 3   don't know if it's dressage, but they show in Wellington
 4   because I went to go see them once.
 5           THE COURT:  And what did you see when you went to go
 6   see them?
 7           PROSPECTIVE JUROR:  They were jumping, there were
 8   jumps, and it was just an interesting experience.  I'm
 9   involved with it very peripherally, so . . .
10           THE COURT:  So you've been to events where you've
11   seen horses jumping --
12           PROSPECTIVE JUROR:  Yes.
13           THE COURT:  -- and doing that kind of activity?
14           PROSPECTIVE JUROR:  Yes.
15           THE COURT:  All right.  And do you have any personal
16   knowledge of how much your friends paid for these horses?  I
17   don't want you to tell me specifically, but do you know what
18   they --
19           PROSPECTIVE JUROR:  I don't.
20           THE COURT:  You don't have any information about how
21   much they paid for these horses?
22           PROSPECTIVE JUROR:  No.
23           THE COURT:  Or how much they may have sold a horse
24   for?
25           PROSPECTIVE JUROR:  No.
```

1          THE COURT:  Do you ever discuss with them how they

2    care for the horses and what -- you know, what type of

3    veterinary care they get for the horses?

4          PROSPECTIVE JUROR:  I do know that it's expensive.

5    I do know that it's very expensive, but beyond that, I haven't

6    really paid much of an interest in it.

7          THE COURT:  Okay.  How many of these events do you

8    think you've been to where you've seen the horses engage in

9    these jumping type of activities?

10          PROSPECTIVE JUROR:  I've been to two.

11          THE COURT:  Two?

12          So based upon your friend's involvement in the horse

13    world, so to speak, and your peripheral exposure to it, do you

14    think you have any opinions one way or the other about how

15    this case should be resolved?

16          PROSPECTIVE JUROR:  I don't.  I used to ride myself

17    when I was younger, but I had an accident where I was injured,

18    and I never got back on the horse, so . . .

19          THE COURT:  And you did it for just riding, you

20    weren't in competition?

21          PROSPECTIVE JUROR:  I mean, amateur, nothing very --

22    you know, over the summers it was something that I would do,

23    not beyond ninth grade.  So it was very -- it wasn't very

24    serious.

25          THE COURT:  What were you doing, jumping activities?

```
 1              PROSPECTIVE JUROR:  Yeah, jumping.  We would care
 2    for the horses in the stables, as well, and that was something
 3    I did for every Sunday with my father until he passed.
 4              THE COURT:  All right.  And did you own your own
 5    horse?
 6              PROSPECTIVE JUROR:  I did not.
 7              THE COURT:  And were you involved in the medical
 8    treatment or care of the horses?
 9              PROSPECTIVE JUROR:  No, I was not.  I was just -- we
10    would just take care -- we learned how to take care of the
11    horses and spend days at the stables, you know, cleaning the
12    stables, taking care of the horses, clean the horses, but
13    nothing medically involved.
14              THE COURT:  Did you ever have any experience with
15    any horses you were involved with that may have had some
16    physical deficiencies or ailments that prevented them from
17    being able to ride or jump?
18              PROSPECTIVE JUROR:  Temperament issues, that's it,
19    but nothing physical.
20              THE COURT:  Thank you, ma'am.
21              Ms. Smith, good morning.
22              PROSPECTIVE JUROR:  Good morning.  I'm Michelle
23    Smith.  I reside in Lake Worth and have been living there for
24    about 15 years.  My educational background is an associate's
25    degree.  I am employed as a consultant in a statistical
```

1   rate-making organization for workers' compensation insurance.

2   I'm married.  My husband is an ATM technician.  I have two

3   adult children.  My daughter is -- is a technician for

4   radiology, and my son drives a truck.

5          I sat on a jury probably about 25 years ago, and it

6   was a drug case.

7          I have not been involved in a lawsuit.  I don't have

8   any disabilities.

9          Based on the description of the case, I might have

10  some personal views that may affect my ability to be fair and

11  impartial.  I can follow the law as instructed by the Court,

12  and I don't have a reason for not sitting in on the case.  The

13  only thing that I do need to tell you is that if the case goes

14  on longer than next Wednesday, I would not be able to be there

15  Thursday.  I'm scheduled for pre-op for surgery.

16         THE COURT:  All right, ma'am.  We will -- well, let

17  me ask you this about your jury experience.  You said it was a

18  drug case.  Did you and the other jurors reach a verdict in

19  that case?

20         PROSPECTIVE JUROR:  Yes, we did.

21         THE COURT:  Were you the foreperson?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  That was a criminal case.  Have you

24  heard me speaking to the other jurors about the difference in

25  the amount of proof necessary in a criminal case versus in a

```
 1   civil case?
 2           PROSPECTIVE JUROR:  I have.
 3           THE COURT:  And you would be able to make that
 4   distinction if you're on this jury?
 5           PROSPECTIVE JUROR:  Yes.
 6           THE COURT:  All right.  So we'll talk to you later
 7   separately about what personal views you might have that might
 8   affect your ability to be fair.  All right?
 9           PROSPECTIVE JUROR:  Okay.
10           THE COURT:  Thank you.
11           All right.  Ms. Screciu.  Good morning.
12           PROSPECTIVE JUROR:  Good morning.  My name is
13   Beatrice Screciu.  I live in Loxahatchee, Florida, since 2001.
14   I have some college.  I am employed.  I work for the Delray
15   Beach police department as the executive assistant for the
16   chiefs.  I am married.  My husband works at Publix as a meat
17   cutter in Wellington.  I have an adult daughter that just
18   graduated from Keizer University with an associate's in
19   criminal justice.
20           I sat on a jury about five or six years ago.  It was
21   a civil case, which, it was a personal injury lawsuit which
22   stemmed from an accident.  We were there for about a day, and
23   then we came back from lunch and they settled out of court, so
24   we got dismissed.
25           I've never been a part of a lawsuit.  I don't have
```

```
 1   any disabilities.  Based on the description of the case, I

 2   don't have any opinions, I would be able to follow the law,

 3   and the only thing is my position, the chief is the secretary

 4   to the Palm Beach County Association of Chiefs of Police,

 5   which, they're having a monthly meeting next week.  I'm the

 6   secretary for it, so I have to be there to take minutes.  This

 7   week I have to get ready for the meeting, I have to send out

 8   the agenda and so forth.  But that would be the only thing.

 9           THE COURT:  So tell me this again, now.  You --

10   there's some meeting coming up for what?

11           PROSPECTIVE JUROR:  The Palm Beach County

12   Association of Chiefs of Police.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR:  And the chief is the secretary.

15   So being that he's the secretary, I have to go and take

16   minutes.

17           THE COURT:  Okay.  So he doesn't take the minutes

18   even though he's the secretary?

19           PROSPECTIVE JUROR:  I do all the work.

20           THE COURT:  You have to take the minutes for him?

21           PROSPECTIVE JUROR:  Correct.

22           THE COURT:  So you're the secretary's secretary, is

23   that it?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  So is there -- there's no one else in
```

1    the office who might be able to take -- go to the meeting with

2    him and take the minutes for him?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  No?  You're the only one that can do

5    that?

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  Okay.  And when is this meeting?

8              PROSPECTIVE JUROR:  It's next Thursday.  But the

9    week before I have to get the minutes from the previous

10   meeting, I have to get the agenda ready, I have to make copies

11   and distribute them.

12             THE COURT:  Would you be able to do that on Friday?

13             PROSPECTIVE JUROR:  I guess I could.

14             THE COURT:  Okay.  And so next Thursday we're hoping

15   the case will be over by then, so if you could take care of

16   all those administrative things on Friday when we won't be

17   here, and if you're at the meeting next Thursday, if you can

18   go to the meeting, would you be able to serve?

19             PROSPECTIVE JUROR:  Sure.

20             THE COURT:  You don't sound too convinced.

21             PROSPECTIVE JUROR:  Well, besides that I do handle

22   their calendars, the calendars for the three chiefs, and the

23   e-mails and memos and letters that we have to send out.  So

24   it's kinda hard, but . . .

25             THE COURT:  All right.  Well, the police departments

```
 1    call upon citizens all the time in criminal cases, don't they?
 2              PROSPECTIVE JUROR:  Yes, they do.
 3              THE COURT:  So maybe the police department should
 4    have their fair share of jury service, too, no?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  All right.  So anything about your jury
 7    experience where I understand you sat for a day and then the
 8    case was settled that would affect your ability to be fair in
 9    this case?
10              PROSPECTIVE JUROR:  No.
11              THE COURT:  All right.  And how long have you been
12    working in this position that you have?
13              PROSPECTIVE JUROR:  Since 2011, but previous to that
14    I was in Internal Affairs for about two years.  Then before
15    that, I was in the Records Department.
16              THE COURT:  All right.
17              PROSPECTIVE JUROR:  I've worked there since 2001.
18              THE COURT:  Okay.  Thank you.
19              PROSPECTIVE JUROR:  Thank you.
20              THE COURT:  If we could go to Ms. Bradshaw.  Good
21    morning.
22              PROSPECTIVE JUROR:  Good morning.
23              My name is Jill Bradshaw.  I live in Lake Worth.
24    I've been there about 15 years.  I have college education.  I
25    am employed.  I am an office manager.  I'm married.  My
```

```
 1   husband works in commercial air conditioning.  I have a
 2   stepson, he is an adult, and he works for fire sprinkler.
 3   I've never sat on a jury.  I've never been involved in a
 4   lawsuit.  I have no disabilities, I have no personal views or
 5   opinions that would affect the outcomes or be impartial to the
 6   parties, I would be able to follow the law, and there's no
 7   reasons that I could not sit as a juror.
 8           THE COURT:  What type of business do you work as an
 9   office manager?
10           PROSPECTIVE JUROR:  Heavy equipment, the local
11   caterpillar dealer, Kelly Tractor.
12           THE COURT:  And what other type of work have you
13   done, if any?
14           PROSPECTIVE JUROR:  Before that, I'm a mechanical
15   contractor, and before that, hotel business.
16           THE COURT:  All right.  Thank you.
17           PROSPECTIVE JUROR:  You're welcome.
18           THE COURT:  Mr. Sellers, good morning, sir.
19           PROSPECTIVE JUROR:  How you doing?
20           THE COURT:  Fine.  Yourself?
21           PROSPECTIVE JUROR:  Yes, my name is Robert Sellers.
22   I live in Belle Glade, Florida.  I've been living there for
23   the last 27 years, and my background, I'm prior military,
24   graduated from Glade Central High School.  I own my own
25   trucking business, but due to a recent heart attack --
```

```
 1              THE COURT:  I'm sorry, can you hold that up a little
 2    closer to you?  I'm having trouble hearing you.
 3              You said you have your own trucking business and?
 4              PROSPECTIVE JUROR:  Yes, and due to a recent heart
 5    attack, I have stopped trucking.
 6              THE COURT:  Okay.
 7              PROSPECTIVE JUROR:  And I'm married.  I've been
 8    married now for 28 years.  And my wife doesn't work.  Right
 9    now I'm disabled.  I have six kids, five of them in college
10    now, engineering and nursing.
11              I've never been on a jury.  I've never been selected
12    for a jury.  I never sued anyone.  I don't have any
13    disabilities sitting on this jury to help out with this case,
14    other than the heart condition.  That's it.
15              Based on this case, yes, I can give you a fair
16    opinion, you know.
17              Yes, I would be able to follow the law and whatever
18    the Court render, and there's no reason I can't be a juror.
19              THE COURT:  Okay.  Sir, you said that you never sued
20    anyone.  Has anyone ever sued you?
21              PROSPECTIVE JUROR:  I never sued anyone, but I had
22    an issue once with a landlord.  He was a slumlord at the time,
23    I didn't make it to the case in time.  I was like five minutes
24    late due to a blowout on the car that I was there and they
25    ruled in his favor.
```

```
 1              THE COURT:  Okay.  So a landlord sued you over some
 2   rent issue, or what was the issue involved?
 3              PROSPECTIVE JUROR:  I was suing him.  I paid the
 4   money to the Court.  I was suing him to repair the facility,
 5   and being that I held the money up in the court system until
 6   he could get the building fixed.  But being that I was late
 7   getting there, they just gave him the money and just ruled him
 8   out as the slumlord.
 9              THE COURT:  Okay.  So you did sue your landlord at
10   one time.  You did sue somebody, your landlord.
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  And you were trying to get him to repair
13   the place where you were living?
14              PROSPECTIVE JUROR:  Right.
15              THE COURT:  And you got to the case too late, and so
16   they ruled in his favor and gave him the money that you had
17   put into the registry of the Court?
18              Okay.  Anything about that experience, the way that
19   turned out, that would affect your ability to be a fair juror
20   in this case?
21              PROSPECTIVE JUROR:  No, I didn't have no ill feeling
22   about it, because I knew the guy, you know.  It was all right,
23   you know, but I would have liked to him to fix the building,
24   that's it.
25              THE COURT:  But will you hold that against anybody
```

```
 1    in this case that you didn't --

 2              PROSPECTIVE JUROR:  No.

 3              THE COURT:  -- you got treated the way you did in

 4    that case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  It won't affect you in this case?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  You mentioned that you had a recent

 9    heart attack.  Anything about your heart condition that would

10    affect your ability to sit for a few days and listen to the

11    evidence and pay attention and make a decision?

12              PROSPECTIVE JUROR:  No, if anything was to come up.

13    I take nitroglycerin if it was to come up.  If I have an issue

14    I just take nitroglycerin or something.  Hopefully, it will

15    resolve.

16              THE COURT:  If you're on the jury and you have any

17    kind of issue like that, let us know so we can take a break

18    and let you take whatever medication you need, all right?

19              PROSPECTIVE JUROR:  Sure thing.

20              THE COURT:  If you do take that medication does it

21    affect your ability to pay attention or make you sleepy or

22    groggy or anything like that?

23              PROSPECTIVE JUROR:  No, it usually just runs your

24    blood pressure -- give you a little, light headache, other

25    than that but it doesn't -- you know, it doesn't do anything.
```

```
 1              THE COURT:  You'd be able to pay attention, follow
 2    what's going on?
 3              PROSPECTIVE JUROR:  Sure.
 4              THE COURT:  Thank you, sir.
 5              Ms. Shappell, good morning.
 6              PROSPECTIVE JUROR:  Good morning.  I'm Peggy
 7    Shappell, and I live in Loxahatchee, Florida.  I've been there
 8    for about 30, 31 years.  I have a master's degree.  My degree
 9    is in social work.  I am employed.  I'm an outpatient
10    therapist.  I work for a mental health organization called
11    Chrysalis Health, which is located, the main office is located
12    in Broward, but I work out of the Palm Beach County office.
13    I've been there about a little over four, four and a half
14    years, but I've worked in the field of social work and
15    counseling for, I don't know, maybe 35, 38 years, something
16    like that.
17              I am married.  My husband works from home.  He works
18    in computers.  He's a program manager for a company that runs
19    insurance -- not insurance, lab work, like Quest and other
20    sorts of kinds of insurance or lab medical things.  I'm not
21    sure what he really does.  He's on the phone a lot.  He works
22    a lot of hours.
23              I do have two adult children.  My older son is a
24    biologist.  He works for an engineering firm where he does
25    natural resource surveys and reports for, like, the State of
```

1   Florida or the -- I can't think of what the name of the agency

2   is.  A lot of letters.  Or he has to write surveys about the

3   environmental conditions where they're doing buildings and

4   things like that.  Mostly roads and various things like that.

5   But he loves his little job, out tromping through the woods.

6          My younger son is -- has a couple years of college,

7   never finished.  He works for a tool company as a technician.

8   So he fixes a lot of tools, and that's what he does.

9          Involved in a lawsuit?  Kind of.  The insurance

10  companies sued someone, and there was a judgment in my favor

11  for, I don't know, $2500 or something like that like 20, 30

12  years ago, but I never got a dime of it.

13         Let's see, have I been sued?  No.  Have I been a

14  witness?  Yes.  I worked for the State of Florida child

15  welfare services, DCF.  I worked for them for almost 20 years,

16  and so I was involved with a lot of juvenile court and

17  delinquency issues, some family court issues with divorce and

18  adoption and various different things over the 20 years.  So

19  I've been a witness many times.

20         Do I have any disabilities?  No.  I would be able to

21  sit as a juror.  I don't really have any strong involvement

22  with this type of case, although I've owned horses from the

23  time I was a child.  I have an elderly horse at the moment.

24  Only rode for pleasure myself, but I know people who have been

25  in the horse show business, that sort of thing.  You know, I

```
 1   was just a spectator, wasn't super involved in their -- their

 2   showing and that sort of thing.

 3              I would be able to follow the law.  Any reason I

 4   couldn't serve as a juror?  Like I said, I'm an outpatient

 5   therapist, so I am paid on a fee-for-service basis, so if I

 6   don't work I don't get paid.

 7              So like today I had to cancel all of my clients.  So

 8   if I had to be every day, I would not have any income.

 9              I could work some evening hours if I knew that we

10   would be out in time to plan and schedule clients, but it

11   would be very difficult for me to reorganize my cases, and I'm

12   currently assigned 33 or 34 Children and Families that I work

13   with.  So it's very involved.

14              THE COURT:  All right.  If you don't work for the

15   next five or six days, is that going to be a financial

16   hardship for you?

17              PROSPECTIVE JUROR:  Yes.  Because I carry the

18   insurance for our family, and I would have no money to pay for

19   that.  My agency does not pay me for this time I'm not

20   working.

21              THE COURT:  All right.  Let me ask you a few

22   questions about your background.

23              You said that your insurance company sued on your

24   behalf and got a judgment against someone but you never saw

25   the money?
```

```
 1              PROSPECTIVE JUROR:  Yes.
 2          THE COURT:  Does the insurance company pay you on a
 3    claim that you made, and then they went after the person that
 4    caused an accident and --
 5              PROSPECTIVE JUROR:  Yeah, I think that was probably
 6    what happened, but he was found negligent.  It was like an
 7    18-year-old who fled the scene or something.  I don't know.
 8    It was 30 years ago, so I don't really remember a lot of the
 9    details.  I just know I never won that little piece of paper
10    that came after the suit.
11          THE COURT:  But the insurance company had paid you
12    for the claim that you had --
13              PROSPECTIVE JUROR:  Well, we had replaced our car,
14    but there obviously were some -- that was some money that
15    came, minor money.  It wasn't more than two or $3000, I don't
16    think.
17          THE COURT:  All right.  Is there anything about that
18    experience that would affect your ability to be fair?
19              PROSPECTIVE JUROR:  No, not at all.
20          THE COURT:  So you said that you were a witness for
21    DCF on many occasions.  Anything about your experience as
22    being a witness, the way you were treated, the way you were
23    handled by attorneys that might cause you any resentment or
24    affect your ability to be fair in this case?
25              PROSPECTIVE JUROR:  No, just was very involved in
```

```
 1   the court system.
 2          THE COURT:  Anything about your experience with the
 3   Court system, the way cases turned out that, again, might
 4   affect your ability to be fair in this case?
 5          PROSPECTIVE JUROR:  No, I had a couple rough
 6   attorney experiences over the years, but, you know, that was
 7   water under the bridge.
 8          THE COURT:  Would you hold it against any lawyers in
 9   this case?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  So you said you have owned horses
12   yourself in the past.
13          PROSPECTIVE JUROR:  Yes.
14          THE COURT:  How many horses have you owned?
15          PROSPECTIVE JUROR:  Well, growing up we -- I lived
16   on a farm in the midwest, so we had several different horses
17   growing up, but then when I lived here in Florida I've owned
18   three.
19          THE COURT:  And these were horses that you just rode
20   for pleasure?
21          PROSPECTIVE JUROR:  Pleasure horses, yes.
22          THE COURT:  Never involved in competitions of any
23   kind?
24          PROSPECTIVE JUROR:  Oh, no, I wasn't that good.
25          THE COURT:  But you said that you know people who
```

```
 1   are involved in owning horses and competing with the horses?

 2            PROSPECTIVE JUROR:  Yes, I do, Paso Finos.

 3            THE COURT:  What is that?

 4            PROSPECTIVE JUROR:  They're kind of exotic trotters.

 5            THE COURT:  Okay.

 6            PROSPECTIVE JUROR:  One of my horses was a race

 7   horse from the track down in Broward, but I never really

 8   competed.

 9            THE COURT:  Now, was a Paso Fino, is that a horse

10   that races, or is that a horse that does this dressage-type

11   competition?

12            PROSPECTIVE JUROR:  They do show.  They do cart

13   racing or cart shows where they have to do certain maneuvers.

14   They don't jump, at least my friends don't jump.  They've

15   shown in costume class, they've shown in -- I don't know what

16   they call it, some sort of period dress where they dress like

17   in the 19-whatevers, or whatever.  So I've only gone to see

18   them several times.  I've been out to the Wellington to the

19   equestrian festivals and seen the jumpers and things out

20   there.

21            THE COURT:  But you've never -- your friends don't

22   engage in the jumping-type competitions?

23            PROSPECTIVE JUROR:  No.

24            THE COURT:  And you've never engaged in a

25   jumping-type competition?
```

```
 1                PROSPECTIVE JUROR:  Oh, no, I'd fall.

 2                THE COURT:  But you've observed jumping

 3    competitions?

 4                PROSPECTIVE JUROR:  Oh, yeah.

 5                THE COURT:  How often do you go to those type of

 6    competitions?

 7                PROSPECTIVE JUROR:  Oh, maybe once or twice a year.

 8                THE COURT:  Do you know anything in your experience

 9    about the value or the cost of these types of horses?  And I'm

10    not asking you to tell me what those are, I'm just saying do

11    you have some idea based on your experience of how much these

12    horses cost?

13                PROSPECTIVE JUROR:  Well, I know what it costs to

14    feed my horse.

15                THE COURT:  I'm not talking about the feeding, I'm

16    talking the purchase.

17                PROSPECTIVE JUROR:  Well, those horses are very,

18    very expensive, I'm aware of that.  You know, I've seen like

19    the race horses and have read about the cost of purchasing

20    them and the cost of training and maintaining them, yes.

21                THE COURT:  So you have some understanding based

22    upon your experience?

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  Do you feel that based upon your

25    experience you would have some predisposition in this case, or
```

```
 1    would you be able to listen to the evidence and weigh it and
 2    come up with an independent evaluation?
 3              PROSPECTIVE JUROR:  I don't believe I would have a
 4    problem with that.
 5              THE COURT:  Again, your issue is financial hardship
 6    of being here.
 7              PROSPECTIVE JUROR:  That would be correct.
 8              THE COURT:  Okay.  All right.  Thank you, ma'am.
 9              Is it Ms. Chepren?
10              PROSPECTIVE JUROR:  Hi.  Good morning.  My name is
11    Lisa Chepren, and I have lived in Delray Beach for the past 15
12    years.  I have some college education.  I'm employed in the
13    financial services industry as a portfolio associate.  I'm
14    unmarried with no children.  I have sat on a jury.  It was a
15    real estate case, civil.  Never have been involved in a
16    lawsuit.  No disabilities.  I feel I can be impartial and can
17    follow the law, and there's no reason why I shouldn't be able
18    to sit on this case.
19              THE COURT:  All right.  Can you tell me a little
20    about your job; portfolio manager, is that what you said?
21              PROSPECTIVE JUROR:  Portfolio associate.  I assist a
22    financial adviser at Morgan Stanley.  Basically, it's an
23    administration position, sales support, marketing, things of
24    that nature.
25              THE COURT:  All right.  And how long have you done
```

```
 1   that?
 2              PROSPECTIVE JUROR:  For about 23 years.
 3              THE COURT:  Did you say you were married or not
 4   married?
 5              PROSPECTIVE JUROR:  I'm unmarried, no.
 6              THE COURT:  Your jury experience, what kind of a
 7   case was that again?
 8              PROSPECTIVE JUROR:  It was a real estate, civil.
 9              THE COURT:  Did you and the other jurors reach a
10   verdict?
11              PROSPECTIVE JUROR:  We did.
12              THE COURT:  Were you the foreperson?
13              PROSPECTIVE JUROR:  I was not.
14              THE COURT:  Anything about that experience that
15   would affect you in this case in any way?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  All right.  Thank you.
18              PROSPECTIVE JUROR:  Thank you.
19              THE COURT:  Mr. Jones, good morning, sir.
20              PROSPECTIVE JUROR:  Good morning.  My name is Jason
21   Jones.  I live in Boynton.  I've lived there for about 10
22   months.  I have a master's degree in accounting, and I am a
23   CPA.  I'm currently the director of revenue for Citrix
24   Systems.  I am married.  I have a two-year-old.  My wife
25   works.  She's a recruiter.
```

```
 1              I've never sat on a jury before, I've never been
 2    involved in a lawsuit.  I don't have any disabilities.  When I
 3    heard the description of the case I did have some initial
 4    strong reactions religiously.
 5              THE COURT:  Don't tell us about it.  We'll talk to
 6    you about that separately.  All right?
 7              PROSPECTIVE JUROR:  Okay.
 8              I would be able to follow the law, and I don't think
 9    there's any reason why I couldn't sit on the case.
10              THE COURT:  All right, sir; you said you lived in
11    Boynton for three months.  Where did you live before that?
12              PROSPECTIVE JUROR:  Ten months.
13              Bought a house 10 months ago and then before that
14    was in Boca for about six years.
15              THE COURT:  But you've been in Palm Beach County?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  We'll talk to you separately about what
18    you said your reactions were to the description of the case,
19    all right?  Thank you, sir.  We'll talk to you later.
20              Mr. Friedlander, good morning sir.
21              PROSPECTIVE JUROR:  Good morning.  My name is Andrew
22    Friedlander.  I live in Boynton Beach for the past year.  I
23    have a bachelor's degree.  I'm not employed, but I'm supposed
24    to start a new job tomorrow.  I'm not married.  I don't have
25    adult children.  I have never sat on a jury.  I was almost
```

```
 1    involved in a lawsuit.  I do have a disability.  I do not have
 2    any views that would affect this case.  I would be able to
 3    follow the law, and as far as number 12, I have been out of
 4    work for the past year, and I'm supposed to start a job
 5    tomorrow.
 6            THE COURT:  Timing isn't great here, is it?
 7            PROSPECTIVE JUROR:  No.
 8            THE COURT:  What type of a job are you starting
 9    tomorrow?
10            PROSPECTIVE JUROR:  With the Florida Panthers.
11            THE COURT:  Down in Broward?
12            PROSPECTIVE JUROR:  Yes.
13            THE COURT:  What type of work are you going to be
14    doing for them?
15            PROSPECTIVE JUROR:  Manager of ticket operations.
16            THE COURT:  All right.  So maybe a little difficult
17    for you starting a new job and not showing up on the first day
18    of work, huh?
19            PROSPECTIVE JUROR:  Kind of.
20            THE COURT:  Okay.
21            What type of work have you done in the past?
22            PROSPECTIVE JUROR:  Ticket operations for the past
23    12 years with different teams.
24            THE COURT:  You said you have a disability.  What
25    disability is that?
```

```
 1              PROSPECTIVE JUROR:  I'd rather discuss that in
 2   private, if possible.
 3              THE COURT:  Sure.
 4              Thank you, sir.
 5              PROSPECTIVE JUROR:  Thank you.
 6              THE COURT:  Is it Mr. Simile?
 7              PROSPECTIVE JUROR:  Simile, correct.
 8              THE COURT:  Good morning, sir.  How are you?
 9              PROSPECTIVE JUROR:  Good morning.  My name is John
10   Simile.  I live in West Boynton Beach for 25 years.  I have a
11   high school diploma and about a year and a half of college.
12   I'm employed for Costco for 29 years this August.  Right now
13   I'm in member services.  I'm married 30 years next year.  My
14   spouse works for Interdecker Apparel in Miami, it's a clothing
15   industry.  I have two children, 26 and 22, both boys.  They
16   both work.
17              Never sat on a jury before.  No lawsuits or
18   anything, been sued or nothing like that.  I had a heart
19   attack.  I have anxiety.  I love horse racing, just racing.
20   And I have no problems sitting around, except for my anxiety.
21   But I can control that.
22              THE COURT:  All right, sir.
23              You said you had two adult sons.  What do they do
24   for a living?
25              PROSPECTIVE JUROR:  One's doing mortgages, but they
```

```
 1    got business degrees from FAU, and the other one just

 2    graduated.  He's doing some waitering now.

 3              THE COURT:  All right.  You said you have some

 4    anxiety issues but you can control it.  Do you think it's

 5    going to be difficult for you to be sitting on a jury and

 6    listening to the evidence and having to make a decision?  Is

 7    that going to be too much for your anxiety?

 8              PROSPECTIVE JUROR:  I don't know.  As long as it's

 9    not an airplane, I might be all right.  If I can take my

10    medicine I should be fine.

11              THE COURT:  Can you say that again about an

12    airplane?

13              PROSPECTIVE JUROR:  As long as I'm not sitting on an

14    airplane for eight hours.

15              THE COURT:  Well, you won't.

16              PROSPECTIVE JUROR:  I might be able to handle it.  I

17    just got kicked off a plane last month for my anxiety.

18              THE COURT:  All right.  But do you know -- knowing

19    the nature of what a jury has to do, you sit over here and

20    listen to the witnesses testify, you listen to the attorneys'

21    arguments, then you have to go in with the other jurors at the

22    end and sit and discuss the case and come to a decision.  Do

23    you think that's going to be too difficult for you or you can

24    handle it?

25              PROSPECTIVE JUROR:  I can try, sure.
```

```
 1                 THE COURT:  All right.  Well --
 2                 PROSPECTIVE JUROR:  Yes, I could do it.
 3                 THE COURT:  You think so, okay.
 4            Then you said you like horse racing.
 5                 PROSPECTIVE JUROR:  Just racing, yeah.
 6                 THE COURT:  Do you follow horse competitions?
 7                 PROSPECTIVE JUROR:  Every night.  No, no.
 8                 THE COURT:  The jumping and that kind of show horse?
 9                 PROSPECTIVE JUROR:  No, Gulf Stream, Saratoga
10   Aqueduct.
11                 THE COURT:  The fact that you like horse racing,
12   would that cause you to favor one side or the other in this
13   case?
14                 PROSPECTIVE JUROR:  No, I don't think so.  I lost
15   plenty of money.
16                 THE COURT:  That's betting on horses.
17                 PROSPECTIVE JUROR:  Betting on horses, yes.
18                 THE COURT:  Thank you, sir.
19            Ms. McMillian, we have another McMillian here.
20                 PROSPECTIVE JUROR:  Yes, good morning.
21                 THE COURT:  Good morning.  How are you?
22                 PROSPECTIVE JUROR:  I'm okay.  My name is Asia
23   McMillian.  I live in Riviera Beach, and I have lived there
24   for the last 25 years.  I have a master's degree.  I'm
25   employed by the Palm Beach County School District.  I work
```

```
 1   with adults.  I'm single.  I have one living adult son.  He
 2   works, he's self-employed.  He works with computers.
 3             I've never sat on a jury.  I have been involved in a
 4   lawsuit.  I was a codefendant, civil case.
 5             I have no disabilities.  I have no personal views,
 6   opinions or attitudes that would affect my ability to be fair
 7   and impartial.  I can follow the law as instructed, and there
 8   is no reason I should not sit on this jury.
 9             THE COURT:  Are you the teacher?
10             PROSPECTIVE JUROR:  I work -- I'm a program
11   coordinator for adults, ESOL and -- English speakers and GED.
12             THE COURT:  How long have you done that?
13             PROSPECTIVE JUROR:  Thirty-one years.
14             THE COURT:  You said you were a codefendant in a
15   lawsuit.  What was that about?
16             PROSPECTIVE JUROR:  Okay.  A friend of mine's, we
17   had a joint account, boyfriend, joint account, and he wrote a
18   check to a travel agency that I knew nothing about.  Anyway,
19   we got sued, and we lost, but he had to pay.
20             THE COURT:  And the check bounced?  What was the --
21             PROSPECTIVE JUROR:  Check bounced, yes.
22             THE COURT:  So that was what the lawsuit was about?
23             PROSPECTIVE JUROR:  Uh-huh.
24             THE COURT:  Yes?
25             PROSPECTIVE JUROR:  Yes, I'm sorry.
```

```
 1              THE COURT:  Anything about that case that would
 2    affect your ability to be fair in this case?
 3              PROSPECTIVE JUROR:  No, I didn't have an issue with
 4    the plaintiff, only the defendant.
 5              THE COURT:  Your codefendant.
 6              PROSPECTIVE JUROR:  My codefendant.
 7              THE COURT:  So you're not going to blame the person
 8    who sued you?
 9              PROSPECTIVE JUROR:  No, sir.
10              THE COURT:  Thank you, ma'am.
11              All right.  Ladies and gentlemen, I want to thank
12    you for going through those questions with me.  We're going to
13    take a break before we continue.  Our court reporter's been
14    going for close to two hours now, so he needs to get a little
15    bit of a break.
16              So I'm going to ask you to follow a couple of rules
17    while we're on break.  Do not discuss this case among
18    yourselves or with anyone else, do not form any opinions about
19    the case, do not call -- if you call work or home or friends
20    and tell them you're being considered to sit on a jury, do not
21    discuss the nature of the case with them because we don't want
22    them to say something to you about this kind of a case that
23    might influence you.  And do not get on your cellphones or
24    iPads or any electronic devices that you might have and
25    conduct any research about any of the individuals that have
```

```
1    been mentioned to you thus far or about the subject matter of

2    horses and competitions and anything of that nature.

3              Don't do any independent research.  Whatever you

4    need to know about this case will be presented to you in the

5    courtroom if you're selected.

6              And, lastly, if you see any of the attorneys or

7    their clients anywhere outside the courtroom and they don't

8    acknowledge you, they don't say hello, they actually walk the

9    other way and avoid you, it's not -- they're not being rude,

10   they're not being discourteous.  They're obligated to avoid

11   contact with you.  So please understand that.  Don't think

12   they're -- don't think they're being rude or discourteous to

13   you, because it's part of their job to avoid any contact with

14   you, so please understand that.

15             So let's take a 15-minute recess.  If you could be

16   back outside in 15 minutes, and we'll continue with this

17   process.  Thank you very much.

18        (The venire exits the courtroom.)

19             THE COURT:  Please be seated, everyone.

20             Anything we need to discuss right now?

21             MR. HART:  Your Honor, if I may, were you planning

22   to do the individual questioning of the prospective jurors

23   that we identified as needing some further follow-up before

24   you allowed us to ask questions or how were you planning to do

25   that?
```

```
 1              THE COURT:  No, I was going to do that at the end
 2  when we finished.
 3              MR. HART:  Thank you.
 4              THE COURT:  Okay.  All right.  So we'll see you in
 5  about 15 minutes.  Thanks.
 6              MR. CATANESE:  Thank you, Your Honor.
 7      (A recess was taken from 11:00 a.m. to 11:22 a.m., after
 8  which the following proceedings were had:)
 9              THE COURT:  Please be seated, everyone.
10              Are we ready to bring the jurors back in?
11              MR. CATANESE:  Yes, Your Honor.
12              THE COURT:  Defense ready?
13              MS. CORTVRIEND:  Yes, Your Honor.
14              MR. HART:  Yes, Your Honor.
15              THE COURT:  Bring the jurors back in, please.
16        (The venire enters the courtroom.)
17              THE COURT:  Welcome back, everyone.  Please be
18  seated, ladies and gentlemen.
19              Thank you again for your cooperation, everyone.  We
20  appreciate your willingness to be considered to act as jurors
21  in this case.
22              What I would like to do is ask some general
23  questions to the entire group, and then after I've gone
24  through those additional questions, the attorneys will have
25  some additional follow-up.
```

```
 1              I should have asked this early on before we began,
 2    but I'll ask now.  Does anyone know any of the people that
 3    have been introduced to you today?  Any of the attorneys, any
 4    of the clients, anyone you see here in the courtroom?
 5              PROSPECTIVE JUROR:  (Hundley) I know your children.
 6              THE COURT:  Ms. Hundley, okay.
 7              PROSPECTIVE JUROR:  They went to school together.
 8              THE COURT:  Is it Jennifer, Jessica?
 9              PROSPECTIVE JUROR:  Jessica, yes.  John Michael was
10    . . .
11              THE COURT:  Yes, I wasn't sure if you were -- is
12    your husband Mike?
13              PROSPECTIVE JUROR:  Paul.
14              THE COURT:  Okay.  Got that wrong.  Sorry.  Jessica,
15    right?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  Went to school with one of my sons.  How
18    is she doing, by the way?
19              PROSPECTIVE JUROR:  Good.  She's getting married.
20              THE COURT:  Is she?  Congratulations.
21              So the fact that we've had some interaction in the
22    past, anything about that which would affect your ability to
23    be fair in this case?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  Anything that would affect your ability
```

```
 1   to follow my instructions and abide by my instructions in the
 2   case?
 3                PROSPECTIVE JUROR:  No.
 4                THE COURT:  Okay.  Thank you.
 5                Anyone else?
 6                All right.  So a couple of you indicated that you
 7   have had -- either owned horses or ridden horses.  Is there
 8   anyone else that has -- we haven't already spoken to that has
 9   owned a horse in the past?  No one else.
10                All right.  Is there anyone else who rode horses on
11   a regular basis other than there's maybe an occasional
12   vacation or something, you went on a -- rode a horse, but rode
13   regularly?
14                Okay.  Is it Ms. Isaacs?
15                PROSPECTIVE JUROR:  Yes.
16                THE COURT:  Yes, ma'am.
17                PROSPECTIVE JUROR:  When I was a child, maybe 10.
18                THE COURT:  And --
19                PROSPECTIVE JUROR:  Not since then, no.  Like,
20   lessons.
21                THE COURT:  You took riding lessons, yes?
22                PROSPECTIVE JUROR:  Yes.
23                THE COURT:  All right.  Did you -- you never owned
24   your own horse, though?
25                PROSPECTIVE JUROR:  No.
```

```
 1              THE COURT:  All right.  Anything more than just a
 2   few lessons, and that was it?
 3              PROSPECTIVE JUROR:  I took lessons for, I think
 4   about a year.  I was in one, like, little show at the place
 5   that we had lessons.
 6              THE COURT:  Okay.  And when you say a show, what did
 7   you do in the show?
 8              PROSPECTIVE JUROR:  I think we went around the
 9   track.  We galloped.  Nothing too exciting.
10              THE COURT:  You wouldn't do any jumping?
11              PROSPECTIVE JUROR:  No.
12              THE COURT:  Anything about that experience that
13   would influence your ability to be fair in this case?
14              PROSPECTIVE JUROR:  No.  I think I would have a hard
15   time if the animal was mistreated in any way, but other than
16   that, no.
17              THE COURT:  All right.  Thank you.
18              Anyone else who has taken riding lessons or has
19   ridden on a regular basis horses?
20              Okay.  Mr. West, is it?
21              PROSPECTIVE JUROR:  Yes, sir.
22              THE COURT:  Why don't you get that microphone, sir.
23              PROSPECTIVE JUROR:  I also worked for a land
24   developer and developed a thoroughbred horse ranch for a
25   former Wellington resident, and I did dressage training
```

1  facilities that I built also.  I know that's -- I just wanted

2  full disclosure.

3           THE COURT:  So you built and helped construct those

4  type of facilities?

5           PROSPECTIVE JUROR:  Correct, sir.

6           THE COURT:  But you didn't actually participate in

7  those kind of activities?

8           PROSPECTIVE JUROR:  No, I did not, sir.

9           THE COURT:  Did you ever watch or observe those kind

10 of horse shows and jumping competitions?

11          PROSPECTIVE JUROR:  Just the training on the

12 property.

13          THE COURT:  How often did you see that?

14          PROSPECTIVE JUROR:  On a daily basis.  I was there

15 for almost 18 months developing the property as well as the

16 horses once they came in.  It was probably a good 11 months

17 that I was there that they were training there.

18          THE COURT:  In observing those horses and their

19 activities, did you feel like you developed any type of

20 expertise about how these horses conduct themselves or how

21 they're supposed to be able to work -- jump and run?

22          PROSPECTIVE JUROR:  Not in any way, just that they

23 were beautiful animals.

24          THE COURT:  Did you pick up any information about

25 how much they cost?

1            PROSPECTIVE JUROR:  I do have an idea on the dollar

2      value of the horses that the owner had.

3            THE COURT:  Based upon this particular --

4            PROSPECTIVE JUROR:  Conversations with the owner and

5      his daughter who was competing in dressage.

6            THE COURT:  Do you know if there was buying and

7      selling during the time period that you were working there?

8            PROSPECTIVE JUROR:  There was a couple of horses

9      that came and went, but I'm not sure if they were acquisitions

10     or . . .

11           THE COURT:  And did you discuss with them the prices

12     of the horses that were being -- coming and going?

13           PROSPECTIVE JUROR:  Not specifically, no.

14           THE COURT:  Okay.  All right.  Thank you.

15           Anyone else who has had experience with horses?

16           Does anyone here, either yourself or any family

17     members, work in that equine or horse-related industries?  No?

18           Okay.

19           Anyone whose family members, you know, ride

20     regularly, if you don't personally, but you have a family

21     member who rides horses regularly, has experience with horses?

22           I don't see anyone.

23           Does anyone here other than I think it was our

24     occupational therapist who -- Ms. Shappell, who says that

25     she's gone to the shows, and maybe Ms. Sorte, you've gone to

1  the shows.  Anyone else who goes to the Wellington equine

2  horse festival-type shows?

3         Okay.  That's Mr. Duvall.  Yes, sir.

4         PROSPECTIVE JUROR:  Yes.

5         THE COURT:  How often have you gone?

6         PROSPECTIVE JUROR:  Probably about three times.  I'm

7  on the board of the business development board, and they have

8  an event out there every year.

9         THE COURT:  Okay.  And do you do anything other than

10 casually observe?

11        PROSPECTIVE JUROR:  That's all I do, casually

12 observe.

13        THE COURT:  Do you feel like you've had any

14 specialized knowledge or understanding of the animals?

15        PROSPECTIVE JUROR:  No.

16        THE COURT:  Or how they're cared for, what their

17 value is?

18        PROSPECTIVE JUROR:  I think I have, people have

19 mentioned to me some of the value of the jumpers, I think.

20        THE COURT:  So you have some exposure to what people

21 say they may cost or what they're worth?

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Okay.  And, again, could you, based upon

24 what you may have heard, can you base your decision on

25 evidence presented here and not base it on what you may have

```
 1    heard outside from outside sources?
 2              PROSPECTIVE JUROR:  I can base it on what we hear
 3    here.
 4              THE COURT:  You can?
 5              Okay.  Mr. West, same with you.  If you're on the
 6    jury, can you base your decision on the evidence that's
 7    presented here and not based upon what you might have heard
 8    from other sources that people that you know?
 9              PROSPECTIVE JUROR:  Yes.  Yes, sir.
10              THE COURT:  All right.  Thank you.
11              Are any of your family members veterinarians, or
12    close friends veterinarians?  I don't see anyone.  All right.
13              Is there anyone here who feels that putting horses
14    through either horse racing or these competitions, where the
15    horses jump and have to compete, is cruel, and because of your
16    personal views don't think that animals should be put in those
17    situations where they have to compete or run races and things
18    of that nature?  That it's cruel?  Okay.  That's Mr. Jones.
19              Is that something that was kind of your strong
20    reaction that you may have indicated to us earlier?  Is that
21    connected to your strong reactions you stressed earlier?
22              PROSPECTIVE JUROR:  Yes.
23              THE COURT:  We'll talk to you more specifically
24    about that later.  Thank you.
25              Okay.  Ms. Sorte?
```

```
 1              PROSPECTIVE JUROR:  I've -- the reaction I have is
 2   towards animal welfare in general.  I know that there are
 3   owners that do treat their animals very well, and they live
 4   very good lives, but if there is some sort of cruelty, that is
 5   something that I do struggle with.
 6              THE COURT:  Okay.  Are you saying if, if you see
 7   that there's cruelty?
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Okay.  But do you have a view that
10   horses and animals in general, you know, they have dogs that
11   race and horses that race?
12              PROSPECTIVE JUROR:  I'm not very -- I'm not a fan of
13   it.
14              THE COURT:  So you're not a fan of --
15              PROSPECTIVE JUROR:  Dog racing, horse racing
16   specifically.
17              THE COURT:  Or what about these competitions,
18   dressage-type showing competitions?
19              PROSPECTIVE JUROR:  I don't really -- I don't have
20   an opinion just because I don't know about that, and the
21   experience I have had, they are actually taken very good care
22   of, but I know there are different kinds of owners, but I know
23   that there are certain elements that do upset me when it comes
24   to these kinds of events.
25              THE COURT:  Okay.  So would that affect your ability
```

```
 1   to be fair in this case in evaluating the evidence that's
 2   presented?
 3           PROSPECTIVE JUROR:  I don't believe so.  I would
 4   like to think no, but I don't know the details.  I don't know
 5   if there's some sort of neglect or any kind of abuse that's a
 6   factor in this case.
 7           THE COURT:  Okay.  Thank you, ma'am.
 8           All right.  And Ms. Smith?
 9           PROSPECTIVE JUROR:  Just personally, I feel that
10   it's cruel to have dogs train -- I mean -- dogs -- horses be
11   trained to, you know, do events, to race, to be shown, things
12   like that.
13           THE COURT:  And do you think that having that view,
14   it might affect your ability to be fair in this case in
15   evaluating the evidence?
16           PROSPECTIVE JUROR:  I don't think so, but I don't
17   know the details of the case, so I couldn't say a hundred
18   percent.
19           THE COURT:  But just generally speaking, you are
20   against having animals have to undergo these kind of
21   competitions?
22           PROSPECTIVE JUROR:  Correct.
23           THE COURT:  And training, yes?
24           PROSPECTIVE JUROR:  Yes, correct.
25           THE COURT:  Okay.  Thank you.
```

```
 1              Anyone else feel similarly?  No?

 2              Mr. Zendejas is from Mexico.  Is there anyone who

 3   feels that because he's from Mexico, that he shouldn't be

 4   entitled to the same rights and fair trial as anyone else

 5   who's here who's an American citizen and would feel that he

 6   shouldn't be entitled to come into a court in the United

 7   States and assert claims against American citizens?

 8              All right.  I don't see anyone who indicates that

 9   they would feel that way.

10              All right.  Well, I'm going to turn it over to the

11   attorneys and see if they have any additional questions that

12   they would like to ask you.

13              Mr. Catanese.

14              MR. CATANESE:  Thank you, Your Honor.

15              Good morning, everyone.  My name is T. Randolph

16   Cantonese.  I represent Mr. Zendejas.  Thank you for being

17   here.

18              Just a couple questions for you, and this is --

19   these are general questions to everyone.

20              Does anybody here speak Spanish?

21              Yes, ma'am.

22              PROSPECTIVE JUROR:  Four:  Sort of.

23              THE COURT:  That's Ms. Bradley?  No, Ms. Kuck.

24   That's Ms. Kuck.  I'm sorry.

25              MR. CATANESE:  Ms. Kuck, would you tell us if you're
```

```
 1  fluent in Spanish?
 2          PROSPECTIVE JUROR:  Okay.  When I was younger I took
 3  six years of it in high school and college, and since I lived
 4  in Miami, I was able to converse, and I could actually read
 5  and write it.  But since I've moved up to Palm Beach County, I
 6  am not fluent like I used to be because I really don't have
 7  that many people to practice with like I did when I lived in
 8  Dade County.
 9          MR. CATANESE:  Ms. Kuck, are you -- do you feel that
10  you're able to read the Spanish language, for example, if you
11  saw Spanish in text messages or letters or e-mails, is that
12  something that you believe that you'd be able to read?
13          PROSPECTIVE JUROR:  No, I'm not.
14          MR. CATANESE:  How would you describe your level of
15  ability to read in Spanish?
16          PROSPECTIVE JUROR:  Well, when I was younger I could
17  read actually Don Quixote in Spanish, but nowadays not really.
18  I can text a coworker in Spanish with a few -- with some
19  things, but my verbiage, the way~-- the conjugating of the
20  verbs is not as good as it used to be.
21          MR. CATANESE:  And, I'm sorry, Ms. Screciu?
22          PROSPECTIVE JUROR:  Screciu, yes.
23          MR. CATANESE:  What is your level of proficiency in
24  Spanish?
25          PROSPECTIVE JUROR:  I'm very fluent in Spanish.
```

1              MR. CATANESE:  Would you say that you speak Spanish

2    as well as you speak English?

3              PROSPECTIVE JUROR:  Not really, but I'm originally

4    from Romania and Romanian is a Latin language, and my

5    daughter's father is from Colombia.  We were together for four

6    years, and his mother didn't speak any English, so I picked it

7    up, and now I speak it on a daily basis.

8              MR. CATANESE:  Do you also -- what's your opinion as

9    to your level of reading Spanish?

10             PROSPECTIVE JUROR:  I can read it.

11             MR. CATANESE:  So do you believe you wouldn't have

12   any trouble reading text messages or e-mails or printed

13   documents that were in the Spanish language?

14             PROSPECTIVE JUROR:  No.

15             MR. CATANESE:  Thank you.

16        Does anybody else have any belief that they can

17   speak Spanish or read Spanish?  Thank you.  Oh, I'm sorry,

18   yes, ma'am.

19             PROSPECTIVE JUROR:  I took Spanish in -- I took

20   Spanish in high school and college, but -- so it was very

21   basic.

22             THE COURT:  That Ms. Macallister?

23             PROSPECTIVE JUROR:  Yes, Irene.

24             MR. CATANESE:  Ms. Macallister, do you feel that you

25   have the ability to understand the Spanish language if it's in

```
 1   written form, for example, in a text or e-mail or printed
 2   document?
 3           PROSPECTIVE JUROR:  It depends on the -- you know,
 4   it depends on how basic it is.  I can read and speak, again,
 5   very basic Spanish, but if it's really detailed, I don't know
 6   that I could decipher that.
 7           MR. CATANESE:  Okay.  Thank you.
 8           The Court had asked a question if anybody here had
 9   any, I believe it was relatives or relationships with
10   veterinarians, and I believe there was nobody that said yes to
11   that.  I just want to ask again to be sure, because I want to
12   ask some follow-up questions.  Does anybody -- I'm sorry.
13           PROSPECTIVE JUROR:  I have an aunt --
14           THE COURT:  Hold on, ma'am.  Let's get the
15   microphone.
16           PROSPECTIVE JUROR:  Sorry.  I have an aunt who was
17   married to a veterinarian, but they've both passed away, and I
18   didn't live near them, I just remember them as from my
19   childhood.
20           THE COURT:  It's Ms. Shappel.
21           PROSPECTIVE JUROR:  Peggy Shappel.
22           MR. CATANESE:  So Ms. Shappell, other than that,
23   that's your relationship you just described for us with the
24   veterinarian?
25           PROSPECTIVE JUROR:  That, and using them to treat my
```

```
 1    animals, but that's about it, yes.

 2              MR. CATANESE:  Has anybody here ever employed a

 3    veterinarian to provide any type of service, for example, a

 4    cat, a dog, a horse or any other type of animal?  Okay.  It

 5    seems like almost everyone.

 6              Okay.  Does anybody here have an opinion -- let me

 7    say it this way.  Does anybody here have a negative opinion

 8    about veterinarians because of any prior experience where you

 9    have used a veterinarian to help your pet or an animal that

10    you owned?  So, no one?

11              I'm sorry, yes, sir.  And you are, please?

12              PROSPECTIVE JUROR:  Spero Mehallis.

13              MR. CATANESE:  Yes, sir.

14              PROSPECTIVE JUROR:  I wouldn't say with my current

15    veterinarian, but with a previous veterinarian, there was one

16    that I didn't believe took care of my old dog properly, and

17    that's partially maybe due to why he passed.

18              MR. CATANESE:  Does that experience -- do you

19    believe that experience would make it unable for you to listen

20    to -- listen to a veterinarian who may come to this courtroom

21    and talk about his opinions about this case?

22              PROSPECTIVE JUROR:  Not necessarily.

23              MR. CATANESE:  Do you feel that you'd be able to

24    listen to that in an unbiased fashion and to give a fair

25    listening to whatever the veterinarian might say?
```

```
 1                PROSPECTIVE JUROR:  Yes.
 2                MR. CATANESE:  Has anybody else had an experience
 3       with a veterinarian that they believe would influence their
 4       ability to listen before they would make a decision regarding
 5       any veterinary testimony you might hear in this case?
 6                Yes, ma'am.
 7                THE COURT:  Ms. Isaacs.
 8                PROSPECTIVE JUROR:  I just wanted to answer to the
 9       two previous questions.  It's not a close relationship, but
10       the partner -- the partner of the -- the firm that my
11       husband's of counsel of, one of the wives of a partner is a
12       veterinarian.  So I don't know if you needed to know that.  I
13       just wanted to put that out there.
14                MR. CATANESE:  Thank you.
15                PROSPECTIVE JUROR:  You're welcome.
16                MR. CATANESE:  Okay.
17                Anybody have anything else to say about
18       veterinarians before I move on?  Yes, ma'am.  This is --
19                THE COURT:  Ms. Smith.
20                MR. CATANESE:  Ms. Smith?
21                PROSPECTIVE JUROR:  Yes, hi.
22                I guess I should say that my son had a bad
23       experience where he bought -- he purchased a dog, and he
24       brought it to the veterinarian that the person that he
25       purchased it from told him to go to, and that vet gave the dog
```

 1   a clean bill of health, and he later found out that the dog

 2   had a lot of health issues.

 3             MR. CATANESE:  Okay.  Do you feel that it would in

 4   any way affect your ability to listen impartially to any

 5   testimony that you might hear about from a veterinarian in

 6   this case?

 7             PROSPECTIVE JUROR:  No.

 8             MR. CATANESE:  Okay.  Very good.  Thank you.

 9             Does anybody have a hearing problem or some type of

10   hearing deficiency where it would be difficult for you to hear

11   clearly testimony given in this case or videos that might be

12   played in this case?  Yes, ma'am.

13             THE COURT:  Ms. Kuck.

14             PROSPECTIVE JUROR:  Normally I don't, but I think

15   I'm having sinus issues today.  Normally I don't, but I think

16   that I'm having sinus issues today, and it seems like my ears

17   seem clogged.  So some of -- I can hear really good the judge

18   and some, but either you're talking really low or I'm just

19   having an issue hearing you.

20             MR. CATANESE:  Okay.  Thank you very much.  I'll try

21   to speak a little louder.

22             Does anybody else have any type of hearing concerns,

23   or has everyone else heard everything so far clearly?  It

24   appears that no one is saying yes to that, so accept that.

25             Also, regarding vision, in this case if you do serve

 1     as a juror, there's going to be stuff that you'll be reading,

 2     stuff you'll be watching on the TV screens.  Does anybody have

 3     any visual issues that can't be corrected, for example, with

 4     glasses or contact lenses?  Does everybody here believe that

 5     they'll be able to see the TV screen and read okay without

 6     having any further assistance than what you normally have?

 7             Okay.  Thank you.  It appears that everybody's

 8     indicating that they can see and will have no problems with

 9     visual of the matter.

10             In this case, you may hear some testimony about the

11     value of the horse.  You may hear some other testimony about

12     values of other horses.  Some of these values might be quite

13     high.

14             Does anybody here feel that they would be unable to

15     be impartial because there's evidence in this case that one or

16     both of the parties have horses that are fairly expensive?

17     Does anybody feel that that would bias them in some way or

18     cause them not to view the facts with an unbiased opinion?

19             Okay.  Very good.

20             Also, if the facts of the case indicate that, as the

21     Court had indicated, that my client, Mr. Zendejas, is from

22     Mexico, which I'll say he is, does anybody feel, sitting here

23     today, that he doesn't have the right to be in this courtroom

24     and ask you for help in this case?  Anybody feel that he

25     doesn't have that right because he's from Mexico?  Indicates

```
1    that no one's saying yes.
2            And then, finally, if the facts of this case at the
3    end of the trial indicate that there should be an award in
4    favor of Mr. Zendejas, would anybody here feel or hesitate to
5    award Mr. Zendejas any amount of money if, for example, that
6    money amount was high or was a large sum?  Does anybody feel
7    that they would be unable to do that if you decided the facts
8    warranted it?
9            Okay.  It seems no one is saying yes to that answer.
10           So I want to thank you very much for your time and
11   your consideration.
12           THE COURT:  Thank you.
13           Mr. Hart.
14           MR. HART:  Thank you, Your Honor.
15           You have to excuse me if I lean down a little here
16   for the mike.
17           Once again, thanks for being here.
18           Importantly -- and I'll try and keep this brief --
19   in this case, Mr. Zendejas is the plaintiff, and his attorney
20   gets to go first, and this afternoon those of you who are
21   selected to serve are going to hear his opening statement
22   first, and it's going to be about 45 minutes or so
23   approximately.
24           Is there anybody here, like my wife or my daughter,
25   sometimes make up their impression before they hear the second
```

     1    side of the story?

     2            Because as you know, there's going to be a second

     3    side of this story, and it's going to be quite different.

     4    Some people do make up their mind before, and they're just

     5    quick, you know, impressions.  Anybody who feels like they

     6    couldn't wait to hear the second side of this story before

     7    they make up their mind?

     8            Good, good.

     9            And along that line, Ms. Chen, I did notice in the

    10    questions that you had a concern over anything you thought

    11    might be deceptive or I assume you would not have an issue, I

    12    mean, you'll be able to hear that second side of the story

    13    before you make up your mind in terms of allegations of any

    14    deception or nondisclosure or something of that nature?

    15            PROSPECTIVE JUROR:  Yes, I should be able to, yes.

    16            MR. HART:  Thank you.

    17            Mr. Mehallis, you were discussing sports management.

    18    I just wanted to get a little bit more of a feel for what it

    19    is you do in the sports management area.

    20            PROSPECTIVE JUROR:  I worked in corporate

    21    sponsorship on three Super Bowls.  I have my MBA in sport

    22    management, and I also teach a sport administration course at

    23    Florida Atlantic University undergrad.

    24            MR. HART:  You've been teaching that for how long,

    25    sir?

```
 1                PROSPECTIVE JUROR:  Going on eight years.

 2                MR. HART:  Moving along, Mr. Duvall, I heard you

 3     talking about when you were --

 4                THE COURT:  I'm sorry, Mr. Hart, why don't you just

 5     have a seat so it will be easier for you to stay near the

 6     microphone.

 7                MR. HART:  Thank you, Your Honor.

 8                THE COURT:  And Mr. Duvall is right there in the

 9     front.

10                MR. HART:  Mr. Duvall, I heard, I believe you were

11     saying Wells Fargo, there was an occasion in which I think you

12     had to sue attorneys.  Malpractice, was that what I was

13     understanding?

14                PROSPECTIVE JUROR:  That's correct.

15                MR. HART:  And that was on behalf of the company?

16     You were not personally suing any attorneys for malpractice,

17     correct?

18                PROSPECTIVE JUROR:  That's correct.

19                MR. HART:  Did the -- did that go to trial, or did

20     it get settled?

21                PROSPECTIVE JUROR:  Yes, it settled.

22                MR. HART:  Okay.  Did --

23                PROSPECTIVE JUROR:  It actually went to trial.  It

24     settled before.

25                MR. HART:  Did that particular experience of having
```

```
 1   to sue attorneys in any way kinda leave you with a bad feeling
 2   that might influence how you feel about attorneys in this
 3   courtroom who are presenting a case?
 4            PROSPECTIVE JUROR:  No, it wouldn't.  Just a
 5   particular situation.
 6            MR. HART:  Okay.  Excuse me one minute.
 7            Thank you.  Those are the only questions I have at
 8   this time.  Thank you.
 9            THE COURT:  Thank you.
10            Ms. Leonard?  And you can also be seated,
11   Ms. Leonard.
12            MS. LEONARD:  I don't mean to be disrespectful, but
13   I will sit.
14            Thank you again for all of you being here and
15   answering our questions.  I just had a couple very short
16   follow-up questions.
17            Mr. West.
18            PROSPECTIVE JUROR:  Yes.
19            MS. LEONARD:  I believe you said that part of your
20   current business was transporting animals?
21            PROSPECTIVE JUROR:  That's correct.  Basically in my
22   business I had a client recently call me on a Saturday, asked
23   me if I could be in South Bend, Indiana on Monday morning to
24   pick up a new dog for her.  So I flew up there the next Monday
25   morning and drove it back down.
```

1                And I also do a lot of pet sitting, house sitting,

2    taking care of animals for my clients.

3                MS. LEONARD:  Have you ever transported horses or

4    house sat for a horse?

5                PROSPECTIVE JUROR:  No, I have not.

6                MS. LEONARD:  I believe you said your business is

7    brand new?  You just started a company?

8                PROSPECTIVE JUROR:  It is brand new.  It's barely a

9    month old.  Yes.

10               MS. LEONARD:  And it would be a hardship for you to

11   be on the jury with that and your mother, taking care of your

12   mother?

13               PROSPECTIVE JUROR:  It certainly would be quite a

14   challenge for me.

15               As I said, I've already had a lot of work I've

16   committed to over the next two weeks, so . . .

17               MS. LEONARD:  I don't think I have any other

18   questions.

19               THE COURT:  All right.  Thank you.

20               See if there's something else I wanted to . . . oh,

21   yes.

22               I want to go over the names of witnesses that may be

23   called during the trial to see if any of you recognize these

24   names.  So if you recognize any of these names, please let us

25   know.

```
 1              Okay.  Again, Mr. Zendejas, you don't know him.

 2    Ms. Redman, you don't -- no one knows Ms. Redman, correct?

 3              Mr. Syquia, no one knows him.

 4              A Diego Ulibarri, who is I think a veterinarian.

 5    Does anyone know him?

 6              Jorge Gomez, I believe another veterinarian.  Anyone

 7    know him?

 8              Selina Watt, another veterinarian.  Leslie Howard.

 9    Michael (sic) Morrissey.  Katelyn Hess, Kenneth Ball.

10              Oh, I'm sorry.

11              Yes, sir.  Hold on.  Let's get the microphone for

12    you.  And that is Mr. Simile?

13              PROSPECTIVE JUROR:  Yes, sir.  Yes, Your Honor.

14              THE COURT:  Whose name?

15              PROSPECTIVE JUROR:  That was a Katelyn Hess?

16              THE COURT:  Yes.  Do you know a Katelyn Hess?

17              PROSPECTIVE JUROR:  Is she like 22 years old?

18    There's a lot of Hesses, but I do know a Katelyn Hess,

19    H-e-s-s.

20              THE COURT:  This person's name is spelled

21    K-a-t-e-l-y-n.  Is that the same spelling of the person you

22    know?

23              PROSPECTIVE JUROR:  I'm not sure.  It's one of my

24    son's friends.

25              THE COURT:  Apparently, this person lives in New
```

```
 1    York.
 2              PROSPECTIVE JUROR:  No.
 3              THE COURT:  Okay.
 4              Kenneth Ball.  Anyone know Kenneth Ball?
 5              Simon Nizri, N-i-z-r-i, Simon Nizri.  Peter Leone.
 6              I think that's everyone.  Did I miss any of the
 7    witnesses?
 8              MR. CATANESE:  Yes, Your Honor, the two experts for
 9    the plaintiffs.
10              THE COURT:  Go ahead.
11              MR. CATANESE:  Dr. Vlahos and Ms. Timpanaro.
12              THE COURT:  Does anyone know a Ted Vlahos or a Rita
13    Timpanaro?  Anyone else that I may have missed?
14              Ms. Leonard, did I miss someone else?
15              MS. LEONARD:  No, I had one more question.  I was
16    wondering if I could ask one more question.
17              THE COURT:  Sure.  Yes, you may.
18              MS. LEONARD:  My client, Mr. Syquia, is not going to
19    be able to attend the entire trial due to a previous
20    obligation.  Would any of you hold it against him if you did
21    not see him every day here in the trial?
22              Okay.  That's all I have.
23              THE COURT:  All right.  Thank you.
24              Now, there are a number of you that we needed to
25    speak to individually because you wanted to discuss things
```

```
 1    privately, and then there were certain issues that we wouldn't
 2    want to hear what you have to say, the other jurors to hear
 3    what you might have to say about some of your experiences.  So
 4    I'm going to go through my notes and see if we're all in
 5    agreement on the people that we need to speak to.
 6              We need to speak to Mr. Ozaltin, we need to speak to
 7    Mr. Mehallis.  We need to speak to Ms. Smith.  We need to
 8    speak to Mr. Jones and Mr. Friedlander.  So those of you who I
 9    just called out, those people that we need to speak to, if you
10    could wait outside the courtroom, and we'll call you in one by
11    one and speak to you individually.  Everyone else -- hold on,
12    Mr. Friedlander.
13              Everyone else, I'm going to excuse for about a half
14    an hour.  Say 12:30.  If you can -- you're being excused until
15    about 12:30.  Hopefully by 12:30 we'll have finished speaking
16    to these individuals and have made our decision about who's
17    going to be on the jury.  I can't guarantee we'll be finished
18    by then, but we'll hope to be finished by 12:30.
19              Again, don't discuss the case, don't form any
20    opinions about the case, don't do any independent research
21    about the case.  And, again, if you see any of the lawyers or
22    their clients, don't be offended if they don't acknowledge
23    you.
24              So we'll take a recess with everyone except those
25    few individuals that I've asked you to wait outside, and we'll
```

```
 1    call you in one by one.  Thank you for your cooperation.
 2         (The venire exits the courtroom.)
 3              THE COURT:  You can all be seated.
 4              Can you bring Mr. Ozaltin in?  Juror number 1.
 5              Mr. Ozaltin, why don't you just have a seat right up
 6    there.  Have a seat, sir.
 7              What was it -- you said you had some family issues
 8    that would prevent you from being on the jury.  What was it
 9    that you wanted to tell us?
10              PROSPECTIVE JUROR:  My -- is bigger issue my
11    understanding the detail, the quality and the words and I
12    cannot speak well English.  I'm not much reading either.
13              THE COURT:  All right.  So that's the biggest issue
14    is your English language speaking?
15              PROSPECTIVE JUROR:  Yes.  I feel like embarrassing,
16    you know, in front of the people.
17              And then second thing's my older daughter, she's
18    graduate from FAU tomorrow like around 4:00 o'clock.  So --
19              THE COURT:  Okay.
20              PROSPECTIVE JUROR:  Plus, she has a treatment,
21    cancer treatment.  So I'm dealing with that.  All the problems
22    that I have.
23              THE COURT:  Your daughter who's graduating is also
24    having cancer treatment?
25              PROSPECTIVE JUROR:  Yes.  She has a cancer
```

1    treatment.

2           Actually, my wife and my daughter, same time they

3    was having cancer treatment, but I lost my wife two years ago.

4    My daughter still she's going to treatment for the cancer.

5           THE COURT:  I'm sorry to hear that.

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  All right.  So -- but your main issue is

8    the English language?

9           All right.  Let me see if the attorneys have any

10   additional questions.

11          Mr. Catanese, do you have any additional questions

12   for Mr. Ozaltin?  Do you have any additional questions?

13          I just want to know if you have any additional

14   questions we can deal.

15          MR. HART:  No, Your Honor.

16          MR. CATANESE:  No, Your Honor.

17          THE COURT:  Ms. Leonard?

18          MS. LEONARD:  No.

19          THE COURT:  Thank you, sir.  We'll let you know in a

20   few minutes.  Thank you for your cooperation.

21          Can you send in Mr. Mehallis?

22          Welcome back, sir.  Have a seat.  Thank you.

23          So you had some experience or I guess it was your

24   uncle who knew somebody in the thoroughbred racing field,

25   seemed like he was an important person.  You said his name, I

1    didn't know who he was but sounded like he was somebody that

2    if I knew anything about horses I would know who this guy was.

3         PROSPECTIVE JUROR:  Harry Mangurian was the

4    individual who my uncle was the CFO for.  Harry also owned the

5    Celtics back in the late '70s, early '80s, the Larry Bird era.

6         THE COURT:  Okay.

7         PROSPECTIVE JUROR:  And Harry was a pretty big name

8    in thoroughbred racing, especially around these parts.  He was

9    I think at one time one of the number 1 breeders in the world,

10   and so I heard a lot of those stories.  I'd have my uncle come

11   to my sport administration course and talk a little bit about

12   that experience as well as his experience with the Celtics.

13        THE COURT:  So having been exposed to this

14   individual who's dealing with thoroughbred racers and not

15   these show-type horses, correct?

16        PROSPECTIVE JUROR:  Correct.

17        THE COURT:  All right.  You had some sense of what

18   thoroughbred race horses are worth and how much they go for,

19   that kind of thing?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Did you ever have any experiences

22   dealing with their health or any problems that they may have

23   had, these thoroughbreds?

24        PROSPECTIVE JUROR:  Heard stories, not personal

25   experience.

```
 1            THE COURT:  Anything that you think based on your

 2   discussions with this individual that might affect your

 3   ability to be fair in evaluating the testimony that's

 4   presented here in the courtroom?

 5            PROSPECTIVE JUROR:  I don't think so.

 6            THE COURT:  So you think you could listen to the

 7   witnesses and base your decision on what's presented here and

 8   not based upon what you may have heard, the stories you may

 9   have heard from this other individual?

10            PROSPECTIVE JUROR:  It's tough to say.  I would

11   definitely have a thought, a recollection of maybe some

12   comparisons and things.  I know there were some issues that my

13   uncle and Harry dealt with in some transactions, of course,

14   that I was told about.  I would do my best to kind of put all

15   that aside, of course.

16            THE COURT:  Okay.  Well, what kind of issues came up

17   with these horses?

18            PROSPECTIVE JUROR:  I think it was value, and a lot

19   of it he would tell me about is how they would syndicate the

20   horses and buy into the blood lines and stuff like that,

21   studding and stuff of that nature, and kind of how certain I

22   guess race horses turned out and whether they panned out or

23   not.

24            THE COURT:  All right.  Were you involved in any

25   discussions where this individual was claiming that he got
```

```
 1   ripped off by someone, the horse that he bought, and they
 2   deceived him and they failed to disclose?
 3           PROSPECTIVE JUROR:  I don't think anything deceived
 4   them, no.
 5           THE COURT:  Okay.  Just that they -- he may have
 6   invested in a horse hoping it was going to be a very
 7   successful horse, and it just didn't turn out what he had
 8   hoped?
 9           PROSPECTIVE JUROR:  For the most part.
10           THE COURT:  But nothing about their condition, their
11   medical condition or their physical condition that was
12   misrepresented or failure to disclose conditions that the
13   horse might have had?
14           PROSPECTIVE JUROR:  I don't think so, no.
15           THE COURT:  Nothing like that?
16           PROSPECTIVE JUROR:  No.
17           THE COURT:  Okay.  All right.
18           And, again, this horse is not a thoroughbred, so can
19   you kind of separate the thoroughbred-type horse from this
20   other type of horse?
21           PROSPECTIVE JUROR:  Sure.
22           THE COURT:  Okay.  All right.  Mr. Catanese, do you
23   have any additional questions?
24           MR. CATANESE:  No, Your Honor.
25           THE COURT:  Mr. Hart?
```

```
 1              MR. HART:  Mr. Mehallis, I did hear when you were
 2    being questioned earlier that in particular, you had some
 3    knowledge of purchases and sales and some of the things that
 4    went on with respect to -- and this case involves a purchase
 5    and sale of a horse.
 6              Were there any specific issues you remember talking
 7    with your uncle or others about what goes on in the industry
 8    with respect to sales and purchases that bothered you?
 9              PROSPECTIVE JUROR:  Not really.
10              MR. HART:  Okay.
11              PROSPECTIVE JUROR:  Nothing that would bother me
12    necessarily, no.
13              MR. HART:  Did you hear anything that suggested that
14    either a seller or a purchaser was, you know, in some way
15    being deceptive with the other?  Did you hear anything
16    about -- that might lead you to believe that in the industry
17    there's more of a problem than in other industries?
18              PROSPECTIVE JUROR:  Could you restate that?
19              MR. HART:  Yeah.  I mean, you talked about how you
20    had discussed with your uncle and others the sale and purchase
21    of thoroughbreds, and you know about what takes place in the
22    industry.
23              PROSPECTIVE JUROR:  Little bit, yeah.
24              MR. HART:  Is there anything in those discussions
25    you had over the years that led you to believe there's more
```

1  problems or deceptiveness with sales and purchases in the

2  thoroughbred industry, the horse industry, than in other

3  industries?

4          PROSPECTIVE JUROR:  No, no.

5          MR. HART:  Okay.

6          PROSPECTIVE JUROR:  The only thing that I'd say -- I

7  don't know if this is a factor in the case, but based off of

8  some of the questioning and stuff, would be if a translation

9  in something was an issue, my business background would

10  probably lean strongly towards one side than another, as well

11  as my kind of political background.

12          MR. HART:  When you say it would lean, why would

13  that?  Which side would it lean, and why?

14          PROSPECTIVE JUROR:  Meaning if we're doing business

15  in the United States and the translation is an issue in the

16  purchase of something, then that would probably play a strong

17  factor for me personally in saying if we're doing business

18  here, I don't think it's something of a misrepresentation of a

19  translation when we're talking text messages and stuff like

20  that is something I was thinking about.

21          MR. HART:  You said your political background.  What

22  do you mean by that?

23          PROSPECTIVE JUROR:  I'm a very strong conservative.

24  I work for a very strong conservative.

25          MR. HART:  And in terms of -- but I gather from

1   everything you've discussed, you still think at the end of the

2   day, if you're chosen to serve, that you can kind of push all

3   this to the side and listen to the facts of this case and

4   decide it on the merits?

5           PROSPECTIVE JUROR:  Correct.

6           MR. HART:  Okay.  Ms. Leonard?

7           MS. LEONARD:  I don't have any further questions.

8           THE COURT:  Thank you, sir.  We'll let you know as

9   soon as we can.

10          Can you send Ms. Smith in, please?

11          Welcome back, Ms. Smith.  And I had a note that we

12  wanted to talk to you, but I don't recall what it was about.

13  What were the issues that we needed to discuss with you?

14          PROSPECTIVE JUROR:  About me being fair and

15  impartial regarding an incident that occurred not too long ago

16  that I really don't know if I'd be able to.

17          THE COURT:  Okay.  And can you give us -- what is it

18  that causes you to have some concern about being able to be

19  fair and impartial?

20          PROSPECTIVE JUROR:  Okay.  Relating to the case, and

21  it's something similar, and I believe that when you talked

22  about the case, you said that there may not have been full

23  disclosure regarding, you know, the purchase of the horse, and

24  not too long ago, probably about a month and a half ago, my

25  son purchased a dog and spent a lot of money on him, which,

1    money that he didn't really have, and brought it home, and a

2    few days later noticed some issues, and, you know, ended up

3    bringing him to another vet, and the vet said that he had --

4    it could either be that his joint was out of place, or that

5    it -- he had a broken paw, but they -- it was never treated,

6    so the dog could have been abused.

7            He also had a broken tail, which the vet had lied

8    about and said that -- not the vet, the place he bought it at,

9    lied about and said that he was born like that, and it turned

10   out that it was broken, and he's already spent money on x-rays

11   and all kinds of stuff, and he's not getting anywhere with the

12   vet.  The vet won't give him a refund, nor will they give him

13   any money towards all these additional vet visits.

14           And turns out that the dog may need surgeries in the

15   future and all of that.

16           THE COURT:  So based upon your son's experience

17   where he thinks he was not told the truth about the dog he

18   purchased, that that might cause you to have some leanings in

19   this case?

20           PROSPECTIVE JUROR:  Correct, yes.

21           MR. CATANESE:  And you might be starting out

22   thinking that whatever the -- Mr. Zendejas is alleging here

23   might be true before you've heard any of the evidence?

24           PROSPECTIVE JUROR:  I mean, I'd like to feel that I

25   could be impartial and listen to the evidence.  This is just

1    like a thorn in my side that it's so recent that it happened,

2    that it still bothers me that we spent all this money and has

3    to continue to spend money when he wasn't given a full

4    disclosure for this animal.

5              THE COURT:  Thank you for letting us know.

6              Mr. Catanese, you have any additional questions?

7              MR. CATANESE:  No, Your Honor.

8              THE COURT:  Mr. Hart?

9              MR. HART:  And so I gather -- and thank you,

10    Ms. Smith, for being very candid about that.  I gather you

11    feel like it might influence your ability, could, you just

12    don't know, in terms of a case that, you know, the plaintiff

13    is claiming there were things that weren't disclosed about the

14    horse?

15              PROSPECTIVE JUROR:  That's right.  Yes.

16              MR. HART:  Thank you for your honesty on that, and I

17    have no further questions.

18              THE COURT:  Ms. Leonard?

19              MS. LEONARD:  I don't have any questions.

20              THE COURT:  Thank you, Ms. Smith.

21              Could you send Mr. Jones in, please.

22              Welcome back, Mr. Jones.

23              PROSPECTIVE JUROR:  Thank you.

24              THE COURT:  Have a seat.

25              All right.  Mr. Jones, you indicated earlier that

```
1    when I gave you a description of the case you had a strong

2    reaction to it, and you also mentioned that you had some

3    concern about the treatment of animals.  So why don't you tell

4    us what your strong emotions are and how this affects your

5    ability to be a fair juror.

6              PROSPECTIVE JUROR:  So, my wife affectionately calls

7    me PETA, even though I'm not a member of the PETA

8    organization, she calls me PETA every time I watch a

9    television show or a movie, I can't watch, I'm like, oh, no.

10             So I really have a bit of a challenge with -- I

11   don't know a lot about, you know, like the horse business, but

12   I have a challenge with animals in general doing things

13   outside of what they're naturally supposed to do.  So I look

14   at, you know, the -- you know, the jumping, you know, parading

15   around, if you will, as it's almost, you know, unfair to

16   animals.

17             And so when I heard the description, I know my first

18   reaction was sadness.

19             THE COURT:  All right.  And do you think that these

20   feelings and your concern for animals might affect your

21   ability to be a fair juror in the case?  Fairly evaluate the

22   evidence?

23             PROSPECTIVE JUROR:  It's tough.  I really do.  I

24   feel like this is my first time, you know, going through this

25   process, and I find this whole process extremely interesting,
```

```
 1    but as I'm sitting through, I'm thinking to myself, you know,

 2    I don't know, neither side deserves anything.  So I'm -- it's

 3    a bit of a challenge.

 4            THE COURT:  So because both sides are involved in

 5    buying and selling animals that are involved in this activity,

 6    you kind of -- you're kind of against everybody here, so to

 7    speak?

 8            PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  You have a negative feeling towards both

10    sides?

11            PROSPECTIVE JUROR:  Yes, to be honest.

12            THE COURT:  Okay.

13            PROSPECTIVE JUROR:  And it's terrible, because this

14    is extremely interesting.

15            THE COURT:  You also I thought made an allusion to

16    or a reference to a religious belief earlier.  I thought I

17    heard you say that.

18            PROSPECTIVE JUROR:  Yes.

19            THE COURT:  So what about your religious beliefs?

20            PROSPECTIVE JUROR:  I'm a devout Christian,

21    absolutely.

22            THE COURT:  How would that affect your ability to be

23    a juror here?

24            PROSPECTIVE JUROR:  You know, I don't believe in

25    gambling, so I don't actually believe this is a racing case,
```

```
 1   but before I heard, you know, all the facts and circumstances,

 2   you know, again, that was something I was like, oh, my gosh,

 3   and then there's racing and gambling, but it's not.

 4          But I do make every decision, I try to go into,

 5   before I make a decision, try to go into it with prayer,

 6   so . . .

 7          THE COURT:  All right.  But again, you kinda have

 8   negative feelings about this whole situation because of the

 9   way the animals are dealt with?

10          PROSPECTIVE JUROR:  I do.  And I don't remember the

11   gentleman's name.  He asked a question earlier, and I didn't

12   say anything, and I really probably should have, when you

13   asked if anyone had any challenges with, you know, if

14   Mr. Zendejas would receive a large sum of money.  And I didn't

15   say anything, but as I was thinking through the question more,

16   I was like I think I would.  I don't know if -- if -- again, I

17   don't know all of the details, but, you know, based upon, you

18   know, dealing with, you know, the animals and how they're --

19   how I perceive, you know, they're being treated, you know,

20   being unfairly put on display, I don't know if I would be okay

21   awarding a large sum of money for this.  Let each party just

22   go their separate ways.

23          THE COURT:  Any questions, Mr. Catanese?

24          MR. CATANESE:  No, Your Honor.

25          THE COURT:  Mr. Hart?
```

```
 1              MR. HART:  No questions, Your Honor.

 2              THE COURT:  Ms. Leonard?

 3              MS. LEONARD:  Would -- I know that you have a

 4   negative feeling you've expressed about the industry in

 5   general, but would that cause you to lean for or against one

 6   of the parties in this case, or would you feel negatively

 7   equally towards everyone?

 8              PROSPECTIVE JUROR:  Negatively equally.  I didn't --

 9   I wasn't leaning towards anyone in particular.

10              THE COURT:  Thank you, Mr. Jones.  Appreciate your

11   honesty.  Have a nice -- we'll get back to you shortly.  Okay?

12              And can I -- before we bring Mr. Friedlander in, do

13   we really need to talk to Mr. Friedlander?  He's going to

14   start a job tomorrow, and we're probably not going to reach

15   him anyway.  Can we tell Mr. Friedlander we don't need to

16   speak to him?

17              MR. HART:  Yes.

18              MR. CATANESE:  We agree, Your Honor.

19              THE COURT:  Ms. Leonard?

20              MS. LEONARD:  Agreed.

21              THE COURT:  Okay.  You can tell Mr. Friedlander we

22   don't need to speak to him.

23              COURTROOM SECURITY OFFICER:  So he can go --

24              THE COURT:  Well, come back at 12:30.

25              Thank you.
```

```
 1              All right.  So why don't you take a few minutes to
 2   go through your notes, and we'll then start our selection
 3   process.  We'll go through the entire panel and strikes for
 4   cause first, and then after that we'll start exercising
 5   peremptories.  I alternate who goes first on a juror.  So the
 6   plaintiff will go on the first juror first, and defense will
 7   go second, and we'll keep going back and forth until we seat
 8   eight jurors.  All right?
 9              MR. HART:  Sounds good, Your Honor.  What time would
10   you like us back?
11              THE COURT:  You don't need to leave, but how much
12   time do you think you'll need?
13              MR. HART:  Fifteen, 20 minutes would be sufficient.
14              THE COURT:  Fifteen or 20 minutes just for you to
15   talk among yourselves?
16              MR. HART:  Ten maybe.
17              THE COURT:  How about 10?
18              MR. HART:  Ten's good, Your Honor.  We can do it in
19   10.
20              MR. CHAPMAN:  Your Honor, one quick question.  Is
21   Your Honor inclined to -- if Your Honor's inclined to excuse
22   any other juror that you see, in the exercise of your
23   discretion, should not sit, are you going to do that first, or
24   are you going to wait for us to work through the jurors?
25              THE COURT:  I'm not weighing in on this until I'm
```

```
 1   asked to.

 2          MR. CHAPMAN:  Very good.

 3          THE COURT:  I don't interject my own opinions about

 4   people.

 5          MR. CHAPMAN:  Okay.

 6          THE COURT:  Unless you overlook someone who I think

 7   has a hardship and shouldn't have to sit, I might say, well,

 8   do we really want to keep this person here who says that

 9   they're going to have a hardship?  You might both not think

10   that they -- I might interject there.

11          MR. CHAPMAN:  Thank you.

12          MR. HART:  That will work.  Thank you, Your Honor.

13          MR. CATANESE:  Thank you, Your Honor.

14      (A recess was taken from 12:19 p.m. to 12:36 p.m., after

15   which the following proceedings were had:)

16          THE COURT:  Please be seated, everyone.

17          We ready to go?

18          MR. CHAPMAN:  Yes, Your Honor.

19          MR. HART:  We are, Your Honor.

20          THE COURT:  Okay.  So let's first go through strikes

21   for cause for the plaintiff.  Do you have the plaintiff

22   strikes for cause?

23          MR. CATANESE:  I'm sorry, Your Honor?

24          THE COURT:  Strikes for cause from the plaintiff.

25          MR. CATANESE:  Your Honor, juror number 15.
```

```
1              THE COURT:  Any objection?

2              MR. HART:  No objection.

3              MS. LEONARD:  No objection.

4              THE COURT:  Granted.

5              MR. CATANESE:  Next, Your Honor, 21, Mr. Jones.

6              THE COURT:  Any objection?

7              MR. HART:  No.

8              THE COURT:  Ms. Leonard, any objection?

9              MS. LEONARD:  No.

10             THE COURT:  Granted.

11             MR. CATANESE:  Number 23, Mr. Simile.

12             MR. HART:  What was the issue?

13             MR. CATANESE:  The cause is I think it's a health

14   issue.  He testified or represented that he's got anxiety

15   issues, he got thrown off a plane recently.  I just don't know

16   if he's stable, and I feel that he could cause a lot of

17   disruption during the trial, and especially in the

18   deliberation process.

19             THE COURT:  I don't think we're going to actually

20   get to him, so I don't think it's an issue.

21             Do you have any objection to excusing him?  I don't

22   think we're going to reach him.

23             MR. HART:  I don't think we're going to reach him,

24   but I didn't feel that there was any cause shown why he should

25   be thrown off.
```

```
 1                THE COURT:  He seemed like he said he could handle
 2    it.
 3                MR. CATANESE:  We feel -- I mean, just even the
 4    agitation level that he had here, Your Honor, we just felt
 5    that, I just don't know if he can control himself.  That's our
 6    concern.
 7                THE COURT:  Well, I really don't think it's going to
 8    be an issue, but let me see what other strikes the defense
 9    has, and then we'll see how many people are left, and I'll
10    make a decision on him.  So I'll hold off on him for now.
11                MR. CATANESE:  The only other person, Your Honor, is
12    juror number 10, Mr. Stenglein.  He said he had a heart
13    condition, if you recall, he's the insurance officer.
14                THE COURT:  Do you have any objection?
15                MR. HART:  No, we were going to raise that as a
16    hardship, as well, Your Honor.  No objection.
17                THE COURT:  Granted as to him.
18                What about juror number 1?
19                MR. CATANESE:  He doesn't speak English.
20                THE COURT:  Well, that's why I'm raising it.
21                MR. CATANESE:  Yes, Your Honor, we would ask to have
22    him excused.
23                THE COURT:  Do you agree?
24                MR. HART:  Agreed.  He's not qualified.
25                MS. LEONARD:  Agreed.
```

```
 1              THE COURT:  So one's excused.  Ten's excused.
 2         All right.  Any others from the plaintiff?
 3              MR. CATANESE:  Not at this time, Your Honor.
 4              THE COURT:  All right.  I'll hold off on 23 for now.
 5         What about the defense?
 6              MR. HART:  We had, Your Honor -- one's off.
 7    Number -- Ms. Chen, juror 11, we had raised.  You had talked
 8    about --
 9              THE COURT:  You need to stand near the microphone.
10              MR. HART:  Sorry about that.
11              Juror number 11, Your Honor, Ms. Chen, had discussed
12    the hardship of, I believe her kids were back in school the
13    first day, and she was worried about not -- didn't have the
14    assistance, and --
15              MS. LEONARD:  Her husband was out of town.
16              MR. HART:  Her husband's out of town and I don't
17    want to get into a position where she's resenting us come
18    Monday, because we're going to be here Monday.
19              THE COURT:  Hold on.  Let me see if there's an
20    objection.
21              Any objection?
22              MR. CATANESE:  Yes, Your Honor, we don't think
23    there's any reason to dismiss her at this time.
24              THE COURT:  Well, let me hold off and see how --
25    make sure we have enough people without her before I excuse
```

1    her.  So let's see what else we have.

2            MS. LEONARD:  Mr. West, who is number 13.  He's

3    taking care of an elderly mother with Alzheimer's who's 74,

4    and he also just started a business.  So he raised hardship

5    issues with that, as well.

6            THE COURT:  Any objection to Mr. West?

7            MR. CATANESE:  Your Honor, let me say it this way.

8    I'm concerned that we have enough people here and that we

9    don't agree to get rid of too many, then we don't have enough

10   jurors.  So conceptually we don't have an objection, but I do

11   because he -- I think I just want to make sure we don't run

12   out of jurors today.

13           THE COURT:  I don't think we're going to run out of

14   jurors.

15           MR. CATANESE:  So, with that --

16           THE COURT:  I think, you know, he's got that new

17   business, and I don't think he can afford to give up two weeks

18   of his new business, so I'll excuse him.

19           MR. CATANESE:  No objection.

20           THE COURT:  Anything else?  Any others for

21   plaintiff?

22           MR. CATANESE:  Not at this time, Your Honor.

23           THE COURT:  No, I'm sorry, for defendant.  I'm

24   sorry.

25           MS. LEONARD:  Peggy Shappell, number 19, said that

1  it would be a financial hardship for her to be on this jury,

2  that she doesn't get paid if she is -- she doesn't get paid if

3  she is not working, and she has the insurance for her family.

4          MR. CATANESE:  Your Honor, we agree to have her

5  excused.

6          THE COURT:  Okay.  I'll excuse her.

7          MS. LEONARD:  And then Mr. Friedlander, I think Your

8  Honor's already made a decision on him.

9          THE COURT:  Right.  He's excused, as is Mr. Jones.

10          Any others for the defense?

11          MR. HART:  One moment, Your Honor.

12          MS. LEONARD:  Your Honor, number 14, Ms. Sorte, said

13  that she raised concerns about cruelty to animals, et cetera.

14  We weren't sure if she could be fair and impartial.

15          MR. CATANESE:  Your Honor, we are not seeking to

16  have her excused, and so we are not agreeing to have her

17  excused at this time.

18          THE COURT:  Okay.  Hold on.

19          MR. HART:  Did we do number 15?

20          MS. LEONARD:  She's gone.

21          THE COURT:  Yes.

22          If we excused Ms. Chen because of her childcare

23  issues and Ms. Sorte and Mr. Simile, we would have exactly the

24  amount of jurors we need.

25          MR. CHAPMAN:  May we have a moment, Your Honor?

```
 1              THE COURT:  All right.  Hold on.  I think actually
 2    we'll have one extra.  Yeah, we'd have exactly 14, which is
 3    what we need.
 4              So I'm inclined to not have Ms. Chen here if she's
 5    going to be worried about her childcare issues and Ms. Sorte
 6    who expressed some concern about cruelty to animals, and
 7    Mr. Simile who was -- complained about anxiety.  So I'll
 8    excuse those three.  So we have 14 eligible jurors, and you'll
 9    have three strikes a side, and no backstriking, as hopefully
10    you heard.
11              So are you ready to start exercising your
12    peremptories?  Both sides ready?
13              MR. CHAPMAN:  Two seconds, Your Honor.
14              MR. HART:  Your Honor, just so I make sure, the ones
15    that are out now would be number 1.
16              THE COURT:  Yes.
17              MR. HART:  Number 10.
18              THE COURT:  Correct.
19              MR. HART:  Number 11.
20              THE COURT:  Right.
21              MR. HART:  Number 13.
22              THE COURT:  Correct.
23              MR. HART:  Number 14.
24              THE COURT:  Yes.
25              MR. HART:  Number 15.
```

```
 1              THE COURT:  Yes.

 2              MR. HART:  Number 19.

 3              THE COURT:  Yes.

 4              MR. HART:  Twenty-one.

 5              THE COURT:  Yep.

 6              MR. HART:  And 22?

 7              THE COURT:  Yes.

 8              MR. HART:  And 23.

 9              THE COURT:  Correct.

10              MR. HART:  Thank you, Your Honor.

11              MR. CHAPMAN:  We're ready, Your Honor.

12              THE COURT:  All right.  Let's start on juror

13    number 2, plaintiff; what's your position on juror two?

14              MR. CATANESE:  Acceptable.

15              THE COURT:  Defense?

16              MR. HART:  Acceptable.

17              MS. LEONARD:  Acceptable.

18              THE COURT:  Juror three, defense?

19              MR. HART:  Acceptable.

20              THE COURT:  Plaintiff?

21              MR. CATANESE:  Acceptable.

22              THE COURT:  Juror four, plaintiff?

23              MR. CATANESE:  Acceptable.

24              THE COURT:  Defense?

25              MR. HART:  Acceptable.
```

```
 1              MS. LEONARD:  Acceptable.

 2              THE COURT:  Juror five, defense?

 3              MR. HART:  Acceptable.

 4              MR. CATANESE:  Your Honor, plaintiff would exercise

 5    a peremptory with juror number 5.

 6              THE COURT:  Number 6, plaintiff?

 7              MR. CATANESE:  Acceptable.

 8              THE COURT:  Defense?

 9              MR. HART:  Acceptable.

10              THE COURT:  Seven, defense?

11              MR. HART:  Acceptable.

12              THE COURT:  Plaintiff?

13              MR. CATANESE:  Plaintiff exercises a peremptory,

14    Your Honor.

15              THE COURT:  Number 8, plaintiff?

16              MR. CATANESE:  Acceptable.

17              THE COURT:  Defense?

18              MR. HART:  Your Honor, with respect to juror

19    number 8, defense exercises a peremptory.

20              THE COURT:  Nine, defense?

21              MS. LEONARD:  Acceptable.

22              THE COURT:  Plaintiff?

23              MR. CATANESE:  Acceptable, Your Honor.

24              THE COURT:  I'm sorry, you accepted him, right?

25              MS. LEONARD:  Yes.
```

```
 1                    MR. HART:  Yes, we did.

 2                    THE COURT:  Twelve, plaintiff?

 3                    MR. CATANESE:  Acceptable.

 4                    THE COURT:  Defense?

 5                    MR. HART:  Acceptable.

 6                    MR. CHAPMAN:  Just so I understand where we are,

 7      Your Honor, that's six?

 8                    THE COURT:  Correct.

 9                    MR. CHAPMAN:  Okay.

10                    THE COURT:  And you have one strike left, and the

11      defendants have two strikes left.

12                    MR. CHAPMAN:  And that constitutes our main panel.

13      We're now discussing alternates?

14                    THE COURT:  No, there are no alternates.  All eight

15      will deliberate if they're all here.

16                    MR. CHAPMAN:  Understood.

17                    THE COURT:  There are no alternates in civil trials

18      in federal court.

19                    MR. CHAPMAN:  True statement.  True statement.

20      Excuse me.

21                    THE COURT:  Thank you.

22                    So the next two jurors are --

23                    MR. HART:  Sixteen?

24                    THE COURT:  -- will be deliberating if they're here

25      at the end of the trial.
```

```
 1                    So we're up to number 16, and I believe it's defense
 2      first.
 3                    MR. HART:  Your Honor, we'll exercise a peremptory,
 4      the defense, as to number 16.
 5                    THE COURT:  Seventeen, plaintiff?
 6                    MR. CATANESE:  Your Honor, does the plaintiff have
 7      one peremptory left?
 8                    THE COURT:  Correct.
 9                    MR. CATANESE:  Okay.  Thank you.
10                    THE COURT:  You each have one left.
11                    MR. CATANESE:  Acceptable, Your Honor.
12                    THE COURT:  And, I'm sorry, did the defense --
13                    MS. LEONARD:  We didn't go on this one left.
14                    MR. HART:  We're talking 17?
15                    THE COURT:  Yes.
16                    MR. HART:  Your Honor, the defendants will exercise
17      its last peremptory on number 17.
18                    THE COURT:  All right.  Plaintiff, you get to choose
19      between -- you get to strike one of the next three.
20                    MR. CATANESE:  Your Honor, plaintiff would exercise
21      one of its last peremptory regarding juror 18.
22                    THE COURT:  All right.  So then 20 and 24 are the
23      next two jurors.
24                    So let me call out the numbers of the jurors that I
25      have, make sure we're all in agreement:  Two, three, four,
```

```
 1    six, nine, 20 -- I'm sorry, 12, I forgot 12.  Six, nine, 12,
 2    20 and 24; is that correct?
 3              MS. LEONARD:  Yes, Your Honor.
 4              MR. CHAPMAN:  Concur, Your Honor.
 5              MR. CATANESE:  That's correct, Your Honor.
 6              THE COURT:  Okay.  So we'll bring the jurors in,
 7    we'll have them sworn, and we'll break for lunch, and then
 8    we'll come back after lunch and do openings.  So I'm going to
 9    ask the jurors to come back at 2:15.  Is that enough time to
10    get everybody ready?  And then I'm not sure how much time
11    after the openings we'll have to actually start the evidence,
12    but we'll see.
13              MR. CATANESE:  Your Honor, what time would you like
14    us to be back?  By 2:15?
15              THE COURT:  Yeah.
16              MR. CATANESE:  Thank you, Your Honor.
17              THE COURT:  Okay.  Well, let's see what time we get
18    everyone out of here.  I'm going to take an hour and 15
19    minutes, whatever that turns out to be.
20              MR. CATANESE:  Very well.  Thank you, Your Honor.
21              THE COURT:  Let's bring the jurors in.
22         (The venire enters the courtroom.)
23              THE COURT:  Welcome back, everyone.  Please be
24    seated, ladies and gentlemen.  Sorry that we kept you a little
25    longer than we had hoped, but we're ready to let you know
```

```
 1   who's going to be serving on the jury.  Again, we thank you
 2   for your cooperation and your patience.
 3            I'm going to call out eight names.  When I call your
 4   name, if you could please take a seat in the jury box, and
 5   Ms. Ferrante will show you which seat to sit in.
 6   Mr. Zinmeister, Ms. Bradley, Ms. Kuck, Ms. Hundley,
 7   Mr. Kainec, Mr. Mehallis, Ms. Chepren, and Ms. McMillian.
 8            Everyone else, I want to thank all of you for being
 9   with us today.  We appreciate your willingness to be
10   considered to act as jurors in this case.  I need to ask you
11   to continue to call the jury number that you've been assigned
12   to call for the rest of -- I think this is your first week; is
13   that correct?  So you need to continue to call this week and
14   next week in case you're needed back here on another case.  I
15   can't guarantee that you won't be called, but it's not likely.
16            So thank you again for being with us.  It was a
17   pleasure having you, and we wish you all good luck.  Thank
18   you.  Have a good afternoon.
19            Please be seat, everyone.
20            All right.  Ladies and gentlemen, thank you again
21   for your willingness to serve as jurors in this case.  We're
22   not going to keep you much longer.  We're going to send you to
23   lunch, but the first thing we have to do is have you sworn as
24   the jurors to try this case, so if you could please rise and
25   face Ms. Ferrante, and she'll swear you in.
```

```
 1          (The jury was duly impaneled and sworn.)
 2          THE COURT:  So, again, ladies and gentlemen, we're
 3   going to take a lunch break before we begin with the trial.
 4   I'm going to remind you to not discuss the case with anyone,
 5   don't form any opinions about the case, don't conduct any
 6   independent research about the case or about any of the
 7   individuals that have been mentioned to you, about any of the
 8   issues about horses and show horses.  Stay away from the
 9   Internet on all these issues.
10          If you call home or your employers and you tell them
11   you've been selected to act as a juror, again, they're going
12   to ask you what's the case about.  Don't discuss the subject
13   matter, because, again, people have opinions and views about
14   issues that they might unintentionally impart to you, and we
15   don't want you to be influenced by what others think.
16          So Ms. Ferrante's going to show you where the jury
17   room is, and when you come back from lunch go directly into
18   that jury room.  She'll show you how to get in.  And I'm going
19   to ask you to be back at, say, 10 minutes after 2:00, an hour
20   and 15 minute.  If you want to get something to eat, you can't
21   find anything in this building other than a snack on the third
22   floor.  There's a soda machine and a snack machine.  That's
23   about it.  If you want to get something for lunch, you have to
24   walk down Clematis Street, and there are a number of
25   restaurants that you can find something to eat down the
```

```
 1    street.
 2           So, again, we appreciate your willingness to serve
 3    on the case.  We'll get started at 2:10; and enjoy your lunch.
 4    We'll see you after lunch.  Thank you.
 5         (The jury exits the courtroom.)
 6           THE COURT:  All right.  You can be seated.
 7           Anything else we need to talk about before we begin
 8    opening statements?  Covered everything?
 9           MR. CATANESE:  I think we have, Your Honor.
10           THE COURT:  All right.  So we'll see you at 2:10,
11    and we'll get things going.
12           Thank you.
13           MR. CATANESE:  Thank you, Your Honor.
14         (A recess was taken from 12:58 p.m. to 2:14 p.m., after
15    which the following proceedings were had:)
16           THE COURT:  Good afternoon, please be seated.
17           Are we ready to bring the jurors out?
18           MR. CATANESE:  Yes, Your Honor.
19           THE COURT:  Defense ready?
20           I'm going to read the jurors the standard
21    preliminary instructions before we do the openings, all right?
22           MR. CATANESE:  Yes, Your Honor.
23           MR. HART:  Yes, Your Honor.
24           THE COURT:  So let's bring the jurors in, please.
25         (The jury enters the courtroom.)
```

```
1              THE COURT:  Welcome back, everyone.  Please be
2    seated.
3              Thank you for, again, being back, ladies and
4    gentlemen.  We appreciate your willingness to serve on this
5    jury.  We're going to begin in a few minutes, but before we
6    hear from the attorneys, I want to read you some instructions
7    that I'm going to ask you to follow during the course of the
8    trial.  Some of these things we've talked about already, but
9    I'm going to go over them again, and some of them will be new.
10             So now that you've been sworn, I need to explain
11   some basic principles about a civil trial that -- and your
12   duty as jurors.  These are preliminary instructions, and I'll
13   give you more detailed instructions at the end of the trial.
14             It's your duty to listen to the evidence, decide
15   what happened and apply the law to the facts.  It's my job to
16   provide you with the law that you must apply, and you must
17   follow that law even if you do not agree with it.
18             You must decide the case only on the evidence
19   presented in the courtroom.  Evidence comes in many forms.  It
20   can be testimony about what someone saw, heard or smelled.  It
21   can be an exhibit or a photograph, and it could be someone's
22   opinion.
23             Some evidence may prove a fact indirectly.  Let's
24   say a witness saw wet grass outside and people walking into
25   the courthouse carrying wet umbrellas.  This might be indirect
```

1    evidence that it rained, even though the witness didn't

2    personally see it rain.

3           Indirect evidence like that is also called

4    circumstantial evidence.  It's simply a chain of circumstances

5    that likely proves a fact.

6           As far as the law is concerned, it makes no

7    difference whether evidence is direct or indirect.  You may

8    choose to believe or disbelieve either kind.  Your job is to

9    give each piece of evidence whatever weight you think it

10   deserves.

11          During the trial, you will hear certain things that

12   are not evidence, and you must not consider them as evidence.

13   First, the lawyers' statements and arguments are not evidence.

14   In their opening statements, which you'll hear after I've

15   finished reading these instructions to you, and their

16   arguments, closing arguments, at the end of the trial, the

17   lawyers will discuss the case.  Their remarks may help you

18   follow each side's arguments and the presentation of evidence.

19   But the remarks themselves aren't evidence, and they shouldn't

20   play a role in your deliberations in terms of relying upon it

21   as evidence.

22          Second, the lawyers' questions and objections aren't

23   evidence.  Only the witnesses' answers are the evidence.

24   Don't decide that something is true just because a lawyer's

25   question suggests that it is.

1          For example, a lawyer may ask a witness:  You saw

2    Mr. Jones hit his sister, didn't you?  That question is not

3    evidence of what the witness saw or what Mr. Jones did unless

4    the witness agrees with it.

5          There are rules of evidence that control what the

6    Court can receive into evidence.  When a lawyer asks a

7    question or presents an exhibit, the opposing lawyer may

8    object if he or she thinks that the rules of evidence don't

9    permit it.  If I overrule the objection, then the question

10   will be answered and the exhibit will be received into

11   evidence.  But if I sustain the objection, then the witness

12   cannot answer the question, and the Court cannot receive the

13   exhibit.  So when I sustain an objection to a question or to

14   an exhibit, you must ignore the question and the exhibit and

15   not guess what the answer might have been to the question or

16   what the exhibit might have contained.

17         Sometimes I may disallow evidence.  This is also

18   called striking evidence and order you to disregard or ignore

19   it, and that means you must not consider that evidence when

20   you are deciding the case.  I may allow some evidence for only

21   a limited purpose, and when I instruct you that I have

22   admitted an item of evidence for a limited purpose, you must

23   consider it only for that purpose and no other.

24         To reach a verdict, you may have to decide which

25   testimony to believe and which testimony not to believe.  You

1   may believe everything a witness says, part of what a witness

2   says, or none of what a witness says.

3         When considering a witness' testimony, you may take

4   into account the witness' opportunity and ability to hear, see

5   or know the things about which he or she testified, the

6   witness' memory, the witness' manner while testifying, any

7   interest the witness may have in the outcome of the case, any

8   bias or prejudice the witness may have, any other evidence

9   that contradicts the witness' testimony, the reasonableness of

10  the witness' testimony in light of all the evidence and any

11  other factors bearing on believability.

12        At the end of the trial, I'll give you additional

13  guidelines for determining a witness' credibility.

14        Now, as we said at the outset, this is a civil case,

15  and, again, I described to you earlier what the basic claim is

16  by the plaintiff and the defendant's denial of those claims,

17  but you should know that the plaintiff has the burden of

18  proving his case by what's called the preponderance of the

19  evidence.  And that means that the plaintiff must prove that

20  in light of all the evidence, what he claims is more likely

21  true than not true.  So if you could put the evidence favoring

22  the plaintiff and the evidence favoring either of the

23  defendants on opposite sides of balancing scales, the

24  plaintiff needs to have the scales tip to his side.  If the

25  plaintiff fails to meet this burden, you must find in favor of

1    the defendants.

2          To decide whether any fact has been proved by a

3    preponderance of the evidence you may, unless I instruct you

4    otherwise, consider the testimony of all the witnesses,

5    regardless of who may have called them, and all of the

6    exhibits that were received in evidence, regardless of who may

7    have produced them.

8          After considering all the evidence, if you decide a

9    claim or a fact is more likely true than not, then the claim

10   or fact has been proved by a preponderance of the evidence.

11         On certain issues called affirmative defenses, the

12   defendant that is asserting that defense has the burden of

13   proving the elements of the defense by a preponderance of the

14   evidence, and I'll instruct you on the facts that each or

15   either of the defendants must prove for any affirmative

16   defense that they have asserted.

17         Again, after considering all the evidence, if you

18   decide that a particular defendant has successfully proven

19   that the required facts are more likely true than not, then

20   the affirmative defense is proved.

21         While serving on the jury you may not talk with

22   anyone about anything related to the case.  You may tell

23   people that you're a juror and give them information about

24   when you must be in court.  But you must not discuss anything

25   about the case itself with anyone.  You shouldn't even talk

1    about the case with each other until your deliberations begin.

2    You want to make sure you've heard everything, all the

3    evidence, the lawyers' closing arguments and my instructions

4    on the law before you begin deliberating.  You should keep an

5    open mind until the end of the trial.  Premature discussions

6    may lead to a premature decision.

7              In this age of technology, I want to emphasize that

8    in addition to not talking face to face with anyone about the

9    case, you must not communicate with anyone about the case by

10   any other means.  This includes e-mails, text messages,

11   Internet, including social networking websites, such as Face

12   book and Twitter, et cetera.

13             Again, as we discussed earlier, you shouldn't Google

14   or search online for any information about the case, the

15   parties or the law.  Don't read or listen to the news about

16   this case if it's reported in the press, visit any places

17   related to the case or research any fact or issue regarding

18   the case.

19             The law forbids the jurors to talk with anyone else

20   about the case and forbids anyone else to talk to the jurors

21   about the case because you must base your decision only on the

22   testimony and other evidence presented in the courtroom.  It

23   is not fair to the parties if you base your decision in any

24   way on information you acquire outside the courtroom.

25             For example, the law often uses words and phrases in

```
 1   special ways, so it's important that any definitions you hear
 2   come only from me and not from any other source.
 3           Only you jurors can decide a verdict in this case,
 4   and the law sees you as only fair, and only you have promised
 5   to be fair.  No one else is so qualified.
 6           Now, if you wish to take notes during the trial to
 7   help you remember what the witnesses say, you may do so.  If
 8   you do take notes, please don't share them with anyone until
 9   you go to the jury room to decide the case, and don't let
10   note-taking distract you from carefully listening to and
11   observing the witnesses.
12           When you leave the courtroom, you should leave your
13   notes at your seat because I don't want you to take them back
14   with you into the jury room and start comparing notes because
15   you might be tempted to, again, compare notes and say, hey,
16   did you get what this person said, and then you start
17   prematurely discussing the case, and we don't want you to do
18   that.  So just leave them at your seat.  No one's going to
19   look at them, and when you begin your deliberations you'll be
20   able to take them back.
21           Whether or not you take notes, you should rely on
22   your own memory of the testimony.  Your notes are there only
23   to help your memory.  They're not entitled to any greater
24   weight than your memory or impression about what the testimony
25   was.
```

1        Now, in terms of the procedure for going through the

2   trial, each side or each party may make what's called an

3   opening statement.  They don't have to, but I expect that they

4   all will.

5        An opening statement isn't evidence, and it's not

6   supposed to be argumentative.  It's just an outline of what

7   the party intends to prove.  So they'll explain to you what

8   the issues are and what they believe the evidence is going to

9   show during the course of the trial.

10        After the opening statements are made, then the

11   plaintiff will get to present his evidence and witnesses.  He

12   will present witnesses, they'll be asked questions, they'll be

13   cross-examined by the defense witnesses, he'll present

14   exhibits, and once he's presented all of his evidence and all

15   of his witnesses, he will what's called rest his case, at

16   which time the defendants will have the opportunity to present

17   their witnesses and evidence.

18        Because the plaintiff has the burden of proof, he

19   has the opportunity after the defense witnesses have been

20   presented to present what's called a rebuttal evidence, which

21   is he can rebut some of the evidence that the defendants have

22   presented.

23        After all the evidence is presented, then you'll

24   hear the closing or final arguments of the attorneys.  After

25   that, I will instruct you on the applicable law, and then you

 1    will begin your deliberations.

 2              So, again, we expect the case to last into next

 3    week.  We will try and move as quickly as possible, and

 4    hopefully sooner rather than later, but we're going to now

 5    hear from the attorneys in their opening statements, and we'll

 6    first hear from plaintiff's counsel.

 7              Mr. Catanese.

 8              MR. CATANESE:  Thank you, Your Honor.

 9              Good afternoon, everyone.  My name is T. Randolph

10    Cantonese.  I represent Mr. Zendejas.  It's a pleasure to be

11    here this afternoon, and I want to share with you what we

12    anticipate the evidence to show and some of the issues that

13    you'll need to decide.

14              During the case I will be referring to visual

15    testimony in the form of depositions that were done by video.

16    You're going to see some videos of this horse in competition.

17    There's also going to be some documents.  But I'm not going to

18    do that now, and the reason is I want to look at your faces, I

19    want you to see my face, and I want to have eye contact with

20    you.  Because sometimes what happens is when we start looking

21    at the computers, we can lose focus.  And out of respect for

22    you, I want to make sure that you can see my face, hear what

23    I'm saying and understand what we intend to prove in this

24    case.

25              Again, I represent Mr. Zendejas.  He is from Mexico.

He has an interpreter here, and so when he does testify, he'll be testifying in Spanish, and you'll be hearing the interpreters.

Also, during the trial there are going to be some witnesses who testify in person.  For example, Mr. Zendejas and Mrs. Redman, who's a defendant, and Mr. Syquia, who is here, who is a defendant.  But some of the witnesses are going to testify via video, so they won't be here in person.  So you're going to be watching them testify via video, and we have a number of people who will be doing that, just so that you know that.

All right.  Why are we all here?  This case involves a horse, and the horse is name is Vorst.  And this horse is a jumper.  I'm going to explaining to you in a minute what that is and why that's important in this case.

You live in the state of Florida, we have Wellington, which is nearby, and most of the activities and things that happen in this case involving the sale of a horse happened in Wellington, and that's why we're here.

Mr. Zendejas purchased Vorst from Mrs. Redman, who's sitting at the defense table.  Mrs. Redman was assisted in the sale of Vorst by Mr. Syquia, and Mr. Syquia's sitting back there in a blue suit.  So you have the name of the horse is Vorst, Mr. Zendejas is buying the horse, Mrs. Redman is selling the horse, Mr. Syquia is helping.

1          There's another person who helped in the sale, and

2     that person's name is Simon Nizri.  Mr. Nizri is from Mexico,

3     and he was assisting Mr. Zendejas.  Chances are you won't see

4     Mr. Nizri testify in court in person, but you'll hear from him

5     in video.  So when it's time to hear from Mr. Nizri, it will

6     be generally, I think, by video.

7          I mentioned earlier that Vorst is a jumper.  What's

8     a jumper?  Vorst is what you would call an athletic sport

9     horse.  He's not a race horse, he's not a horse that maybe

10    like you might have heard of quarter horse racing or races

11    like that.  He's an athletic horse.  And what that means is

12    horses like that compete in a circuit.  They go to a

13    showground, and they have certain obstacles, and they have a

14    certain amount of time, and the horse is judged based on

15    whether or not it successfully gets over the jumps at certain

16    heights or certain obstacles within a prescribed period of

17    time.

18         You will hear evidence in this case about this horse

19    competing when Mrs. Redman owned the horse, as well as when

20    Mr. Zendejas took possession of the horse.  And I'll be

21    talking more about that later.

22         But for your information now, Vorst is a jumper, and

23    when he competes, the main purpose of this horse as a sport

24    horse is to go over jumps, hopefully without what we call

25    faults, in a specific period of time.

```
 1              The other thing that will happen early in this case

 2   is, as you learn more about Vorst, is that when Mrs. Redman

 3   owned the horse, the horse had competed at what we call Grand

 4   Prix competition.  What does that mean?  Grand Prix

 5   competition is that the horse is at a certain level.  Meaning,

 6   for example, if any of you were in high school and you used to

 7   maybe do pole vaulting, or maybe you had high hurdles, you

 8   would remember with pole vaulting there were certain levels

 9   that you would go over, high hurdles, certain levels.  Well,

10   in the jumping industry there's certain levels, and you will

11   hear testimony and evidence about these levels.

12              For example, 1.15-meter, 1.20-meter, 1.4-meter,

13   1.6-meter.  And when you hear that testimony, it will be

14   explained to you that that's the various heights that the

15   horse is being asked to jump over.  And the higher those

16   heights are, the horse can be described as a Grand Prix horse.

17              So you will hear testimony in this case about Vorst,

18   whether the horse was a Grand Prix horse and whether that

19   horse was capable of competing at that level.

20              Okay.  The dispute between Mrs. Redman and

21   Mr. Zendejas is with respect to Vorst and the horse's ability

22   to jump.  I just described for you certain levels of jumping.

23   In the horse industry there's a phrase called "dirty stopper."

24   You will hear evidence in this case from various witnesses,

25   including an expert witness we have for Mr. Zendejas named
```

```
 1   Rita Timpanaro.  I will tell you more about Rita in a minute.
 2              "Dirty stopper," when you hear from the witnesses,
 3   the people who are in this business, generally means, and the
 4   evidence will show when they testify, it means a horse that's
 5   stopping without reason.  It comes up to the jump, and for no
 6   reason the horse just stops.  That's what a dirty stopper
 7   means.  There will be a lot of testimony about this horse,
 8   whether the horse was justified in stopping, whether the horse
 9   stopped for a reason, whether the horse had all kinds of
10   things.
11              One of the issues for you to decide in this case, a
12   very important issue, why is Vorst stopping.  I will talk
13   about that in a minute.  So one of the first issues you're
14   going to need to decide early on in this case is why is this
15   horse stopping in competition.
16              You will hear evidence in the course of this case
17   that when Mrs. Redman first bought Vorst in July of 2011, the
18   horse was stopping for the owner of the horse before she
19   bought it.  So the evidence will be Mrs.  Redman buys a horse
20   in July 2011, but she knows when she's buys it, from talking
21   to the people selling her the horse and the agent involved
22   named Mr. Morrissey, who you'll also hear from, that this
23   horse was stopping.
24              You will also hear testimony in this case that
25   Mrs. Redman buys the horse, and then she hires Mr. Syquia to
```

 1    come in, and Mr. Syquia trains the horse at her facility in

 2    Kentucky.

 3            You will hear evidence from Mr. Syquia, I believe

 4    from Mrs. Redman, as well, that the horse is being trained and

 5    getting ready for competition with Mrs. Redman at her ranch in

 6    Kentucky in August-September time period of 2012, 2012.

 7            You'll also hear evidence from Mr. Syquia and I

 8    believe from Mrs. Redman, too, that the very first time they

 9    put Vorst in competition in Kentucky at the Kentucky National,

10    the horse stopped.  So Mrs. Redman buys the horse.  The

11    evidence will show she knew it was stopping with the prior

12    owner.  The very first time she puts it in competition with

13    Mr. Syquia the horse stops.

14            You will hear testimony from various persons as to,

15    well, why did the horse stop.  You will hear evidence from our

16    side through our veterinarian named Mr. -- or Dr. Ted Vlahos,

17    that the horse is stopping because it's in pain.  And I'll

18    explain to you why this horse had pain and how it relates to

19    the horse stopping.  But right now I'm focused just on the

20    idea that Ms. Redman buys a horse, she knows it's stopping,

21    the first time she puts it in competition the horse stops.

22    That's what the evidence will show.

23            Now, what happens after the horse stops is

24    Mrs. Redman, with Mr. Syquia, owns this horse for two years,

25    approximately two years.

```
 1              During that two-year period, Mr. Syquia rides this
 2   horse many times in the two-year period.  During the course of
 3   this case, you will watch videos of Vorst in competition while
 4   Mrs. Redman owned the horse and while Mr. Syquia is riding the
 5   horse.
 6              The videos that you see in this case, every one of
 7   them, there's four, the horse stops every single time.  That's
 8   what the videos, when you watch them, that's what you'll see.
 9   Mr. Syquia is on the horse, he's riding the horse, the horse
10   stops.
11              The last video you're going to see is going to be
12   one of Mr. Zendejas' son, Juan Jose Zendejas.  This is after
13   Mr. Zendejas buys the horse, and when Mr. Juan Jose, his son,
14   rides the horse in Canada, the horse stops.
15              In this case, given the evidence that I believe will
16   come in at this time, you're not going to be seeing any videos
17   of this horse riding around successfully in competition, just
18   the videos of the horse stopping.
19              The times when the horse stopped with Mr. Syquia,
20   these happen February 6 of 2013, May 15, 2013, and August 25
21   of 2013.  Those dates are important, because those dates are
22   before Mr. Zendejas purchases Vorst from Mrs. Redman.
23              Let me read these dates to you again:  February 6,
24   2013, May 15, 2013, and August 25th of 2013.  Mr. Zendejas
25   buys the horse from Mrs. Redman in April, March-April of 2014.
```

1    So all of these dates happen before he buys the horse.

2           Now, during the time that Mrs. Redman owned this

3    horse, this horse had undergone from veterinary care.  I

4    talked earlier about Dr. Ted Vlahos.  Let me tell you a little

5    bit about who he is.  First of all, he's the only veterinarian

6    that you will be hearing from in this case, and he's coming to

7    testify for Mr. Zendejas.  I want to share with you a little

8    about who Dr. Vlahos is, because I think this will assist you.

9    And, again, this will be, I anticipate, coming into evidence

10   when he testifies when he's here with you.

11          The evidence will show that Dr. Vlahos has a

12   specialty in equine veterinary care.  He's been a doctor of

13   veterinary medicine since 1988.  He has been a board certified

14   specialist for horses since 1997.  He is the sole equine

15   specialist for the American Board of Veterinary Practitioners

16   and its Council of Regents.  The evidence will show that in

17   the world or in the United States there's only eight regents

18   for the entire country.  He's the only veterinarian part of

19   this regent board for horses, the only one.  And you're going

20   to be able to hear from him in this case.

21          Also, Dr. Vlahos will tell you he's been on

22   programs, on national TV, such as Good Morning America.

23          When Dr. Vlahos comes to speak with you and you hear

24   from him, here's what he's going to tell you about why Vorst

25   is stopping.  The primary thing he's going to tell you is the

horse is stopping because it has pain.  Just like a human
being, when a horse is asked to go over a jump, it has to
exercise, it has to jump, it has to move.  So imagine, for
example -- I'll start over again with that.

          One of the things that you're going to hear about in
this case is the term "lameness" and the term "soundness," or
lame or sound.  So one of the things that you're going to be
called on to decide is was Vorst lame, or was Vorst sound, or
what type of problems did Vorst have physically before
Mrs. Redman sold the horse to Mr. Zendejas?

          And also what you're going to have to decide, if
these medical problems existed, did she disclose them to
Mr. Zendejas before he bought the horse?

          The evidence will show that this horse had serious
medical problems.  You'll hear that from Dr. Vlahos.
Mrs. Redman knew about this.  Mr. Syquia knew about this, and
they never told Mr. Zendejas.

          Here's an example.

          The evidence is going to show that Mr. Zendejas and
Mrs. Redman agreed that he would buy Vorst from Mrs. Redman
for $250,000, a quarter of a million dollars, all cash.

          The evidence is going to show through Mrs. Redman,
through her bank records, I'll be asking her questions about
this, that in early March of 2014, Mr. Zendejas sends her
$10,000 by wire.  This happens right around the time that the

 1   horse has a pre-purchase examination by Dr. Gomez.  I'll talk

 2   to you about that in a minute.

 3          The evidence is also going to show that on April 3rd

 4   of 2014, Mr. Zendejas wires another $40,000 to Mrs. Redman.

 5   So she's got $50,000 of his money.  The evidence is also going

 6   to show that at that time, Mrs. Redman believed the horse to

 7   be her horse.  You will hear her testify about that hopefully

 8   when she testifies in trial.

 9          So as of April 3rd, 2014, Mrs. Redman's got $50,000

10   of Mr. Zendejas' money, and in her mind the horse is still

11   hers.  Why?  He hasn't paid the other $200,000.

12          The evidence is going to show this.  Between

13   April 3rd of 2014 and April 23rd of 2014, Vorst developed

14   physical problems.  Dr. Vlahos will testify, and he'll give

15   you his opinions based upon a review of other veterinary

16   records, that in his opinion, this horse had lameness in

17   April.

18          The evidence will also show that Mr. Zendejas did

19   not know this.  Mrs. Redman never disclosed it to

20   Mr. Zendejas, nor did Mr. Syquia.

21          So Mr. Zendejas, acting without knowledge of any of

22   this bad stuff going on in April that you'll hear about from

23   Dr. Vlahos, sends $200,000 to Mrs. Redman.

24          So on April 23rd of 2014, she's got $250,000 of

25   Mr. Zendejas' money.  And the evidence will show that as of

1    that date, Mr. Zendejas had no knowledge of the medical

2    treatments Vorst was receiving in April, before

3    Mrs. Redman got the final payment of $200,000.

4            The evidence is also going to show that once

5    Mr. Zendejas had made an agreement with Mrs. Redman to buy

6    Vorst, they agreed that the horse would go through what's

7    known as a prepurchase examination.

8            What is a prepurchase examination?  You will hear

9    testimony from Dr. Vlahos, also by video Dr. Gomez, who did

10   the prepurchase exam.  The reason the prepurchase exam is

11   done, you'll hear testimony about this, is for what reason?

12   It's a chance for Mr. Zendejas to determine, is this horse

13   okay, does the horse have a problem, is the horse worth what

14   I'm paying for it?  You will hear testimony from Dr. Gomez

15   about how he did the prepurchase exam.

16           What you will also hear about the prepurchase

17   exam -- again, this is happening in early March of 2014,

18   before Mr. Zendejas sends Mrs. Redman all this money.  You

19   will hear testimony in this case from Dr. Gomez and Mr. Syquia

20   that in the purchase examination, there's a document or

21   section called Seller's Statement.  The Seller's Statement has

22   a series of questions that asks -- this is the vet asking this

23   question of the seller, Dr. Gomez asking Mr. Syquia,

24   Mrs. Redman, please answer these questions for me.

25           One of the questions, is there any unknown health

1    issues that I need to know about?  Is there anything that

2    could affect this horse's ability to be fit as a jumper?

3            The evidence will show that Mr. Syquia said the

4    horse is fine.  The evidence will show that Dr. Gomez did not

5    know of preexisting conditions of Vorst before the prepurchase

6    exam.  So what does Dr. Gomez do?  And you will see this on

7    the screen.  He does a prepurchase examination.  And what does

8    he find?  Vorst is a hundred percent sound.  Soundness, what

9    does that mean?  The horse can work.  The horse can

10   participate as an athlete.  The horse can do what Mr. Zendejas

11   is trying to do with this horse.

12           What does lameness mean?  It's kind of like the

13   opposite of soundness.  If I'm lame, that means I really can't

14   do what I'm supposed to do because a physical ability, I have

15   a sore back, I have a sore hind leg.

16           You will hear from Dr. Vlahos that Vorst had

17   suffered from lameness the entire time that Mrs. Redman owned

18   the horse; from the records that he reviewed, you will hear

19   him give his opinion on that.  So you will also hear

20   Dr. Vlahos testify that in April, before Mr. Zendejas sent

21   Mrs. Redman $200,000, the medical records for treatment of the

22   horse, not by Dr. Vlahos but by other veterinarians, the horse

23   developed lameness.  Wasn't a hundred percent sound.

24           The evidence is going to show that Mr. Zendejas,

25   again, didn't know this, was never told this, and he's sitting

1    in Mexico with no knowledge of what's going on.

2              What you will also hear during this trial is that

3    Mrs. Redman, during the time she owned the horse, had insured

4    the horse.  The moment she bought the horse she bought a

5    policy of insurance.  The evidence will show that the policy

6    of insurance was to provide compensation to Mrs. Redman in the

7    event that Vorst developed problems, the horse died or some

8    other disability.  She had the policy for three years.

9              First year on the policy you will hear evidence, you

10   will see evidence of this, hopefully from Mrs. Redman, that

11   the horse didn't have any exclusions in the policy.  Second

12   year, no exclusions in the policy.  Third year, exclusions.

13   That means the insurance company in the policy is saying if

14   this happens, we're not going to pay.  You will hear from

15   Dr. Vlahos telling you about those exclusions and what they

16   mean.

17             Again, the evidence will show that Mr. Zendejas was

18   never told about this, didn't know about it, and if he had

19   known this, he wasn't gonna buy Vorst.  In fact, the evidence

20   will show when you hear ultimately from Mr. Zendejas is, I

21   just wanted to buy a horse for my son.  I didn't want to buy a

22   problem.  I didn't want to buy a horse that wasn't safe.

23             And what his testimony will be is, I trusted

24   Mrs. Redman, I trusted Mr. Syquia, I had no reason not to, and

25   his testimony will be, if I had known about the insurance

```
 1    stuff, if I had known about the stuff when you own the horse
 2    about the stopping, if I had known about the other medical
 3    problems, I wouldn't have bought the horse, and I wouldn't
 4    have paid you the money.  And you'll hear this from
 5    Mr. Zendejas.
 6            One of the witnesses you're going to hear from in
 7    this case is a woman named Leslie Howard.  Again, she's going
 8    to testify via video.  Who is Leslie Howard?  Leslie Howard is
 9    someone who's very well regarded in the horse business.  I
10    think everybody agrees that she won a gold medal and a silver
11    medal in the Olympics with show jumpers.  So she's very well
12    respected.  You'll hear from her.
13            After Mr. Zendejas buys the horse, he did have to
14    use the services of Leslie Howard.  I will get into that in a
15    minute, but here's what I want to say to you now.  You will
16    hear testimony from Ms. Howard via video where she's watching
17    his son compete in Canada where the horse stops, and you know
18    what she says?  The horse shouldn't have stopped.  No reason
19    for the horse to stop.  Her testimony is consistent with what
20    I said earlier, which is, what's a dirty stopper?  Stops for
21    no reason.  It's a small little tidbit, but I wanted to bring
22    it to your attention, and we'll emphasize that during the
23    case.  But it will be -- hopefully, you'll hear that from her.
24            So Mr. Zendejas, then, not knowing any of this, I
25    just want to tell you a little bit about the evidence what
```

```
 1    happens in the sale, and then I want to tell you what happens
 2    after the sale, and then I'll be done.
 3           Mr. Zendejas was using someone named Simon Nizri to
 4    assist him in buying the horse.  Mr. Nizri is a trainer.  He
 5    was out at Wellington.  Mr. Nizri is a friend of Mr. Syquia.
 6           So the evidence will show Mr. Zendejas talks to
 7    Mr. Nizri, who had trained his son, Juan Jose, at the time,
 8    and said hey, I'm thinking about getting a horse for my son,
 9    can you help me do that.  The evidence will then show that
10    Mr. Nizri went to Wellington, to show grounds, contacted
11    Mr. Syquia (sic) and said, hey, let's buy -- let's take a look
12    at this horse, Vorst.
13           The evidence will show that Mr. Syquia and Mr. Nizri
14    organized a testing of the horse in Wellington at Mr. Syquia's
15    barn where Mr. Zendejas and his wife and some other family
16    members and his son went to the barn area to try the horse.
17    The evidence will show that the horse was tried twice without
18    problem, and at that time the horse performed well.
19           The evidence will also show that in this industry,
20    it's not normal to test a horse in competition, because people
21    are concerned if the horse gets hurt in competition, you
22    haven't bought the horse yet, there's a problem.  You'll hear
23    testimony about that.
24           So they test the horse.
25           Now, Mr. Zendejas and Mr. Nizri, you'll see
```

1    Mr. Nizri on video, the evidence will show that Mr. Nizri had

2    inquired of Mr. Syquia, tell us about the horse, are there any

3    medical problems we need to know about?  Is there anything we

4    need to know about this horse?  Is this horse going to be a

5    problem for us?  And the evidence is going to show that

6    Mr. Syquia said this is a great horse, I love this horse,

7    words to the effect, and never disclosed any of the

8    preexisting problems with the horse, stopping, medical or

9    otherwise.

10          One of the things in this case you're going to need

11   to decide is when Mr. Syquia made those statements to

12   Mr. Zendejas and to Mr. Nizri, were those statements true, or

13   were they false?

14          You're also going to need to decide this.  One of

15   the things that you will hear from Mr. Nizri is, well, I did

16   tell them this horse was stopping, I did tell them the horse

17   stopped.

18          Well, you'll have to decide whether or not that's a

19   true statement or not, given everything that you hear in the

20   case.

21          The evidence will show that when Mr. Syquia

22   interviewed with Mr. Nizri regarding Vorst, Mr. Nizri said, do

23   you have any videos on the horse, can you give them to me?

24   The evidence is going to show that Mr. Nizri (sic) did give

25   him a video, did give him a link, but the videos always showed

1    the horse doing well in competition and not stopping.

2          The evidence will also show through Mr. Nizri that

3    when he did go on the Internet to search for videos of Vorst,

4    never saw videos of the horse stopping.  You'll hear that from

5    Mr. Nizri, again, via video.

6          So another issue you're going to need to decide is,

7    who did Mr. Nizri work for in this transaction?  Who did he

8    work for?  The evidence is going to show that Mr. Nizri worked

9    for Mrs. Redman.  He was her agent.  I don't expect there will

10   be any argument about that.

11         Now, who did Mr. Nizri work for?  You're going to

12   need to decide that, too.  Was Mr. Nizri working for

13   Mr. Zendejas, or was Mr. Nizri working for Mrs. Redman?

14   You're going to need to decide that, who did he act as an

15   agent for.

16         Now, to assist you in that, you're going to hear

17   some evidence about commissions.  Commissions.  And you're

18   also going to hear from Mrs. Redman when she testifies about

19   this when I question her.

20         You will hear evidence that in the horse business, a

21   normal commission to pay on a horse when somebody buys it is

22   10 to 15 percent.  You will hear some people say, oh, it's as

23   high as 20 percent.  You'll hear Mr. Syquia tell you that.  As

24   high as 20 percent.

25         The evidence is going to show the following in this

1  case:  When Mrs. Redman got her money from Mr. Zendejas on the

2  23rd of April, 23rd of April, the first person she paid a

3  commission to was who?  Mr. Nizri, $25,000 in cash by wire,

4  25,000 in cash by wire, day after she gets the money from

5  Mr. Zendejas.

6          You will hear testimony from Mrs. Redman when I

7  examine her, well, why did you pay Mr. Nizri?  I believe the

8  testimony will be, it was fair.  It was the right thing to do.

9  He helped facilitate things, and Mr. Syquia told me we should

10  do that.  You'll have to decide when she's paying this

11  commission to Mr. Nizri, is that indicative he acted on her

12  behalf as her agent?  You'll have to decide that.

13          Also, who else got a commission here?  The evidence

14  is going to show that Mr. Syquia got a check for $37,500 from

15  Mrs. Redman right after she gets the money from Mr. Zendejas.

16          So Mr. Nizri's getting $25,000, Mr. Syquia's getting

17  $37,500.  We'll do the math together during the trial.  It's

18  more than 20 percent.  It's more than 15 percent.  It's more

19  than 10 percent.  You'll have to decide whether or not you

20  feel those commissions were excessive, and you'll have to

21  decide if you believe they support a finding that Mr. Nizri

22  was also acting for the benefit of Mrs. Redman in the sale of

23  this horse.

24          Next, Mr. Zendejas takes possession of the horse on

25  April 24, 2014, April 24, 2014, the day after Mrs. Redman gets

1    the money from Mr. Zendejas.  In this case, you're gonna see a

2    bill of sale.  In fact, you're going to see two bills of sale.

3    One bill of sale's going to be signed by Mrs. Redman.  Another

4    bill of sale's going to be signed by Mr. Nizri and by

5    Mr. Syquia.  You're never gonna see a bill of sale signed by

6    Mr. Zendejas.

7         When you look at the bill of sale, one of the

8    questions is going to be what does the bill of sale say?  Does

9    the bill of sale disclose the problems with Vorst that

10   Mrs. Redman knew about to Mr. Zendejas?  You'll have to decide

11   that.  Does the bill of sale put Mr. Zendejas on notice that

12   Vorst had a problem with jumping, stopping, health problems,

13   lameness?  You can look at the bill of sale, and you'll have

14   to decide whether or not that's disclosed.

15        Next in terms of what you'll need to decide is

16   Mr. Zendejas takes possession of Vorst, and he takes the horse

17   to Mexico.  When he gets to Mexico, he puts the horse in

18   competition, the horse stops.  Mr. Zendejas will testify, I

19   didn't know why the horse was stopping.  The veterinarian that

20   Mr. Zendejas had in Mexico is a veterinarian named Diego

21   Ulibarri.  You will be hearing from Diego Ulibarri by video.

22   Who is Diego Ulibarri?

23        The evidence will show that Dr. Ulibarri is a

24   licensed veterinary in Mexico.  His specialty is

25   hunter-jumpers.  The evidence will show that he's worked with

 1   thousands of horses over time, and at the 2016 Rio Olympics,

 2   Dr. Ulibarri was the U.S., U.S. equestrian team veterinarian

 3   for hunter-jumpers.  He's the veterinarian taking care of

 4   Vorst in Mexico.  That's what the evidence is going to show.

 5             His testimony, when you hear it, will be the entire

 6   time the horse is in Mexico with Mr. Zendejas, the horse is

 7   being treated fabulously.  The horse is being treated well,

 8   but the horse is stopping in competition.  Dr. Ulibarri will

 9   testify, you'll hear this on the screen on video, I looked at

10   the horse, the horse didn't have infection.  I looked at the

11   horse, he was healthy.  Mr. Zendejas treated the horse well.

12   He's going to testify that this horse never had a condition

13   known as shipping fever, never had an infection, sent it out

14   for clinical testing.  Independent lab came back, of course,

15   never had an infection.

16             You'll need to decide that factor, because you'll be

17   hearing from the defense in a moment, and they'll be asking

18   you to decide that, too.  So one of the things you're going to

19   have to decide in this case is after Mr. Zendejas got this

20   horse, did the horse have shipping fever, did he do something

21   bad to the horse in Mexico, and that's why the horse is

22   stopping.  Dr. Ulibarri, who is the only veterinarian you'll

23   hear from, the only veterinarian who treated the horse in

24   Mexico, is going to be testifying and telling you the horse

25   didn't have any problems, never knew why the horse was

1    stopping.

2            Next, the evidence will show that Mr. Zendejas takes

3    the horse from Mexico to Canada.  Remember earlier I mentioned

4    that the horse stopped in Canada with his son, Juan Jose?

5    You'll be seeing a video on that.  Takes the horse to Canada.

6            When the horse gets to Canada, the horse gets

7    examined by a veterinarian named Selina Watt.  She's a

8    veterinarian.  She's right out here at Palm Beach, in

9    Wellington.  She was in Canada to assist the show people up

10   there, and she was a vet working for Mr. Zendejas.  She looks

11   at Vorst, and the evidence will be that she passed the horse

12   for competition.  The horse was healthy, the horse was capable

13   to compete.

14           The evidence will show that once Juan Jose rode the

15   horse in competition, the horse stopped.  But this time when

16   the horse stopped, the evidence is going to show the horse had

17   some injuries, bad injuries.

18           Now, right around this time, and just before this

19   happens, Mr. Zendejas is complaining to Mr. Nizri and to

20   Mr. Syquia that the horse is stopping, and he says to them,

21   the evidence will show this through him, I want my money back.

22   You take the horse back, give me my money back, let's call it

23   a day.

24           The testimony will be that there was an agreement

25   made with Mrs. Redman where she said I'll take the horseback,

1    or I'll give you another horse, or I'll give you all cash, or

2    I'll give you a horse and cash, but generally, I'll take the

3    horseback.  And Mr. Zendejas agreed to give it back.

4          But after the horse gets hurt up in Canada,

5    Mrs. Redman changed her mind.  I don't want the horse back

6    anymore, it's injured now.

7          The testimony you will hear from Dr. Vlahos is that

8    this horse is stopping because it's in pain, and the reason

9    this horse is not jumping is because it's in pain all the way

10   back to the time that Mrs. Redman owned the horse.

11         The evidence is going to show that after the horse

12   stopped in Canada and Mrs. Redman indicates she doesn't want

13   the horse back, Mr. Syquia continues to work with Mr. Zendejas

14   to try to get things resolved, and he convinces him,

15   rehabilitate the horse, and we still think we can work this

16   out.  That's what the evidence will show.

17         Mr. Zendejas hires Leslie Howard.  Remember Leslie

18   Howard?  She's the lady that went to the Olympics, the jumper

19   with the Olympic medals.  He gets the horse to Leslie Howard.

20   The evidence is going to show the horse goes with Ms. Howard,

21   she has the horse for months, she trains it, she rehabilitates

22   it.  She gets the horse healthy again.

23         The evidence is going to show that Leslie Howard,

24   two-time Olympic winner, puts the horse in competition.  What

25   does it do?  First time she gets the horse in competition, it

1    stops, with Leslie Howard.

2           After this happens, Mr. Zendejas is continuing to

3    complain.

4           There's another issue you're going to have to decide

5    that happens right about this time.  Mr. Syquia, again, in the

6    blue suit, he sends Mr. Zendejas' son $25,000.  25,000.  He

7    tells his son, tells Mr. Zendejas, hey, you know what, just as

8    a matter of good faith, just because I feel bad over what

9    happened here, I want to return my commission.  So here's

10   $25,000 to you.

11          One of the things that you're going to need to

12   decide in this case is when Mr. Syquia and Mr. Nizri, because

13   Mr. Nizri was part of that, return this money to Mr. Zendejas,

14   did Mr. Zendejas ever agree when he got that money -- by the

15   way, it was paid to his son -- but when he got that money,

16   that he was going to not sue Mr. Syquia, not be here in court

17   today, not ask Mr. Syquia to respond to problems that

18   Mr. Zendejas incurred?  You'll have to decide that.  Was there

19   some kind of an agreement made between Mr. Zendejas and

20   Mr. Syquia that said, hey, when I give you this money, we're

21   done?

22          Mr. Zendejas will tell you there was never such an

23   agreement, never a document, nothing, and that, yes, he took

24   the money, but that's all he did.  You'll have to decide

25   whether or not there was an agreement like that.

```
 1              After Ms. Howard got the horse, the evidence is
 2   going to show the horse took a journey back to Wellington, to
 3   a woman named Katelyn Hess.  Who's Katelyn Hess?  She will be
 4   testifying via video.  Katelyn Hess is a trainer who has her
 5   barn right next to Mr. Syquia's barn here in Wellington, right
 6   next-door.  So in late 2014-2015, the horse comes to
 7   Wellington.  The evidence is going to show that Mr. Syquia
 8   asked Ms. Hess to take this horse on consignment.  Can you
 9   sell this horse?
10              The evidence is going to show that he never told
11   Ms. Hess that this horse was stopping, so she agrees to take
12   it on consignment.  The evidence is going to show you --
13   you'll hear from her again by video -- that she's training the
14   horse, she's paying for the horse, she ultimately puts the
15   horse in competition.  This is in early 2015.  What does the
16   horse do?  It stops.
17              In fact, the horse stopped so severely with her, and
18   you'll hear this from her on the video, that she deemed the
19   horse to be a dangerous animal.  She wouldn't get back on the
20   horse again.  Didn't want to ride the horse again.
21              Finally, after that happens, she goes to
22   Mr. Syquia -- you'll hear evidence of this -- she says to him,
23   this horse isn't worth what I thought it was worth, because
24   the evidence will be she thought she might be able to sell it
25   for 250,000, 210,000.  She says, I don't think this horse is
```

1    worth any -- maybe $30,000.  And the evidence you'll find is

2    that she did have a third-party buyer that offered 30,000 for

3    this horse.  It was presented to Mr. Zendejas.  Mr. Zendejas

4    said no, I'll never take that.  I don't want that.  I paid

5    250,000.  The evidence will be he asked for his money back.

6           Now, I talked about Rita Timpanaro.  Rita Timpanaro

7    is an expert that you'll hear from from Mr. Zendejas.  And who

8    is she, and what does she have to say about this case?

9           Bear with me, please.

10          Okay.  Rita Timpanaro is gonna come to you, and

11   she'll be telling you her opinion as to the value of Vorst on

12   the day that Mr. Zendejas picked up the horse from

13   Mrs. Redman, all the way back on April 25th of 2014.

14   Ms. Timpanaro is a certified equine appraiser.  She's been

15   doing this for 30-plus years.  She's a judge for the United

16   States Equestrian Federation.  She's worked with

17   hunter-jumpers her whole life.  I can tell you a lot more.

18   She'll do it.

19          You'll hear from her.  Her testimony will be the

20   horse is worth $30,000 on the day that Mr. Zendejas took

21   possession of this horse from Mrs. Redman.  That's what she'll

22   be telling you.

23          Couple more things, and then I'll be completed, but

24   thank you again for your patience.

25          As I mentioned earlier, one of the things that

1    you'll have to decide in this case is when Mr. Nizri and

2    Mr. Zendejas asked Mr. Syquia about the health of Vorst, did

3    Mr. Syquia or Mrs. Redman disclose Vorst's health history

4    truthfully, accurately and completely.  And you'll need to

5    decide that in this case.

6           One of the other things you're going to need to

7    decide is when Mr. Nizri was acting and interfacing with

8    Mr. Zendejas, did Mrs. Redman know about it, did she consent

9    to it, did she ever ratify it.  That will be something for you

10   to decide.

11          The evidence will show that both Mr. Syquia and

12   Mrs. Redman agree that she consented to what Mr. Syquia was

13   doing, and she ratified what he was doing.  And you'll also

14   hear testimony from her that she always knew about the health

15   of Vorst, that she knew what was going on with the horse's

16   health.

17          Finally -- and thank you very much for your

18   patience -- finally, what you're going to need to decide is

19   damages for Mr. Zendejas at the end of the case.  There will

20   be evidence put on by Mr. Zendejas about what he spent, how

21   much he spent, stuff that he paid for, and you'll also, again,

22   hear from Ms. Timpanaro as to what she thinks the horse was

23   worth on the day he bought it.  And at the end of the case,

24   you'll have to decide whether or not you think -- your answers

25   to these issues, and ultimately if there's damages, how much

1    damage for Mr. Zendejas.

2            I want to thank you very much for your time and

3    appreciate it.

4            THE COURT:  Thank you, Mr. Catanese.

5            Mr. Hart?

6            MR. HART:  Your Honor, if I might?  Due to my

7    sinuses, my voice has been fading, and I apologize for that,

8    but maybe I can get the handheld mike.

9            THE COURT:  Yes.

10           MR. HART:  I'd also like to bring up my graph.

11           One person on my squad I forgot to mention is the

12   all-important technician, Will, here, and if I could have

13   that.

14           Thank you.

15           As I mentioned in the jury selection, I appreciate

16   your patience to hear the other side of this story.  And this

17   case is about the mismanagement and abuse of an up-and-coming

18   show jumping horse that was just coming into his own.  And as

19   a result of what happened to Vorst after he was purchased by

20   Mr. Zendejas, on June 15, almost two months after he was

21   purchased by Mr. Zendejas, he suffered two severe right leg

22   suspensory ligament damage as to -- you know, in a very

23   aggressive ride by Mr. Zendejas' son, Juan Jose, that

24   essentially ended his career.  And I want to go back and tell

25   you what the evidence is going to show in a chronological

```
 1    manner and go through the history of this, and the story in

 2    essence as it was.

 3              At the end of 2013 and 2014, Vorst was competing at

 4    the Winter Equestrian Festival right here in Wellington,

 5    Florida.  And at the competitions, as Mr. Catanese mentioned,

 6    they go over different levels.  Beginning competitive horses,

 7    1.15 to 1.2 meters, all the way up to Olympic caliber of

 8    1.6 meters, which very few horses can do, and would be in the

 9    range of a million to up to 5 million, the value of those

10    horses.

11              Vorst was doing very well in the Winter Equestrian

12    Festival.  This wasn't a horse that was stopping, he didn't

13    have severe injuries.

14              And if you will, I'd like you to put up the first

15    slide.

16              If you'll notice in the right-hand corner this is

17    12/27/13, at the winter equestrian festival, Vorst is jumping

18    a height of 1.40 meters.  That is a very strong performance,

19    where there were 18 entrants, and he's placing fifth.  He's

20    not stopping in that competition, and he's doing very well.

21              If you'll put up the next slide for me, please.

22              Right after that, on January 15 of 2014, Vorst is

23    once again competing at this Winter Equestrian Festival, and

24    1.4 meters, again, and he finishes 40th out of 101.

25              Next slide, please.
```

1              Shortly after that, on January 22, 2014, you can see

2    that, once again, at 1.40.  And that's a significant figure,

3    the evidence will show, because in Vorst's three- to four-year

4    career, his record was inconsistent.  $250,000 does not buy

5    you an Olympic horse.  And the evidence will show Mr. Zendejas

6    knew that.  But, frankly, for the first time in Vorst's

7    career, he's moved up from 1.2 and 1.3 and 1.35 to 1.4 and

8    consistently doing that.  And if you'll notice, he finished

9    11th out of 108.  That is an excellent performance at the

10   Winter Equestrian Festival.  That's not a horse that's

11   stopping.  That's not a horse that's injured.

12            Next slide, please.

13            Yet a fourth result, on February 19, 2014.  Once

14   again, same place here in Wellington.  1.4 again for the

15   fourth time, 48 entrants.  He places seventh, a very fine

16   result.

17            And, finally, if you'll show me the next slide.

18            February 26, 2014, 1.4 meters, 40 entrants, he

19   places 20th.  Twentieth is the middle of the pack, but once

20   again, Vorst is a potential Grand Prix horse.  What you'll

21   hear is Grand Prix show jumpers that go over the rails -- and

22   there are a number of combination of rails -- you know, the

23   best Grand Prix horses, they go over 1.4 to 1.6.  That is the

24   cream of the crop.  And Vorst's record, as you'll see from the

25   evidence, was inconsistent.  But these were his last five

 1   performances before he was sold to Mr. Zendejas.

 2           What happened after February 26th.  Almost

 3   immediately, Mr. Simon Nizri, who was a trainer and works with

 4   Mr. Zendejas under his employment, at the very beginning of

 5   March -- and Mr. Nizri is somebody who's affiliated with

 6   Mr. Zendejas, not my client.  Mr. Nizri approaches my client

 7   through Mr. Colin Syquia, who is a very good rider, and you'll

 8   hear from him very soon in this case, and says we would be

 9   interested in buying Vorst.  We have a $250,000 budget, and,

10   you know, could we buy him.

11           Mr. Syquia says we're not publicly offering him for

12   sale, but Mrs. Redman would sell him, and why don't you come

13   out and see what he's like.

14           On March 2, Mr. Zendejas is there with his son, Juan

15   Jose.  He's buying Vorst for Juan Jose.  They test ride Vorst.

16   Vorst clears 1.5 meters.  That's outstanding.  Bear in mind

17   it's not in the ring where everybody is, which is more

18   challenging, but it's very good.  And a couple of days later

19   they come back out, Mr. Zendejas, his son, his brother-in-law,

20   whole squad, and they test ride Vorst again.  And once again,

21   he clears 1.5 meters.

22           What you're going to hear, and I'll circle back to

23   this later, is that what Mr. Zendejas and his trainer,

24   Mr. Nizri, relied on when they bought Vorst, was what they

25   saw.  And what they saw was a horse in his last five

1    performances at Wellington, here, the equestrian festival, had

2    some of his best five performances in his three- to four-year

3    career.  1.40 meters.  We just looked at all the results.

4    These are good results.  And frankly, they're thinking they're

5    getting a real buy, because this is not the kind of horse, if

6    he continues to progress, that would, you know, be at

7    $250,000.

8              So what happens next?

9              If you'll post the next slide, please.

10             Mr. Zendejas and Mr. Nizri get a veterinarian -- and

11   you're going to hear from other veterinarians other than the

12   experts they've hired.  There are going to be three of them,

13   not one, but two and three that were engaged by Mr. Zendejas,

14   who looked at Vorst and gave him a clean bill of health.

15             Now, bear in mind these horses are like other

16   athletes, and show jumping horses, you're going to hear lots

17   of evidence on, they get sore feet, they get sore backs, you

18   know, and lots of injuries, but these are relatively minor, as

19   opposed to injuries where you blow out both right legs or you

20   blow out a knee.  There are differences in injuries.

21             What you're going to hear, and I'm not going to

22   belabor this point at this point, but this prepurchase

23   examination by Dr. Gomez, who's one of the world renowned

24   equestrian vet (sic), he basically says Vorst has a right foot

25   issue.  It's been sore.  He orders some treatment for it.  He

```
 1   basically points it out to Mr. Nizri.  You'll hear testimony
 2   from Mr. Nizri it was relatively minor, they understood the
 3   matter.  But most importantly, Vorst is not lame and has the
 4   one injury, and he's good to go, and Mr. Zendejas relied on
 5   that.
 6           If you'll go to the next slide, please.
 7           This is important, because the prepurchase
 8   examination took place on March 10, and you can see from this
 9   particular slide that Mr. Nizri is reporting back to
10   Mr. Zendejas, and he's explaining everything that was done and
11   the treatment that was ordered.  Mr. Zendejas is not being
12   kept in the dark here.  He knows what's going on.  And that
13   will be evident through a lot of other things.
14           So what happens -- well, you'll note in this, before
15   we move on from this, you'll see the horse is going to have
16   some x-rays taken today, and we're going to have it rechecked
17   on Thursday.  So as to see how it bends its forefoot after
18   poultice treatment.  I did that on purpose so that you could
19   have more time to arrange the payment.
20           What happened next is Mr. Zendejas did not pay for
21   Vorst until April the 24th in full.
22           Why is that important?  Because between March 10 and
23   April the 24th, Vorst is no longer jumping.  My client,
24   Mrs. Redman, you'll hear, whenever she's going to sell a
25   horse, in the interest of not having the horse injured during
```

1    the downtime, makes sure that the horse is no longer

2    competitively jumping, because injury's always a risk if

3    you're doing that.

4             But Vorst's layoff for seven weeks, is important,

5    because like any athlete, if you're off for seven weeks,

6    you're not going to be able to go back immediately in the

7    competition.  And Mr. Nizri advised Mr. Zendejas that this

8    horse has been off, and when you take him, don't put him right

9    back into competition.

10            If you'll show me the next slide.  This is a brief

11   clip of what Mr. Nizri said to Mr. Zendejas.

12            Please.

13            (Video played.)

14            "Around the time that the horse was being shipped to

15   Mexico, didn't Colin Syquia tell you that the horse was not

16   competition fit and that the horse should not be sent directly

17   to the showring?

18            "Yes, because what had happened" --

19            "Around the time that the horse was being shipped to

20   Mexico, didn't Colin Syquia tell you that the horse was not

21   competition fit and that the horse should not be sent directly

22   to the showring?

23            "Yes, because what had happened was that the

24   horse -- like the payment of the horse took a long time to get

25   to Mr. -- to Ms. Redman.  They sent a deposit, and it took a

1  while to get the money together to pay for the horse, and all

2  that time the horse was just, you know, basically not jumped.

3  So, yeah, he was not fit enough to start in competition

4  directly.

5          "Okay.  And did you convey that -- did you relay

6  that information?  Did you tell Mr. Zendejas or Juan Jose that

7  the horse was not competition fit at the time he was shipped

8  to Mexico?

9          "Yeah, they knew that when they paid the deposit

10  until they paid the whole price that the horse was not shown,

11  and that's why they took it to jump a low class, or that was

12  the plan, to jump low in Xalapa.

13          "But in fact -- and to that point though, Mr. Nizri,

14  the horse was still rushed into competition, wasn't he?

15          "Yes.

16          "I'm sorry, so your answer was yes?

17          "Yes."

18      (Video stopped.)

19      MR. HART:  Now, let's bring this forward to

20  April 24.  In fact, April 25, and I'm going to put up a chart

21  of Vorst's travels here.

22          And what happened on April 25, when Vorst was

23  delivered to Mr. Nizri on behalf of Mr. Zendejas?  What you're

24  going to see, ladies and gentlemen, is on the 25th of April,

25  he was put into a truck and moved for two hours, or however

1    long it took to get from Wellington to Miami, and from there,

2    there's some quarantine that's required before a horse can

3    leave the country for a number of days, and he was flown from

4    Mexico -- or from Miami, excuse me, to Mexico City, which is

5    at least a four-hour flight.  And once he arrived, Vorst, in

6    Mexico City, he was trucked another, it looks like four hours

7    to Xalapa, where he arrived on April 30.

8            Keep in mind, the evidence is going to show Vorst

9    has got a whole new team, and the show jumping events, it

10   really is a team.  You have a rider.  Juan Jose would be the

11   next rider.  You have a trainer.  Mr. Nizri was his trainer.

12   You have a farrier who takes care of the feet.  You have a

13   groom who's with the horse all the time.  This is a whole new

14   squad, a whole new team.  Vorst is, you know, arriving, and

15   he's going to have to deal with completely new surroundings.

16           And what happens?  The very next day, on May 1, they

17   put him into competition in Xalapa, a major show.  He's also

18   shown in competition on the 3rd of May, on the 9th of May, on

19   the 10th of May.

20           The evidence is going to show Mr. Zendejas was very

21   impatient with the horse.  He didn't do well in Xalapa.

22           And if you'll put the next slide up for me, please.

23           What you will see in this particular slide -- excuse

24   me while I switch glasses -- is that Dr. Ulibarri, once again,

25   a doctor who is on behalf of Mr. Zendejas, looks at Vorst and

1  notes that he came out of the ring on May 9 shaking,

2  trembling, slightly dehydrated.

3          I would suggest to you in this e-mail that it was

4  more than slight dehydration, as they gave him electrolytes,

5  10 liters of water and other things in order to -- and they

6  had to do that through a tube -- in order to get this horse

7  get back to where he was.  They made the decision on the 9th,

8  that despite that, they would go ahead on the 10th, and they

9  would put him right back in the ring.  He didn't do well on

10  the 10th, and as a result, Mr. Zendejas now ships Vorst back

11  to his home in Toluca, which is another six to eight hours

12  through Mexico City, and when he arrives in Toluca,

13  Dr. Ulibarri looks at him again.

14          At this point, Dr. Ulibarri says that he's got a

15  sound in his lung, as you can see from the e-mail in front of

16  you, prescribes him antibiotics, because there's this noise in

17  his lungs, and they want to clear it up.  Four days later, on

18  May 16, Dr. Ulibarri looks at Vorst one more time and gives

19  him a clean bill of health, finds he is not lame.

20          By the way, that's important, as the evidence will

21  show, because at this point this is the second of the three

22  vets that looked at Vorst, and they haven't found any

23  significant lameness, and his own Dr. Ulibarri, on the 16th of

24  May, gives Vorst a clean bill of health, not finding any of

25  these alleged preexisting conditions.

1          What's next for Vorst?  After a May 16 examination

2    where Dr. Ulibarri gives him the go to keep moving, he's on

3    the move again.  He is shipped by truck on a long journey from

4    Toluca to the border between the United States and Mexico, and

5    then there's a quarantine period there.

6          Next up for Vorst, he is shipped for two days, eight

7    to 10-hour days, and he arrives at the border of the United

8    States and Canada.

9          From there, another two to three hours in a truck on

10   to a place called Spruce Meadows at the beginning of June.

11   Spruce Meadows is one of the -- in Calgary -- premier show

12   jumping events in the world.  A beautiful venue, difficult

13   courses, as you'll hear.  Designers -- and by the way, in

14   terms of the world of show jumping, and you will see a video

15   of it, the courses are designed to be challenging.  They come

16   in combinations.  You go over one fence, and there's another

17   fence waiting of you.  All of the horses during their careers

18   stop at some point or another.

19         The evidence will show that, you know, Vorst was a

20   horse that had appeared in competition over three to four

21   years probably over a hundred times, and the three to four

22   stoppings does not make a -- in any way the horse a stopper or

23   a dirty stopper.  And you'll hear from riders that rode Vorst,

24   like Michael Morrissey, who is an, you know, Olympic caliber

25   rider, that really when the horses stop, most of the time it's

1    because the jockeys brought them in at the wrong angle, or

2    there's a reason for it.

3           Let's look at what happened when he gets to Spruce

4    Meadows.

5           If you will, next clip, please.

6           At Spruce Meadows, pretty much immediately entered

7    right back in the competition.  Bear in mind, he hasn't had

8    any realtime to train with Mr. Zendejas' son.  But the key

9    point here is Vorst finished 13th.  It's not great.  It's

10   1.20 meters.  It's in the middle of the pack.  But he

11   finished.  It's not like we have some type of perpetual

12   stopper.  And as you'll learn during the course of the next

13   three to four days, if a horse goes up to make the jump and he

14   does not jump for whatever reason, that's called a refusal, he

15   had to circle around and do it again.  If he refuses twice,

16   he's eliminated.

17          There are rules for stopping, but the key in this is

18   that Vorst did not stop twice.  It's not even evident that he

19   stopped once, because when you complete the competition,

20   finish 13th out of 20, middle of the pack.

21          Next slide, please.

22          Right back into competition on June 7th.  And on

23   June 7 -- and this is 1.20 meters, and he finishes 22nd out of

24   39.  Not particularly great, but once again, he's completing

25   the competition, doing the best he can, and he finishes it up.

1          Now, in between the 7th and the following weekend,

2     when Vorst is going to be shown again, yet a third

3     veterinarian for Mr. Zendejas looks at Vorst.

4          If you will, next slide, please.  And we'll keep

5     this clip short.  This is Dr. Selina Watt, who sees Vorst on

6     June 11, and this is what she had to say.

7          (Video played.)

8          "Is it your position that with the horse being sound

9     as of your June 11th, 2014, note, that it was fit to compete

10    at least with respect to the soundness issue you had been

11    consulted?

12          "Yes."

13          After that -- next slide, please -- he's back in

14    competition on the 14th of June.  And this is a very important

15    date.  He finishes eighth, and he gets into what's called the

16    jump-off.  As you'll see from what's in front of you, on

17    number 8 on Vorst, there's a zero and a 70.  The zero means he

18    completed the first run of about 12 hurdles without hitting

19    any of them, without stopping, and the fact that he had a

20    clean run and got all over -- over all the hurdles, means he

21    qualified for the jump-off, which is a playoff.  And he

22    finished eight out of 20th.  (sic).

23          Now, you'll notice right next to the zero and the

24    70:46 there's a 14.  That indicates in evidence is that in the

25    jump off he didn't do well.  He finished last of the horses

1    that made the playoff, and you're going to hear testimony from

2    Mr. Zendejas that he frankly was embarrassed at Spruce

3    Meadows.  You know, 1.20 meters, this horse should have been

4    able to go over that basically in his sleep with no training,

5    which others are going to debate, and that's just not the

6    case, as you'll hear from the evidence.  But Mr. Zendejas was

7    not happy in the least with that performance, and at this

8    point he's really not happy with Vorst, because he's not

9    getting the same results he got at the Winter Equestrian

10   Festival when he was under my client's ownership.

11           But then again, as you'll hear from our expert, who

12   is a renowned top 25 rider in the world, Peter Leone, who will

13   be here on Thursday, the way Vorst was mismanaged and handled

14   and frankly, it amounted to abuse, certainly increased the

15   possibility of injury and most certainly increased the fact

16   that he would not be performing as well at these competitions.

17           At the end of the day, on the 14th, Mr. Zendejas

18   decides that -- with Mr. Nizri, that they're going to be very

19   aggressive with Vorst on the 15th.  He hasn't been doing well.

20   Let's take a video of Vorst.  Let's send it back to Colin

21   Syquia and back to Mrs. Redman and tell them we want our

22   money.  He hasn't been performing at the level.

23           If you'll go to the 15th, please.

24           The 15th is the day that Vorst sustains two very

25   serious injuries to both right legs.  He was aggressively

1    rode.  He did not complete the competition.  Frankly, he

2    never, ever again competed at that level.  These are

3    suspensory ligament damages to both right legs, which is

4    unusual.

5              You'll hear evidence from a number of people after

6    June 15 is the fact that he wouldn't jump anymore.  No, he

7    wouldn't.  His career was basically done on that.

8              If you'll go to the next exhibit.

9              At this point, Mr. Zendejas has told Nizri, and

10   Nizri has told Mr. Syquia on behalf of my client they want

11   their money back, after the horse has now been severely

12   injured, and Mr. Nizri, in this e-mail you're looking at,

13   tells Mr. Zendejas the problem we're dealing with right now is

14   not the hoof that we knew about before, but it's the ligament.

15             Next slide, please.

16             We have to understand that we cannot force Colin's

17   client to take an injured horse if it happened to us.

18             Next slide, please.

19             (Video played.)

20             "Yes, I did say that."

21             And here's Mr. Nizri's testimony on the subject:

22             "Can you explain to us why you thought that the

23   injury was serious, something quite serious?

24             "Because suspensory ligament injuries can finish a

25   horse's career.  Like it's one of those injuries that they can

```
 1  either come back or they cannot come back from."

 2           (Video stopped.)

 3           And that's what happened.  This injury did finish

 4  his career.

 5           Next slide, please.

 6           Hold off on that one for a moment.  Thank you.  You

 7  can pull back on~-- you can leave it right there.

 8           So as Mr. Catanese said, why are we here?  The

 9  evidence is going to show we're here not because Vorst was

10  some perpetual stopper or that he had some undisclosed serious

11  injury prior to June 15 at Spruce Meadows, because you're

12  going to hear from three veterinarians that he hired that all

13  said, as we went through, that he was not lame.

14           The reason we're here is because Mr. Zendejas didn't

15  like the horse.  He expected that horse to be performing just

16  like he was at the Wellington equestrian festival.

17           In fact, now you can go to the next slide, please,

18  the very day that Mr. Zendejas bought Vorst, really, thanks a

19  lot, my Siamon (sic).  That's Mr. Nizri.  I hope we can buy a

20  better one soon.  He's eyeing better horses right from the

21  start.

22           And if you'll go to the next slide, when he's

23  talking to Mr. Nizri again, and this is Mr. Zendejas:  "To be

24  honest, it was a huge mistake having believed the horse could

25  be a GP, when it never gave results that could live up to such
```

1  expectations.  Unfortunately I trusted you, now I have this

2  problem."

3         After Vorst was injured, Mr. Zendejas continued to

4  be in the industry and show competitively his jumpers, and if

5  you'll pull up the next slide with the first one, Mr. Zendejas

6  bought some more horses, show jumpers.  The first one is

7  Heros.  Eleven years old, a solid Grand Prix.  He spent

8  800,000 Euros on that horse.

9         Next, please.

10        Hector, $350,000 -- 350,000 Euros, a seven-year-old

11 prospect for Grand Prix.

12        Next, please.

13        Cottica, a seven-year-old prospect, 700,000 Euros.

14        He bought another horse.

15        Next, please.

16        Enzo, $700,000 for Enzo.

17        Next.  Tino La Chapelle, $1,800,000.  In the words

18 of Mr. Zendejas, an extraordinary horse.

19        Next.  Just Nice, $750,000 -- Euros, excuse me.  A

20 better prospect than Cottica.

21        And finally a seventh horse, Vivo Columbia,

22 1,500,000 Euros.

23        In total, these seven horses that he bought shortly

24 after Vorst were for 6,600,000 Euros.  And, of course, the

25 Euros were worth more than the American dollars at all times

```
 1    when these horses were bought.  We're talking seven or
 2    $8 million.  Why is this important?  Because it goes back to
 3    what the evidence is going to show and the point, he just
 4    didn't like Vorst because it just wasn't of the same caliber.
 5    He had been impatient with Vorst, as we saw from the chart in
 6    the way he put him right back in the competition, and his
 7    opinion of Vorst was that he just wasn't good.  It was beyond
 8    that.
 9            If you'll pull up the next slide, please.  This is
10    Mr. Zendejas talking about Vorst after the June 14
11    embarrassment with hitting the rails.
12            (Video played.)
13            "Mr. Nizri told you the horse was garbage?
14            "Yes.
15            "Did you agree with Mr. Nizri?
16            "Completely."
17            (Video stopped.)
18            The opinion of the horse is that he's garbage.
19            Next slide, please.
20            (Video played.)
21            "Vorst has the heart of a chicken."
22            (Video stopped.)
23            I want to go back to this whole issue of due
24    diligence and why they bought the horse.  I told you I'd come
25    back to it, because it's what they saw.
```

1          The next couple of slides, and we're getting to the

2    conclusion of this, are important, because it's Mr. Nizri

3    talking about why it is they really bought Vorst.

4          Please.

5          (Video playing.)

6          "Horse showing and I saw the horse in training for a

7    long period of time and I knew -- I had made an opinion of the

8    horse already."

9          Next.

10         (Video played.)

11         "It is your understanding that Vorst was performing

12   well at the Winter Equestrian Festival prior to the time that

13   your client bought him?

14         Yes."

15         (Video stopped.)

16         (Video played.)

17         "Did you do any other due diligence with regards to

18   trying to locate all of those videos that were available, that

19   were publicly available online of the horse jumping?

20         "No, because I saw the horse in person and I got a

21   chance to see the horse for quite a while at the equine clinic

22   and at the show in Wellington."

23         And finally.

24         (Video played.)

25         "So it's very difficult to pick a decision regarding

1   a show record.  In my personal experience and my opinion,

2   it's -- your decisions are made when you really see the horse

3   physically and when you see the horses jump and perform live.

4   And, of course you have to investigate and see if the horse

5   has done the classes that you want him to do, and that he's

6   careful enough and that he's fast enough, and, you know, you

7   investigate, but you never actually can know the entire

8   history of a horse.

9           "Let me start (inaudible) a little bit.  Would

10  you -- would you agree with me that the horse's most recent

11  performances in competition would have more relevance to, say,

12  the horse's show performance from two years prior?

13          "Correct.

14          "And have you, in fact, witnessed Vorst competing at

15  the Winter Equestrian Festival prior to the horse being sold

16  to Mr. Zendejas?

17          "Yes, I saw him in the class with Colin.

18          "And the horse did quite well, didn't he?

19          "Yes.

20          "So you saw what you needed to see on behalf of your

21  client, right?

22          "I did."

23          (Video stopped.)

24          And that really, in short, in terms of summarizing

25  Mr. Nizri's testimony, is exactly why they bought the horse.

1    The rest of the evidence will show as you will hear over the

2    next three or four days, they saw what he did at the Winter

3    Equestrian Festival.

4            Couple of last points that were raised.  This whole

5    issue is some type of commission.  The bottom line when you

6    hear the evidence is you'll hear from Mr. Nizri, video, since

7    he's not here, stating that he had discussed the commissions

8    with Mr. Zendejas.  Mr. Zendejas did not want to pay for his

9    $25,000 commission, and that he told -- Mr. Nizri told

10   Mr. Zendejas that it would be paid for by Mrs. Redman.

11   Mrs. Redman, this hit her at the last minute, but the evidence

12   will show when she testifies, that she agreed to do it

13   because, you know, basically Mr. Syquia had told her it would

14   be the thing to do.

15           And, lastly, there's been much made of these three

16   videos you'll see from the plaintiff where he had three stops,

17   which will be explained by the jockeys, and one of those cases

18   it was at the Hamptons, in New York, in August of 2013, where

19   the conditions were bad.  But, you know, so that you can --

20   for every time there was one of these alleged stops, there

21   were many completions in performance.

22           And, finally, I'd like to close with a -- if you

23   will, next -- video, please.

24           At the same timeframe in 2013, that they're

25   complaining of stoppage, we'd like to show you just a video of

1    Vorst competing in May of 2013, and this will let you see who

2    the horse is and illustrate for you what this jumping is all

3    about.

4              And if you'll play it, please.

5              (Video played.)

6              That was Vorst, and he was a wonderful horse, and my

7    client would take him back to this day and still feel strongly

8    about him, but she's not giving Mr. Zendejas any of his money

9    back.

10             Thank you for listening to the presentation, and

11   we're done.  Thank you.

12             THE COURT:  Thank you, Mr. Hart.

13             MS. SMERYAGE:  Good afternoon, ladies and gentlemen

14   of the jury.  My name is Colleen Smeryage.  I, along with

15   Patty Leonard, who you met earlier in jury selection, have the

16   pleasure of representing Colin Syquia in this case.

17             You'll be hearing from Mr. Syquia most likely

18   starting tomorrow, and I'm going to try and keep my opening

19   remarks as brief as possible, because I'm excited for you to

20   meet him and excited for us to get underway today.

21             You've heard a lot of themes, details, facts

22   floating around, and sometimes when we're sitting here at the

23   very beginning of trial, before any of this evidence has

24   actually come in, it can be very hard to keep things straight.

25   The story starts to sound a little confusing, and the facts,

1    you know, sound a little bit complicated.

2            I'm here to tell you that this is actually a very

3    simple case in the end, and it largely boils down to a simple

4    question, did my client, Colin Syquia, who acted as the

5    seller's agent in this transaction, and Mrs. Redman, the

6    horse's owner, sell Mr. Zendejas a dirty stopper.  At the end

7    of the case, after you've heard all of the evidence, I'm gonna

8    be asking you to find that the answer to that question is also

9    simple:  No.

10           In order for you to get there, you're going to learn

11   a lot about the horse world, maybe more than you ever wanted

12   to know.  And you're also gonna learn an awful lot about this

13   particular horse.

14           Going several years back in time, you're going to

15   hear from former riders who rode Vorst even prior to when

16   Mrs. Redman purchased the horse.  You're going to hear from

17   Michael Morrissey, who will testify that he truly loved this

18   horse.  He competed with Vorst dozens of times in dozens of

19   classes, had Vorst in his care for months and months, and rode

20   him every day they were together in the year and a half that

21   Michael Morrissey trained him.

22           After all of that time with the horse, Michael

23   Morrissey will testify that he would not call Vorst a stopper,

24   let alone a dirty stopper.  Michael will also testify that,

25   yes, there were a couple of competitions where he can remember

1    Vorst stopping, but, quote, "nothing that was troubling to him

2    or that would label him a stopper or anything in that sense."

3         You'll also hear Mr. Morrissey testify that every

4    horse stops in competition.  In fact, Michael Morrissey will

5    testify that he had never ridden a horse as many times over

6    and in as many big classes as Vorst and not seen a horse stop,

7    because every horse stops.

8         And as you'll hear Michael Morrissey testify, most

9    of Vorst's stops, if not all of them, were due to rider error

10   or the horse having some other very good reason to stop.

11   You'll also hear Michael Morrissey talk a lot about this

12   particular horse's large stride, which was an unusually long

13   stride.  You'll hear Michael Morrissey talk about Vorst's

14   careful nature, meaning that the horse didn't like to knock

15   down rails when it went over jumps.

16        You'll also hear Mr. Morrissey testify about the

17   need to get to know this horse, in and out, in order to

18   successfully compete with him.

19        You're going to hear echos of those same themes from

20   two Olympic horse jumpers who will testify in this case, too,

21   Leslie Howard and Peter Leone.  Leslie Howard's testimony will

22   take us back even further in time to when she rode the horse

23   prior to Michael Morrissey and prior to Mrs. Redman's

24   ownership.  She'll testify that Vorst was a quality horse, he

25   was a rising prospect with a great deal of talent, but one

```
 1   that needed a strong rider.
 2          Like Michael Morrissey, Ms. Howard will also testify
 3   that every horse stops at some point in its life.  She'll talk
 4   about one of her most iconic jumpers, a different horse named
 5   Gem Twist, who also stopped with her on multiple occasions.
 6   She'll testify about horses stopping in the Olympics, even,
 7   perhaps the highest level of competition in this sport.  And
 8   all of these things will be reiterated by our expert, Peter
 9   Leone, another Olympian, who will offer a great deal of
10   insight into the sport, value of these animals, and how a
11   rider can best manage their horse in order to be successful in
12   show jumping competitions.
13          You'll hear a great deal from Mr.~Leone on the
14   subject of horses stopping, including why he thinks that Vorst
15   may have stopped on the few occasions that he did.
16          Now, of course, you won't be able to answer the
17   question of whether my (sic) client, Mrs. Redman, sold a dirty
18   stopper to Mr. Zendejas without hearing from Mr. Syquia, who,
19   out of any witness testifying in this trial, spent the longest
20   amount of time training and competing with the horse.
21          Mr. Syquia will testify that he rode this horse in
22   approximately 65 classes at competition, showing the horse
23   just about every month they were together.  In each of these
24   classes, the horse was required to jump at least 12 times,
25   meaning, just in competition alone, excluding their daily
```

1    practices, Mr. Syquia jumped this horse over 780 times.  And

2    out of those 780 jumps, Mr. Syquia remembers the horse

3    stopping just four times, or roughly one out of every 200

4    jumps in competition.

5              Mr. Syquia's here to talk about each one of those

6    stops, what he remembers about them and why he thinks they

7    happened.  Mr. Syquia is here to tell you that this horse is

8    not a stopper, and he's certainly not a dirty stopper.

9              Mr. Syquia will also testify as to the details of

10   the transaction, what was said, by whom and when.  Through

11   this testimony, the evidence will establish that Mr. Syquia

12   told Simon Nizri, the buyer's agent, that the horse had an

13   inconsistent show record, that Vorst had stopped in

14   competition, that Vorst was a careful horse, that he was not

15   for a beginner level rider, that Vorst had an unusually long

16   stride that required familiarity and control and, very

17   importantly, that the horse would need time to adjust to a new

18   rider, and that the new rider should work his way up to higher

19   jumps after starting at lower heights.

20             Mr. Syquia gave Simon Nizri a copy of the show

21   record, which made clear that the horse had a lot of potential

22   to jump at the meter 40 level, where the horse had already

23   been jumping, but also demonstrated that Vorst had an

24   inconsistent show record, sometimes winning a class, other

25   times not placing in competition, as athletes sometimes do.

1   Please be comfortable with this horse's history, Mr. Syquia

2   told Mr. Nizri.

3           Now, rather than look at the show record or ask the

4   specifics about certain classes or go find videos of prior

5   competitions, Mr. Zendejas made up his mind, he wanted the

6   horse.  And that makes sense, because the horse had just

7   competed quite successfully at the Winter Equestrian Festival,

8   as you saw, where Simon Nizri had watched Vorst compete

9   several times.

10          And it also makes sense, because Mr. Zendejas' son,

11  as you also heard, had two very successful test rides of the

12  horse where everyone agrees the horse jumped beautifully.

13          So Mr. Zendejas moved forward with the sale.  And

14  he's previously testified that he relied 100 percent on the

15  recommendations of his trainer, Simon Nizri, who he trusted

16  completely and had known for 20 years, 100 percent, which

17  means, of course, that he did not rely on Colin Syquia.

18          The testimony will show that at that point,

19  Mr. Zendejas and his agent selected their own veterinarian,

20  Dr. Gomez, to perform a prepurchase examination of Vorst.

21  Dr. Gomez, one of the finest veterinarians in the industry,

22  performed that exam, and you'll hear him testify that the

23  seller didn't influence the examination, and that he found the

24  horse was sound.  He passed the horse.

25          He did, however, have one recommendation.  You'll

1    hear a lot about it.  His recommendation was that Vorst's

2    coffin joints, a joint just above the hoof, be injected prior

3    to the sale.  The evidence in this case will show that

4    Dr. Gomez made this recommendation not because there was

5    something wrong with the horse, but because it's actually

6    quite common for show jumpers who land on their feet and who

7    put a lot of stress on that joint to undergo this type of

8    preventative treatment.

9            Even one of the plaintiff's own experts has agreed

10   this type of treatment is common for show jumpers and is

11   preventative.

12           The evidence will also show that Simon Nizri had

13   knowledge of these coffin joint injections and requested that

14   Mrs. Redman's vet do them so that Mrs. Redman would have to

15   pay for them and not the buyer.  You'll learn that these

16   coffin joints were never a secret, but Simon Nizri himself

17   told Mr. Zendejas they had been performed by Mrs. Redman's vet

18   in order to save Mr. Zendejas money.

19           And because Dr. Gomez ordered the coffin joint

20   injections he also did one more thing.  He ordered a recheck

21   of Vorst to make sure that everything was well after those

22   coffin joint injections had taken place.  And when he did that

23   recheck, he found that the horse was well, that the horse was

24   not lame in any problematic way, but was sound and could

25   continue his job jumping.

1        You'll learn that after the horse was passed by

2    Dr. Gomez, Mr. Zendejas was advised.  He and his trusted

3    agent, Simon Nizri, did not elect to do any additional due

4    diligence, but instead elected to purchase the horse.

5        At that point, in order to ensure that the horse did

6    not suffer any injury in the six weeks that Mr. Zendejas

7    needed to come up with the money for the horse, Mrs. Redman

8    and Colin put the horse in what is known in the industry as

9    bubble wrap.  What this means is that the horse isn't jumped.

10   He's still ridden and exercised on a flat course.  And the

11   reason for this is that you don't want to take any risks

12   jumping the animal prior to the closing, when ownership is

13   somewhat in flux.

14       So for roughly six weeks, you'll learn, the horse

15   didn't do any jumping.  And although nothing happens during

16   those six weeks, it's still an incredibly important time

17   period in this story, because as you're going to hear from a

18   number of witnesses, you do not want to enter a horse in a

19   competition after six or seven weeks of that horse not

20   jumping.

21       Throughout testimony that's already been taken and

22   that you'll hear again during trial, the witnesses are going

23   to explain that having a horse in bubble wrap for six or seven

24   weeks and then sending him straight into competition is the

25   equivalent of sending a boxer into the ring after six weeks of

1   keeping him in a closet.  As Peter Leone will testify, it's

2   like showing up to the Kentucky derby and hoping to win after

3   you haven't raced your horse or done anything challenging with

4   it in two months' time.  It simply isn't done.

5           Yet it's exactly what happened here.  The evidence

6   will show that after a grueling travel schedule of being

7   trucked from Wellington to Miami, being quarantined for days

8   in Miami, being flown in the bottom of a plane to Mexico City,

9   and then being trucked for several more hours, Vorst was

10  immediately shown in competition in a brand new environment,

11  in a brand new country, with a brand new rider, after what was

12  now seven weeks of no jumping.  And although the horse did

13  fine at first, Vorst stopped, as every horse does.

14          But the horse didn't stop because of a health

15  defect.  And we know that because the evidence will show, as

16  the plaintiff acknowledged earlier today, that the horse came

17  perfect to Mexico.  It wasn't lame when it arrived.  There was

18  no infection being hidden.  The horse was healthy and sound.

19  The only issue with this horse, the evidence will show, is

20  that he hadn't been jumped in seven weeks and hadn't

21  adequately practiced with Juan Jose, his new rider.

22          But after the Mexico competition and after that

23  stopped occurred, Mr. Zendejas didn't go back to the drawing

24  board.  He didn't devote time to training.  He didn't

25  encourage his son to learn this horse or the horse's careful

nature.  Instead, Mr. Zendejas didn't listen to anything Colin Syquia had said about taking time with Vorst, learning the ins and outs of riding a very careful, very powerful, very athletic horse.

Instead, Mr. Zendejas had the horse trucked to Canada, another weeklong journey that ended at Spruce Meadows in Calgary.  Spruce Meadows being regarded as one of the most challenging showgrounds in the whole world.

And once there, vets again found that the horse was sound to compete and free from defect.  That was the clip you heard of Selena Watt earlier.  It was exactly as Mr. Syquia had represented prior to the sale.

After showing well the first weekend, Vorst stopped the second weekend, except this time the horse was injured, badly injured.

As you'll see from the testimony, Mr. Zendejas had already decided by that point the horse was no good, that he had the heart of a chicken, and that Mr. Zendejas didn't want this horse.

So what did he do?  He contacted my client, Colin Syquia, to try to arrange a return of the horse that he had injured, and for months my client did everything he possibly could to reach a resolution, even though Mr. Syquia hadn't done anything wrong.

But the horse had been injured, and the veterinary

1   reports consistently showed that this was not an old injury,

2   this was a new injury, one that had taken place under

3   Mr. Zendejas' watch, by pushing the horse too much, too soon.

4           As a result of the injury, Mrs. Redman couldn't take

5   the horse back.  Still, Mr. Syquia did everything he could to

6   facilitate an outcome that would resolve this dispute.

7           As part of his attempt to resolve everything with

8   Mr. Zendejas, the evidence is going to show that Mr. Syquia,

9   along with Mr. Nizri, paid Mr. Zendejas the portion of the

10  purchase price that represented the $25,000 commission

11  Mr. Zendejas had paid.  All $25,000 of that commission was

12  paid to Mr. Zendejas, half of which came from my client,

13  despite the fact that Mr. Syquia had done nothing wrong, had

14  worked hard at a resolution, and hadn't taken any money from

15  Mr. Zendejas that related to the sale.

16          Nevertheless, in a good-faith effort to resolve the

17  dispute with Mr. Zendejas, my client paid him everything he

18  could.

19          As you'll hear, Mr. Syquia wasn't in a position to

20  refund $250,000.  He didn't have it to give.  He didn't make

21  $250,000 off this sale, and he wasn't the seller.  The entire

22  amount that my client earned after this sale was $33,750.  I

23  know plaintiff told you earlier that it was $37,500, but

24  that's incorrect.  It was $33,750.  That included both the

25  standard 10 percent commission based on the sale of the horse,

1  as well as payment for training services Mr. Syquia spent

2  nearly two years providing at a discounted rate.  And of that

3  10 percent commission, my client had already paid $12,500 of

4  these funds to Mr. Zendejas.

5       So we're here right now to talk about $10,000 that

6  my client earned for his services after we deduct the $12,500

7  he's already paid.

8       In sum, the evidence is going to show you that

9  Mr. Syquia was honest and fair in all of his dealings, and

10  that he has done everything he can to resolve this dispute,

11  and that is where you come in.

12       At the conclusion of the evidence, I'm going to be

13  asking you to answer that question about whether Mr. Syquia

14  and Mrs. Redman sold Mr. Zendejas a dirty stopper, and I'm

15  going to ask you to answer that question with a "no," an

16  answer that is supported by the greater weight of the evidence

17  you'll hear.

18       As you listen, I want you to know that I appreciate

19  your time, your attention and all of your help resolving this

20  dispute.  Your role is incredibly important, and Mr. Syquia

21  thanks you for being here.

22       I also want to let you know that after this

23  Wednesday, you will likely not see Mr. Syquia in the courtroom

24  again.  That's only because he's been invited to a very

25  special and high level competition that will be occurring in

```
 1    Malaysia and only happens once every few years.  He had

 2    accepted the invitation to compete there shortly before we got

 3    the exact dates for trial, and I want you to understand that

 4    he would be here if he could.

 5              So after Wednesday, he'll leave for the Southeast

 6    Asia Games.  He's not leaving because he doesn't consider this

 7    trial to be important.  To the contrary, this trial is

 8    incredibly important to him and to his future.  He appreciates

 9    you understanding, and he appreciates all of your time.

10              Thank you.

11              THE COURT:  Thank you.

12              Ladies and gentlemen, before we hear from the first

13    witness, let's take a 15-minute recess.  Don't discuss the

14    case or form any opinions, leave your notes, and we'll see you

15    in about 15 minutes.  You can just step into the jury room and

16    leave your notes at your seats, please.

17              Thank you.

18         (The jury exits the courtroom.)

19              THE COURT:  All right.  You can all be seated.

20              We'll see you in about 15 minutes.  All right?

21              MR. CHAPMAN:  Your Honor, one housekeeping detail,

22    please.

23              THE COURT:  Yes.

24              MR. CHAPMAN:  Present on Your Honor's e-mail is a

25    proposed formal order from this morning's ruling regarding
```

```
 1   third-party subpoenas.  Because of the late hour we've got

 2   insurance counsel waiting for the order before they'll

 3   transmit.

 4            THE COURT:  I'll try and get it out.

 5            MR. CHAPMAN:  And the marshals had asked for,

 6   downstairs, it asked for an updated electronics order with the

 7   list of what's permitted to be brought in.  We had one extra

 8   computer and I think a cellphone.

 9            If we submit an order directly without a motion, can

10   Your Honor review that and if acceptable, sign it?

11            THE COURT:  Sure.

12            MR. CHAPMAN:  Thank you.

13            MR. CATANESE:  Thank you, Your Honor.

14       (A recess was taken from 4:06 p.m. to 4:21 p.m., after

15   which the following proceedings were had:)

16            THE COURT:  Please be seated, everyone.

17            We ready to proceed?

18            MR. CATANESE:  Yes, Your Honor.

19            THE COURT:  If I could just make a suggestion, to

20   try and slow down, because we not only have the court reporter

21   to try and keep up with everything, but the interpreters.  If

22   we can just maybe try and slow down a little bit your normal

23   speaking pace for their benefit.  All right?

24            MR. CATANESE:  Yes, Your Honor.

25            MR. HART:  Your Honor, only one housekeeping matter.
```

```
 1   With respect to Mrs. Redman, she does tire sometimes late in
 2   the day.   Normally I never have anyone eat anything in the
 3   court, but she had a snack.
 4              THE COURT:   That's fine.
 5              MR. HART:   Hopefully she'll be okay, but if you have
 6   any issues, tell the judge during your testimony.
 7              THE COURT:   Yeah, if you feel like you need a break.
 8              MR. HART:   It's been a long day for her.   She is 75,
 9   and sometimes, I know at the end of the day she does tend to
10   fatigue some.   I'll have to leave it to you to tell the judge
11   if there's an issue.
12              THE COURT:   Do we need some time before we get
13   started, or are you all right?
14              THE WITNESS:   Well, let's go ahead and see how it
15   goes.   I can try.
16              THE COURT:   But you don't need any more time before
17   we start?
18              THE WITNESS:   I think it's okay.
19              THE COURT:   All right.   Let's -- if you can move
20   that lecturn.
21              Let's bring the jury in, please.
22              MR. CATANESE:   Your Honor, before the jury comes in,
23   I was just talking to Mr. Hart.   When we did the deposition of
24   Mrs. Redman, there was some difficulty.   We had to suspend the
25   deposition, and Mr. Hart and I were just talking.   If
```

1    Mrs. Redman's testifying and I feel that maybe it's a little

2    too much for her, I might look back at Mr. Hart and also to

3    the Court, and if that happens, we might jointly ask if she

4    could stop for a brief recess if that happens.

5            THE COURT:  Let me make this suggestion.  And I hate

6    to waste time, especially when we're thinking about it's going

7    to take five or six days to finish this case.  Do you want to

8    postpone things until tomorrow morning when she'll be fresh?

9    Does that make sense?

10           MR. HART:  I think it would, Your Honor.  She's

11   fresh in the mornings, but our experience over two long days

12   of deposition is that my client does tire toward the end of

13   the day.

14           THE COURT:  I mean, again, I don't want to waste

15   time, but do you think it makes more sense to wait until

16   tomorrow morning?

17           MR. CATANESE:  I mean, in deference to Mrs. Redman,

18   Your Honor, I would say yes.  And I do want to start with her,

19   but in fairness, I do think it'd be best if she were to start

20   in the morning.

21           THE COURT:  Again, we have to understand that we

22   have to get Mr. Syquia on the stand, off the stand by the end

23   of business Wednesday.  So we'll see how things go tomorrow,

24   and, you know, again, I don't want to -- I hate to waste time,

25   but it's only half an hour, so it's not like we're going to

```
1    be, you know, a major setback.
2              MR. CATANESE:  My thinking, Your Honor, is if we let
3    her get rest tonight and we start in the morning, it will
4    probably go a little faster because she'll be fresh.
5              THE COURT:  Does anybody have a problem with that,
6    understanding that Mr. Syquia's going to be done Wednesday
7    afternoon?
8              MR. CATANESE:  Understood.
9              MR. HART:  No objection.
10             THE COURT:  All right.  Let's bring the jurors in.
11        (The jury enters the courtroom.)
12             THE COURT:  Welcome back, everyone.  Please be
13   seated, ladies and gentlemen.
14             Thank you for your patience, ladies and gentlemen.
15   I know we took a little longer on the break, and after
16   thinking about the time of the day and starting with the
17   witness that we're going to have to interrupt in about a half
18   an hour, we think it probably makes more sense to recess for
19   the day and start with the first witness first thing in the
20   morning with the testimony.  It's been a long day for
21   everyone.  So we think it will actually go more quickly if we
22   take a break now because of who the witness is going to be,
23   the first witness.
24             So we're going to recess.  I don't know if you think
25   that's good or bad news, but you're going to get out a little
```

```
 1   early today.

 2           So I want to remind you not to discuss the case,

 3   don't form any opinions about the case, don't discuss the case

 4   with anyone, don't do any research, avoid newspaper reports

 5   about the case.  There was a reporter in here earlier, so it's

 6   possible there might be something in the newspapers about the

 7   case.  Can't -- don't know for sure, but if you happen to see

 8   anything in the newspapers about the case, please avoid

 9   reading it.

10           And if you can be back tomorrow at 9:00 in the jury

11   room, and we'll hopefully start right at 9:00 o'clock and move

12   the case along as quickly as we can for your benefit.

13           All right.  So thank you for your service.  We'll --

14   leave your notes at your seat, and we'll see you tomorrow at

15   9:00 o'clock.  Have a pleasant evening.

16       (The jury exits the courtroom.)

17           THE COURT:  Be seated, everyone.

18           I heard mention of the depositions going to be

19   presented to the jurors.  Are there objections that I'm going

20   to need to rule on in any of these depositions, or are there

21   not, before they're presented?  If there are, I need to have

22   transcripts and know what the objections are.

23           MR. CATANESE:  Your Honor, over the weekend we

24   started that process.  With respect to Mr. Nizri, who would be

25   the first video person, my plan was to have Mrs. Redman go,
```

```
 1    Mr. Syquia, live; then Mr. Nizri.  We exchanged excerpts,

 2    defense and plaintiff.  I think we also exchanged objections.

 3    Our plan was, I think to talk today, or at some point before

 4    we get to Mr. Nizri, to resolve that.

 5              We did also exchange designations I believe for all

 6    of the other witnesses with the exception of the parties.  We

 7    haven't done that, and I don't know if we will do that.  And

 8    we are working behind the scenes to resolve that, but I don't

 9    believe we will resolve all of the objections that either

10    defense counsel or plaintiff might make.

11              How would you like us to proceed with that, Your

12    Honor?

13              THE COURT:  Well, obviously if you can resolve the

14    objections, that makes it easier for me and less time that I

15    have to spend going over everything, but, you know, I need to

16    have the objections before the witness is presented so I can

17    rule on them so we don't delay things.

18              MR. CATANESE:  Completely agree.

19              THE COURT:  The sooner you can get it to me the

20    better.

21              MR. CATANESE:  Your Honor, I also took the liberty

22    of making copies, hard copies of the stenographic

23    transcription of all of the depositions for people who would

24    be testifying via video.  I'm prepared to deliver those to the

25    Court, or would you like us to just give those to you before
```

```
 1   each of the witnesses?

 2           THE COURT:  Well, I would like you to give them to

 3   me when you know for sure that you can't resolve certain

 4   objections, and so that I can start looking at them.

 5           MR. CATANESE:  Yes, Your Honor.

 6           THE COURT:  Again, if you can work it out, as much

 7   as you can work out, fine, but once you know that you can't

 8   work it out any further and these are the objections that

 9   you're going to have, then get it to me so I can start working

10   on it.  I want to try and do it on downtime rather than the

11   middle of trial.

12           MR. CATANESE:  We will try to respect that, Your

13   Honor, and do as you're requesting.

14           THE COURT:  Okay.  So you don't have anything for me

15   right now, then, that I should be looking at this evening,

16   assuming I have time to do that?

17           MR. CATANESE:  The only thing we could give you

18   right now would be the objections that were made yesterday,

19   but we haven't started to meet and confer on those.

20           THE COURT:  All right.  I will wait for you to try

21   and work it out, and then, again, the sooner you can get

22   something to me, the better.

23           MR. CATANESE:  Yes, Your Honor.

24           MR. CHAPMAN:  Your Honor, the only item I can think

25   of, not to waste time, the Court's time, is the jury
```

1    instructions now; you've got two competing sets.  There are a

2    lot of common ground, and that's good.  There are a few --

3    there are items that are not common ground, and we're also

4    meeting behind the scenes on that, probably a little later in

5    the week than earlier in the week.

6           If Your Honor wants to look at what's before you and

7    give us any guidance in that respect, we certainly would

8    appreciate it.

9           THE COURT:  Well, again --

10          MR. CHAPMAN:  I don't think we're quite ready for a

11   jury charge conference yet.

12          THE COURT:  Well, I heard it was going to be a day.

13          MR. CHAPMAN:  We're going to work hard to make it

14   not a day.

15          THE COURT:  Okay.  Well, let's see if -- how --

16   again, if you can narrow the issues that, again, saves time.

17          MR. CATANESE:  We'll do our best, Your Honor.

18          MR. CHAPMAN:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          So anything else for this evening?

21          MR. HART:  I don't think so, Your Honor, no.

22          THE COURT:  Okay.

23          MR. CATANESE:  Your Honor, one question.  We have

24   all these boxes here.

25          THE COURT:  You can leave them.

 1                   MR. CATANESE:  Thank you.

 2                   MR. HART:  Thank you.

 3                   THE COURT:  I can't assure their safety, but you can

 4      leave them.

 5                   MR. CATANESE:  Thank you, Your Honor.

 6                   THE COURT:  I'm not a guarantor of your items.

 7                   All right.  Have a nice evening.  We'll see you

 8      tomorrow morning.

 9            (The evening recess was taken at 4:32 p.m.)

10                              *  *  *  *  *

```
 1                      * * * * *

 2                     I N D E X

 3   Jury Voir Dire                              18

 4   Court's Preliminary Jury Charge            150

 5   Opening Statements

 6          By Mr. Catanese                     158

 7          By Mr. Hart                         184

 8          By Ms. Smeryage                     205

 9                   * * * * *

10                 E X H I B I T S

11   (None.)

12                   * * * * *

13                   CERTIFICATE

14       I, Stephen W. Franklin, Registered Merit Reporter, and

15   Certified Realtime Reporter, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18       Dated this 2nd day of OCTOBER, 2017.

19

20       /s/Stephen W. Franklin
        _____
21       Stephen W. Franklin, RMR, CRR

22

23

24

25
```

WITNESSNAME — Index — COURTROOM SECURITY OFFICER: 38414

**COURTROOM SECURITY OFFICER:**
**[1]** 133/22
**MR. CATANESE:**
**[114]** 7/9 8/5 8/10 10/1
10/10 10/13 11/2 11/18
13/22 14/2 14/7 14/25
15/17 16/2 16/9 16/12
16/23 17/1 17/13 17/20
17/25 20/23 94/5 94/10
104/13 104/24 105/8
105/13 105/20 105/22
105/25 106/7 106/10
106/14 106/23 107/6
107/21 108/1 108/12
108/17 108/22 109/1
109/13 109/15 109/19
110/2 110/7 110/19
118/7 118/10 121/15
124/23 128/20 129/6
132/23 133/17 135/12
135/22 135/24 136/4
136/10 136/12 137/2
137/10 137/18 137/20
138/2 138/21 139/6
139/14 139/18 139/21
140/3 140/14 142/13
142/20 142/22 143/3
143/6 143/12 143/15
143/22 144/2 145/5
145/8 145/10 145/19
146/4 146/12 146/15
146/19 149/8 149/12
149/17 149/21 158/7
218/12 218/17 218/23
219/21 220/16 221/1
221/7 222/22 223/17
223/20 224/4 224/11
224/16 224/22 225/16
225/22 225/25 226/4
**MR. CHAPMAN: [24]**
18/12 21/6 134/19 135/1
135/4 135/10 135/17
140/24 141/12 142/10
144/5 144/8 144/11
144/15 144/18 146/3
217/20 217/23 218/4
218/11 224/23 225/9
225/12 225/17
**MR. HART: [93]** 9/19
10/9 14/19 15/5 15/12
15/23 16/13 16/22 16/25
17/6 17/11 21/17 93/20
94/2 94/13 112/13
113/15 113/23 114/1
114/6 114/9 114/14
114/18 114/21 114/24
115/5 121/14 124/25
125/9 125/12 125/18
125/23 126/4 126/11
126/20 126/24 127/5
129/8 129/15 132/25
133/16 134/8 134/12
134/15 134/17 135/11
135/18 136/1 136/6

136/11 136/22 137/14
137/23 138/5 138/9
138/15 140/10 140/18
141/13 141/16 141/18
141/20 141/22 141/24
142/1 142/3 142/5 142/7
142/9 142/15 142/18
142/24 143/2 143/8
143/10 143/17 143/25
144/4 144/22 145/2
145/13 145/15 149/22
184/5 184/9 191/18
218/24 219/4 219/7
220/9 221/8 225/20
226/1
**MR. YOSHIDA: [1]**
21/12
**MS. CORTVRIEND:**
**[10]** 8/18 8/25 9/4 12/3
12/20 13/21 18/6 18/14
21/22 94/12
**MS. LEONARD: [31]**
11/5 12/1 21/25 115/11
115/18 116/2 116/5
116/9 116/16 118/14
118/17 121/17 127/6
129/18 133/2 133/19
136/2 136/8 137/24
138/14 139/1 139/24
140/6 140/11 140/19
142/16 142/25 143/20
143/24 145/12 146/2
**MS. SMERYAGE: [2]**
22/3 205/12
**PROSPECTIVE**
**JUROR: [471]**
**THE COURT: [621]**
**THE COURTROOM**
**DEPUTY: [2]** 22/23
22/25
**THE INTERPRETER:**
**[2]** 3/22 3/24
**THE WITNESS: [2]**
219/13 219/17
**VOICES: [1]** 3/3

**$**

**$1,800,000 [1]** 200/17
**$10,000 [2]** 166/25
216/5
**$12,500 [2]** 216/3 216/6
**$200,000 [4]** 167/11
167/23 168/3 169/21
**$25,000 [7]** 175/3
175/16 180/6 180/10
204/9 215/10 215/11
**$250,000 [7]** 166/21
167/24 186/4 187/9
188/7 215/20 215/21
**$2500 [1]** 78/11
**$30,000 [2]** 182/1
182/20
**$3000 [1]** 80/15
**$33,750 [2]** 215/22
215/24
**$350,000 [1]** 200/10

**$37,500 [3]** 175/14
175/17 215/23
**$40,000 [1]** 167/4
**$50,000 [2]** 167/5 167/9
**$700,000 [1]** 200/16
**$750,000 [1]** 200/19
**$8 [1]** 201/2
**$8 million [1]** 201/2

**,**

**'70s [1]** 122/5
**'80s [1]** 122/5
**'til [1]** 50/14

**-**

**-and [4]** 2/4 2/7 2/13
2/19
**-v [1]** 1/5

**/**

**/s/Stephen [1]** 227/20

**1**

**1,500,000 [1]** 200/22
**1.15 [1]** 185/7
**1.15-meter [1]** 161/12
**1.2 [1]** 186/7
**1.2 meters [1]** 185/7
**1.20 meters [3]** 195/10
195/23 197/3
**1.20-meter [1]** 161/12
**1.3 [1]** 186/7
**1.35 [1]** 186/7
**1.4 [3]** 186/7 186/14
186/23
**1.4 meters [2]** 185/24
186/18
**1.4-meter [1]** 161/12
**1.40 [1]** 186/2
**1.40 meters [2]** 185/18
188/3
**1.5 [1]** 187/16
**1.5 meters [1]** 187/21
**1.6 [1]** 186/23
**1.6 meters [1]** 185/8
**1.6-meter [1]** 161/13
**10 [18]** 14/14 49/4 49/12
50/14 51/7 51/8 56/21
85/21 86/13 96/17
134/17 134/19 137/12
141/17 148/19 174/22
189/8 189/22
**10 liters [1]** 193/5
**10 percent [3]** 175/19
215/25 216/3
**10-hour [1]** 194/7
**10-month-old [1]** 56/8
**100 percent [2]** 210/14
210/16
**101 [1]** 185/24
**107 [1]** 2/6
**108 [1]** 186/9
**10th [3]** 192/19 193/8
193/10
**11 [6]** 51/13 98/16 138/7
138/11 141/19 196/6
**1100 [2]** 2/18 2/21

**11:00 [1]** 94/7
**11:00 o'clock [1]** 50/14
**11:22 [1]** 94/7
**11th [2]** 186/9 196/9
**12 [10]** 49/6 51/6 51/15
87/3 87/23 146/1 146/1
146/1 196/18 208/24
**12/27/13 [1]** 185/17
**1200 [2]** 2/12 2/15
**12008 [1]** 2/6
**12:19 [1]** 135/14
**12:30 [5]** 119/14 119/15
119/15 119/18 133/24
**12:36 [1]** 135/14
**12:58 [1]** 149/14
**13 [3]** 139/2 141/21
185/17
**13th [2]** 195/9 195/20
**14 [7]** 38/5 140/12 141/2
141/8 141/23 196/24
201/10
**14th [2]** 196/14 197/17
**15 [19]** 14/14 67/24
72/24 84/11 93/16 94/5
135/25 140/19 141/25
146/18 148/20 164/20
164/24 184/20 185/22
198/6 199/11 217/15
217/20
**15 percent [2]** 174/22
175/18
**15-81229-CIV-KAM [1]**
1/2
**15-minute [2]** 93/15
217/13
**15-month-old [1]** 62/20
**150 [1]** 227/4
**158 [1]** 227/6
**15th [3]** 197/19 197/23
197/24
**16 [4]** 145/1 145/4
193/18 194/1
**16th [1]** 193/23
**17 [5]** 36/25 51/3 59/5
145/14 145/17
**18 [6]** 48/18 53/20 98/15
145/21 185/19 227/3
**18-month [1]** 34/25
**18-year-old [1]** 80/7
**184 [1]** 227/7
**19 [3]** 139/25 142/2
186/13
**19-whatevers [1]** 82/17
**1988 [2]** 35/1 165/13
**1997 [1]** 165/14

**2**

**20 [13]** 30/3 33/24 40/21
78/11 78/15 78/18
134/13 134/14 145/22
146/1 146/2 195/20
210/16
**20 percent [2]** 174/23
174/24 175/18
**200 [1]** 209/3
**2001 [2]** 69/13 72/17

**2011 [3]** 72/13 162/17
162/20
**2012 [2]** 163/6 163/6
**2013 [10]** 164/20 164/20
164/21 164/24 164/24
164/24 185/3 204/18
204/24 205/1
**2014 [18]** 10/9 164/25
166/24 167/4 167/9
167/13 167/13 167/24
168/17 175/25 175/25
182/13 185/3 185/22
186/1 186/13 186/18
196/9
**2014-2015 [1]** 181/6
**2015 [2]** 181/6 181/15
**2016 [1]** 177/1
**2017 [2]** 1/8 227/18
**205 [1]** 227/8
**20th [2]** 186/19 196/22
**21 [3]** 37/24 39/24 136/5
**210,000 [1]** 181/25
**213 [2]** 2/3 2/9
**22 [4]** 88/15 117/17
142/6 186/1
**22nd [1]** 195/23
**23 [4]** 85/2 136/11 138/4
142/8
**23rd [4]** 167/13 167/24
175/2 175/2
**24 [6]** 34/4 145/22 146/2
175/25 175/25 191/20
**24th [2]** 189/21 189/23
**25 [8]** 31/10 68/5 88/10
90/24 164/20 191/20
191/22 197/12
**25,000 [2]** 175/4 180/6
**250,000 [2]** 181/25
182/5
**257 [1]** 1/10
**25th [3]** 164/24 182/13
191/24
**26 [3]** 4/2 88/15 186/18
**26th [1]** 187/2
**27 [1]** 73/23
**28 [4]** 38/2 42/13 47/8
74/8
**29 [1]** 88/12
**2:00 [1]** 148/19
**2:10 [2]** 149/3 149/16
**2:14 [1]** 149/14
**2:15 [2]** 146/9 146/14
**2nd [1]** 227/18

**3**

**30 [7]** 30/18 31/24 77/8
78/11 80/8 88/13 192/7
**30,000 [1]** 182/2
**30-plus [2]** 182/15
**31 [1]** 77/8
**31255 [2]** 2/3 2/9
**32 [1]** 48/10
**33 [1]** 79/12
**33401 [5]** 1/19 2/13 2/16
2/19 2/22
**33414 [1]** 2/7

**3**
**34** [1] 79/12
**35** [1] 77/15
**350,000** [1] 200/10
**37** [1] 17/24
**3768** [1] 1/18
**38** [2] 42/17 77/15
**39** [2] 17/25 195/24
**3rd** [4] 167/3 167/9 167/13 192/18

**4**
**40** [2] 186/18 209/22
**40th** [1] 185/24
**45** [1] 112/22
**48** [1] 186/15
**4:00 o'clock** [1] 120/18
**4:06** [1] 218/14
**4:21** [1] 218/14
**4:32** [1] 226/9

**5**
**5 million** [1] 185/9
**514-3768** [1] 1/18
**525** [4] 2/12 2/15 2/18 2/21
**561** [1] 1/18
**5:00 o'clock** [2] 11/12 63/11

**6**
**6,600,000** [1] 200/24
**65** [1] 208/22

**7**
**70** [2] 53/6 196/17
**700,000** [1] 200/13
**701** [1] 1/18
**70:46** [1] 196/24
**74** [1] 139/3
**74-year-old** [1] 59/12
**75** [1] 219/8
**780** [2] 209/1 209/2
**7th** [2] 195/22 196/1

**8**
**800,000** [1] 200/8

**9**
**91** [2] 27/13 29/5
**91362** [2] 2/4 2/10
**9:00 in** [1] 222/10
**9:00 o'clock** [2] 221/11 222/15
**9th** [2] 192/18 193/7

**A**
**a.m** [2] 94/7 94/7
**abide** [1] 96/1
**ability** [41] 30/24 32/22 36/2 36/4 42/6 44/16 45/23 48/4 54/14 58/7 60/21 61/14 68/10 69/8 72/8 75/19 76/10 76/21 80/18 80/24 81/4 91/6 92/2 95/22 95/25 97/13

**102**/25 103/14 105/15 106/25 109/4 110/4 123/3 129/11 130/5 130/21 131/22 153/4 161/21 169/2 169/14
**able** [63] 6/22 7/2 7/24 15/14 15/21 27/25 29/24 30/24 33/16 35/8 36/18 37/5 38/9 39/10 44/12 47/16 51/13 52/25 53/8 55/19 56/16 59/10 61/3 61/11 61/25 63/1 63/2 63/24 64/6 67/17 68/14 69/3 70/2 71/1 71/12 71/18 73/6 74/17 77/1 78/20 79/3 84/1 84/17 86/8 87/2 89/16 98/21 105/4 105/10 105/12 108/23 111/5 113/12 113/15 118/19 127/16 127/18 156/20 165/20 181/24 190/6 197/4 208/16
**above** [3] 50/15 211/2 227/17
**above-entitled** [1] 227/17
**absence** [1] 50/4
**absolutely** [2] 60/1 131/21
**abundance** [1] 13/6
**abuse** [3] 103/5 184/17 197/14
**abused** [1] 128/6
**abutted** [1] 46/7
**accent** [1] 28/12
**accept** [1] 110/24
**acceptable** [19] 142/14 142/16 142/17 142/19 142/21 142/23 142/25 143/1 143/3 143/7 143/9 143/11 143/16 143/21 143/23 144/3 144/5 145/11 218/10
**accepted** [2] 143/24 217/2
**accident** [10] 30/20 31/25 32/4 32/14 33/2 38/6 38/20 66/17 69/22 80/4
**account** [3] 91/17 91/17 153/4
**accountant** [4] 40/13 51/4 51/23 53/19
**accounting** [4] 38/1 38/14 54/1 85/22
**accounts** [1] 43/14
**accurate** [2] 23/23 24/5
**accurately** [1] 183/4
**acknowledge** [2] 93/8 119/22
**acknowledged** [1] 213/16
**acquire** [1] 155/24
**acquisitions** [1] 99/9
**act** [7] 19/2 19/5 19/21

**94**/24 97/10 148/11 174/14
**acted** [2] 175/11 206/4
**acting** [3] 167/21 175/22 183/7
**action** [2] 5/13 5/18
**actions** [1] 2/17
**activities** [9] 57/2 57/7 59/19 64/21 66/9 66/25 98/7 98/19 159/17
**activity** [3] 58/2 65/13 131/5
**acts** [1] 6/1
**actually** [23] 9/13 33/2 34/21 35/5 35/16 46/6 62/18 93/8 98/6 102/21 105/4 105/17 114/23 121/2 131/25 136/19 141/1 146/11 203/7 205/24 206/2 211/5 221/21
**add** [1] 9/20
**addition** [1] 155/8
**additional** [16] 12/25 16/16 23/8 23/11 94/24 94/25 104/11 121/10 121/11 121/12 121/13 124/23 128/13 129/6 153/12 212/3
**address** [2] 10/11 10/17
**addressed** [1] 10/20
**addresses** [1] 7/6
**adequately** [1] 213/21
**adjunct** [2] 56/7 56/24
**adjust** [1] 209/17
**administration** [6] 42/14 56/14 56/25 84/23 113/22 122/11
**administrative** [1] 71/16
**admission** [1] 6/17
**admissions** [1] 6/14
**admitted** [1] 152/22
**admitting** [1] 6/17
**adoption** [1] 78/18
**adult** [17] 30/18 34/2 38/3 40/1 42/18 47/11 48/20 51/5 59/7 62/20 68/3 69/17 73/2 77/23 86/25 88/23 91/1
**adults** [2] 91/1 91/11
**advance** [1] 21/21
**advanced** [1] 59/12
**advertising** [1] 37/19
**advised** [2] 190/7 212/2
**adviser** [1] 84/22
**advocate** [1] 34/2
**Affairs** [1] 72/14
**affect** [36] 29/23 30/24 32/22 36/1 36/3 39/19 42/6 44/16 45/23 54/14 58/6 60/21 68/10 69/8 72/8 73/5 75/19 76/6 76/10 76/21 80/18 80/24 81/4 85/15 87/2 91/6 92/2 95/22 95/25 102/25 103/14 110/4 123/2

**130**/20 131/22 169/2
**affectionately** [1] 130/6
**affects** [1] 130/4
**affiliated** [1] 187/5
**affirmative** [3] 154/11 154/15 154/20
**affirmatively** [3] 4/13 5/8 12/16
**afford** [1] 139/17
**after** [69] 3/7 5/21 23/11 25/8 61/23 63/11 80/3 80/10 94/7 94/23 134/4 135/14 146/8 146/11 148/19 149/4 149/14 151/14 154/8 154/17 157/10 157/19 157/23 157/24 163/23 164/12 171/13 172/2 175/4 175/15 175/25 177/19 179/4 179/11 180/2 181/1 181/21 184/19 184/20 185/22 186/1 187/2 189/17 194/1 196/13 198/5 198/11 200/3 200/24 201/10 206/7 206/22 209/19 211/21 212/1 212/19 212/25 213/2 213/6 213/11 213/22 213/22 214/13 215/22 216/6 216/22 217/5 218/14 221/15
**afternoon** [7] 112/20 147/18 149/16 158/9 158/11 205/13 221/7
**again** [100] 3/7 4/15 4/22 6/18 7/25 12/16 12/17 13/2 13/6 13/8 13/14 13/18 16/1 17/15 19/1 19/15 19/17 21/25 22/18 23/14 24/7 24/15 25/9 50/2 70/9 81/3 84/5 85/7 89/11 94/19 100/23 107/4 107/11 112/17 115/14 117/1 119/19 119/21 124/18 132/2 132/7 132/16 147/1 147/16 147/20 148/2 148/11 148/13 149/2 150/3 150/9 153/15 154/17 155/13 156/15 158/2 158/25 164/23 165/9 166/4 168/17 169/25 170/17 171/7 174/5 179/22 180/5 181/13 181/20 181/20 182/24 183/21 185/23 185/24 186/14 186/16 186/20 187/20 192/24 193/13 194/3 195/15 195/24 196/2 197/11 198/2 199/22 212/24 216/24 220/14 220/21 220/24 224/6 224/21 225/9 225/16 225/16

**against** [12] 11/21 19/12 26/13 46/23 75/25 79/24 81/8 103/20 104/7 118/20 131/6 133/5
**age** [1] 155/7
**agency** [6] 5/25 6/16 6/20 78/17 79/19 161/15
**agenda** [2] 70/8 71/10
**agent** [10] 6/2 6/14 162/21 174/9 174/15 175/12 206/5 209/12 210/19 212/3
**aggressive** [2] 184/23 197/19
**aggressively** [1] 197/25
**agitation** [1] 137/4
**ago** [18] 27/11 29/4 30/19 31/24 34/4 34/8 35/1 38/5 51/8 68/5 69/20 78/12 80/8 86/13 121/3 127/15 127/24 211/9
**agree** [11] 28/2 133/18 137/23 139/9 140/4 150/17 180/14 183/12 201/15 203/10 223/18
**agreed** [8] 133/20 137/24 137/25 166/20 168/6 179/3 204/12 211/9
**agreeing** [1] 140/16
**agreement** [9] 11/8 35/21 119/5 145/25 168/5 178/24 180/19 180/23 180/25
**agrees** [4] 152/4 171/10 181/11 210/12
**ahead** [4] 32/2 118/10 193/8 219/14
**ailments** [1] 67/16
**air** [1] 73/1
**airplane** [3] 89/9 89/12 89/14
**AL** [1] 1/6
**ALEJANDRO** [3] 1/3 19/11 21/15
**all-important** [1] 184/12
**allegation** [4] 55/2 55/3 55/8 55/14
**allegation's** [1] 55/16
**allegations** [1] 113/13
**alleged** [2] 193/25 204/20
**alleging** [1] 128/12
**allocating** [1] 63/16
**allow** [4] 3/17 4/15 12/15 152/20
**allowed** [5] 6/3 8/15 35/17 52/8 93/24
**allusion** [1] 131/15
**almost** [8] 31/10 78/15 86/25 98/15 108/5 130/15 184/20 187/2
**alone** [2] 206/24 208/25
**along** [6] 25/20 113/9 114/2 205/14 215/9

Case 9:15-cv-81229-KAM   Document 287   Entered on FLSD Docket 10/04/2017   Page 230 of
257
{WITNESSNAME}                                                                    Index: along..athletic

**A**

**along...** [1] 222/12
**already** [14] 62/7 62/8
63/11 96/8 116/15
128/10 140/8 150/8
202/8 209/22 212/21
214/17 216/3 216/7
**also** [74] 1/20 3/16 4/21
18/3 21/14 22/5 43/4
43/23 56/6 61/5 61/16
61/24 63/17 97/23 98/1
106/8 110/25 111/20
113/22 115/10 116/1
120/23 122/4 128/7
130/2 131/15 139/4
151/3 152/17 158/17
159/4 162/22 162/24
163/7 165/21 166/11
167/3 167/5 167/18
168/4 168/9 168/16
169/19 170/2 172/19
173/14 174/2 174/18
175/13 175/22 183/13
183/21 184/10 192/17
206/8 206/12 206/24
207/3 207/11 207/16
208/2 208/5 209/9
209/23 210/10 210/11
211/12 211/20 216/22
220/2 223/2 223/5
223/21 225/3
**alternate** [3] 34/9 36/1
134/5
**alternates** [3] 144/13
144/14 144/17
**although** [3] 78/22
212/15 213/12
**always** [5] 40/12 52/10
173/25 183/14 190/2
**Alzheimer's** [3] 59/12
60/25 139/3
**am** [23] 15/20 15/21
29/19 51/3 51/4 56/6
59/5 59/6 59/21 62/17
62/17 63/7 67/25 69/14
69/16 72/25 72/25 77/9
77/17 79/5 85/22 85/24
105/6
**amateur** [1] 66/21
**ambulance** [1] 27/7
**amend** [2] 5/19 5/21
**America** [1] 165/22
**American** [5] 12/6 104/5
104/7 165/15 200/25
**among** [4] 19/20 20/13
92/17 134/15
**amount** [9] 17/6 50/18
68/25 112/5 112/6
140/24 160/14 208/20
215/22
**amounted** [1] 197/14
**Ana** [2] 1/20 3/23
**Andrew** [1] 86/21
**angle** [1] 195/1
**animal** [7] 97/15 102/2
108/4 108/9 129/4

181/19 212/12
**animals** [22] 59/17
59/23 61/7 98/23 100/14
101/16 102/3 102/10
103/20 108/1 115/20
116/2 130/3 130/12
130/16 130/20 131/5
132/9 132/18 140/13
141/6 208/10
**announce** [2] 3/7 3/20
**another** [23] 23/18 49/5
59/24 90/19 117/6 117/8
126/10 128/3 147/14
160/1 167/4 174/6 176/3
179/1 180/4 192/6
193/11 194/9 194/16
194/18 200/14 208/9
214/6
**answer** [13] 24/11 50/7
109/8 112/9 152/12
152/15 168/24 191/16
206/8 208/16 216/13
216/15 216/16
**answered** [1] 152/10
**answering** [5] 20/15
23/4 24/14 24/17 115/15
**answers** [5] 23/9 23/19
23/24 151/23 183/24
**antibiotics** [1] 193/16
**anticipate** [2] 158/12
165/9
**anxiety** [7] 88/19 88/20
89/4 89/7 89/17 136/14
141/7
**any** [202] 3/11 4/14 6/8
7/8 7/18 12/16 13/11
15/3 16/6 17/20 20/10
20/15 20/20 22/20 25/3
25/4 25/7 27/15 27/15
27/19 28/12 29/22 30/25
34/2 34/12 37/2 37/3
37/4 38/8 39/19 40/9
40/9 41/12 41/14 43/6
43/7 48/7 49/4 51/5
51/11 51/12 51/15 53/25
56/18 57/17 57/19 59/7
59/9 60/17 62/20 62/22
62/23 65/15 65/20 66/14
67/14 67/15 68/8 70/1
70/2 73/13 74/12 76/16
78/20 78/21 79/3 79/8
80/23 81/8 81/22 85/15
86/2 86/9 87/2 92/18
92/24 92/25 92/25 93/3
93/6 93/13 95/2 95/3
95/3 97/10 97/15 98/19
98/22 98/24 99/16
100/13 101/11 103/5
104/11 106/6 106/12
106/16 107/9 108/3
108/4 108/8 109/5 110/4
110/4 110/22 111/3
111/6 112/5 113/13
114/16 115/1 116/17
116/23 116/24 118/6
118/20 119/19 119/20

119/21 121/9 121/11
121/12 121/13 122/21
122/22 123/24 124/23
125/6 127/7 128/13
128/23 129/6 129/19
132/13 132/23 134/22
136/1 136/16 136/8
136/21 136/24 137/14
138/2 138/21 138/23
139/6 139/20 140/10
148/5 148/5 148/6 148/7
153/6 153/7 153/8
153/10 154/2 154/15
155/10 155/14 155/16
155/17 155/23 156/1
156/2 156/23 161/6
164/16 167/21 168/25
170/11 171/24 173/2
173/7 173/23 174/10
177/25 182/1 190/5
193/22 193/24 194/22
195/8 196/19 202/17
205/8 205/23 208/19
211/24 212/3 212/6
212/11 212/15 215/14
217/14 219/6 219/16
222/3 222/4 222/20
224/8 225/7
**anybody** [22] 75/25
104/20 106/16 107/8
107/12 108/2 108/6
108/7 109/2 109/17
110/9 110/22 111/2
111/14 111/17 111/22
112/24 112/6 116/18
112/24 113/5 221/5
**anymore** [2] 179/6
198/6
**anyone** [40] 74/12 74/20
74/20 74/21 92/18 95/2
95/4 96/5 96/8 96/10
97/18 99/15 99/16 99/19
99/22 99/23 100/1
101/12 101/13 104/1
104/2 104/4 104/8 117/5
117/6 118/4 118/12
118/13 132/13 133/9
148/4 154/22 154/25
155/8 155/9 155/19
155/20 156/8 219/2
222/4
**anything** [62] 4/22 11/4
16/12 31/11 32/21 39/18
42/5 44/15 45/22 46/11
46/18 48/3 54/13 54/21
57/21 60/21 72/8 75/18
76/9 76/12 76/22 76/25
80/17 80/21 81/2 83/8
85/14 88/18 92/1 93/2
93/20 95/22 95/25 97/1
97/12 100/9 109/17
113/10 122/2 123/1
124/3 125/13 125/15
125/24 131/2 132/12
132/15 139/20 148/21
149/7 154/22 154/24

169/1 173/3 207/2 213/3
214/1 214/24 219/2
222/8 224/14 225/20
**anyway** [2] 91/18
133/15
**anywhere** [2] 93/7
128/11
**aol.com** [1] 1/19
**apologize** [3] 3/21 54/7
184/7
**Apparel** [1] 88/14
**Apparently** [1] 117/25
**appearances** [5] 1/15
2/1 3/6 3/7 3/20
**appeared** [1] 194/20
**appears** [2] 110/24
111/7
**applicable** [2] 19/7
157/25
**application** [1] 13/11
**applies** [1] 19/7
**apply** [3] 28/1 150/15
150/16
**appraiser** [1] 182/14
**appreciate** [11] 22/2
26/21 94/20 133/10
147/9 149/2 150/4 184/3
184/15 216/18 225/8
**appreciates** [2] 217/8
217/9
**approaches** [1] 187/6
**appropriate** [1] 16/19
**approximately** [5] 25/13
31/24 112/23 163/25
208/22
**April** [24] 10/9 164/25
164/25 167/3 167/9
167/13 167/13 167/17
167/22 167/24 168/2
169/20 175/2 175/2
175/25 175/25 182/13
189/21 189/23 191/20
191/20 191/22 191/24
192/7
**April 23rd** [2] 167/13
167/24
**April 24** [3] 175/25
175/25 191/20
**April 25** [2] 191/20
191/22
**April 25th** [1] 182/13
**April 30** [1] 192/7
**April 3rd** [3] 167/3
167/9 167/13
**Aqueduct** [1] 90/10
**area** [8] 29/10 34/20
34/21 42/16 44/1 61/5
113/19 172/16
**aren't** [3] 8/23 151/19
151/22
**Arena** [1] 34/19
**argument** [4] 8/20 8/23
10/20 174/10
**argumentative** [1] 157/6
**arguments** [7] 89/21
151/13 151/16 151/16

151/18 155/3 157/24
**around** [16] 14/11 17/17
57/5 59/17 88/20 97/8
120/18 122/8 130/15
164/17 166/25 178/18
190/14 190/19 195/15
205/22
**arrange** [2] 189/19
214/21
**arrangements** [1] 61/9
**arrived** [3] 192/5 192/7
213/17
**arrives** [2] 193/12 194/7
**arriving** [1] 192/14
**Asia** [2] 90/22 217/6
**aside** [2] 35/9 123/15
**ask** [34] 17/19 19/3
19/17 20/10 20/15 22/22
23/3 24/6 24/12 24/12
26/7 28/11 68/17 79/21
92/16 93/24 94/22 95/2
104/12 107/11 107/12
111/24 118/16 137/21
146/9 147/10 148/12
148/19 150/7 152/1
180/17 210/3 216/15
220/3
**asked** [16] 24/20 95/1
107/8 115/22 119/25
132/11 132/13 135/1
157/12 161/15 166/2
181/8 182/5 183/22 218/5
218/6
**asking** [8] 23/4 83/10
166/23 168/22 168/23
177/17 206/8 216/13
**asks** [2] 152/6 168/22
**assert** [1] 104/7
**asserted** [1] 154/16
**asserting** [1] 154/12
**assess** [1] 63/18
**assigned** [2] 79/12
147/11
**assignments** [1] 57/3
**assist** [5] 84/21 165/8
172/4 174/16 178/9
**assistance** [3] 52/9 111/6
138/14
**assistant** [1] 69/15
**assisted** [1] 159/21
**assisting** [4] 21/8 21/12
21/14 160/3
**associate** [2] 84/13
84/21
**associate's** [2] 67/24
69/18
**Association** [2] 70/4
70/12
**assume** [3] 3/5 14/23
113/11
**assuming** [1] 224/16
**assure** [1] 226/3
**athlete** [2] 169/10 190/5
**athletes** [2] 188/16
209/25
**athletic** [3] 160/8 160/11

## A

**athletic... [1]** 214/4
**Atlantic [6]** 28/22 29/8 29/9 56/7 56/15 113/23
**ATM [1]** 68/2
**attached [1]** 17/22
**attack [4]** 73/25 74/5 76/9 88/19
**attempt [1]** 215/7
**attend [1]** 118/19
**attention [6]** 10/25 76/11 76/21 77/1 171/22 216/19
**attitudes [2]** 62/23 91/6
**attorney [7]** 21/1 40/1 40/20 61/17 61/20 81/6 112/19
**attorneys [21]** 14/14 20/14 20/21 23/9 23/10 43/24 44/21 44/24 80/23 93/6 94/24 95/3 104/11 114/12 114/16 115/1 115/2 121/9 150/6 157/24 158/5
**attorneys' [1]** 89/20
**audience [1]** 14/10
**August [6]** 1/8 88/12 163/6 164/20 164/24 204/18
**August 25 [1]** 164/20
**August 25th [1]** 164/24
**August-September [1]** 163/6
**aunt [2]** 107/13 107/16
**authenticated [1]** 8/23
**authority [1]** 33/8
**authorizing [1]** 13/20
**auto [2]** 37/25 38/13
**available [3]** 13/18 202/18 202/19
**Avenue [1]** 29/9
**Avery [2]** 2/5 21/8
**avoid [6]** 33/2 93/9 93/10 93/13 222/4 222/8
**award [5]** 16/22 17/5 17/6 112/3 112/5
**awarding [1]** 132/21
**aware [1]** 83/18
**away [9]** 48/25 49/17 50/16 51/17 51/19 53/10 63/7 107/17 148/8
**awful [1]** 206/12

## B

**bachelor's [4]** 30/16 37/1 51/3 86/23
**back [74]** 49/6 49/11 66/18 69/23 93/16 94/10 94/15 94/17 115/25 121/22 122/5 127/11 129/22 133/11 133/24 134/7 134/10 138/12 146/8 146/9 146/14 146/23 147/14 148/17 148/19 150/1 150/3 156/13 156/20 159/22

169/15 177/14 178/21 178/22 178/22 179/3 179/5 179/10 179/13 181/2 181/19 182/5 182/13 184/24 187/19 187/22 189/9 190/6 190/9 193/7 193/9 193/10 195/7 195/22 196/13 197/20 197/21 198/11 199/1 199/11 199/7 201/2 201/6 201/23 201/25 205/7 205/9 206/14 207/22 213/23 215/5 220/2 221/12 222/10
**background [12]** 19/24 24/18 27/2 34/15 56/17 60/2 67/24 73/23 79/22 126/9 126/11 126/21
**backs [1]** 188/17
**backstriking [2]** 14/19 141/9
**bad [8]** 109/22 115/1 167/22 177/21 178/17 180/8 204/19 221/25
**badly [1]** 214/15
**baker [1]** 37/11
**balancing [1]** 153/23
**ball [4]** 50/3 117/9 118/4 118/4
**bank [7]** 43/3 43/20 43/25 45/3 45/4 45/9 166/23
**banking [3]** 43/24 43/24 44/2
**barely [1]** 116/8
**barn [4]** 172/15 172/16 181/5 181/5
**base [7]** 100/24 100/25 101/2 101/6 123/7 155/21 155/23
**based [30]** 8/16 9/12 9/15 10/7 12/25 23/8 24/21 27/18 41/6 41/14 45/4 56/10 66/12 68/9 70/1 74/15 83/11 83/21 83/24 99/3 100/23 101/7 123/1 123/8 126/7 128/16 132/17 160/14 167/15 215/25
**bases [1]** 7/4
**basic [5]** 106/21 107/4 107/5 150/11 153/15
**basically [8]** 84/22 115/21 188/24 189/1 191/2 197/4 198/7 204/13
**basis [7]** 15/16 63/19 79/5 96/11 97/19 98/14 106/7
**Beach [31]** 1/7 1/19 2/13 2/16 2/19 2/22 21/19 27/3 30/15 34/8 36/25 37/23 37/24 42/23 47/8 47/9 51/9 56/4 62/16 69/15 70/4 70/11 77/12

84/1 84/15 86/22 88/10 90/23 90/25 105/5 178/8
**bear [4]** 182/9 187/16 188/15 195/7
**bearing [1]** 153/11
**Beatrice [1]** 69/13
**beautiful [2]** 98/23 194/12
**beautifully [1]** 210/12
**because [92]** 10/3 10/23 17/10 20/16 22/9 23/21 24/14 40/6 46/23 53/2 53/14 55/7 55/16 65/4 75/22 79/17 92/21 93/13 101/15 102/20 104/3 105/6 107/11 108/8 111/15 111/25 113/2 118/25 131/4 131/13 132/8 138/18 139/11 140/22 148/13 151/24 155/21 156/13 156/14 157/18 158/20 163/17 164/21 165/8 166/1 169/14 172/20 177/16 179/8 179/9 180/8 180/12 181/23 186/3 188/5 189/7 189/22 190/2 190/5 190/18 190/23 193/16 193/21 195/1 195/19 197/8 198/24 199/9 199/11 199/14 201/2 201/4 201/25 202/2 202/20 204/13 205/19 207/7 210/6 210/10 211/4 211/5 211/19 212/17 213/14 213/15 216/24 217/6 218/1 218/20 221/4 221/22
**before [81]** 1/12 3/8 7/9 10/20 10/21 11/5 20/20 22/20 24/12 24/14 24/17 27/14 34/3 36/7 37/13 40/4 40/6 42/21 51/8 55/20 56/9 59/8 59/8 60/8 60/12 62/21 62/22 71/9 72/14 73/14 73/15 86/1 86/11 86/13 88/17 92/13 93/23 95/1 109/4 109/18 112/25 113/4 113/6 113/13 114/24 128/23 132/1 132/5 133/12 138/25 148/3 149/7 149/21 150/5 155/4 162/18 164/22 165/1 166/9 166/13 168/2 168/18 169/5 169/20 178/18 187/1 189/14 192/2 198/14 205/23 217/2 217/12 218/2 219/12 219/16 219/22 222/21 223/3 223/16 223/25 225/6
**began [1]** 95/1
**begin [7]** 148/3 149/7 150/5 155/1 155/4

156/19 158/1
**beginner [1]** 209/15
**beginning [5]** 5/24 185/6 187/4 194/10 205/23
**behalf [9]** 18/22 45/1 79/24 114/15 175/12 191/23 192/25 198/10 203/20
**behind [4]** 4/16 24/10 223/8 225/4
**being [73]** 5/17 6/21 11/11 12/22 13/6 18/22 20/1 21/16 21/25 22/3 22/12 22/16 23/23 24/5 24/16 25/5 25/22 25/24 28/5 30/6 32/7 32/9 40/25 41/6 41/22 54/23 60/18 61/22 61/25 62/7 67/17 70/15 75/5 75/6 80/22 84/6 92/20 93/9 93/10 93/12 99/12 104/16 112/17 115/14 119/14 120/8 125/2 125/15 127/14 127/18 129/10 132/19 132/20 147/8 147/16 150/3 161/15 163/4 166/2 177/7 177/7 189/11 190/14 190/19 196/8 203/15 213/6 213/7 213/8 213/9 213/18 214/7 216/21
**belabor [1]** 188/22
**belief [2]** 106/16 131/16
**beliefs [1]** 131/19
**believability [1]** 153/11
**believe [39]** 10/22 15/15 16/6 18/4 26/9 35/1 84/3 40/3 105/12 106/11 107/9 107/10 108/16 108/19 109/3 111/4 114/10 115/19 116/6 117/6 125/16 125/25 127/21 131/24 131/25 138/12 145/1 151/8 152/25 152/25 153/1 157/8 163/3 163/8 164/15 175/7 175/21 223/5 223/9
**believed [2]** 167/6 199/24
**believes [2]** 24/25 25/1
**Belle [1]** 73/22
**Bend [1]** 115/23
**bends [1]** 189/17
**benefit [4]** 55/1 175/22 218/23 222/12
**besides [7]** 30/6 31/12 37/12 38/15 49/15 53/25 71/21
**best [8]** 61/14 123/14 186/23 188/2 195/25 208/11 220/19 225/7
**better [5]** 199/20 199/20 200/20 223/20 224/22
**betting [2]** 90/16 90/17

between [9] 19/16 36/14 145/19 161/20 167/12 180/19 189/22 194/4 196/1
**beverage [1]** 60/9
**beyond [11]** 33/9 33/10 33/14 33/18 36/8 38/25 49/19 49/22 66/5 66/23 201/7
**bias [2]** 111/17 153/8
**big [2]** 122/7 207/6
**bigger [1]** 120/10
**biggest [1]** 120/13
**bill [15]** 10/15 10/23 110/1 176/2 176/3 176/4 176/5 176/7 176/8 176/9 176/11 176/13 188/14 193/19 193/24
**bills [1]** 176/2
**biologist [1]** 77/24
**Bird [1]** 122/5
**bit [17]** 19/21 26/20 43/10 49/7 63/12 63/22 92/15 113/18 122/11 125/23 130/10 131/3 165/5 171/25 203/9 206/1 218/22
**blame [1]** 92/7
**blood [2]** 76/24 123/20
**blow [2]** 188/19 188/20
**blowout [1]** 74/24
**blue [2]** 159/23 180/6
**Blvd [3]** 2/12 2/15 2/18
**board [7]** 47/9 100/7 100/7 165/13 165/15 165/19 213/24
**Boca [4]** 33/24 42/12 48/18 86/14
**body [2]** 38/1 38/13
**boils [1]** 206/3
**book [1]** 155/12
**booked [1]** 62/8
**border [2]** 194/4 194/7
**born [2]** 26/23 37/23 128/9
**both [30]** 4/20 17/19 18/4 24/14 41/2 41/17 42/21 42/24 42/24 43/1 43/14 44/6 49/3 50/10 54/23 64/3 64/23 88/15 88/16 107/17 111/16 131/4 131/9 135/9 141/12 183/11 188/19 197/25 198/3 215/24
**bother [1]** 125/11
**bothered [1]** 125/8
**bothers [1]** 129/2
**bottom [2]** 204/5 213/8
**bought [24]** 64/11 64/19 86/13 109/23 124/1 128/8 162/17 162/19 166/13 170/4 170/4 171/3 172/22 183/23 187/24 199/18 200/6 200/14 200/23 201/1 201/24 202/3 202/13

**B**

**bought...** [1] 203/25
**Boulevard** [3]  2/6 2/21 29/8
**bounced** [2]  91/20 91/21
**boundaries** [1]  7/18
**Bowen** [2]  2/17 2/20
**Bowls** [1]  113/21
**box** [2]  34/7 147/4
**boxer** [1]  212/25
**boxes** [1]  225/24
**boyfriend** [1]  91/17
**Boynton** [6]  27/3 56/4 85/21 86/11 86/22 88/10
**boys** [1]  88/15
**Bradley** [5]  30/13 30/15 36/15 104/23 147/6
**Bradshaw** [2]  72/20 72/23
**brand** [5]  116/7 116/8 213/10 213/11 213/11
**break** [11]  20/13 53/5 76/17 92/13 92/15 92/17 146/7 148/3 219/7 221/15 221/22
**breakdown** [1]  52/13
**breeders** [1]  122/9
**bridge** [1]  81/7
**brief** [8]  6/9 6/10 24/18 25/9 112/18 190/10 205/19 220/4
**bring** [20]  3/8 7/9 10/25 11/5 11/23 18/17 59/17 94/10 94/15 120/4 133/12 146/6 146/21 149/17 149/24 171/21 184/10 191/19 219/21 221/10
**bringing** [2]  14/25 128/3
**broken** [3]  128/5 128/7 128/10
**brother** [2]  61/19 187/19
**brother-in-law** [2]  61/19 187/19
**brought** [6]  19/12 46/16 109/24 128/1 195/1 218/7
**Broward** [3]  77/12 82/7 87/11
**bubble** [2]  212/9 212/23
**budget** [1]  187/9
**building** [4]  46/7 75/6 75/23 148/21
**buildings** [1]  78/3
**built** [2]  98/1 98/3
**burden** [5]  44/9 153/17 153/25 154/12 157/18
**burn** [1]  64/3
**burning** [2]  49/2 50/10
**Burt** [2]  2/11 2/14
**bus** [1]  53/16
**business** [37]  37/13 37/14 37/19 42/14 50/1 53/23 53/24 58/14 59/6 59/13 60/5 60/8 61/3

61/25 62/4 62/9 73/8 73/15 73/25 74/3 78/25 89/1 100/7 115/20 115/22 116/6 126/9 126/14 126/17 130/11 139/4 139/17 139/18 162/3 171/9 174/20 220/23
**busy** [1]  63/22
**buy** [14]  64/17 64/25 123/20 166/20 168/5 170/19 170/21 170/21 170/22 172/11 186/4 187/10 188/5 199/19
**buyer** [2]  182/2 211/15
**buyer's** [1]  209/12
**buying** [7]  58/15 99/6 131/5 159/24 172/4 187/9 187/15
**buys** [10]  162/19 162/20 162/25 163/10 163/20 164/13 164/25 165/1 171/13 174/21

**C**

**CA** [2]  2/4 2/10
**calendars** [2]  71/22 71/22
**Calgary** [2]  194/11 214/7
**caliber** [3]  185/7 194/24 201/4
**called** [24]  33/15 45/15 50/12 59/15 61/12 64/5 77/10 116/23 119/9 147/15 151/3 152/18 153/18 154/5 154/11 157/2 157/15 157/20 161/23 166/8 168/21 194/10 195/14 196/15
**calls** [3]  49/21 130/6 130/8
**came** [11]  58/19 69/23 80/10 80/15 98/16 99/9 123/16 177/14 193/1 213/16 215/12
**camera** [1]  14/6
**can't** [19]  4/13 34/13 38/10 47/17 47/23 49/17 63/7 74/18 78/1 111/3 119/17 130/9 147/15 148/20 169/13 222/7 224/3 224/7 226/3
**Canada** [11]  164/14 171/17 178/3 178/4 178/5 178/6 178/9 179/4 179/12 194/8 214/6
**cancel** [1]  79/7
**cancer** [5]  120/21 120/24 120/25 121/3 121/4
**candid** [1]  129/10
**candle** [5]  49/3 50/10 64/3
**cannot** [8]  15/22 20/18 30/25 120/12 152/12

152/12 208/16 199/1
**Cantonese** [2]  104/16 158/10
**capable** [2]  161/19 178/12
**capital** [1]  21/9
**car** [3]  30/19 74/24 80/13
**card** [1]  60/14
**care** [26]  9/3 51/19 52/3 59/11 60/1 60/25 61/12 61/22 66/2 66/3 67/1 67/8 67/10 67/10 67/12 71/15 102/21 108/16 116/2 116/11 139/3 165/3 165/12 177/3 192/12 206/19
**cared** [1]  100/16
**career** [10]  44/3 44/4 56/21 184/24 186/4 186/7 188/3 198/7 198/25 199/4
**careers** [1]  194/17
**careful** [5]  203/6 207/14 209/14 213/25 214/3
**carefully** [1]  156/10
**caring** [1]  7/3
**Carlton** [3]  2/11 2/14 21/19
**carrier** [2]  51/5 54/4
**carry** [2]  50/3 79/17
**carrying** [1]  150/25
**cart** [2]  82/12 82/13
**case** [274]
**cases** [12]  33/6 41/4 41/9 41/15 42/22 42/25 44/6 44/16 72/1 79/11 81/3 204/17
**cash** [5]  166/21 175/3 175/4 179/1 179/2
**casually** [2]  100/10 100/11
**cat** [1]  108/4
**Catanes** [1]  2/2
**Catanese** [18]  2/2 2/8 14/24 20/23 21/1 21/4 21/8 21/14 104/13 121/11 124/22 129/6 132/23 158/7 184/4 185/5 199/8 227/6
**Catanese's** [1]  9/21
**catch** [2]  22/15 63/25
**categories** [1]  5/8
**categorization** [2]  5/14 5/17
**category** [1]  3/18
**caterpillar** [1]  73/11
**cause** [17]  5/13 5/17 41/13 46/19 55/9 80/23 90/12 111/18 128/18 133/5 134/4 135/21 135/22 135/24 136/13 136/15 136/22
**caused** [1]  80/4
**causes** [1]  127/18
**caution** [1]  13/6

**Cedar** [2]  2/3 2/9
**cellphone** [1]  218/8
**cellphones** [1]  92/23
**Celtics** [2]  122/5 122/12
**center** [1]  63/19
**Central** [1]  73/24
**ceremony** [1]  28/24
**certain** [17]  82/13 102/23 119/1 123/21 151/11 154/11 160/13 160/14 160/15 160/16 161/5 161/8 161/9 161/10 161/22 210/4 224/3
**certainly** [7]  26/10 49/22 116/13 197/14 197/15 209/8 225/7
**certificate** [2]  33/25 227/13
**certified** [3]  165/13 182/14 227/15
**certify** [1]  227/15
**cetera** [5]  49/1 49/13 49/21 140/13 155/12
**CFO** [2]  56/12 122/4
**chain** [1]  151/4
**chairs** [2]  14/11 17/17
**challenge** [5]  51/17 116/14 130/10 130/12 131/3
**challenges** [1]  132/13
**challenging** [5]  5/16 187/18 194/15 213/3 214/5
**chance** [2]  168/12 202/21
**Chances** [1]  160/3
**change** [1]  6/11
**changed** [1]  177/9
**chaotic** [1]  49/20
**Chapelle** [1]  200/17
**Chapman** [3]  2/5 2/5 21/8
**charge** [5]  36/8 38/21 43/13 225/11 227/4
**charged** [2]  32/7 32/9 33/1
**chart** [2]  191/20 201/5
**check** [4]  91/18 91/20 91/21 175/14
**checking** [1]  61/10
**cheese** [1]  37/11
**Chen** [7]  50/24 51/1 113/9 138/7 138/11 140/22 141/4
**Chepren** [3]  84/9 84/11 147/7
**chicken** [2]  201/21 214/18
**chief** [3]  48/19 70/3 70/14
**chiefs** [4]  69/16 70/4 70/12 71/22
**child** [6]  52/3 52/23 63/8 78/14 78/23 96/17
**childcare** [3]  63/9

140/22 141/5
**childhood** [2]  64/12 107/19
**children** [20]  29/20 30/18 34/3 37/2 38/3 40/1 42/18 47/11 48/21 51/5 51/6 59/7 62/20 68/3 77/23 79/12 84/14 86/25 88/15 95/5
**choose** [2]  145/18 151/8
**chose** [1]  8/7
**chosen** [1]  127/2
**Christian** [1]  131/20
**chronological** [1]  184/25
**Chrysalis** [1]  77/11
**circle** [2]  187/22 195/15
**circuit** [1]  160/12
**circumstances** [2]  132/1 151/4
**circumstantial** [1]  151/4
**citizen** [1]  104/5
**citizens** [2]  72/1 104/7
**Citrix** [1]  85/23
**City** [7]  27/3 46/6 64/13 192/4 192/6 193/12 213/8
**CIV** [1]  1/2
**civic** [2]  19/4 26/6
**civil** [22]  19/9 19/15 32/13 33/12 34/4 35/2 35/19 36/15 39/4 42/22 44/10 51/9 54/8 59/8 69/1 69/21 84/15 85/8 91/4 144/17 150/11 153/14
**claim** [12]  4/14 5/9 5/24 6/2 6/2 12/16 25/6 80/3 80/12 153/15 154/9 154/9
**claiming** [3]  24/22 123/25 129/13
**claims** [6]  19/12 25/10 34/24 104/7 153/16 153/20
**class** [4]  82/15 191/11 203/17 209/24
**classes** [6]  203/5 206/19 207/6 208/22 208/24 210/4
**clean** [6]  67/12 110/1 188/14 193/19 193/24 196/20
**cleaning** [1]  67/11
**clear** [5]  8/17 193/17 209/21
**clearly** [3]  13/3 110/11 110/23
**clears** [2]  187/16 187/21
**Clematis** [2]  1/18 148/24
**clerk** [3]  40/3 47/12 47/19
**client** [27]  9/3 10/14 11/7 21/20 21/25 22/2 111/21 115/22 118/18

**C**

**client... [18]** 187/6 187/6 189/23 198/10 198/17 202/13 203/21 205/7 214/22 215/12 215/17 215/22 216/3 216/6 220/12

**client's [1]** 197/10

**clients [9]** 20/14 20/22 62/7 79/7 79/10 93/7 95/4 116/2 119/22

**clinic [1]** 202/21

**clinical [1]** 177/14

**clip [4]** 190/11 195/5 196/5 214/10

**clogged [1]** 110/17

**close [4]** 92/14 101/12 109/9 204/22

**closely [2]** 56/12 63/1

**closer [2]** 17/9 74/2

**closet [1]** 213/1

**closing [5]** 10/20 151/16 155/3 157/24 212/12

**clothing [1]** 88/14

**club [1]** 60/3

**clubs [1]** 60/10

**codefendant [4]** 91/4 91/14 92/5 92/6

**coffin [5]** 211/2 211/13 211/16 211/19 211/22

**COLIN [14]** 1/6 19/13 22/2 187/7 190/15 190/20 197/20 203/17 205/16 206/4 210/17 212/8 214/1 214/20

**Colin's [1]** 198/16

**collectively [1]** 14/19

**Colleen [3]** 2/20 22/5 205/14

**college [14]** 29/19 31/13 33/25 37/25 40/2 48/18 69/14 72/24 74/9 78/6 84/12 88/11 105/3 106/20

**Colombia [1]** 106/5

**Columbia [1]** 200/21

**combination [1]** 186/22

**combinations [1]** 194/16

**comes [6]** 102/23 150/19 162/5 165/23 181/6 219/22

**comfortable [1]** 210/1

**coming [11]** 9/23 14/23 21/11 55/7 63/20 70/10 99/12 165/6 165/9 184/17 184/18

**commercial [2]** 42/16 73/1

**commission [11]** 174/21 175/3 175/11 175/13 180/9 204/5 204/9 215/10 215/11 215/25 216/3

**Commissioners [1]** 47/10

**commissions [4]** 174/17 174/17 175/20 204/7

**committed [2]** 25/21 116/16

**common [4]** 211/6 211/10 225/2 225/3

**communicate [1]** 155/9

**community [2]** 26/5 63/15

**companies [1]** 78/10

**company [18]** 13/10 13/13 13/24 15/8 31/6 31/21 38/2 48/20 49/10 59/22 77/18 78/7 79/23 80/2 80/11 114/15 116/7 170/13

**compare [1]** 156/15

**comparing [1]** 156/14

**comparisons [1]** 123/12

**compensation [2]** 68/1 170/6

**compete [10]** 101/15 101/17 160/12 171/17 178/13 196/9 207/18 210/8 214/10 217/2

**competed [5]** 82/8 161/3 198/2 206/18 210/7

**competes [1]** 160/23

**competing [1]** 58/1 82/1 99/5 160/19 161/19 185/3 185/23 203/14 205/1 208/20 225/1

**competition [54]** 66/20 82/11 82/25 158/16 161/4 161/5 162/15 163/5 163/9 163/12 163/21 164/3 164/17 172/20 172/21 174/1 176/18 177/8 178/12 178/15 179/24 179/25 181/15 185/20 190/7 190/9 190/16 190/21 191/3 191/7 191/14 192/17 192/18 194/20 195/7 195/19 195/22 195/25 196/14 198/1 201/6 203/11 207/4 208/7 208/22 208/25 209/4 209/14 209/25 212/19 212/24 213/10 213/22 216/25

**competitions [17]** 57/18 81/22 82/22 83/3 83/6 90/6 93/2 98/10 101/14 102/17 102/18 103/21 185/5 197/16 206/25 208/12 210/5

**competitive [1]** 185/6

**competitively [2]** 190/2 200/4

**complain [1]** 180/3

**complained [1]** 141/7

**complaining [2]** 178/19 204/25

**complaint [1]** 6/5

**complete [4]** 8/21 14/16

**195/7 208/1**

**completed [4]** 11/11 11/23 182/23 196/18

**completely [6]** 12/22 183/4 192/15 201/16 210/16 223/18

**completing [1]** 195/24

**completions [1]** 204/21

**complicated [1]** 206/1

**comptroller's [1]** 40/3

**computer [3]** 31/16 31/22 218/8

**computers [3]** 77/18 91/2 158/21

**conceptually [1]** 139/10

**concern [7]** 12/21 113/10 127/18 130/3 130/20 137/6 141/6

**concerned [6]** 11/11 13/2 62/5 139/8 151/6 172/21

**concerns [2]** 110/22 140/13

**Concierge [1]** 59/15

**conclude [2]** 55/15 55/17

**conclusion [2]** 202/2 216/12

**conclusions [1]** 3/10

**Concur [1]** 146/4

**condition [10]** 24/24 25/2 49/2 74/14 76/9 124/10 124/11 124/11 137/13 177/12

**conditioning [1]** 73/1

**conditions [8]** 13/10 13/12 25/7 78/3 124/12 169/5 193/25 204/19

**conduct [5]** 14/13 55/8 92/25 98/20 148/5

**confer [1]** 224/19

**conference [2]** 3/7 225/11

**confusing [1]** 205/25

**Congratulations [1]** 95/20

**conjugating [1]** 105/19

**connected [1]** 101/21

**connection [1]** 25/5

**consent [1]** 183/8

**consented [1]** 183/12

**consequently [1]** 43/4

**conservative [2]** 126/23 126/24

**consider [6]** 26/10 151/12 152/19 152/23 154/4 217/6

**consideration [5]** 26/1 50/22 51/16 63/3 112/11

**considered [4]** 19/2 92/20 94/20 147/10

**considering [5]** 51/18 53/12 153/3 154/8 154/17

**consignment [2]** 181/8 181/12

**consistent [2]** 12/10 171/19

**consistently [2]** 186/8 215/1

**constantly [1]** 61/10

**constitutes [1]** 144/12

**constraints [1]** 11/22

**construct [1]** 98/3

**construction [2]** 34/5 38/2

**consultant [1]** 67/25

**consulted [1]** 196/11

**contact [4]** 93/11 93/13 111/4 158/19

**contacted [2]** 172/10 214/20

**contained [1]** 152/16

**contentions [1]** 10/14

**continue [2]** 92/13 93/16 129/3 147/11 147/13 211/25

**continued [1]** 200/3

**continues [2]** 179/13 188/6

**continuing [1]** 180/2

**contractor [1]** 73/15

**contradict [2]** 4/11 12/12

**contradicts [2]** 4/18 153/9

**contrary [2]** 11/15 217/7

**control [5]** 88/21 89/4 137/5 152/5 209/16

**conversation [1]** 4/24

**Conversations [1]** 99/4

**converse [1]** 105/4

**convey [1]** 191/5

**convinced [1]** 71/20

**convinces [1]** 179/14

**cooperation [4]** 94/19 120/1 121/20 147/2

**coordinator [1]** 91/11

**copies [3]** 71/10 223/22 223/22

**copy [3]** 14/5 14/5 209/20

**corner [1]** 185/16

**corporate [6]** 29/19 43/13 43/24 43/25 56/6 113/20

**correct [39]** 5/19 8/6 10/2 13/24 18/12 25/12 35/3 38/22 44/6 44/22 46/14 46/15 55/21 61/19 70/21 84/7 88/7 98/5 103/22 103/24 114/14 114/17 114/18 115/21 117/2 122/15 122/16 127/5 128/20 141/18 141/22 142/9 144/8 145/8 146/2 146/5 147/13 203/13 227/16

**corrected [1]** 11/3

**correctly [1]** 18/11

**Cortvriend [2]** 2/14 21/24

**cost [2]** 83/9 83/12 83/19 83/20 98/25 100/21

**Costco [1]** 88/12

**costs [1]** 83/13

**costume [1]** 82/15

**Cottica [2]** 200/13 200/20

**couldn't [8]** 40/11 43/9 56/18 79/4 86/9 103/17 113/6 215/4

**Council [1]** 165/16

**counsel [6]** 13/24 14/5 109/11 158/6 218/2 223/10

**counseling [1]** 77/15

**country [6]** 59/17 60/3 60/10 165/18 192/3 213/11

**county [15]** 34/4 34/8 37/23 42/23 47/9 47/9 48/7 51/9 70/4 70/11 77/12 86/15 90/25 105/5 105/8

**couple [17]** 35/5 49/10 51/17 53/1 53/3 78/6 81/5 92/16 96/6 99/8 104/18 115/15 182/23 187/18 202/1 204/4 206/25

**course [20]** 15/1 15/20 19/6 35/10 56/14 113/22 122/11 123/13 123/15 150/7 157/9 162/16 164/2 177/14 195/12 200/24 203/4 208/16 210/17 212/10

**courses [2]** 194/13 194/15

**court [50]** 1/1 1/18 3/1 3/5 3/19 4/16 6/18 7/18 10/19 10/22 13/7 13/25 14/5 17/23 23/21 24/15 41/7 41/25 45/13 46/10 47/19 47/25 48/1 51/14 59/11 63/2 68/11 69/23 74/18 75/4 75/5 75/17 78/16 78/17 81/1 81/3 92/13 104/6 107/8 111/21 144/18 152/6 152/12 154/24 160/4 180/16 218/20 219/3 220/3 223/25

**Court's [4]** 10/24 10/25 224/25 227/4

**courthouse [1]** 150/25

**courtroom [25]** 18/18 22/11 23/15 93/5 93/7 93/18 94/16 95/4 108/20 111/23 115/3 119/10 120/2 123/4 146/22 149/5 149/25 150/10 155/22 155/24 156/12 216/23 217/18 221/11 222/16

**Courts [1]** 47/13

**Covered [1]** 149/8

**C**

**coworker [1]** 105/18
**CPA [2]** 39/25 40/15
85/23
**CPE [1]** 1/17
**cream [1]** 186/24
**create [2]** 49/23 63/7
**created [2]** 49/10 50/5
**credibility [1]** 153/13
**credit [1]** 60/14
**crime [1]** 33/8
**criminal [15]** 19/9 32/12
33/6 33/19 36/1 36/14
38/21 38/24 42/21 44/6
44/10 68/23 68/25 69/19
72/1
**criminally [2]** 32/7 33/1
**crop [1]** 186/24
**cross [2]** 7/18 157/13
**cross-examined [1]**
157/13
**CRR [2]** 1/17 227/21
**cruel [3]** 101/15 101/18
103/10
**cruelty [4]** 102/4 102/7
140/13 141/6
**current [3]** 43/11 108/14
115/20
**currently [11]** 29/19
37/1 37/8 39/25 42/15
56/4 59/12 62/15 63/9
79/12 85/23
**custodian [1]** 15/16
**customarily [1]** 9/25
15/15
**customer [1]** 59/18
**cut [1]** 34/7
**cutter [2]** 34/7 69/17

**D**

**Dade [2]** 34/3 105/8
**daily [4]** 63/19 98/14
106/7 208/25
**damage [3]** 16/21 184/1
184/22
**damages [9]** 16/16 16/22
16/22 16/25 17/2 35/20
183/19 183/25 198/3
**dangerous [1]** 181/19
**dark [1]** 189/12
**date [5]** 7/14 8/12 10/6
168/1 196/15
**Dated [1]** 227/18
**dates [5]** 164/21 164/21
164/23 165/1 217/3
**daughter [12]** 28/19
47/12 47/18 63/9 68/3
69/17 99/5 112/24
120/17 120/23 121/2
121/4
**daughter's [2]** 42/19
106/5
**daughters [1]** 29/2
**David [2]** 8 21/14
**days [26]** 25/14 25/21
26/4 49/18 51/17 52/15

52/18 53/1 53/4 53/4
53/5 53/9 67/11 76/10
79/15 128/2 187/18
192/3 193/17 194/6
194/7 195/13 204/2
213/7 220/7 220/11
**Daytona [1]** 30/11
**DCF [2]** 78/15 80/21
**deal [8]** 11/1 11/2 57/23
121/14 192/15 207/25
208/9 208/13
**dealer [1]** 73/11
**dealing [8]** 57/17 58/7
58/9 120/21 122/14
122/22 132/18 198/13
**dealings [1]** 216/9
**dealt [3]** 56/13 123/13
132/9
**debate [1]** 197/5
**deceive [1]** 54/25
**deceived [2]** 124/2 124/3
**deception [1]** 113/14
**deceptive [2]** 113/11
125/15
**deceptiveness [1]** 126/1
**decide [45]** 19/18 25/11
35/20 55/4 127/4 150/14
150/18 151/24 152/24
154/2 154/8 154/18
156/3 156/9 158/13
162/11 162/14 166/8
166/11 173/11 173/14
173/18 174/6 174/12
174/14 175/10 175/12
175/19 175/21 176/10
176/14 176/15 177/16
177/18 177/19 180/4
180/12 180/18 180/24
183/1 183/5 183/7
183/10 183/18 183/24
**decided [2]** 112/7
214/17
**decides [1]** 197/18
**deciding [1]** 152/20
**decipher [1]** 107/6
**decision [24]** 17/18 19/8
26/1 26/10 33/7 42/24
55/20 76/11 89/6 89/22
100/24 101/6 109/4
119/16 123/7 132/4
132/5 137/10 140/8
155/6 155/21 155/23
193/7 202/25
**decisions [3]** 20/18
23/12 203/2
**declaration [3]** 3/14 5/2
15/9
**deduct [1]** 216/6
**deemed [1]** 181/18
**defect [3]** 5/19 213/15
214/10
**defendant [9]** 2/11 2/17
22/2 92/4 139/23 154/12
154/18 159/6 159/7
**defendant's [1]** 153/16
**defendants [17]** 1/7 5/23

6/1 6/6 8/3 8/7 8/15
19/13 24/21 25/3 144/11
145/16 153/23 154/1
154/15 157/16 157/21
**defense [37]** 3/17 4/14
5/9 12/17 14/5 14/19
16/2 18/3 94/12 134/6
137/8 138/5 140/10
142/15 142/18 142/24
143/2 143/8 143/10
143/17 143/19 143/20
144/4 145/1 145/4
145/12 149/19 154/12
154/13 154/16 154/20
157/13 157/19 159/21
177/17 223/2 223/10
**defenses [1]** 154/11
**deference [1]** 220/17
**deficiencies [1]** 67/16
**deficiency [1]** 110/10
**definitely [2]** 28/25
123/11
**definitions [1]** 156/1
**definitive [1]** 12/7
**degree [10]** 30/16 37/1
39/25 51/3 67/25 77/8
77/8 85/22 86/23 90/24
**degrees [1]** 89/1
**dehydrated [1]** 193/2
**dehydration [1]** 193/4
**delay [1]** 223/17
**deliberate [4]** 34/10
35/17 36/6 144/15
**deliberating [2]** 144/24
155/4
**deliberation [1]** 136/18
**deliberations [4]** 151/20
155/1 156/19 158/1
**delinquency [1]** 78/17
**deliver [1]** 223/24
**delivered [1]** 191/23
**delivering [1]** 61/6
**Delray [6]** 29/10 29/11
36/25 62/16 69/14 84/11
**demonstrated [1]**
209/23
**denial [1]** 153/16
**deny [2]** 25/3 25/4
**department [9]** 38/1
38/14 47/10 48/7 48/10
63/6 69/15 72/3 72/15
**departments [1]** 71/25
**depending [1]** 24/1
**depends [2]** 107/3 107/4
**depose [1]** 8/7
**deposed [1]** 8/8
**deposit [2]** 190/25 191/9
**deposition [7]** 8/5 8/22
45/15 45/15 219/23
219/25 220/12
**depositions [6]** 7/1 7/4
158/15 222/18 222/20
223/23
**derby [1]** 213/2
**describe [2]** 19/15
105/14

**described [4]** 107/23
153/15 161/16 161/22
**description [9]** 25/10
27/19 56/10 68/9 70/1
86/3 86/18 130/1 130/17
**deserves [2]** 131/2
151/10
**designations [1]** 223/5
**designed [1]** 194/15
**Designers [1]** 194/13
**despite [2]** 193/8 215/13
**detail [2]** 120/11 217/21
**detailed [2]** 107/5
150/13
**details [7]** 9/23 80/9
103/4 103/17 132/17
205/21 209/9
**determination [2]** 10/22
20/4
**determine [5]** 19/8
19/20 19/22 34/6 168/12
**determining [1]** 153/13
**develop [1]** 49/12
**developed [5]** 97/24
98/19 167/13 169/23
170/7
**developer [1]** 97/24
**developing [1]** 98/15
**development [3]** 42/19
63/15 100/7
**devices [1]** 92/24
**devote [1]** 213/24
**devout [1]** 131/20
**Diane [1]** 30/15
**didn't [59]** 6/25 8/21
10/3 16/12 16/25 36/5
39/8 46/12 46/17 46/24
64/4 74/23 75/21 76/1
92/3 98/6 106/6 107/18
108/16 122/1 124/7
128/1 132/11 132/14
133/8 136/24 138/13
145/13 151/1 152/2
169/25 170/11 170/18
170/21 170/22 176/19
177/10 177/25 181/20
185/12 190/15 190/20
192/21 193/9 196/25
199/14 201/4 203/18
207/14 210/23 212/15
213/14 213/23 213/24
213/24 214/1 214/18
215/20 215/20
**died [1]** 170/7
**Diego [4]** 117/4 176/20
176/21 176/22
**difference [4]** 36/13
44/9 68/24 151/7
**differences [1]** 188/20
**different [7]** 78/18
81/16 87/23 102/22
113/3 185/6 208/4
**difficult [9]** 36/23 24/15
79/11 87/16 89/5 89/23
110/10 194/12 202/25
**difficulty [3]** 59/11 63/8

219/24
**diligence [3]** 201/24
202/17 212/4
**dime [1]** 78/12
**diploma [2]** 59/5 88/11
**dire [5]** 16/5 16/6 16/15
16/24 227/3
**direct [1]** 151/7
**directed [1]** 12/5
**directly [5]** 148/17
190/16 190/21 191/4
218/9
**director [4]** 49/9 60/10
63/14 85/23
**dirty [10]** 161/23 162/2
162/6 171/20 194/23
206/6 206/24 208/17
209/8 216/14
**disabilities [20]** 29/22
30/23 34/12 37/4 38/8
40/9 43/6 47/15 51/12
56/10 59/9 62/22 68/8
70/1 73/4 74/13 78/20
84/16 86/2 91/5
**disability [5]** 27/15 87/1
87/24 87/25 170/8
**disabled [1]** 74/9
**disallow [1]** 152/17
**disbelieve [1]** 151/8
**disclose [5]** 124/2
124/12 166/12 176/9
183/3
**disclosed [7]** 7/5 8/2
8/17 129/13 167/19
173/7 176/14
**disclosure [4]** 4/7 98/2
127/23 129/4
**disclosures [1]** 4/3
**discounted [1]** 216/2
**discourteous [2]** 93/10
93/12
**discovery [8]** 4/4 4/18
8/3 8/25 12/25 15/10
15/20 15/25
**discretion [1]** 134/23
**discuss [22]** 7/13 7/14
20/11 20/13 41/4 66/1
88/1 89/22 92/17 92/21
93/20 99/11 118/25
119/19 127/13 148/4
148/12 151/17 154/24
217/13 222/2 222/3
**discussed [7]** 14/24
36/15 125/20 127/1
138/11 155/13 204/7
**discussing [5]** 7/17 7/21
113/17 144/13 156/17
**discussion [3]** 4/25
22/15 44/8
**discussions [5]** 41/14
123/2 123/25 125/24
155/5
**dismiss [4]** 5/11 5/12
5/16 138/23
**dismissed [2]** 36/12
69/24

**D**

**Disney [1]** 31/6
**disobedience [1]** 42/22
**display [1]** 132/20
**dispute [6]** 19/16 161/20
215/6 215/17 216/10
216/20
**disputes [1]** 26/6
**disregard [1]** 152/18
**disrespectful [1]** 115/12
**disruption [1]** 136/17
**distinction [4]** 33/17
36/19 44/12 69/4
**distract [1]** 156/10
**distribute [1]** 71/11
**district [6]** 1/1 1/1 1/13
27/13 29/5 90/25
**divorce [1]** 78/17
**doctor [2]** 165/12
192/25
**document [6]** 4/17 5/4
16/1 107/2 168/20
180/23
**documentation [1]** 50/6
**documents [16]** 4/3 4/7
4/11 4/20 5/8 6/23 12/11
12/15 12/22 12/23 12/23
13/18 13/21 15/23
106/13 158/17
**does [67]** 40/20 40/23
40/24 42/17 43/11 47/18
47/24 47/24 48/3 48/20
50/10 54/3 55/8 55/12
59/25 60/25 64/9 76/20
77/21 77/24 78/8 79/19
80/2 82/10 95/2 99/16
99/23 104/20 106/16
107/12 108/6 108/7
108/18 110/9 110/22
111/2 111/4 111/14
111/17 111/22 112/6
117/5 118/12 145/6
159/1 161/4 168/13
169/6 169/7 169/7 169/9
169/12 176/8 176/8
182/8 186/4 194/22
195/14 213/13 219/1
219/9 220/9 220/12
221/5
**doesn't [19]** 9/13 9/16
9/22 39/5 50/16 55/13
57/23 63/7 70/17 74/8
76/25 76/25 111/23
111/25 137/19 140/2
140/2 179/12 217/6
**dog [11]** 102/15 108/4
108/16 109/23 109/25
110/1 115/24 127/25
128/6 128/14 128/17
**dogs [3]** 102/10 103/10
103/10
**doing [30]** 10/3 13/5
20/6 20/7 31/17 45/8
47/7 51/19 65/13 66/25
73/19 78/3 87/14 88/25

89/2 95/18 126/14
126/17 130/12 159/10
174/1 182/15 183/13
183/13 185/11 185/20
186/8 190/3 195/25
197/19
**dollar [1]** 99/1
**dollars [2]** 166/21
200/25
**Don [1]** 105/17
**don't [179]** 3/6 4/9 6/8
6/15 7/5 8/20 10/17 11/2
11/14 12/6 12/24 15/15
16/11 26/18 27/15 28/1
28/7 29/3 33/5 34/2
34/11 37/2 37/3 37/4
38/7 40/6 40/8 40/9
41/16 43/6 43/7 49/4
51/5 51/11 51/12 51/15
52/10 57/21 65/3 65/17
65/19 65/20 66/16 68/7
68/12 69/25 70/2 71/20
72/1 74/12 77/15 78/11
78/21 79/6 79/6 79/14
80/7 80/8 80/15 82/14
82/14 82/15 82/21 84/3
86/2 86/5 86/8 86/24
89/8 90/14 92/21 93/3
93/7 93/8 93/11 93/12
97/22 99/20 99/22
101/12 101/16 102/19
102/19 102/20 103/3
103/4 103/4 103/16
103/16 104/8 105/6
107/5 109/12 110/14
110/15 114/4 115/12
116/17 117/1 117/2
119/19 119/19 119/20
119/22 119/22 120/5
123/5 124/3 124/14
126/7 126/18 127/7
127/12 127/16 129/12
129/19 130/3 130/11
131/2 131/24 131/25
132/10 132/16 132/17
132/20 133/15 133/22
134/1 134/11 135/3
136/15 136/19 136/20
136/21 136/23 137/5
137/7 138/16 138/22
139/19 139/19 139/10
139/11 139/13 139/17
148/5 148/5 148/12
148/15 151/24 152/8
155/15 156/8 156/9
156/13 156/17 157/3
174/9 179/5 181/25
182/4 187/12 190/8
212/11 217/13 219/16
220/14 220/24 221/24
222/3 222/3 222/4 222/7
223/7 223/8 223/17
224/14 225/10 225/21
**done [31]** 5/20 12/19
30/5 37/10 37/12 38/15
48/6 48/8 49/14 49/16

55/9 63/5 73/13 84/25
87/21 91/12 158/15
168/11 172/2 180/21
189/10 198/7 203/5
205/11 213/3 213/4
214/24 215/13 216/10
221/6 223/7
**door [1]** 181/6
**doubt [6]** 33/9 33/10
33/14 33/18 36/8 38/25
**down [17]** 14/10 22/14
22/17 23/22 26/20 29/10
29/18 82/7 87/11 112/15
115/25 148/24 148/25
206/3 207/15 218/20
218/22
**downstairs [1]** 218/6
**downtime [2]** 190/1
224/10
**dozens [2]** 206/18
206/18
**Dr [1]** 169/6
**Dr. [53]** 7/11 7/13 7/17
7/19 7/21 8/7 8/22 8/21
8/22 8/22 9/23 9/24 10/5
10/7 118/11 163/16
165/4 165/8 165/11
165/21 165/23 166/15
167/1 167/14 167/23
168/9 168/9 168/14
168/19 168/23 169/4
169/16 169/20 169/22
170/15 176/23 177/2
177/8 177/22 179/7
188/23 192/24 193/13
193/14 193/18 193/23
194/2 196/5 210/20
210/21 211/4 211/19
212/2
**Dr. Gomez [12]** 167/1
168/9 168/14 168/19
168/23 169/4 188/23
210/20 210/21 211/4
211/19 212/2
**Dr. Selina [1]** 196/5
**Dr. Steel [2]** 7/13 7/19
**Dr. Steele [3]** 8/12 8/22
8/22
**Dr. Steele's [2]** 9/23
10/5
**Dr. Ted [2]** 163/16
165/4
**Dr. Ulibarri [10]** 176/23
177/2 177/8 177/22
192/24 193/13 193/14
193/18 193/23 194/2
**Dr. Vlahos [21]** 7/11
7/17 7/21 8/7 8/21 9/24
10/7 118/11 165/8
165/11 165/21 165/23
166/15 167/14 167/23
168/9 169/16 169/20
169/22 170/15 179/7
**dragged [2]** 46/23 46/24
**drawing [1]** 213/23
**dress [2]** 82/16 82/16

**dressage [7]** 57/18 58/1
65/3 82/10 97/25 99/5
102/18
**dressage-type [2]** 82/10
102/18
**Drive [2]** 2/3 2/9
**drives [1]** 68/4
**drove [1]** 115/25
**drug [3]** 42/23 68/6
68/18
**due [10]** 73/25 74/4
72/14 108/17 118/19
184/6 201/23 202/17
207/9 212/3
**DUI [3]** 34/9 36/1 36/7
**duly [2]** 22/25 148/1
**during [34]** 4/4 4/10
4/17 8/2 8/5 15/10 15/20
19/6 20/12 21/4 22/21
63/9 99/7 116/23 136/17
150/7 151/11 156/6
157/9 158/14 159/4
164/1 164/2 165/2 170/2
170/3 171/22 175/17
189/25 194/17 195/12
212/15 212/22 219/6
**duties [1]** 63/6
**duty [4]** 27/14 59/8
150/12 150/14
**Duvall [6]** 42/10 42/12
100/3 114/2 114/8
114/10

**E**

**e-mail [7]** 1/19 11/9
107/1 193/3 193/15
198/12 217/24
**e-mails [4]** 71/23 105/11
106/12 155/10
**each [17]** 14/14 19/22
20/3 21/10 23/5 23/7
132/21 145/10 151/9
151/18 154/14 155/1
157/2 157/2 208/23
209/5 224/1
**earlier [21]** 5/7 12/10
101/20 101/21 125/2
129/25 131/16 132/11
153/15 155/13 160/7
165/4 171/20 178/3
182/25 205/15 213/16
214/11 215/23 222/5
225/5
**early [8]** 95/1 122/5
161/1 162/14 166/24
168/17 181/15 222/1
**earned [2]** 215/22 216/6
**earphones [1]** 22/9
**ears [1]** 110/16
**easier [2]** 114/5 223/14
**eat [3]** 148/20 148/25
219/2
**echos [1]** 207/19
**education [2]** 72/24
84/12
**educational [2]** 27/2

67/24
**educator [1]** 47/11
**effect [1]** 173/7
**effort [1]** 215/16
**eight [12]** 14/16 14/17
62/16 89/14 114/1 134/8
144/14 147/3 165/17
193/11 194/6 196/22
**eighth [1]** 196/15
**either [12]** 6/22 24/11
25/16 40/14 41/1 96/7
99/16 101/14 110/18
120/12 125/14 128/4
151/8 153/22 154/15
199/1 223/9
**Either/or [1]** 41/1
**elapsed [1]** 5/21
**elderly [2]** 78/23 139/3
**elect [1]** 212/3
**elected [1]** 212/4
**electrolytes [1]** 193/4
**electronic [1]** 92/24
**electronics [1]** 218/6
**elementary [1]** 53/15
**elements [2]** 102/23
154/13
**Eleven [1]** 200/7
**eligible [1]** 141/8
**eliminated [1]** 195/16
**else [33]** 11/4 31/11
49/14 70/25 92/18 96/5
96/8 96/9 96/10 97/18
99/15 100/1 104/1 104/4
106/16 109/2 109/17
110/22 110/23 116/20
118/13 118/14 119/11
119/13 139/1 139/20
147/8 149/7 155/19
155/20 156/5 175/13
225/20
**embarrass [2]** 20/6 24/4
**embarrassed [1]** 197/2
**embarrassing [1]**
120/15
**embarrassment [1]**
201/11
**Emily [2]** 29/4 29/5
**emotions [1]** 130/4
**emphasize [3]** 26/1
155/7 171/22
**employed [18]** 27/3
30/17 34/1 37/25 39/25
47/9 48/19 62/17 67/25
69/14 72/25 77/9 84/12
86/23 88/12 90/25 91/2
108/2
**employee [1]** 59/21
**employees [1]** 59/20
**employer [1]** 49/25
**employers [1]** 148/10
**employment [2]** 40/22
187/4
**encourage [1]** 47/25
**end [21]** 4/5 11/24 14/18
89/22 94/1 112/3 127/1
144/25 150/13 151/16

**E**

end... [11] 153/12 155/5
183/19 183/23 185/3
197/17 206/3 206/6
219/9 220/12 220/22
ended [3] 128/2 184/24
214/6
ends [3] 49/3 50/10 64/3
engage [2] 66/8 82/22
engaged [2] 82/24
188/13
engineer [1] 47/12
engineering [3] 47/10
74/10 77/24
English [8] 28/13 91/11
106/2 106/6 120/12
120/14 121/8 137/19
enjoy [1] 149/3
enough [7] 138/25 139/8
139/9 146/9 191/3 203/6
203/6
ensure [1] 212/5
enter [1] 212/18
entered [1] 195/6
enters [5] 18/18 94/16
146/22 149/25 221/11
entire [10] 44/4 56/21
94/23 118/19 134/3
165/18 169/17 177/5
203/7 215/21
entitled [5] 35/20 104/4
104/6 156/23 227/17
entity [1] 41/22
entrants [3] 185/19
186/15 186/18
entrepreneur [1] 42/20
entrepreneur/inventor
[1] 42/20
environment [1] 213/10
environmental [1] 78/3
Enzo [2] 200/16 200/16
equally [2] 133/7 133/8
equestrian [16] 82/19
177/2 182/16 185/4
185/11 185/17 185/23
186/10 188/1 188/24
197/9 199/16 202/12
203/15 204/3 210/7
equine [6] 99/17 100/1
165/12 165/14 182/14
202/21
equipment [1] 73/10
equivalent [1] 212/25
era [1] 122/5
errand [1] 59/16
error [1] 207/9
ESOL [1] 91/11
especially [4] 24/8 122/8
136/17 220/6
ESQ [7] 2/2 2/5 2/8 2/11
2/14 2/17 2/20
essence [1] 185/2
essential [2] 20/14 20/16
essentially [1] 184/24
establish [1] 209/11
established [1] 9/24

estate [3] 43/3 84/15
85/8
et [6] 1/6 49/1 49/13
49/21 140/13 155/12
et cetera [5] 49/1 49/13
49/21 140/13 155/12
Eugenie [4] 19/13 21/20
21/20 21/24
Euros [7] 200/8 200/10
200/13 200/19 200/22
200/24 200/25
evaluate [1] 130/21
evaluating [3] 103/1
103/15 123/3
evaluation [1] 84/2
even [17] 5/13 6/4 10/5
28/1 36/5 70/18 130/7
137/3 150/17 151/1
154/25 195/18 206/15
207/22 208/6 211/9
214/23
evening [6] 79/9 222/15
224/15 225/20 226/7
226/9
evenings [2] 49/1 50/12
event [3] 25/20 100/8
170/7
events [7] 63/20 65/10
66/7 102/24 103/11
192/9 194/12
ever [13] 12/6 40/7 66/1
67/14 74/20 98/9 108/2
116/3 122/21 180/14
183/9 198/2 206/11
every [20] 21/10 62/1
67/3 79/8 90/7 100/8
118/21 130/8 132/4
164/6 164/7 204/20
206/20 207/3 207/7
208/3 208/23 209/3
213/13 217/1
everybody [5] 111/4
131/6 146/10 171/10
187/17
everybody's [2] 3/6
111/7
everyone [35] 3/2 3/6
14/10 18/19 18/22 20/25
21/2 21/3 21/23 26/3
93/19 94/9 94/17 94/19
104/15 104/19 108/5
110/23 118/6 119/11
119/13 119/24 133/7
135/16 146/18 146/23
147/8 147/19 150/1
158/9 210/12 218/16
221/12 221/21 222/17
everything [18] 23/22
53/17 59/16 110/23
127/1 149/8 153/1 155/2
173/19 189/10 211/21
214/22 215/5 215/7
215/17 216/10 218/21
223/15
evidence [173] 14/23
15/17 17/8 19/5 19/18

25/14 25/23 33/9 33/15
39/6 55/4 55/20 76/11
84/1 89/6 100/25 101/6
103/1 103/15 111/15
128/23 128/25 130/22
146/11 150/14 150/18
150/19 150/23 151/1
151/3 151/4 151/7 151/9
151/12 151/12 151/13
151/18 151/19 151/21
151/23 151/23 152/3
152/5 152/6 152/8
152/11 152/17 152/18
152/19 152/20 152/22
153/8 153/10 153/19
153/20 153/21 153/22
154/3 154/6 154/8
154/10 154/14 154/17
155/3 155/22 157/5
157/8 157/11 157/14
157/17 157/20 157/21
157/23 158/12 160/18
161/11 161/24 162/4
162/16 162/19 163/3
163/7 163/11 163/15
163/22 164/15 165/9
165/11 165/16 166/14
166/19 166/22 167/3
167/5 167/12 167/18
167/25 168/4 169/3
169/4 169/24 170/5
170/9 170/10 170/17
170/19 171/25 172/6
172/9 172/13 172/17
172/19 173/1 173/5
173/21 173/24 174/2
174/8 174/17 174/20
174/25 175/13 176/23
176/25 177/4 178/2
178/11 178/14 178/16
178/21 179/11 179/16
179/20 179/23 181/1
181/7 181/10 181/12
181/21 182/4 182/21
182/5 183/11 183/20
184/25 186/3 186/5
186/25 188/17 192/8
192/20 193/20 194/19
196/24 197/6 198/5
199/9 201/3 204/1 204/6
204/11 205/23 206/7
209/11 211/3 211/12
213/5 213/15 213/19
215/8 216/8 216/12
216/16

evident [2] 189/13
195/18
exact [2] 8/12 217/3
exactly [5] 140/23 141/2
203/25 213/5 214/11
exam [6] 168/10 168/16
168/15 168/17 169/6
210/22
examination [11] 11/22
167/1 168/7 168/8
168/20 169/7 188/23

189/6 194/1 210/20
210/23
examine [1] 175/7
examined [2] 157/13
178/7
example [14] 10/8 15/9
105/10 107/1 108/3
111/3 112/5 152/1
155/25 159/5 161/6
161/12 166/4 166/18
excellent [1] 186/9
except [5] 5/6 62/1
88/20 119/24 214/14
exception [1] 223/6
excerpts [1] 223/1
excessive [1] 175/20
exchange [1] 223/5
exchanged [3] 4/4 223/1
223/2
excited [2] 205/19
205/20
exciting [1] 97/9
excluding [1] 208/25
exclusion [1] 15/10
exclusions [7] 3/15 5/3
15/19 170/11 170/12
170/12 170/15
exclusively [1] 10/24
excuse [12] 112/15
115/6 119/13 134/21
138/25 139/18 140/6
141/8 144/20 192/4
192/23 200/19
excused [1] 35/25 36/7
119/14 137/22 138/1
138/1 140/5 140/9
140/16 140/17 140/22
excusing [1] 136/21
executive [2] 62/18
69/15
exemplary [1] 16/17
exercise [6] 134/22
143/4 145/3 145/16
145/20 166/3
exercised [1] 212/10
exercises [2] 143/13
143/19
exercising [2] 134/4
141/11
exhibit [11] 17/22 18/2
18/3 150/21 152/7
152/10 152/13 152/14
152/14 152/16 198/8
exhibits [2] 154/6
157/14
existed [1] 166/12
exists [1] 19/16
exits [5] 93/18 120/2
149/5 217/18 222/16
exotic [1] 82/4
expand [1] 7/2
expect [6] 25/13 33/17
62/10 157/3 158/2 174/9
expectations [1] 200/1
expected [1] 199/15
expensive [4] 66/4 66/5

83/18 111/16
experience [41] 32/21
41/6 42/5 44/15 45/22
46/11 46/18 54/21 57/17
57/19 65/8 67/14 68/17
72/7 75/18 80/18 80/21
81/2 83/8 83/11 83/22
83/25 85/6 85/14 97/12
99/15 99/21 102/21
108/8 108/18 108/19
109/2 109/23 114/25
121/23 122/12 122/12
122/25 128/16 203/1
220/11
experiences [4] 19/24
81/6 119/3 122/21
expert [11] 6/23 6/24
7/1 7/12 7/21 9/7 15/14
161/25 182/7 197/11
208/8
expertise [1] 98/20
experts [5] 6/21 9/6
118/8 188/12 211/9
expired [1] 5/22
explain [5] 150/10 157/7
163/18 198/22 212/23
explained [2] 161/14
204/17
explaining [2] 159/14
189/10
explore [1] 8/3
exposed [1] 122/13
exposure [2] 66/13
100/20
express [1] 8/15
expressed [1] 133/4
141/6
extent [5] 5/6 8/19 15/11
39/6 57/6
extra [4] 53/1 53/10
141/2 218/7
extraordinary [1]
200/18
extremely [2] 130/25
131/14
eye [1] 158/19
eyeing [1] 199/20

**F**

fabulously [1] 177/7
face [7] 22/22 147/25
155/8 155/8 155/11
158/19 158/22
faces [1] 158/18
facetted [1] 63/15
facilitate [2] 175/9
215/6
facilities [2] 98/1 98/4
facility [2] 75/4 163/1
fact [32] 4/17 4/18 12/19
25/6 35/25 46/11 46/16
51/18 53/12 55/14 58/4
63/4 90/11 95/21 150/23
151/5 154/2 154/9
154/10 155/17 170/19
176/2 181/17 191/13

**F**

**fact...** [8] 191/20 196/19 197/15 198/6 199/17 203/14 207/4 215/13
**factor** [4] 103/6 126/7 126/17 177/16
**factors** [1] 153/11
**facts** [14] 17/5 25/4 40/6 111/18 111/20 112/2 112/7 127/3 132/1 150/15 154/14 154/19 205/21 205/25
**fading** [1] 184/7
**failed** [1] 124/2
**fails** [1] 153/25
**failure** [1] 124/12
**failures** [1] 49/20
**fair** [47] 19/23 20/1 20/8 20/19 27/22 30/24 32/22 34/12 36/2 41/17 42/6 44/16 45/23 48/4 54/14 54/23 55/19 58/7 60/22 68/10 69/8 72/4 72/8 74/15 75/19 80/18 80/24 81/4 91/6 92/2 95/23 97/13 103/1 103/14 104/4 108/24 123/3 127/14 127/19 130/5 130/21 140/14 155/23 156/4 156/5 175/8 216/9
**fairly** [2] 111/16 130/21
**fairness** [1] 220/19
**faith** [2] 180/8 215/16
**fall** [3] 3/17 24/1 83/1
**false** [1] 173/13
**familiar** [1] 62/25
**familiarity** [1] 209/16
**Families** [1] 79/12
**family** [13] 27/16 28/5 28/18 63/8 78/17 79/18 99/16 99/19 99/20 101/11 120/7 140/3 172/15
**fan** [2] 102/12 102/14
**far** [8] 13/2 14/9 49/5 62/4 87/3 93/1 110/23 151/6
**Fargo** [4] 42/15 43/11 45/1 114/11
**farm** [1] 81/16
**farrier** [1] 192/12
**fashion** [1] 108/24
**fast** [1] 203/6
**faster** [1] 221/4
**father** [2] 67/3 106/5
**fatigue** [1] 219/10
**FAU** [2] 89/1 120/18
**faults** [1] 160/25
**favor** [7] 46/19 74/25 75/16 78/10 90/12 112/4 153/25
**favoring** [2] 153/21 153/22
**February** [5] 164/20 164/23 186/13 186/18 187/2

**February 19** [1] 186/13
**February 26** [1] 186/18
**February 26th** [1] 187/2
**February 6** [2] 164/20 164/23
**federal** [1] 144/18
**Federation** [1] 182/16
**fee** [1] 79/5
**fee-for-service** [1] 79/5
**feed** [1] 83/14
**feeding** [1] 83/15
**feel** [35] 10/20 16/11 83/24 84/16 98/19 100/13 103/9 104/1 104/5 104/9 105/9 106/24 108/23 110/3 111/14 111/17 111/22 111/24 112/4 112/6 113/18 115/12 120/15 128/24 129/11 130/24 133/6 136/16 136/24 137/3 175/20 180/8 205/7 219/7 220/1
**feel's** [1] 20/11
**feeling** [4] 75/21 115/1 131/9 133/4
**feelings** [3] 27/20 130/20 132/8
**feels** [3] 101/13 104/3 113/5
**feet** [3] 188/17 192/12 211/6
**felt** [2] 64/3 137/4
**fence** [2] 194/16 194/17
**Ferrante** [3] 22/22 147/5 147/25
**Ferrante's** [1] 148/16
**festival** [13] 100/2 185/4 185/12 185/17 185/23 186/10 188/1 197/10 199/16 202/12 203/15 204/3 210/7
**festival-type** [1] 100/2
**festivals** [1] 82/19
**fever** [2] 177/13 177/20
**few** [15] 23/3 49/17 76/10 79/21 97/2 105/18 119/25 121/20 128/2 134/1 150/5 185/8 208/15 217/1 225/2
**field** [8] 31/15 31/22 34/18 35/8 54/1 63/13 77/14 121/24
**Fields** [3] 2/11 2/14 21/20
**Fifteen** [2] 134/13 134/14
**fifth** [1] 185/19
**figure** [1] 186/2
**file** [2] 12/23 41/12
**filed** [8] 5/12 5/16 6/9 6/9 10/18 16/5 17/21 18/4
**final** [2] 157/24 168/3
**finally** [8] 112/2 181/21 183/17 183/18 186/17

**200/21** 202/23 204/22
**financial** [6] 62/4 79/15 84/5 84/13 84/22 140/1
**finding** [2] 175/21 193/24
**finds** [1] 193/19
**fine** [12] 9/21 10/16 10/25 16/23 17/1 73/20 89/10 169/4 186/15 213/13 219/4 224/7
**finest** [1] 210/21
**finish** [8] 24/11 24/13 24/17 25/16 195/20 198/24 199/3 220/7
**finished** [14] 12/1 14/15 23/9 78/7 94/2 119/15 119/17 119/18 151/15 186/8 195/9 195/11 196/22 196/25
**finishes** [4] 185/24 195/23 195/25 196/15
**Fino** [1] 82/9
**Finos** [1] 82/2
**firm** [6] 40/17 40/18 53/22 61/15 77/24 109/10
**first** [47] 3/13 11/8 11/11 11/15 11/20 26/13 29/4 43/22 43/23 87/17 112/20 112/22 130/17 130/24 134/4 134/5 134/6 134/6 134/23 135/20 138/13 145/2 147/12 147/23 151/13 158/6 162/13 162/17 163/8 163/12 163/21 165/5 170/9 175/2 179/25 185/14 186/6 196/18 200/5 200/6 213/13 214/13 217/12 221/19 221/19 221/23 222/25
**fit** [6] 169/2 190/16 190/21 191/3 191/7 196/9
**FIU** [1] 35/1
**five** [11] 34/8 43/22 69/20 74/9 74/23 79/15 143/2 186/25 187/25 188/2 220/7
**fix** [1] 75/23
**fixed** [1] 75/6
**fixes** [1] 78/8
**FL** [5] 2/7 2/13 2/16 2/19 2/22
**flat** [1] 212/10
**fled** [1] 80/7
**fleet** [3] 27/4 27/6 27/8
**flew** [1] 115/24
**flexibility** [1] 61/3
**flight** [1] 192/5
**floating** [1] 205/22
**floor** [1] 148/22
**FLORIDA** [25] 1/1 1/7 1/19 21/9 28/22 29/6

**33/25** 42/14 51/2 56/4 56/5 56/7 56/14 59/4 62/16 69/13 73/22 77/7 78/1 78/14 81/17 87/10 113/23 159/16 185/5
**flown** [2] 192/3 213/8
**fluent** [3] 105/1 105/6 105/25
**flux** [1] 212/13
**flying** [1] 59/7
**focus** [1] 158/21
**focused** [1] 163/19
**follow** [43] 3/8 14/14 23/3 23/8 23/11 27/25 29/24 30/24 34/12 35/10 35/11 36/19 37/5 38/9 39/10 40/10 43/8 47/16 49/5 51/13 56/16 59/10 63/1 68/11 70/2 73/6 74/17 77/1 79/3 84/17 86/8 87/3 90/6 91/7 92/16 93/23 94/25 96/1 107/12 115/16 150/7 150/17 151/18
**follow-up** [5] 14/14 93/23 94/25 107/12 115/16
**following** [6] 94/8 135/15 149/15 174/25 196/1 218/15
**food** [1] 60/9
**foot** [1] 188/24
**forbids** [2] 155/19 155/20
**force** [1] 198/16
**foreclosure** [3] 51/11 54/17 54/22
**forefoot** [1] 189/17
**foregoing** [1] 227/15
**foreman** [1] 42/23
**foreperson** [6] 32/19 35/23 39/16 54/11 68/21 85/12
**forgot** [3] 38/12 146/1 184/11
**form** [8] 10/7 92/18 107/1 119/19 148/5 158/15 217/14 222/3
**formal** [1] 217/25
**former** [3] 60/4 97/25 206/15
**forms** [1] 150/19
**formulating** [3] 8/1 9/8 9/11
**forth** [2] 70/8 134/7
**forward** [5] 6/3 21/6 21/10 191/19 210/13
**found** [9] 10/16 32/11 32/18 80/6 110/1 193/22 210/23 211/23 214/9
**Foundation** [1] 63/20
**four** [21] 11/13 34/8 38/3 56/4 77/13 77/13 104/22 106/5 142/22 145/25 164/7 186/3 188/2 192/5 192/6

**193/17** 194/20 194/21 195/13 204/2 209/3
**four-hour** [1] 192/5
**four-year** [2] 186/3 188/2
**fourth** [2] 186/13 186/15
**Franklin** [4] 1/17 227/14 227/20 227/21
**frankly** [5] 186/6 188/4 197/2 197/14 198/1
**fraud** [3] 4/16 13/6 34/24
**free** [2] 16/11 214/10
**fresh** [3] 220/8 220/11 221/4
**Friday** [13] 3/9 3/12 11/8 11/16 14/24 15/2 16/18 25/15 53/8 53/8 63/25 71/12 71/16
**Friday's** [1] 3/7
**Friedlander** [9] 86/20 86/22 119/8 119/12 133/12 133/13 133/15 133/21 140/7
**friend** [2] 91/16 172/5
**friend's** [1] 66/12
**friends** [10] 62/24 64/11 64/12 64/18 65/16 82/14 82/21 92/19 101/12 117/24
**front** [6] 23/22 24/10 114/9 120/16 193/15 196/16
**full** [8] 31/13 51/25 52/3 53/4 98/2 127/22 129/3 189/21
**full-time** [3] 31/13 51/25 52/3
**fundraising** [1] 63/21
**funds** [2] 63/17 216/4
**further** [8] 20/20 22/20 93/23 111/6 127/7 129/17 207/22 224/8
**future** [2] 128/15 217/8

**G**

**gain** [1] 55/1
**galloped** [1] 97/9
**gambling** [2] 131/25 132/3
**Games** [1] 217/6
**garbage** [2] 201/13 201/18
**Gardens** [1] 37/24
**gather** [3] 126/25 129/9 129/10
**gathering** [1] 20/2
**gave** [12] 3/12 7/3 26/19 27/19 75/7 75/16 109/25 130/1 188/14 193/4 199/25 209/20
**GED** [1] 91/11
**Gem** [1] 208/5
**general** [10] 10/9 13/24 16/20 25/9 94/22 102/2 102/10 104/19 130/12

**G**

**general... [1]** 133/5
**generally [7]** 14/13 40/24 40/25 103/19 160/6 162/3 179/2
**gentleman [3]** 26/12 31/25 59/1
**gentleman's [1]** 132/11
**gentlemen [19]** 18/20 18/21 21/7 21/13 21/18 22/4 22/8 23/2 92/11 94/18 146/24 147/20 148/2 150/4 191/24 205/13 217/12 221/13 221/14
**gets [15]** 112/20 160/15 172/21 175/4 175/15 175/25 176/17 178/6 178/6 179/4 179/19 179/22 179/25 195/3 196/15
**getting [10]** 75/7 95/19 128/11 163/5 172/8 175/16 175/16 188/5 197/9 202/1
**girls [2]** 27/11 53/12
**give [33]** 24/18 34/6 35/10 35/11 36/19 45/14 74/15 76/24 108/24 127/17 128/12 128/12 139/17 150/13 151/9 153/12 154/23 167/14 169/19 173/23 173/24 173/25 178/22 179/1 179/1 179/2 179/3 180/20 215/20 223/25 224/2 224/17 225/7
**given [6]** 5/18 10/21 110/11 129/3 164/15 173/19
**gives [3]** 193/18 193/24 194/2
**giving [3]** 53/5 57/3 205/8
**Glade [2]** 73/22 73/24
**glasses [2]** 111/4 192/24
**goes [12]** 4/20 41/7 53/17 68/13 100/1 125/7 134/5 179/20 181/21 195/13 201/2 219/15
**going [231]**
**gold [1]** 171/10
**Gomez [14]** 117/6 167/1 168/9 168/14 168/19 168/23 169/4 169/6 188/23 210/20 210/21 211/4 211/19 212/2
**gone [6]** 82/17 94/23 99/25 99/25 100/5 140/20
**gonna [7]** 49/22 170/19 176/1 176/5 182/10 206/7 206/12
**good [91]** 3/2 3/4 3/23 3/25 4/1 16/10 18/19 18/21 20/25 21/3 21/7

21/13 21/18 21/23 22/1 22/4 26/16 26/17 29/16 30/13 30/14 33/22 33/23 36/23 36/24 39/22 39/23 42/10 42/11 47/3 47/4 47/6 48/16 50/24 50/25 56/2 59/2 59/3 62/13 62/14 64/2 67/21 67/22 69/11 69/12 72/20 72/22 73/18 77/5 77/6 81/24 84/10 85/19 85/20 86/20 86/21 88/8 88/9 90/20 90/21 95/19 98/16 102/4 102/21 104/15 105/20 110/8 110/17 111/19 113/8 113/8 134/9 134/18 135/2 147/17 147/18 149/16 158/9 165/22 180/8 187/7 187/18 188/4 189/4 201/7 205/13 207/10 214/17 215/16 221/25 225/2
**good-faith [1]** 215/16
**Google [1]** 155/13
**gosh [2]** 47/23 132/2
**got [47]** 12/6 15/16 18/8 40/4 41/25 42/2 46/1 46/5 46/23 47/20 48/18 49/1 49/11 53/14 66/18 69/24 75/15 76/3 78/12 79/24 89/1 89/17 91/19 95/14 123/25 136/14 136/15 139/16 167/5 167/9 167/24 168/3 175/1 175/13 175/14 177/19 180/14 180/15 181/1 192/9 193/14 196/20 197/9 202/20 217/2 218/1 225/1
**GP [1]** 199/25
**grade [1]** 66/23
**graduate [2]** 27/12 120/18
**graduated [3]** 69/18 73/24 89/2
**graduating [3]** 28/19 28/21 120/23
**graduation [1]** 28/24
**Grand [9]** 161/3 161/4 161/16 161/18 186/20 186/21 186/23 200/7 200/11
**Granted [3]** 136/4 136/10 137/17
**graph [1]** 184/10
**grass [1]** 150/24
**great [8]** 12/6 87/6 173/6 195/9 195/24 207/25 208/9 208/13
**greater [2]** 156/23 216/16
**Grew [1]** 56/4
**groggy [1]** 76/22
**groom [1]** 192/13
**ground [2]** 225/2 225/3

**grounds [2]** 7/4 172/10
**group [2]** 2/5 94/23
**growing [3]** 64/12 81/15 81/17
**grueling [1]** 213/6
**guarantee [2]** 119/17 147/15
**guarantor [1]** 226/6
**guess [12]** 11/14 12/11 12/18 13/20 29/25 45/2 57/5 71/13 109/22 121/23 123/22 169/23
**guidance [1]** 225/7
**guidelines [1]** 153/13
**guilt [1]** 38/25
**guilty [4]** 32/11 32/18 33/7 33/8
**Gulf [1]** 90/9
**guy [2]** 75/22 122/2

**H**

**H-e-s-s [1]** 117/19
**habits [1]** 24/2
**hadn't [4]** 213/20 213/20 214/23 215/14
**half [8]** 77/13 88/11 119/13 127/24 206/20 215/12 220/25 221/17
**Hamptons [1]** 100/4
**hand [3]** 22/24 47/2 185/16
**handed [2]** 23/6 23/14
**handheld [1]** 184/8
**handle [4]** 71/21 89/16 89/24 137/1
**handled [5]** 45/17 45/18 60/19 80/23 197/13
**handyman [1]** 59/16
**happen [5]** 159/18 161/1 164/20 165/1 222/7
**happened [17]** 18/1 80/6 129/1 150/15 159/19 180/9 184/19 187/2 189/20 190/18 190/23 191/22 195/3 198/17 199/3 209/7 213/5
**happening [2]** 13/17 168/17
**happens [18]** 46/20 158/20 163/23 166/25 170/14 172/1 172/1 178/19 180/2 180/5 181/21 188/8 189/14 192/16 212/15 217/1 220/3 220/4
**happy [2]** 197/7 197/8
**harass [1]** 20/6
**hard [9]** 17/10 24/9 53/2 71/24 97/14 205/24 215/14 223/22 225/13
**hardship [15]** 25/23 25/25 26/2 26/9 50/18 62/4 79/16 84/5 116/10 135/7 135/9 137/16 138/12 139/4 140/1
**hardships [1]** 51/15

**Harry [7]** 56/12 57/9 58/11 122/3 122/4 122/7 123/13
**Hart [17]** 2/11 11/14 16/6 21/17 21/19 21/24 112/13 114/4 124/25 129/8 132/25 184/5 205/12 219/23 219/25 220/2 227/7
**hasn't [4]** 167/11 195/7 197/19 197/22
**hate [2]** 220/5 220/24
**haven't [10]** 35/7 37/3 57/4 66/5 96/8 172/22 193/22 213/3 223/7 224/19
**having [20]** 54/21 61/3 70/5 74/2 89/6 103/13 103/20 110/15 110/16 110/19 111/6 114/25 120/24 121/3 122/13 147/17 189/25 199/24 207/10 212/23
**he'd [1]** 151/13
**he'll [6]** 7/21 19/11 157/13 159/1 167/14 217/5
**he's [72]** 7/21 9/24 24/22 41/7 51/5 54/4 56/13 58/12 70/15 70/18 77/18 77/21 89/2 91/2 104/3 111/25 128/10 128/11 133/13 136/14 136/16 137/13 137/24 139/2 139/16 140/9 157/14 160/9 160/9 160/11 164/9 165/5 165/6 165/10 165/12 165/18 165/21 165/24 165/25 169/25 176/25 177/3 177/12 185/19 185/19 185/20 186/7 187/13 187/15 189/4 189/10 192/15 192/17 193/14 194/2 195/16 195/24 196/13 197/8 197/8 199/20 199/22 201/18 203/5 203/6 204/7 209/8 210/14 212/10 216/7 216/24 217/6
**head [2]** 23/20 50/15
**headache [1]** 76/24
**headed [1]** 43/21
**headset [2]** 22/9 22/14
**health [18]** 24/24 64/2 77/10 77/11 110/1 110/2 122/22 136/13 168/25 176/12 183/2 183/3 183/14 183/16 183/18 193/19 193/24 213/14
**healthcare [3]** 62/17 62/18 63/13
**healthy [4]** 177/11 178/12 179/22 213/18
**hear [123]** 8/14 17/11 23/16 101/2 109/5 110/5

110/10 110/17 111/10 111/11 112/21 112/25 113/6 113/12 119/2 119/2 121/5 125/1 125/13 125/15 150/6 151/11 151/14 153/4 156/1 157/24 158/5 158/6 158/22 160/4 160/5 160/18 161/11 161/13 161/17 161/24 162/2 162/16 162/22 162/24 163/3 163/7 163/14 163/15 165/20 165/23 166/5 166/15 167/7 167/22 168/8 168/11 168/14 168/16 168/19 169/16 169/19 169/17 170/9 170/14 170/20 171/4 171/6 171/12 171/16 171/23 172/22 173/15 173/19 174/4 174/16 174/18 174/20 174/22 174/23 175/6 177/5 177/9 177/23 179/7 181/13 181/18 181/22 182/7 182/19 183/14 183/22 184/16 186/21 187/8 187/22 188/11 188/16 188/21 189/1 189/24 194/13 194/23 197/1 197/6 197/11 198/5 199/12 204/1 204/6 204/6 206/15 206/16 207/3 207/8 207/11 207/13 207/16 207/19 208/13 210/22 211/1 212/17 212/22 215/19 216/17 217/12 217/16
**heard [33]** 35/9 39/8 44/8 58/8 58/13 58/18 58/25 68/24 86/3 100/24 101/1 101/7 110/23 114/2 114/10 122/10 122/24 123/8 123/9 128/23 130/17 131/17 132/1 141/10 150/20 155/2 160/10 205/21 206/7 210/11 214/11 222/18 225/12
**hearing [13]** 33/10 39/2 74/2 110/9 110/10 110/19 110/22 159/2 165/6 176/21 177/17 205/17 208/18
**hearsay [4]** 8/20 9/7 9/17 9/18
**heart [10]** 49/1 73/25 74/4 74/14 76/9 76/9 88/18 137/12 201/21 214/13
**heavily [3]** 56/13 57/10 58/13
**Heavy [1]** 73/10
**hectic [1]** 53/14
**Hector [1]** 200/10

Case 9:15-cv-81229-KAM   Document 287   Entered on FLSD Docket 10/04/2017   Page 239 of
257
WITNESSNAME
Index: height..I've

**H**

**height [1]** 185/18
**heights [4]** 160/16
161/14 161/16 209/19
**held [2]** 43/20 75/5
**hello [1]** 93/8
**help [10]** 52/25 63/17
74/13 108/9 111/24
151/17 156/7 156/23
172/9 216/19
**helped [3]** 98/3 160/1
175/9
**helping [4]** 52/4 52/9
52/24 159/25
**helps [2]** 53/4 61/5
**here [105]** 3/19 3/22
11/12 11/24 18/22 21/6
21/9 21/16 21/19 21/20
21/25 22/3 22/19 22/22
25/22 26/3 28/7 33/17
42/23 43/9 48/25 52/6
53/9 55/2 55/10 62/4
64/14 71/17 81/17 84/6
87/6 89/19 90/19 95/4
99/16 99/23 100/25
101/3 101/7 101/13
104/5 104/17 104/20
107/8 108/2 108/6 108/7
111/4 111/14 111/22
112/4 112/15 112/17
112/24 115/14 118/21
123/4 123/7 126/18
128/22 131/6 131/23
135/8 137/4 138/18
139/8 141/4 144/15
144/24 146/18 147/14
158/11 159/1 159/7
159/8 159/12 159/19
165/10 175/13 178/8
180/9 180/16 181/5
184/12 185/4 186/14
188/1 189/12 191/21
195/9 197/13 199/8
199/9 199/14 204/7
205/22 206/2 209/5
209/7 213/5 216/5
216/21 217/4 222/5
225/24
**here's [6]** 12/9 165/24
166/18 171/15 180/9
198/21
**Heros [1]** 200/7
**hers [1]** 167/11
**hesitate [2]** 17/6 112/4
**Hess [9]** 117/9 117/15
117/16 117/18 181/3
181/3 181/4 181/8
181/11
**Hesses [1]** 117/18
**hey [6]** 42/3 156/15
172/8 172/11 180/7
180/20
**hi [4]** 37/22 50/25 84/10
109/21
**hidden [1]** 213/18
**hiding [2]** 4/16 24/9

**high [15]** 27/3 47/8 59/5
73/24 88/11 105/3
106/20 111/13 112/6
161/6 161/7 161/9
174/23 174/24 216/25
**higher [2]** 161/15
209/18
**highest [1]** 208/7
**himself [2]** 137/5 211/16
**hind [1]** 169/15
**hired [2]** 188/12 199/12
**hires [2]** 162/25 179/17
**history [6]** 53/25 56/17
183/3 185/1 203/8 210/1
**hit [3]** 38/18 152/2
204/11
**hitting [2]** 196/18
201/11
**hold [16]** 3/18 5/25 74/1
75/25 81/8 107/14
117/11 118/20 119/11
137/10 138/4 138/19
138/24 140/18 141/1
199/6
**home [21]** 31/2 34/10
38/16 40/14 42/2 42/4
50/14 52/9 52/11 52/14
52/17 53/5 53/8 53/10
56/8 59/17 77/17 92/19
128/1 148/10 193/11
**homemaker [1]** 42/20
**homes [1]** 60/2
**honest [7]** 20/16 20/17
25/5 62/1 131/11 199/24
216/9
**honesty [2]** 129/16
133/11
**Honor [133]** 3/4 3/23
7/10 7/16 7/24 8/6 8/11
8/19 9/1 9/5 9/20 10/2
10/10 10/12 11/3 11/6
11/19 12/2 12/4 12/21
13/22 13/23 14/1 14/3
14/8 15/1 15/6 15/18
16/4 16/5 16/13 16/24
17/7 17/12 17/14 17/21
18/1 18/7 18/13 20/24
93/21 94/6 94/11 94/13
94/14 104/14 112/14
114/7 117/13 118/8
121/15 121/16 124/24
129/7 132/24 133/1
133/18 134/9 134/18
134/20 134/21 135/12
135/13 135/18 135/19
135/23 135/25 136/5
137/4 137/11 137/16
137/21 138/3 138/6
138/11 138/22 139/7
139/22 140/4 140/11
140/12 140/15 140/25
141/13 141/14 142/10
142/11 143/4 143/14
143/18 143/23 144/7
145/3 145/6 145/11
145/16 145/20 146/3

146/4 146/5 146/13
146/16 146/20 149/9
149/13 149/18 149/22
149/23 158/8 184/6
217/21 218/10 218/13
218/18 218/24 218/25
219/22 220/10 220/18
221/2 222/23 223/12
223/21 224/5 224/13
224/23 224/24 225/6
225/17 225/18 225/21
225/23 226/5
**Honor's [3]** 134/21
140/8 217/24
**HONORABLE [1]** 1/12
**hoof [2]** 198/14 211/2
**hope [2]** 119/18 199/19
**hoped [3]** 62/9 124/8
146/25
**hopefully [11]** 25/18
76/14 119/15 141/9
158/4 160/24 167/7
170/10 171/23 219/5
222/11
**hoping [3]** 71/14 124/6
213/2
**horse [397]**
**horse's [10]** 161/21
169/2 183/15 198/25
203/10 203/12 206/6
207/12 210/1 213/25
**horse-related [3]** 57/2
57/7 99/17
**horseback [2]** 178/25
179/3
**horses [90]** 57/10 57/11
57/18 57/23 57/24 58/9
58/12 58/16 64/12 64/12
64/14 64/17 64/25 65/11
65/16 65/21 66/2 66/3
66/8 67/2 67/8 67/11
67/12 67/12 67/15 78/22
81/11 81/14 81/16 81/19
81/21 82/1 82/1 82/6
83/9 83/12 83/17 83/19
90/16 90/17 93/2 96/7
96/7 96/10 97/19 98/16
98/18 98/20 99/2 99/8
99/12 99/15 99/21 99/21
101/13 101/15 102/10
102/11 103/10 111/2
111/16 116/3 122/2
122/15 122/18 123/17
123/20 123/22 148/8
148/8 160/12 165/14
165/19 177/1 185/6
185/8 185/10 186/23
188/15 188/16 194/17
194/25 196/25 199/20
200/6 200/23 201/1
203/3 208/6 208/14
**hospital [1]** 34/1
**hotel [1]** 73/15
**hour [8]** 119/14 146/18
148/19 192/5 194/7
218/1 220/25 221/18

**hours [11]** 11/13 63/10
77/22 79/9 89/14 92/14
191/25 192/6 193/11
194/9 213/9
**house [4]** 27/13 86/13
116/1 116/4
**housekeeping [3]** 14/20
217/21 218/25
**How'd [1]** 30/9
**Howard [5]** 117/8
171/7 171/8 171/8
171/14 171/16 179/17
179/18 179/19 179/20
179/23 180/1 181/1
207/21 208/2
**Howard's [1]** 207/21
**however [3]** 14/12
191/25 210/25
**huge [1]** 199/24
**huh [9]** 23/20 23/21 24/3
24/3 34/22 36/9 41/10
87/18 91/23
**huh-uh [2]** 23/21 24/3
**human [3]** 31/7 31/8
166/1
**Hundley [5]** 37/21 37/22
95/5 95/6 147/6
**hundred [5]** 49/1
103/17 169/8 169/23
194/21
**hunter [3]** 176/25 177/3
182/17
**hunter-jumpers [3]**
176/25 177/3 182/17
**hurdle [1]** 48/24
**hurdles [4]** 161/7 161/9
196/18 196/20
**hurt [2]** 172/21 179/4
**husband [17]** 30/17
30/20 32/5 38/2 40/19
51/4 51/19 54/3 61/15
62/18 63/4 68/2 69/16
73/1 77/17 95/12 138/15
**husband's [4]** 31/14
40/1 109/11 138/16
**hypothetical [1]** 13/15

**I**

**I'd [11]** 9/20 83/1 88/1
122/10 126/6 127/16
128/24 184/10 185/14
201/24 204/22
**I'll [40]** 12/15 13/20
17/18 19/15 21/8 21/14
23/4 23/5 23/7 24/12
48/25 95/2 110/20
111/22 112/18 137/9
137/10 138/4 139/18
140/6 141/7 150/12
153/12 154/14 160/20
163/17 166/4 166/23
167/1 172/2 178/25
179/1 179/1 179/2 179/2
182/4 182/23 187/22
218/4 219/10
**I'm [187]** 3/19 3/21 5/6

6/10 10/3 11/11 11/15
11/22 12/9 13/2 13/5
13/8 13/15 13/16 14/14
18/25 20/20 21/1 21/1
21/4 21/8 22/1 22/21
23/7 23/9 24/4 24/6
26/11 26/24 27/3 27/3
27/5 27/10 30/16 30/17
32/1 33/23 34/1 34/2
37/1 37/1 37/5 37/11
37/25 38/11 39/25 39/25
39/25 42/15 42/17 43/13
47/9 47/10 48/19 48/20
48/25 49/2 49/9 50/7
50/13 51/13 52/8 53/5
53/5 53/15 54/6 54/12
56/7 61/3 61/8 61/8
62/25 63/16 63/21 64/2
65/8 67/22 68/2 68/15
70/5 72/25 73/14 73/23
74/1 74/2 74/7 74/9 77/6
77/9 77/20 79/4 79/11
79/19 83/9 83/10 83/15
83/15 83/18 84/12 84/13
85/5 85/23 86/23 86/23
86/24 87/4 88/12 88/13
88/13 89/13 90/22 90/24
91/1 91/10 91/25 92/16
99/9 100/6 102/12
102/12 104/10 104/24
105/13 105/21 105/25
106/3 106/17 107/12
108/11 110/15 110/16
110/18 114/4 117/10
117/23 119/4 119/13
120/12 120/21 121/5
126/23 130/7 130/9
131/1 131/1 131/2
131/20 134/25 134/25
135/23 137/20 139/8
139/23 139/23 141/4
143/24 145/12 146/1
146/8 146/10 146/18
147/3 148/4 148/18
149/20 150/7 150/9
158/17 158/23 159/24
163/19 168/14 169/13
169/14 172/8 188/21
191/16 191/20 205/18
205/19 206/2 206/7
216/12 216/14 222/19
223/24 226/6
**I've [68]** 5/14 18/8 29/21
30/3 30/22 33/24 34/11
34/16 38/1 38/7 40/8
42/21 43/1 43/17 47/14
47/14 48/9 48/18 48/18
48/23 49/1 49/9 49/11
49/16 51/2 51/8 52/9
53/14 57/5 58/8 59/4
59/7 60/3 60/6 61/25
62/1 62/21 62/21 66/10
69/25 72/17 72/24 73/3
73/3 73/22 74/7 74/11
74/11 77/7 77/13 77/14
78/19 78/22 81/17 82/17

**I**

**I've... [13]** 82/18 83/18
85/21 86/1 86/1 91/3
94/23 102/1 105/5
116/15 116/15 119/25
151/14
**iconic [1]** 208/4
**idea [3]** 83/11 99/1
163/20
**identified [3]** 7/13 7/14
93/23
**ignore [2]** 152/14 152/18
**ii [1]** 4/2
**ill [1]** 75/21
**illegal [1]** 10/16
**illustrate [1]** 205/2
**imagine [1]** 166/3
**immediately [5]** 14/4
187/3 190/6 195/6
213/10
**impaneled [1]** 148/1
**impart [1]** 148/14
**impartial [13]** 19/23
20/1 20/9 20/19 68/11
73/5 84/16 91/7 111/15
127/15 127/19 128/25
140/14
**impartially [1]** 110/4
**impatient [2]** 192/21
201/5
**impeach [5]** 4/11 4/19
4/22 5/1 5/4
**impeachment [11]** 4/6
4/8 4/12 4/15 12/11
12/13 12/18 13/14 13/19
14/22 15/23
**important [21]** 19/4
19/8 20/8 26/6 121/25
156/1 159/15 162/12
164/21 184/12 189/7
189/22 190/4 193/20
196/14 201/2 202/2
212/16 216/20 217/7
217/8
**importantly [3]** 112/18
189/3 209/17
**impression [2]** 112/25
156/24
**impressions [1]** 113/5
**improper [1]** 55/10
**in-camera [1]** 14/6
**inaudible [1]** 203/9
**incident [1]** 127/15
**inclined [4]** 6/11 134/21
134/21 141/4
**include [1]** 7/4
**included [1]** 215/24
**includes [1]** 155/10
**including [4]** 8/4 155/11
161/25 208/14
**income [1]** 79/8
**inconsistent [5]** 13/4
186/4 186/25 209/13
209/24
**inconvenience [1]** 26/2
**inconvenient [1]** 26/3

**incorrect [1]** 215/24
**increased [2]** 197/14
197/15
**incredibly [3]** 212/16
216/20 217/8
**incurred [1]** 180/18
**independent [5]** 84/2
93/3 119/20 148/6
177/14
**Indiana [1]** 115/23
**indicate [3]** 16/16
111/20 112/3
**indicated [4]** 96/6
101/20 111/21 129/25
**indicates [5]** 6/13 104/8
111/25 179/12 196/24
**indicating [1]** 111/8
**indications [1]** 3/12
**indicative [1]** 175/11
**indirect [3]** 150/25
151/3 151/7
**indirectly [1]** 150/23
**individual [7]** 22/10
93/22 122/4 122/14
123/2 123/9 123/25
**individually [4]** 23/5
26/12 118/25 119/11
**individuals [4]** 92/25
119/16 119/25 148/7
**industries [3]** 99/17
125/17 126/3
**industry [15]** 60/3 84/13
88/15 125/7 125/16
125/22 126/2 126/2
133/4 161/10 161/23
172/19 200/4 210/21
212/8
**infection [4]** 177/10
177/13 177/15 213/8
**influence [7]** 48/4 92/23
97/13 109/3 115/2
129/11 210/23
**influenced [1]** 148/15
**inform [1]** 9/22
**information [12]** 9/7
9/17 9/18 20/3 20/18
65/20 98/24 154/23
155/14 155/24 160/22
191/6
**initial [3]** 3/10 3/11 86/3
**injected [1]** 211/2
**injections [3]** 211/13
211/20 211/22
**injured [14]** 34/5 46/5
46/8 66/17 179/6 186/11
189/25 198/12 198/17
200/3 214/14 214/15
214/22 214/25
**injuries [9]** 178/17
178/17 185/13 188/18
188/19 188/20 197/25
198/24 198/25
**injury [11]** 46/2 69/21
189/4 197/15 198/23
199/3 199/11 212/6
215/1 215/2 215/4

**injury [57]** 190/2
**inquired [1]** 173/2
**inquiry [1]** 14/13
**ins [1]** 214/2
**insight [1]** 208/10
**instead [3]** 212/4 214/1
214/5
**instruct [4]** 152/21
154/3 154/14 157/25
**instructed [9]** 19/6
29/24 30/25 37/5 43/8
51/14 63/1 68/11 91/1
**instructions [16]** 10/21
35/10 35/11 36/19 38/9
39/11 59/10 96/1 96/1
149/21 150/6 150/12
150/13 151/15 155/3
225/1
**insurance [33]** 3/14 3/14
3/15 4/20 5/2 5/3 6/23
13/10 13/12 13/24 14/21
15/2 15/8 15/18 15/19
48/19 49/10 68/1 77/19
77/19 77/20 78/9 79/18
79/23 80/2 80/11 137/13
140/3 170/5 170/6
170/13 170/25 218/2
**insured [1]** 170/3
**intelligent [1]** 20/16
**intend [2]** 7/16 158/23
**intends [2]** 64/20 157/7
**intention [2]** 7/20 14/4
**interaction [1]** 95/21
**Interdecker [1]** 88/14
**interest [3]** 66/6 153/7
189/25
**interested [1]** 187/9
**interesting [3]** 65/8
130/25 131/14
**interfacing [1]** 183/7
**interject [2]** 135/3
135/10
**Internal [1]** 72/14
**International [1]** 34/1
**Internet [3]** 148/9
155/11 174/3
**interpreter [3]** 1/20 1/21
159/1
**interpreters [7]** 3/21
3/21 22/10 22/15 22/17
159/3 218/21
**interrupt [1]** 221/17
**interviewed [1]** 173/22
**introduce [2]** 20/21
20/21
**introduced [3]** 19/11
19/14 95/3
**introducing [1]** 15/16
**inventor [1]** 42/20
**invested [1]** 124/6
**investigate [2]** 203/4
203/7
**investment [1]** 43/23
**invitation [1]** 217/2
**invited [1]** 216/24
**involved [51]** 18/22

27/15 29/22 30/22 33/2
34/11 37/3 38/7 40/8
43/1 43/2 44/20 47/14
47/24 48/22 51/9 51/10
54/16 56/9 56/20 57/1
57/7 57/10 57/14 58/5
58/13 62/22 62/24 64/21
65/9 67/7 67/13 67/15
68/7 73/3 75/2 78/9
78/16 79/1 79/13 80/25
81/22 82/1 84/15 86/2
87/1 91/3 123/24 131/4
131/5 162/21
**involvement [2]** 66/12
78/21
**involves [4]** 24/19 51/11
125/4 159/12
**involving [5]** 38/18
41/15 51/12 51/20
159/18
**iPads [1]** 92/24
**Irene [2]** 36/24 106/23
**Isaacs [3]** 39/22 96/14
109/7
**isn't [5]** 87/6 157/5
181/23 212/9 213/4
**Issacs [1]** 39/24
**issue [41]** 3/13 5/10 5/11
5/20 6/21 7/6 10/11 12/4
14/25 16/14 33/3 54/24
61/21 74/22 75/2 75/2
76/13 76/17 84/5 92/3
110/19 113/11 120/10
120/13 121/7 126/9
126/15 136/12 136/14
136/20 137/8 155/17
162/12 174/6 180/4
188/25 196/10 201/23
204/5 213/19 219/11
**issues [45]** 3/9 6/10 7/8
10/20 19/25 28/5 28/18
29/13 30/21 49/20 51/12
51/20 58/19 60/17 67/18
78/17 78/17 89/4 110/2
110/15 110/16 111/3
119/1 120/7 123/12
123/16 125/6 127/13
128/2 136/15 139/5
140/23 141/5 148/8
148/9 148/14 154/11
157/8 158/12 162/11
162/13 169/1 183/25
219/6 225/16
**it'd [1]** 220/19
**it's [123]** 5/15 5/18 6/15
9/7 9/10 9/18 10/4 12/23
13/2 13/3 13/4 13/12
15/14 17/8 17/10 17/16
18/11 18/14 20/14 20/15
24/9 24/15 26/2 26/6
39/6 40/22 49/22 50/12
50/15 50/17 53/2 55/15
57/15 59/15 61/6 62/22
63/15 63/22 65/3 66/4
66/5 71/8 71/24 79/13
84/22 88/14 89/4 89/8

93/9 93/13 101/18
103/10 106/25 107/5
107/20 109/9 112/22
113/3 116/8 117/23
123/10 126/18 127/21
129/1 130/15 130/23
131/2 131/13 132/3
136/13 136/20 137/7
145/1 147/15 150/14
150/15 151/4 155/16
156/1 157/5 157/6
158/10 160/5 163/17
163/20 168/12 169/12
171/21 172/20 174/22
175/17 175/18 175/18
179/6 179/8 179/9
187/17 187/18 188/25
194/25 195/9 195/9
195/10 195/11 195/18
198/14 198/25 201/25
202/2 202/25 203/2
211/5 212/16 213/1
213/5 219/8 219/18
220/1 220/6 220/25
220/25 221/20 222/5
**item [3]** 14/3 152/22
224/24
**items [4]** 37/16 51/20
225/3 226/6
**itself [2]** 31/25 154/25

**J**

**January [2]** 185/22
186/1
**January 15 [1]** 185/22
**January 22 [1]** 186/1
**Jason [1]** 85/20
**Jennifer [2]** 50/25 95/8
**Jessica [3]** 95/8 95/9
95/14
**Jill [1]** 72/23
**job [14]** 48/24 49/8
50/16 78/5 84/20 86/24
87/4 87/8 87/17 93/13
133/14 150/15 151/8
211/25
**jockeys [1]** 195/1 204/17
**John [5]** 2/11 21/19
29/17 88/9 95/9
**joint [10]** 17/23 18/3
91/17 91/17 128/4 211/2
211/7 211/13 211/19
211/22
**jointly [1]** 220/3
**joints [2]** 211/2 211/16
**Jones [12]** 85/19 85/21
101/18 119/8 129/21
129/22 129/25 133/10
136/5 140/9 152/2 152/3
**Jorden [2]** 2/11 2/14
**Jorge [1]** 11/12
**Jose [11]** 164/12 164/13
172/7 178/4 178/14
184/23 187/15 187/15
191/6 192/10 213/21
**journalist [1]** 38/4

**J**

**journey [3]** 181/2 194/3
214/6
**Juan [11]** 164/12 164/13
172/7 178/4 178/14
184/23 187/14 187/15
191/6 192/10 213/21
**judge [7]** 1/13 18/25
36/6 110/17 182/15
219/6 219/10
**judged [1]** 160/14
**judgment [4]** 5/20 5/23
78/10 79/24
**juggle [1]** 63/10
**July [2]** 162/17 162/20
**July 2011 [1]** 162/20
**jump [21]** 67/17 82/14
82/14 98/21 101/15
161/15 161/22 162/5
166/2 166/3 191/11
191/12 195/13 195/14
196/16 196/21 196/25
198/6 203/3 208/24
209/22
**jump-off [2]** 196/16
196/21
**jumped [5]** 191/2 209/1
210/12 212/9 213/20
**jumper [6]** 159/14 160/7
160/8 160/22 169/2
179/18
**jumpers [13]** 82/19
100/19 171/11 176/25
177/3 182/17 186/21
200/4 200/6 207/20
208/4 211/6 211/10
**jumping [33]** 65/7 65/11
66/9 66/25 67/1 82/22
82/25 83/2 90/8 97/10
98/10 130/14 161/10
161/22 176/12 179/9
184/18 185/17 188/16
189/23 190/2 192/9
194/12 194/14 202/19
205/2 208/12 209/23
211/25 212/12 212/15
212/20 213/12
**jumping-type [2]** 82/22
82/25
**jumps [7]** 65/8 160/15
160/24 207/15 209/2
209/4 209/19
**June [10]** 184/20 194/10
195/22 195/23 196/6
196/9 196/14 198/6
199/11 201/10
**June 11 [1]** 196/6
**June 11th [1]** 196/9
**June 14 [1]** 201/10
**June 15 [3]** 184/20
198/6 199/11
**June 7 [1]** 195/23
**June 7th [1]** 195/22
**Jupiter [4]** 39/24 59/4
59/15 61/2
**juries [4]** 34/3 35/15

42/21 44/5
**juror [37]** 19/23 20/1
20/19 31/1 34/9 38/17
43/7 44/16 45/23 73/7
74/18 75/19 78/21 79/4
111/1 120/4 130/5
130/21 131/23 134/5
134/6 134/22 135/25
137/12 137/18 138/7
138/11 142/12 142/13
142/18 142/22 143/2
143/5 143/18 145/21
148/11 154/23
**jurors [51]** 3/8 7/9 11/5
11/17 14/16 17/20 19/2
19/5 19/21 32/17 33/7
35/16 35/21 38/24 39/14
44/9 54/9 68/18 68/24
85/9 89/21 93/22 94/10
94/15 94/20 119/2 134/8
134/24 139/10 139/12
139/14 140/24 141/8
144/22 145/23 145/24
146/6 146/9 146/21
147/10 147/21 147/24
149/17 149/20 149/24
150/12 155/19 155/20
156/3 221/10 222/19
**jury [92]** 1/11 6/15 7/22
9/17 9/22 10/18 10/21
10/21 14/9 16/7 16/9
18/17 20/9 23/12 27/14
29/21 30/18 31/24 32/19
33/16 34/7 35/8 35/23
37/3 38/5 38/10 39/11
40/4 41/25 42/1 44/13
47/14 48/21 51/8 54/8
54/11 56/9 59/8 62/21
63/3 68/5 68/17 69/4
69/20 72/4 72/6 73/3
74/11 74/12 74/13 76/16
84/14 85/6 86/1 86/25
88/17 89/5 89/19 91/3
91/8 92/20 101/6 116/11
119/17 120/8 140/1
147/1 147/4 147/11
148/1 148/16 148/18
149/5 149/25 150/5
154/21 156/9 156/14
184/15 205/14 205/15
217/15 217/18 219/21
219/22 221/11 222/10
222/16 224/25 225/11
227/3 227/4
**just [132]** 9/20 9/22
10/18 10/19 10/25 13/5
13/15 14/3 14/17 14/20
16/3 16/17 16/20 16/20
17/2 17/2 17/4 20/13
22/13 23/2 24/2 24/4
24/18 26/19 29/4 29/24
33/6 37/18 50/14 50/15
50/16 51/15 51/18 53/9
55/7 55/16 60/6 61/25
62/6 64/3 64/12 64/19
65/8 66/19 67/9 67/10

69/17 75/7 75/7 76/14
76/23 79/1 80/9 80/25
81/19 83/10 88/19 89/1
89/17 90/5 97/1 98/1
98/11 98/22 102/20
103/9 103/19 104/18
107/11 107/18 107/23
109/8 109/13 110/18
113/4 113/18 114/4
115/4 115/15 116/7
119/9 120/5 121/13
124/5 124/7 128/25
129/11 132/21 134/14
136/15 137/3 137/4
137/5 139/4 139/11
141/14 144/6 151/24
156/18 157/6 159/10
161/22 162/6 163/19
164/17 166/1 170/21
171/25 178/18 180/7
180/8 184/18 188/3
191/2 197/5 199/15
200/19 201/3 201/4
201/7 204/25 208/23
208/25 209/3 210/6
211/2 217/15 218/19
218/22 219/23 219/25
223/25
**justice [2]** 26/4 69/19
**justified [1]** 162/8
**juvenile [1]** 78/16

**K**

**K-a-t-e-l-y-n [1]** 117/21
**Kainec [3]** 47/2 47/5
147/7
**KAM [1]** 1/2
**Karen [1]** 63/20
**Katelyn [7]** 117/9
117/15 117/16 117/18
181/3 181/3 181/4
**keep [17]** 22/18 24/16
49/12 50/14 61/4 64/14
112/18 134/7 135/8
147/22 155/4 192/8
194/2 196/4 205/18
205/24 218/21
**keeping [3]** 17/8 48/2
213/1
**Keizer [1]** 69/18
**Kelly [1]** 73/11
**KENNETH [5]** 1/12
18/24 117/9 118/4 118/4
**Kentucky [5]** 163/2
163/6 163/9 163/9 213/2
**kept [2]** 146/24 189/12
**key [2]** 195/8 195/17
**kicked [1]** 89/17
**kids [5]** 27/11 40/14
51/16 74/9 138/12
**kind [33]** 12/10 13/17
27/5 32/7 55/8 64/21
65/13 76/17 78/9 81/23
82/4 85/6 87/19 90/8
92/22 98/7 98/9 101/19
103/5 103/20 122/19

123/14 123/16 123/21
124/19 126/11 127/2
131/6 131/6 151/8
169/12 180/19 188/5
**kinda [7]** 3/17 53/2
56/17 63/25 71/24 115/1
132/7
**kinds [5]** 77/20 102/22
102/24 128/11 162/9
**knee [1]** 188/20
**knew [17]** 13/11 75/22
79/9 91/18 121/24 122/2
163/11 166/16 166/16
176/10 177/25 183/14
183/15 186/6 191/9
198/14 202/7
**knock [1]** 207/14
**know [180]** 4/9 6/8 6/8
7/5 8/20 8/21 10/17
10/19 12/18 12/25 13/14
15/11 20/12 24/7 25/25
26/2 26/9 29/3 33/5
38/11 40/25 50/3 51/20
53/3 53/3 53/4 54/25
57/21 61/24 64/9 64/17
64/18 64/20 65/2 65/3
65/17 66/2 66/4 66/5
66/22 67/1 74/16 75/22
75/23 76/17 76/25 77/15
78/11 78/24 78/25 80/7
80/9 81/6 81/25 82/15
83/8 83/13 83/18 89/8
89/18 93/4 95/2 95/5
98/1 99/6 99/19 101/8
102/2 102/10 102/20
102/22 102/22 103/4
103/4 103/11 103/17
107/3 107/5 109/12
109/12 113/2 113/5
116/25 117/1 117/5
117/7 117/16 117/18
117/22 118/4 118/12
120/16 121/13 121/19
122/1 122/2 123/12
125/14 125/21 126/7
127/8 127/16 127/23
128/2 129/5 129/12
129/12 130/11 130/11
130/14 130/14 130/14
130/15 130/17 130/24
131/1 131/2 131/24
132/1 132/2 132/13
132/12 132/17 132/17
132/18 132/18 132/19
132/19 132/20 133/3
136/15 137/15 139/16
146/25 153/5 153/17
159/11 167/19 169/1
169/5 169/25 170/18
171/17 173/3 173/4
176/19 180/7 183/8
184/22 186/22 187/10
188/6 188/18 191/2
192/14 194/19 194/24
197/3 203/6 203/7
204/13 204/19 206/1

206/12 207/17 213/15
215/23 216/18 216/22
219/9 220/24 221/1
221/15 221/24 222/7
222/22 223/7 223/15
224/3 224/7
**knowing [3]** 17/20 89/18
171/24
**knowingly [1]** 54/25
**knowledge [8]** 58/6
65/16 100/14 125/3
167/21 168/1 170/1
211/13
**known [8]** 168/7 170/19
170/25 171/1 171/12
177/13 210/16 212/8
**knows [6]** 13/7 117/2
117/3 162/20 163/20
189/12
**Kuck [8]** 33/22 33/23
104/23 104/24 104/25
105/9 110/13 147/6

**L**

**La [1]** 200/17
**lab [3]** 77/19 77/20
177/14
**label [1]** 207/2
**labeled [2]** 5/13 6/4
**ladies [19]** 18/20 18/21
21/7 21/13 21/18 22/4
22/8 23/2 92/11 94/18
146/24 147/20 148/2
150/3 191/24 205/13
217/12 221/13 221/14
**lady [2]** 30/20 179/18
**Lake [4]** 29/18 51/2
67/23 72/23
**lame [9]** 10/8 166/7
166/8 169/13 189/3
193/19 199/13 211/24
213/17
**lameness [7]** 166/6
167/16 169/12 169/17
169/23 176/13 193/23
**land [2]** 97/23 211/6
**landlord [5]** 45/25 74/22
75/1 75/9 75/10
**language [6]** 105/10
106/4 106/13 106/25
120/14 121/8
**large [6]** 17/6 23/15
112/6 132/14 132/21
207/12
**largely [1]** 206/3
**Larry [1]** 122/5
**last [23]** 6/9 6/10 18/10
25/13 29/3 29/18 40/21
47/8 48/10 60/7 62/2
73/23 89/17 90/24
145/17 145/21 158/2
164/11 186/25 187/25
196/25 204/4 204/15
**lastly [2]** 93/6 204/15
**late [9]** 12/19 42/1 74/24
75/6 75/15 122/5 181/6

{WITNESSNAME} - {DATE}  {Index.late... - maybe}

**L**

**late... [2]** 218/1 219/1
**later [18]** 11/1 11/12 28/9 28/17 29/13 58/21 58/24 69/6 86/19 101/24 110/1 128/2 158/4 160/21 187/18 187/23 193/17 225/4
**Latin [1]** 106/4
**law [41]** 2/5 10/16 19/7 27/25 28/2 30/25 34/12 37/5 40/10 40/20 40/22 43/8 47/16 49/5 51/13 51/18 51/21 56/16 61/15 61/19 63/1 68/11 70/2 73/6 74/17 79/3 84/17 86/8 87/3 91/7 150/15 150/16 150/17 151/6 155/4 155/15 155/19 155/25 156/4 157/25 187/19
**laws [1]** 29/24
**lawsuit [30]** 27/15 30/22 34/11 37/3 38/7 40/8 43/1 43/2 44/20 46/17 46/24 47/15 48/22 51/10 54/17 56/10 59/9 60/17 62/22 68/7 69/21 69/25 73/4 78/9 84/16 86/2 87/1 91/4 91/15 91/22
**lawsuits [4]** 29/22 41/13 47/24 88/17
**lawyer [4]** 21/9 152/1 152/6 152/7
**lawyer's [1]** 151/24
**lawyers [3]** 81/8 119/21 151/17
**lawyers' [3]** 151/13 151/22 155/3
**lay [1]** 9/9
**laying [1]** 7/18
**layoff [1]** 190/4
**lead [2]** 125/16 155/6
**lean [5]** 112/15 126/10 126/12 126/13 133/5
**leaning [1]** 133/9
**leanings [3]** 27/20 41/12 128/18
**learn [10]** 19/21 30/9 161/2 195/12 206/10 206/12 211/15 212/1 212/14 213/25
**learned [2]** 35/9 67/10
**learning [1]** 214/2
**least [6]** 6/12 82/14 192/5 196/10 197/7 208/24
**leave [16]** 5/19 17/18 115/1 134/11 156/12 156/12 156/18 192/3 199/7 217/5 217/14 217/16 219/10 222/14 225/25 226/4
**leaving [3]** 38/5 38/20 217/6
**lecturn [1]** 219/20

**led [1]** 125/25
**left [7]** 22/11 137/9 144/10 144/11 145/7 145/10 145/13
**leg [2]** 169/15 184/21
**legal [4]** 30/21 34/17 35/10 60/18
**legs [3]** 188/19 197/25 198/3
**lender [1]** 60/13
**lending [2]** 42/16 43/14
**lenses [1]** 111/4
**Leonard [15]** 2/17 3/16 4/23 11/5 22/1 115/10 115/11 118/14 121/17 127/6 129/18 133/2 133/19 136/8 205/15
**Leone [6]** 118/5 197/12 207/21 208/9 208/13 213/1
**Leslie [12]** 117/8 171/7 171/8 171/8 171/14 179/17 179/17 179/19 179/23 180/1 207/21 207/21
**less [1]** 223/14
**lessons [6]** 96/20 96/21 97/2 97/3 97/5 97/18
**let [35]** 3/13 3/20 8/14 10/19 14/13 20/12 23/2 25/24 26/9 28/11 68/16 76/17 76/18 79/21 108/6 116/24 121/9 121/19 127/8 132/21 137/8 138/19 138/24 139/7 145/24 146/25 156/9 164/23 165/4 203/9 205/1 206/24 216/22 220/5 221/2
**let's [26]** 13/9 18/17 78/13 93/15 107/14 117/11 135/20 139/1 142/12 146/17 146/21 149/24 150/23 172/11 172/11 178/22 191/19 195/3 197/20 197/20 217/13 219/14 219/19 219/21 221/10 225/15
**letters [3]** 71/23 78/2 105/11
**letting [1]** 129/5
**level [12]** 105/14 105/23 106/9 137/4 161/5 161/19 197/22 198/2 208/7 209/15 209/22 216/25
**levels [6]** 161/8 161/9 161/10 161/11 161/22 185/6
**liability [5]** 5/11 5/16 5/18 6/3 6/4
**liberty [1]** 223/21
**licensed [1]** 39/24
**lied [2]** 128/7 128/9
**life [3]** 49/16 182/17 208/3

**ligament [4]** 184/22 198/3 198/14 198/24
**light [3]** 76/24 153/10 153/20
**liked [1]** 75/23
**likely [9]** 33/15 39/6 147/15 151/5 153/20 154/9 154/19 205/17 216/23
**limited [4]** 6/24 63/10 152/21 152/22
**line [3]** 16/17 113/9 204/5
**lines [1]** 123/20
**link [1]** 173/25
**Lisa [1]** 84/11
**list [6]** 17/23 18/3 18/4 26/19 26/20 218/7
**listen [20]** 19/5 19/17 25/11 55/4 76/10 84/1 89/20 89/20 108/19 108/20 108/24 109/4 110/4 123/6 127/3 128/25 150/14 155/15 214/1 216/18
**listening [6]** 27/22 55/20 89/6 108/25 156/10 205/10
**lists [2]** 17/19 18/4
**liters [1]** 193/5
**litigator [1]** 41/7
**little [36]** 19/21 26/20 43/10 49/7 49/20 53/5 53/14 63/12 74/1 76/24 77/13 78/5 80/9 84/19 87/16 92/14 97/4 110/21 112/15 113/18 122/11 125/23 146/24 165/4 165/7 171/21 171/25 203/9 205/25 206/1 218/22 220/1 221/4 221/15 221/25 225/4
**live [24]** 29/18 36/25 39/24 47/8 51/2 56/3 59/4 61/1 61/2 69/13 72/23 73/22 77/7 85/21 86/11 86/22 88/10 90/23 102/3 107/18 159/16 199/25 203/3 223/1
**lived [12]** 33/24 37/23 48/18 59/4 81/15 81/17 84/11 85/21 86/10 90/23 103/5 105/7
**lives [3]** 20/7 102/4 117/25
**living [6]** 38/12 67/23 73/22 75/13 88/24 91/1
**LLP [2]** 2/17 2/20
**local [2]** 21/8 73/10
**locate [1]** 202/18
**located [2]** 77/11 77/11
**location [1]** 59/24
**long [27]** 17/27 25/18 30/1 31/8 43/16 47/20 53/18 53/20 56/19 60/5 72/11 84/25 89/8 89/13

**M**

**ma'am [23]** 31/2 33/21 34/14 36/22 37/7 37/20 39/21 40/12 42/8 50/24 55/23 67/20 68/16 84/8 92/10 96/16 103/7 104/21 106/18 107/14 109/6 109/18 110/12
**Macallister [4]** 36/23 36/25 106/22 106/24
**machine [2]** 148/22 148/22
**magazine [1]** 37/19
**mail [7]** 1/19 11/9 107/1 193/3 193/15 198/12 217/24
**mails [4]** 71/23 105/11 106/12 155/10

**91/12 113/24 127/15 127/24 190/24 192/1 194/3 202/7 207/12 209/15 219/8 220/11 221/20
**longer [6]** 68/14 146/25 147/22 189/23 190/1 221/15
**longest [1]** 208/19
**looked [8]** 7/23 8/13 9/15 177/9 177/10 188/3 188/14 193/22
**looking [4]** 158/20 198/12 224/4 224/15
**looks [6]** 178/10 192/6 192/25 193/13 193/18 196/3
**lose [1]** 158/21
**lost [5]** 27/10 60/16 90/14 91/19 121/3
**lot [30]** 6/10 46/21 60/3 77/21 77/22 78/2 78/8 78/16 80/8 110/2 116/1 116/15 117/18 122/10 123/18 127/25 130/11 136/16 162/7 182/17 189/13 199/19 205/21 206/11 206/12 207/11 209/21 211/1 211/7 225/2
**lots [2]** 188/16 188/18
**louder [1]** 110/21
**love [2]** 88/19 173/6
**loved [1]** 206/17
**loves [1]** 78/5
**low [3]** 110/18 191/11 191/12
**lower [1]** 209/19
**Loxahatchee [2]** 69/13 77/7
**luck [1]** 147/17
**lunch [9]** 69/23 146/7 146/8 147/23 148/3 148/17 148/23 149/3 149/4
**lung [1]** 193/15
**lungs [1]** 193/17

**main [5]** 8/20 77/11 121/7 144/12 160/23
**maintaining [1]** 83/20
**major [2]** 192/17 221/1
**maker [1]** 37/11
**makes [5]** 151/6 190/1 210/6 210/10 220/15 221/18 223/14
**making [6]** 13/15 26/1 26/10 61/8 68/1 223/22
**Malaysia [1]** 217/1
**malfeasance [1]** 45/3
**malpractice [2]** 114/12 114/16
**man [2]** 50/7 63/5
**manage [1]** 208/11
**management [9]** 43/15 43/22 56/5 56/11 56/17 56/20 113/17 113/19 113/22
**manager [8]** 42/15 43/12 43/25 72/25 73/9 77/18 84/20 87/15
**maneuvers [1]** 82/13
**Mangurian [3]** 56/12 57/9 122/3
**Mangurian's [1]** 58/11
**manner [2]** 153/6 185/1
**March [7]** 164/25 166/24 168/17 187/5 187/14 189/8 189/22
**March 10 [2]** 189/8 189/22
**March 2 [1]** 187/14
**March-April [1]** 164/25
**Mareen [1]** 42/12
**marketing [4]** 37/15 42/19 56/6 84/23
**MARRA [2]** 1/12 18/25 77/7
**married [27]** 27/10 29/20 30/17 34/2 37/2 38/2 39/25 42/17 47/11 48/20 51/4 56/8 59/6 62/17 68/2 69/16 72/25 74/7 74/8 77/17 85/3 85/4 85/24 86/24 88/13 95/19 107/17
**marshals [1]** 218/5
**Mary [1]** 37/22
**master's [5]** 39/24 42/14 77/8 85/22 90/24
**material [2]** 24/24 25/3 25/4
**math [1]** 175/17
**matter [11]** 4/25 10/16 14/20 21/5 93/1 111/9 148/13 180/8 189/3 218/25 227/17
**May 1 [1]** 192/16
**May 15 [2]** 164/20 164/24
**May 16 [2]** 193/18 194/1
**May 9 [1]** 193/17
**maybe [19]** 6/4 72/3 77/15 83/7 87/16 96/11 96/17 99/25 108/17

Index maybe... - Mr. Nizri

# M

**maybe... [10]** 123/11
134/16 160/9 161/7
161/7 182/1 184/8
206/11 218/22 220/1
**MBA [2]** 56/5 113/21
**McMillian [4]** 90/19
90/19 90/23 147/7
**me [86]** 3/13 3/16 3/20
6/13 6/19 7/25 8/14 23/2
23/22 24/13 24/16 26/9
28/4 28/11 29/23 34/10
36/12 36/12 38/12 43/6
43/10 45/2 45/7 48/24
49/7 51/22 54/6 63/12
63/22 65/17 68/17 68/24
70/9 79/11 79/19 79/21
83/10 84/19 92/12
100/19 102/23 108/6
112/15 115/6 115/22
115/23 116/14 121/9
123/19 125/11 126/17
127/14 129/2 130/7
130/8 137/8 138/19
138/24 139/7 144/20
145/24 156/2 164/23
165/4 168/24 172/9
173/23 175/9 178/22
182/9 185/21 186/17
190/10 192/4 192/22
192/24 200/19 203/9
203/10 220/5 223/14
223/19 224/3 224/9
224/14 224/22
**Meadows [8]** 194/10
194/11 195/4 195/6
197/3 199/11 214/6
214/7
**mean [19]** 9/13 9/16
50/11 63/7 64/10 66/21
103/10 113/12 115/12
125/19 126/22 128/24
137/3 161/4 169/9
169/12 170/16 220/14
220/17
**meaning [5]** 33/15
126/14 161/5 207/14
208/25
**means [13]** 152/19
153/19 155/10 160/11
162/3 162/4 162/7
169/13 170/13 196/17
196/20 210/17 212/9
**meat [1]** 69/16
**mechanical [2]** 47/12
73/14
**medal [2]** 171/10 171/11
**medals [1]** 179/19
**medical [12]** 7/13 10/8
67/7 77/20 124/11
166/12 166/15 168/1
169/21 171/2 173/3
173/8
**medically [1]** 67/13
**medication [2]** 76/18
76/20

**medicine [2]** 89/10
165/13
**meet [3]** 153/25 205/20
224/19
**meeting [9]** 70/5 70/7
70/10 71/1 71/7 71/10
71/17 71/18 225/24
**Mehallis [9]** 55/25 56/3
56/11 108/12 113/17
119/7 121/21 125/1
147/7
**Mehmet [1]** 26/22
**member [3]** 88/13 99/21
130/7
**members [6]** 26/5 60/4
99/17 99/19 101/11
172/16
**memory [4]** 153/6
156/22 156/23 156/24
**memos [1]** 71/23
**mental [1]** 77/10
**mention [5]** 15/2 15/4
64/4 184/11 222/18
**mentioned [13]** 15/1
38/23 50/9 76/8 93/1
100/19 130/2 148/7
160/7 178/3 182/25
184/15 185/5
**Merit [1]** 227/14
**merits [1]** 127/4
**message [1]** 4/25
**messages [6]** 3/16 4/23
105/11 106/12 126/19
155/10
**met [1]** 205/15
**meter [5]** 161/12 161/12
161/12 161/13 209/22
**meters [11]** 185/7 185/8
185/18 185/24 186/18
187/16 187/21 188/3
195/10 195/23 197/3
**Mexico [27]** 104/2 104/3
111/22 111/25 158/25
160/2 170/1 176/17
176/17 176/20 176/24
177/4 177/6 177/21
177/24 178/3 190/15
190/20 191/8 192/4
192/4 192/6 193/12
194/4 213/8 213/17
213/22
**Miami [10]** 42/13 42/22
43/4 46/7 88/14 105/4
192/1 192/4 213/7 213/8
**Michael [14]** 47/4 95/9
117/9 194/24 206/17
206/21 206/22 206/24
207/4 207/8 207/11
207/13 207/23 208/2
**Michelle [1]** 67/22
**microphone [9]** 17/10
23/14 23/15 23/17 97/22
107/15 114/6 117/11
138/9
**middle [5]** 53/15 186/19
195/10 195/20 224/11

**midwest [1]** 81/16
**might [49]** 12/12 35/9
35/12 46/18 48/13 51/10
68/9 69/7 69/7 71/1
80/23 81/3 89/9 89/16
92/23 92/24 101/7
103/14 108/25 109/5
110/5 110/11 111/12
113/11 115/2 119/3
123/2 124/13 125/16
128/18 128/21 128/23
129/11 130/20 135/7
135/9 135/10 148/14
150/25 152/15 152/16
156/15 160/10 181/24
184/6 220/2 220/3 222/6
223/10
**mike [3]** 95/12 112/16
184/8
**military [2]** 30/9 73/23
**million [4]** 166/21 185/9
185/9 201/2
**mind [13]** 24/7 26/3
113/4 113/7 113/13
155/5 167/10 179/5
187/16 188/15 192/8
195/7 210/5
**mine's [1]** 91/16
**minor [3]** 80/15 188/18
189/2
**minute [10]** 93/15 115/6
148/20 159/14 162/1
162/13 167/2 171/15
204/11 217/13
**minutes [20]** 14/14 70/6
70/16 70/17 70/20 71/2
71/9 74/23 93/16 94/5
112/22 121/20 134/1
134/13 134/14 146/19
148/19 150/5 217/15
217/20
**mismanaged [1]** 197/13
**mismanagement [1]**
184/17
**misrepresentation [1]**
126/18
**misrepresentations [4]**
24/23 25/1 25/4 55/3
**misrepresented [1]**
124/12
**miss [2]** 118/6 118/14
**missed [1]** 118/13
**mistake [1]** 199/24
**mistreated [1]** 97/15
**modifications [1]** 3/11
**mom [4]** 38/16 52/4
52/24 56/8
**moment [6]** 78/23
140/11 140/25 170/4
177/17 199/6
**Monday [9]** 25/14 25/17
53/13 53/13 53/16
115/23 115/24 138/18
138/18
**Monday's [1]** 53/13
**money [49]** 17/6 17/6

32/13 34/6 35/20 43/14
75/4 75/5 75/7 75/16
79/18 79/25 80/14 80/15
90/15 112/5 112/6
127/25 128/1 128/10
128/13 129/2 129/3
132/14 132/21 167/5
167/10 167/25 168/18
171/4 175/1 175/4
175/15 176/1 178/21
178/22 180/13 180/14
180/15 180/20 180/24
182/5 191/1 197/22
198/11 205/8 211/18
223/21 226/8
**month [11]** 10/9 29/4
34/25 56/8 60/7 62/2
62/20 89/17 116/9
127/24 208/23
**monthly [1]** 70/5
**months [13]** 47/21 51/7
85/22 86/11 86/12 86/13
98/15 98/16 179/21
184/20 206/19 206/19
214/22
**months' [1]** 213/4
**Morgan [1]** 84/22
**morning [70]** 3/2 3/4
3/23 3/25 4/1 10/17
18/19 18/21 18/22 20/25
21/3 21/7 21/13 21/18
21/23 22/1 22/4 26/16
26/17 29/16 30/13 30/14
33/22 33/23 36/23 36/24
39/22 39/23 42/2 42/10
42/11 47/3 47/4 47/6
48/16 50/24 50/25 56/2
59/2 59/3 62/13 62/14
67/21 67/22 69/11 69/12
72/21 72/22 73/18 77/5
77/6 84/10 85/19 85/20
86/20 86/21 88/8 88/9
90/20 90/21 104/15
115/23 115/25 165/22
220/8 220/16 220/20
221/3 221/20 226/8
**morning's [1]** 217/25
**mornings [1]** 220/11
**Morrissey [14]** 117/9
162/22 194/24 206/17
206/21 206/23 207/3
207/4 207/8 207/11
207/13 207/16 207/23
208/2
**mortgages [1]** 88/25
**most [13]** 14/13 16/8
23/4 124/9 159/17 189/3
194/25 197/15 203/10
205/17 207/8 208/4
214/7
**Mostly [1]** 78/4
**mother [9]** 51/18 51/21
59/12 60/25 61/23 106/6
116/11 116/12 139/3
**mother-in-law [2]** 51/18
51/21

**motion [3]** 5/16 12/5
218/9
**motions [1]** 5/11
**move [10]** 14/11 17/16
25/20 109/18 158/3
166/3 189/15 194/3
219/19 222/11
**moved [4]** 105/5 186/7
191/25 210/13
**movie [1]** 130/9
**moving [2]** 114/2 194/2
**Mr [6]** 104/13 163/16
190/25 208/13 227/6
227/7
**Mr. [390]**
**Mr. Catanese [12]**
14/24 20/23 21/8 21/14
121/11 124/22 129/6
132/23 158/7 184/4
185/5 199/8
**Mr. Catanese's [1]** 9/21
**Mr. Colin [1]** 187/7
**Mr. Duvall [5]** 42/10
100/3 114/2 114/8
114/10
**Mr. Friedlander [8]**
86/20 119/8 119/12
133/12 133/13 133/15
133/21 140/7
**Mr. Hart [14]** 11/14
16/6 21/17 21/24 112/13
114/4 124/25 129/8
132/25 184/5 205/12
219/23 219/25 220/2
**Mr. Jones [11]** 85/19
101/18 119/8 129/21
129/22 129/25 133/10
136/5 140/9 152/2 152/3
**Mr. Juan [1]** 164/13
**Mr. Kainec [2]** 47/2
147/7
**Mr. Mehallis [6]** 55/25
113/17 119/7 121/21
125/1 147/7
**Mr. Morrissey [3]**
162/22 207/3 207/16
**Mr. Nizri [59]** 160/2
160/4 160/5 172/4 172/5
172/7 172/10 172/13
172/25 173/1 173/1
173/12 173/15 173/22
173/22 173/24 174/2
174/5 174/7 174/8
174/11 174/12 174/13
175/3 175/7 175/11
175/21 176/4 178/19
180/12 180/13 183/1
183/7 187/5 187/6
187/24 188/10 189/1
189/2 189/9 190/7
190/11 191/13 191/23
192/11 197/18 198/12
199/19 199/23 201/13
201/15 202/2 204/6
204/9 210/2 215/9
222/24 223/1 223/4

**M**

**Mr. Nizri's [3]** 175/16
198/21 203/25
**Mr. Ozaltin [5]** 26/14
119/6 120/4 120/5
121/12
**Mr. Redman [1]** 7/19
**Mr. Sellers [1]** 73/18
**Mr. Simile [5]** 88/6
117/12 136/11 140/23
141/7
**Mr. Simon [1]** 187/3
**Mr. Stenglein [2]** 48/14
137/12
**Mr. Syquia [75]** 11/7
11/11 11/23 22/6 117/3
118/18 159/6 159/22
159/25 162/25 163/1
163/3 163/7 163/13
163/24 164/1 164/4
164/9 164/19 166/16
167/20 168/19 168/23
169/3 170/24 172/5
172/11 172/13 173/2
173/6 173/11 173/21
174/23 175/9 175/14
176/5 178/20 179/13
180/5 180/12 180/16
180/17 180/20 181/7
181/22 183/2 183/3
183/11 183/12 187/11
198/10 204/13 205/17
208/18 208/21 209/1
209/2 209/7 209/9
209/11 209/20 210/1
214/11 214/23 215/5
215/8 215/13 215/19
216/1 216/9 216/13
216/20 216/23 220/22
223/1
**Mr. Syquia's [6]** 159/22
172/14 175/16 181/5
209/5 221/6
**Mr. West [6]** 59/2 97/20
101/5 115/17 139/2
139/6
**Mr. Zendejas [152]** 21/5
22/9 24/21 33/13 104/2
104/16 111/21 112/4
112/5 112/19 117/1
128/22 132/14 158/10
158/25 159/5 159/20
159/24 160/3 160/20
161/21 161/25 164/13
164/22 164/24 165/7
166/10 166/13 166/17
166/19 166/24 167/4
167/18 167/20 167/21
168/1 168/5 168/12
168/18 169/10 169/20
169/24 170/17 170/20
171/5 171/13 171/24
172/3 172/6 172/15
172/25 173/12 173/14
175/1 175/5 175/15
175/24 176/1 176/6

176/10 176/11 176/16
176/18 176/20 177/6
177/11 177/19 178/2
178/10 178/19 179/3
179/13 179/17 180/2
180/7 180/13 180/14
180/18 180/19 180/22
182/3 182/3 182/7
182/12 182/20 183/2
183/8 183/19 183/20
184/1 184/20 184/21
186/5 187/1 187/4 187/6
187/14 187/19 187/23
188/10 188/13 189/4
189/10 189/11 189/20
190/7 190/11 191/6
191/23 192/20 192/25
192/10 196/3 197/2
197/6 197/17 198/9
198/13 199/14 199/18
199/23 200/3 200/5
200/18 201/10 203/16
204/8 204/8 204/10
205/8 206/6 208/18
210/5 210/13 210/19
211/17 211/18 212/2
212/6 213/23 214/1
214/5 214/16 214/18
215/8 215/9 215/11
215/12 215/15 215/17
216/4 216/14
**Mr. Zendejas' [8]**
164/12 167/10 167/25
180/6 184/23 195/8
210/10 215/3
**Mr. Zinmeister [2]**
29/16 147/6
**Mrs [2]** 11/20 162/19
**Mrs. [78]** 15/20 159/6
159/20 159/21 159/24
160/19 161/2 161/20
162/17 162/25 163/4
163/5 163/8 163/10
163/24 164/4 164/22
164/25 165/2 166/10
166/16 166/20 166/20
166/22 167/4 167/6
167/9 167/19 167/23
168/3 168/5 168/18
168/24 169/17 169/21
170/3 170/6 170/10
170/24 174/9 174/13
174/18 175/1 175/6
175/15 175/22 175/25
176/3 176/10 178/25
179/5 179/10 179/12
182/13 182/21 183/3
183/8 183/12 187/12
189/24 197/21 204/10
204/11 206/5 206/16
207/23 208/17 211/14
211/14 211/17 212/7
215/4 216/14 219/1
219/24 220/1 220/17
222/25
**Mrs. Redman [71]**

15/2 159/6 159/20
159/21 159/24 160/19
161/2 161/20 162/17
162/25 163/4 163/5
163/8 163/10 163/24
164/4 164/22 164/25
165/2 166/10 166/16
166/20 166/20 166/22
167/4 167/6 167/19
167/23 168/18 168/24
169/17 169/21 170/3
170/6 170/10 170/24
174/9 174/13 174/18
175/1 175/6 175/15
175/22 175/25 176/3
176/10 176/10 178/25
179/10 179/12 182/13
182/21 183/3 183/8
183/12 187/12 189/24
197/21 204/10 204/11
206/5 206/16 208/17
211/14 211/17 212/7
215/4 216/14 219/1
219/24 220/17 222/25
**Mrs. Redman got [1]**
168/3
**Mrs. Redman to [1]**
168/5
**Mrs. Redman's [5]**
167/9 207/23 211/14
211/17 220/1
**Ms [4]** 11/10 110/13
181/8 227/8
**Ms. [83]** 3/16 4/23 6/15
11/5 13/9 15/24 21/20
22/22 30/13 33/22 36/15
36/23 37/21 39/22 50/24
62/13 67/21 69/11 72/20
77/5 84/9 90/19 95/6
96/14 99/24 99/25
101/25 103/8 104/23
104/23 104/24 104/25
105/9 105/21 106/22
106/24 107/20 107/22
109/7 109/19 109/20
113/9 115/10 115/11
117/2 117/2 118/11
118/14 119/7 121/17
127/6 127/10 127/11
129/10 129/18 129/20
133/2 133/19 136/8
138/7 138/11 140/12
140/22 140/23 141/4
141/5 147/5 147/6 147/6
147/6 147/7 147/7
147/25 148/16 163/20
171/16 179/20 181/1
181/11 182/14 183/22
190/25 208/2
**Ms. Bradley [4]** 30/13
36/15 104/23 147/6
**Ms. Bradshaw [1]** 72/20
**Ms. Chen [6]** 50/24
113/9 138/7 138/11
140/22 141/4
**Ms. Chepren [2]** 84/9

147/7
**Ms. Eugenie [1]** 21/20
**Ms. Ferrante [3]** 22/22
147/5 147/25
**Ms. Ferrante's [1]**
148/16
**Ms. Hess [1]** 181/11
**Ms. Howard [4]** 171/16
179/20 181/1 208/2
**Ms. Hundley [3]** 37/21
95/6 147/6
**Ms. Isaacs [3]** 39/22
96/14 109/7
**Ms. Kuck [6]** 33/22
104/23 104/24 104/25
105/9 147/6
**Ms. Leonard [12]** 3/16
4/23 11/5 115/10 115/11
118/14 121/17 127/6
129/18 133/2 133/19
136/8
**Ms. Macallister [3]**
36/23 106/22 106/24
**Ms. McMillian [2]**
90/19 147/7
**Ms. Redman [7]** 6/15
13/9 15/24 117/2 117/2
163/20 190/25
**Ms. Screciu [2]** 69/11
105/21
**Ms. Shappel [1]** 107/20
**Ms. Shappell [3]** 77/5
99/24 107/22
**Ms. Smith [9]** 67/21
103/8 109/19 109/20
119/7 127/10 127/11
129/10 129/20
**Ms. Sort [1]** 62/13
**Ms. Sorte [5]** 99/25
101/25 140/12 140/23
141/5
**Ms. Timpanaro [3]**
118/11 182/14 183/22
**much [31]** 21/11 24/25
25/19 34/6 44/2 48/11
63/5 65/16 65/21 65/23
66/6 83/11 89/7 93/17
98/25 110/20 112/10
120/12 122/18 134/11
146/10 147/22 183/17
183/21 183/25 184/2
195/6 204/15 215/3
220/2 224/6
**multi [1]** 63/15
**multi-facetted [1]** 63/15
**multiple [1]** 208/5
**must [14]** 150/16 150/16
150/18 151/12 152/14
152/19 152/22 153/19
153/25 154/15 154/24
154/24 155/9 155/21
**myself [5]** 16/9 20/13
66/16 78/24 131/1

**N**

**N-i-z-r-i [1]** 118/5

**name [38]** 10/5 19/10
20/25 21/3 21/14 21/23
22/5 26/22 29/4 29/4
36/24 37/22 39/23 42/12
47/3 48/17 62/15 69/12
72/23 73/21 78/1 84/10
85/20 86/21 88/9 90/22
104/15 117/14 117/20
121/25 122/7 132/11
147/4 158/9 159/13
159/23 160/2 205/14
**name's [4]** 18/24 21/19
29/17 59/3
**named [10]** 24/22
161/25 162/22 163/16
171/7 172/3 176/20
178/7 181/3 208/4
**names [6]** 18/5 18/11
116/22 116/24 116/24
147/3
**narrow [1]** 225/16
**national [2]** 163/9
165/22
**natural [1]** 77/25
**naturally [1]** 130/13
**nature [14]** 19/16 24/3
34/24 35/4 50/15 84/24
89/19 92/21 93/2 101/18
113/14 123/21 207/14
214/1
**near [3]** 107/18 114/5
138/9
**nearby [1]** 159/17
**nearly [1]** 212/2
**necessarily [7]** 12/19
50/11 55/15 57/22 62/9
108/22 125/12
**necessary [5]** 25/17
25/18 26/18 50/9 68/25
**need [68]** 3/6 7/8 11/2
11/4 12/24 12/25 14/16
17/9 19/21 22/20 23/24
25/11 25/21 26/4 50/3
53/1 53/9 59/18 59/23
59/23 63/17 68/13 76/18
93/4 93/20 119/5 119/6
119/6 119/7 119/7 119/9
128/14 133/13 133/15
133/22 134/11 134/12
138/9 140/24 141/3
147/10 147/13 149/7
150/10 158/13 162/14
169/1 173/3 173/4
173/10 173/14 174/6
174/12 174/14 176/15
177/16 180/11 183/4
183/6 183/18 207/17
209/17 219/7 219/12
219/16 220/20 222/21
223/15
**needed [11]** 11/13 13/25
50/12 60/2 109/12
118/24 127/13 147/14
203/20 208/1 212/7
**needing [2]** 61/22 93/23
**needs [3]** 61/12 92/14

**N**

needs... [1] 153/24
negative [4] 108/7 131/9
132/8 133/4
negatively [2] 133/6
133/8
neglect [1] 103/5
negligent [1] 80/6
neither [2] 5/7 131/2
networking [2] 60/4
155/11
never [72] 4/24 12/24
13/11 26/3 27/14 27/14
29/21 29/21 30/22 34/11
34/16 34/21 37/2 38/7
40/4 40/8 41/25 47/14
47/14 48/21 48/21 56/9
56/9 59/7 62/21 62/21
66/18 69/25 73/3 73/3
74/11 74/11 74/12 74/19
74/21 78/7 78/12 79/24
80/9 81/22 82/7 82/21
82/24 84/15 86/1 86/1
86/25 88/17 91/3 96/23
128/5 166/17 167/19
169/25 170/18 173/7
174/4 176/5 177/12
177/13 177/15 177/25
180/22 180/23 181/10
182/4 198/2 199/25
203/7 207/5 211/16
219/2
Nevertheless [1] 215/16
new [24] 12/22 63/22
64/13 86/24 87/17
115/24 116/7 116/8
117/25 139/16 139/18
150/9 192/9 192/13
192/14 192/15 204/18
209/17 209/18 213/10
213/11 213/11 213/21
215/2
news [2] 155/15 221/25
newspaper [1] 222/4
newspapers [2] 222/6
222/8
next [63] 24/12 25/16
42/2 53/14 62/8 68/14
70/5 71/8 71/14 71/17
79/15 88/13 115/24
145/19 145/23 147/14
158/2 175/24 176/15
178/2 181/5 181/6
185/21 185/25 186/12
186/17 188/8 188/9
189/6 189/20 190/10
192/11 192/16 192/22
194/1 194/6 195/5
195/12 195/21 196/4
196/13 196/23 198/8
198/15 198/18 199/5
199/17 199/22 200/5
200/9 200/12 200/15
200/17 200/19 201/9
201/19 202/1 202/9

204/2 204/23
next-door [1] 181/6
nice [3] 133/11 200/19
226/7
night [4] 6/9 6/10 49/21
90/7
nine [6] 17/4 49/11 51/6
143/20 146/1 146/1
ninth [1] 66/23
nitroglycerin [2] 76/13
76/14
Nizri [73] 118/5 118/5
160/2 160/2 160/4 160/5
172/3 172/4 172/5 172/7
172/10 172/13 172/25
173/1 173/1 173/12
173/15 173/22 173/22
173/24 174/2 174/5
174/7 174/8 174/11
174/12 174/13 175/3
175/7 175/11 175/21
176/4 178/19 180/12
180/13 183/1 183/7
187/3 187/5 187/6
187/24 188/10 189/1
189/2 189/9 190/7
190/11 191/13 191/23
192/11 197/18 198/9
198/10 198/12 199/19
199/23 201/13 201/15
202/2 204/6 204/9
209/12 209/20 210/2
210/8 210/15 211/12
211/16 212/3 215/9
222/24 223/1 223/4
Nizri's [3] 175/16
198/21 203/25
no [194] 1/2 4/7 4/24 5/2
5/3 8/22 11/12 13/19
14/19 15/2 16/8 17/7
24/1 27/21 29/20 29/22
29/23 29/24 30/7 30/10
30/18 30/22 30/23 32/20
32/24 34/13 34/19 35/24
36/3 37/6 38/8 38/9
38/16 39/17 39/20 40/10
42/7 43/9 44/18 45/7
45/24 46/20 46/25 47/15
47/15 47/16 48/5 48/20
50/2 50/6 54/2 54/12
54/15 54/24 55/11 55/13
55/17 56/10 57/20 57/22
57/25 58/3 59/9 60/20
60/23 63/2 65/22 65/25
67/9 68/22 70/25 71/3
71/4 72/4 72/10 73/4
73/4 73/6 74/18 75/21
75/21 76/2 76/5 76/7
76/12 76/23 78/13 78/20
79/18 80/19 80/25 81/5
81/10 81/24 82/23 83/1
84/14 84/16 84/17 85/5
85/16 87/7 88/17 88/20
90/7 90/7 90/9 90/14
91/5 91/5 91/8 92/3 92/9
94/1 95/24 96/3 96/9

96/19 96/25 97/11 97/14
97/16 98/8 99/13 99/17
100/15 103/4 104/1
104/23 105/13 106/14
108/10 110/7 110/24
111/8 112/1 112/9 115/4
116/5 117/2 117/3 118/2
118/15 121/15 121/16
121/18 124/4 124/14
124/16 124/24 125/12
126/4 126/4 129/7
129/17 130/9 132/24
133/1 136/2 136/3 136/7
136/9 137/15 137/16
139/19 139/23 141/9
144/14 144/14 144/17
151/6 152/23 156/5
156/18 162/5 168/1
170/1 170/12 170/24
171/18 171/21 182/4
189/23 190/1 197/4
198/6 202/20 206/9
213/12 213/18 214/17
216/15 221/9 225/21
nobody [1] 107/10
nodding [1] 23/19
noise [1] 193/16
nondisclosure [1]
113/14
none [2] 153/2 227/11
normal [5] 22/16 24/1
172/20 174/21 218/22
normally [6] 9/25 53/11
110/14 110/15 111/6
219/2
North [1] 47/8
not-for-profit [1] 62/19
note [5] 4/5 127/11
156/10 189/14 196/9
note-taking [1] 156/10
noted [1] 6/7
notes [13] 119/4 134/2
156/6 156/8 156/13
156/14 156/15 156/21
156/22 193/1 217/14
217/16 222/14
nothing [15] 6/12 15/7
66/21 67/13 67/19 88/18
91/18 97/9 124/10
124/15 125/11 180/23
207/1 212/15 215/13
nothing's [1] 6/19
notice [8] 5/24 22/8
28/12 113/9 176/11
185/16 186/8 196/23
noticed [1] 128/2
nowadays [1] 105/17
number [44] 12/23
48/23 49/4 49/6 49/6
51/13 51/15 87/3 118/24
120/4 122/9 135/25
136/11 137/12 137/18
138/7 138/11 139/2
139/25 140/12 140/19
141/15 141/17 141/19
141/21 141/23 141/25

142/2 142/13 143/5
143/6 143/15 143/19
145/1 145/4 145/17
147/11 148/24 159/10
186/22 192/3 196/17
198/5 212/18
number 1 [4] 120/4
122/9 137/18 141/15
number 10 [3] 49/4
137/12 141/17
number 11 [3] 51/13
138/11 141/19
number 12 [3] 49/6
51/15 87/3
number 13 [2] 139/2
141/21
number 14 [2] 140/12
141/23
number 15 [3] 135/25
140/19 141/25
number 16 [2] 145/1
145/4
number 17 [1] 145/17
number 19 [2] 139/25
142/2
number 2 [1] 142/13
Number 23 [1] 136/11
number 5 [1] 143/5
Number 6 [1] 143/6
number 8 [3] 143/15
143/19 196/17
number 9 [2] 48/23 49/6
numbers [1] 145/24
nursing [1] 74/10

**O**

o'clock [6] 11/12 50/14
63/11 120/18 222/11
222/15
object [1] 152/8
objecting [1] 6/6
objection [17] 136/1
136/2 136/3 136/6 136/8
136/21 137/14 137/16
138/20 138/21 139/6
139/10 139/19 152/9
152/11 152/13 221/9
objection's [1] 6/7
objections [10] 151/22
222/19 222/22 223/2
223/9 223/14 223/16
224/4 224/8 224/18
obligated [1] 93/10
obligation [1] 118/20
observe [3] 98/9 100/10
100/12
observed [1] 83/2
observing [2] 98/18
156/11
obstacles [2] 160/13
160/16
obtain [1] 20/8
obtained [1] 9/3
obvious [1] 13/3
obviously [3] 16/18
80/14 223/13

occasion [1] 114/11
occasional [1] 96/11
occasions [3] 80/21
208/5 208/15
occupational [1] 99/24
occurred [2] 127/15
213/23
occurring [1] 216/25
OCTOBER [1] 227/18
off [23] 17/10 26/11
53/16 62/2 62/7 63/6
89/17 124/1 126/7
136/15 136/25 137/10
138/4 138/6 138/24
190/5 190/8 196/16
196/21 196/25 199/6
215/21 220/22
offended [1] 119/22
offer [1] 208/9
offered [1] 182/2
offering [1] 187/11
office [14] 40/3 51/5
52/11 52/14 52/19 52/20
52/22 54/5 63/25 71/1
72/25 73/9 77/11 77/12
officer [2] 48/19 137/13
Official [1] 1/18
often [6] 52/14 52/14
83/5 98/13 100/5 155/25
oh [10] 81/24 83/1 83/4
83/7 106/17 116/20
117/10 130/9 132/2
174/22
okay [115] 11/7 12/3
14/2 16/3 17/13 18/6
18/8 18/16 29/1 29/13
30/12 32/10 47/22 48/13
49/17 50/2 51/13 51/25
52/10 53/3 53/7 53/18
55/6 55/23 58/15 60/24
64/8 66/7 69/9 70/13
70/17 71/7 71/14 72/18
74/6 74/19 75/1 75/9
75/18 82/5 84/8 86/7
87/20 90/3 90/22 91/16
94/4 95/6 95/14 96/4
96/14 97/6 97/20 99/14
99/18 100/3 100/9
100/23 101/5 101/18
101/25 102/6 102/9
102/25 103/7 103/25
105/2 107/7 108/4 108/6
109/16 110/3 110/8
110/20 111/5 111/7
111/19 112/9 114/22
116/5 117/1 118/3
118/22 120/19 122/6
123/16 124/5 124/17
124/22 125/10 126/5
127/6 127/17 127/20
131/12 132/20 133/11
133/21 135/5 135/20
140/6 140/18 144/9
145/9 146/6 146/17
161/20 168/13 182/10
191/5 219/5 219/18

**O**

**okay... [3]** 224/14
225/15 225/22
**Okeechobee [4]** 2/12
2/15 2/18 2/21
**old [14]** 51/7 53/6 56/8
59/12 62/20 80/7 85/24
108/16 116/9 117/17
200/7 200/10 200/13
215/1
**older [2]** 77/23 120/17
**oldest [2]** 27/11 42/18
**Olympian [1]** 208/9
**Olympic [6]** 179/19
179/24 185/7 186/5
194/24 207/20
**Olympics [4]** 171/11
177/1 179/18 208/6
**omissions [2]** 24/24 25/4
**once [22]** 14/4 34/9 65/4
74/22 83/7 98/16 112/17
157/14 168/4 178/14
185/23 186/2 186/13
186/19 187/20 192/5
192/24 195/19 195/24
214/9 217/1 224/7
**one [130]** 3/18 6/1 9/20
10/11 10/14 10/18 10/19
11/6 11/14 12/4 13/25
14/20 15/11 17/1 18/2
18/10 21/11 23/18 26/3
27/11 27/12 27/20 29/1
34/3 35/16 37/25 38/3
42/22 46/19 49/5 50/2
51/6 51/6 51/7 53/9
55/20 59/24 59/24 62/2
62/20 63/5 64/18 66/14
70/25 71/4 75/10 82/6
89/1 90/12 91/1 91/13
95/17 96/9 97/4 108/10
108/15 109/11 110/24
111/15 112/9 115/6
117/2 117/3 117/23
118/15 118/16 119/10
119/11 120/1 120/1
122/9 122/9 126/10
133/5 134/20 140/11
141/2 142/4 144/10
145/7 145/10 145/13
145/19 145/21 156/5
162/11 162/13 164/6
164/12 165/19 166/5
166/7 168/25 171/6
173/10 173/14 176/3
176/7 177/18 180/11
182/25 183/6 184/11
188/13 188/23 189/4
193/18 194/11 194/16
198/25 199/6 199/20
200/5 200/6 204/17
204/20 207/25 208/4
209/3 209/5 210/21
210/25 211/9 211/20
214/7 215/2 217/21
218/7 218/25 225/23
**one's [5]** 88/25 112/1

138/1 138/6 156/18
**one-man [1]** 63/5
**ones [2]** 15/4 141/14
**online [4]** 37/15 37/19
155/14 202/19
**only [45]** 4/13 13/19
15/4 15/13 16/14 35/11
39/6 50/12 59/11 59/21
61/21 68/13 70/3 70/8
71/4 78/24 82/17 92/4
115/7 126/6 137/11
150/18 151/23 152/20
152/23 155/21 156/2
156/3 156/4 156/4
156/22 165/5 165/17
165/18 165/19 177/22
177/23 213/19 216/24
217/1 218/20 218/25
220/25 224/17 224/24
**op [1]** 68/15
**open [1]** 155/5
**opening [17]** 7/16 7/20
7/24 9/21 10/7 14/25
15/3 15/22 112/21 149/8
151/14 157/3 157/5
157/10 158/5 205/18
227/5
**openings [3]** 146/8
146/11 149/21
**openly [1]** 20/12
**operate [1]** 61/25
**operations [2]** 87/15
87/22
**operator [1]** 59/6
**opinion [25]** 7/15 8/2
8/9 8/15 8/16 9/8 9/11
9/12 9/16 10/1 10/7
74/16 102/20 106/8
108/6 108/7 111/18
150/22 167/16 169/19
182/11 201/7 201/18
202/7 203/1
**opinions [23]** 7/3 7/5
7/17 8/2 8/4 30/23 37/4
40/10 47/15 62/23 66/14
70/2 73/5 91/6 92/18
108/21 119/20 135/3
148/5 148/13 167/15
217/14 222/3
**opponent [1]** 6/17
**opportunity [5]** 8/3
23/10 153/4 157/16
157/19
**opposed [3]** 26/2 32/12
188/19
**opposing [1]** 152/7
**opposite [2]** 153/23
169/13
**order [24]** 3/1 11/7
11/23 12/5 13/17 13/20
13/25 19/20 19/22 20/3
23/22 26/6 152/18 193/5
193/6 206/10 207/17
208/11 211/18 212/5
217/25 218/2 218/6
218/9

ordered [3] 189/11
211/19 211/20
**orders [1]** 188/25
**ordinarily [3]** 9/8 9/10
9/18
**organization [5]** 62/19
63/4 68/1 77/10 130/8
**organized [1]** 172/14
**originally [1]** 106/3
**others [7]** 125/7 125/20
138/2 139/20 140/10
148/15 197/5
**otherwise [4]** 5/6 12/14
154/4 173/9
**our [40]** 3/19 7/21 8/20
8/23 10/18 11/20 12/21
14/3 16/5 16/24 21/25
22/15 23/12 23/21 26/1
26/4 26/10 56/8 63/6
63/8 63/8 63/9 63/19
79/18 80/13 92/13 99/23
115/15 119/16 134/2
137/5 144/12 163/15
163/16 197/11 197/21
208/8 220/11 223/3
225/17
**outcome [2]** 153/7 215/6
**outcomes [1]** 73/5
**outline [1]** 157/6
**outpatient [2]** 77/9 79/4
**outs [1]** 214/3
**outset [1]** 153/14
**outside [12]** 10/18 31/2
57/4 93/7 93/16 101/1
101/1 119/10 119/25
130/13 150/24 155/2
**outstanding [2]** 7/8
187/16
**over [42]** 16/8 18/25
22/11 28/7 47/2 66/22
71/15 75/1 77/13 78/18
81/6 89/19 104/10
113/10 116/16 116/22
125/25 150/9 160/15
160/24 161/9 161/15
166/2 166/4 177/1 180/8
185/6 186/21 186/23
194/16 194/20 194/21
196/20 196/20 197/4
204/1 207/5 207/15
209/1 220/11 222/23
223/15
**overlook [1]** 135/6
**overnight [1]** 42/3
**overrule [1]** 152/9
**own [19]** 31/21 43/3
55/1 59/14 61/15 61/16
67/4 67/4 73/24 73/24
74/3 96/24 135/3 156/22
171/1 184/18 193/23
210/19 211/9
**owned [16]** 78/22 81/11
81/14 81/17 96/7 96/9
96/23 108/10 122/4
160/19 161/3 164/4
165/2 169/17 170/3

179/10
**owner [7]** 46/1 59/6 99/2
99/4 162/18 163/12
206/6
**owners [2]** 102/3 102/22
**ownership [3]** 197/10
207/24 212/12
**owning [1]** 82/1
**owns [2]** 38/2 163/24
**Ozaltin [6]** 26/14 26/22
119/6 120/4 120/5
121/12

**P**

**P.A [2]** 2/11 2/14
**p.m [7]** 135/14 135/14
149/14 149/14 218/14
218/14 226/9
**pace [2]** 22/16 218/23
**pack [3]** 186/19 195/10
195/20
**page [2]** 1/16 17/24
17/25
**page 37 [1]** 17/24
**page 39 [1]** 17/25
**PAGES [1]** 1/10
**paid [25]** 24/25 65/16
65/21 66/6 75/3 79/5
79/6 80/11 140/2 140/2
167/11 171/4 175/2
180/15 182/4 183/21
191/9 191/10 204/10
215/9 215/11 215/12
215/17 216/3 216/7
**pain [5]** 163/17 163/18
166/1 179/8 179/9
**Palm [22]** 1/7 1/19 2/13
2/16 2/19 2/22 21/19
30/15 34/8 37/23 37/23
42/23 47/8 47/9 51/8
70/4 70/11 77/12 86/15
90/25 105/5 178/8
**panel [2]** 134/3 144/12
**panned [1]** 123/22
**Panthers [1]** 87/10
**paper [1]** 80/9
**papers [1]** 10/19
**parading [1]** 130/14
**paragraph [1]** 4/5
**paralegal [5]** 33/25
34/14 35/10 35/12 61/18
**part-time [2]** 30/17
31/14
**partially [1]** 108/17
**participate [2]** 98/6
169/10
**participation [1]** 18/24
**particular [11]** 18/24
99/3 114/25 115/5 125/2
133/9 154/18 189/9
192/23 206/13 207/12
**particularly [2]** 8/11
195/24
**parties [8]** 18/11 19/16
73/6 111/16 133/6
155/15 155/23 223/6

**partner [3]** 109/10
109/10 109/11
**parts [1]** 122/8
**party [7]** 4/3 6/17
132/21 157/2 157/7
182/2 218/1
**Paso [2]** 82/2 82/9
**passed [8]** 51/18 58/12
67/3 107/17 108/17
178/11 210/24 212/1
**past [13]** 30/16 31/3
37/12 43/13 62/16 81/12
84/11 86/22 87/4 87/21
87/22 95/22 96/9
**patience [5]** 147/2
182/24 183/18 184/16
221/14
**patient [2]** 34/2 63/18
**patients [1]** 63/19
**Patricia [2]** 2/17 22/1
**Patrick [1]** 59/4
**Patty [1]** 205/15
**Paul [1]** 95/13
**paw [1]** 128/5
**pay [14]** 76/11 76/21
77/1 79/18 79/19 80/2
91/19 170/14 174/21
175/7 189/20 191/1
204/8 211/15
**paying [1]** 168/14
175/10 181/14
**payment [4]** 168/3
189/19 190/24 216/1
**Peggy [7]** 77/6 107/21
139/25
**pending [1]** 15/22
**people [39]** 24/2 24/9
24/10 25/21 40/23 40/24
41/12 41/13 49/11 54/25
54/25 63/17 64/9 78/24
81/25 95/2 100/18
100/20 101/8 105/7
113/4 119/5 119/9
120/16 135/4 137/9
138/25 139/8 148/13
150/24 154/23 159/10
162/3 162/21 172/20
174/22 178/9 198/5
223/23
**perceive [1]** 132/19
**percent [3]** 103/18
169/8 169/23 174/22
174/23 174/24 175/18
175/18 175/19 210/14
210/16 215/25 216/3
**peremptories [2]** 134/5
141/12
**peremptory [7]** 143/5
143/13 143/19 145/3
145/7 145/17 145/21
**perfect [1]** 213/17
**perform [3]** 19/3 203/3
210/20
**performance [5]** 185/18
186/9 197/7 203/12
204/21

**P**

**performances [4]** 187/1 188/1 188/2 203/11
**performed [3]** 172/18 210/22 211/17
**performing [4]** 197/16 197/22 199/15 202/11
**perhaps [1]** 208/7
**period [12]** 25/22 25/24 82/16 99/7 160/16 160/25 163/6 164/1 164/2 194/5 202/7 212/17
**peripheral [1]** 66/13
**peripherally [1]** 65/9
**permit [1]** 152/9
**permitted [1]** 218/7
**perpetrate [1]** 4/16
**perpetrated [1]** 13/7
**perpetual [2]** 195/11 199/10
**person [20]** 33/1 41/21 41/22 80/3 92/7 109/24 117/21 117/25 121/25 135/8 137/11 156/16 159/5 159/8 160/1 160/4 175/2 184/11 202/20 222/25
**person's [2]** 117/20 160/2
**personal [22]** 20/7 20/11 29/23 30/23 37/4 38/8 40/9 43/7 46/2 48/24 51/10 62/23 65/1 65/15 68/10 69/7 69/21 73/4 91/5 101/16 122/24 203/1
**personally [14]** 43/2 43/3 45/5 45/7 49/25 51/20 57/1 64/22 64/24 99/20 103/9 114/16 126/17 151/2
**persons [1]** 163/14
**pet [2]** 108/9 116/1
**PETA [3]** 130/7 130/7 130/8
**Peter [5]** 118/5 197/12 207/21 208/8 213/1
**phone [2]** 49/21 77/21
**photograph [1]** 150/21
**phrase [1]** 161/23
**phrases [1]** 155/25
**physical [5]** 67/16 67/19 124/11 167/14 169/14
**physically [2]** 166/9 203/3
**pick [5]** 14/17 50/3 98/24 115/24 202/25
**picked [4]** 41/24 42/1 106/6 182/12
**piece [2]** 80/9 151/9
**pilot [5]** 29/19 30/2 30/3 30/6 30/9
**place [10]** 75/13 97/4 125/21 128/4 128/8 186/14 189/8 194/10

**places [3]** 155/16 186/15 186/19
**placing [2]** 185/19 209/25
**plaintiff [50]** 1/4 2/2 6/9 10/15 11/9 14/18 17/5 19/10 21/15 33/13 33/17 39/5 46/23 55/21 92/4 112/19 129/12 134/6 135/21 135/21 135/24 138/2 139/21 142/13 142/20 142/22 143/4 143/6 143/12 143/13 143/15 143/22 144/2 145/5 145/6 145/18 145/20 153/16 153/17 153/19 153/22 153/24 153/25 157/11 157/18 204/16 211/16 215/23 223/2 223/10
**plaintiff's [4]** 7/12 18/2 158/6 211/9
**plaintiffs [4]** 6/2 6/9 9/9 118/9
**plan [4]** 79/10 191/12 222/25 223/3
**plane [3]** 89/17 136/15 213/8
**planning [3]** 28/23 93/21 93/24
**Plantation [1]** 56/5
**play [3]** 126/16 151/20 205/4
**played [10]** 110/12 190/13 196/7 198/19 201/12 201/20 202/10 202/16 202/24 205/5
**playing [1]** 202/5
**playoff [2]** 196/21 197/1
**PLC [1]** 2/5
**pleading [1]** 5/21
**pleadings [1]** 5/22
**pleasant [1]** 222/15
**please [65]** 3/2 18/19 20/5 20/12 22/22 22/24 23/1 23/13 23/16 23/18 23/24 24/10 24/13 93/11 93/14 93/19 94/9 94/15 94/17 108/11 116/24 127/10 129/21 135/16 146/23 147/4 147/19 147/24 149/16 149/24 150/1 156/8 168/24 182/9 185/21 185/25 186/12 188/9 189/6 190/12 192/22 195/5 195/21 196/4 196/13 197/23 198/15 198/18 199/5 199/17 200/9 200/12 200/15 201/9 201/19 202/4 204/23 205/4 210/1 217/16 217/22 218/16 219/21 221/12 222/8
**pleasure [8]** 22/5 62/12

**78/24 87/20 81/21 147/17 158/10 205/16
**plenty [1]** 90/15
**plus [2]** 120/20 182/15
**point [18]** 5/19 6/12 9/20 188/22 188/22 191/13 193/14 193/21 194/18 195/9 197/8 198/9 201/3 208/3 210/18 212/5 214/17 223/3
**points [2]** 189/1 204/4
**pole [2]** 161/7 161/8
**police [5]** 69/15 70/4 70/12 71/25 72/3
**policy [10]** 3/15 5/3 15/19 170/5 170/5 170/8 170/9 170/11 170/12 170/13
**political [2]** 126/11 126/21
**portfolio [3]** 84/13 84/20 84/21
**portion [1]** 215/9
**position [11]** 43/11 43/16 43/17 49/18 70/3 72/12 84/23 138/17 142/13 196/8 215/19
**positions [1]** 43/19
**possession [5]** 4/3 160/20 175/24 176/16 182/21
**possibility [1]** 197/15
**possible [6]** 25/19 25/20 88/2 158/3 205/19 222/6
**possibly [2]** 62/7 214/22
**post [3]** 51/4 54/5 188/9
**postpone [1]** 220/8
**potential [2]** 186/20 209/21
**poultice [1]** 189/18
**powerful [1]** 214/3
**practice [2]** 40/20 105/7
**practiced [3]** 34/21 35/7 213/21
**practices [1]** 209/1
**Practitioners [1]** 165/15
**prayer [1]** 132/5
**pre [2]** 68/15 167/1
**pre-op [1]** 68/15
**pre-purchase [1]** 167/1
**predicate [1]** 9/9
**predisposition [2]** 41/14 83/25
**preexisting [3]** 169/5 173/8 193/25
**prefer [1]** 14/12
**prejudice [1]** 153/8
**preliminary [3]** 149/21 150/12 227/4
**premature [2]** 155/5 155/6
**prematurely [1]** 156/17
**premier [1]** 194/11
**prepared [1]** 223/24
**preponderance [6]**

**33/15 39/6 153/18 154/3 154/10 154/13
**prepurchase [11]** 168/7 168/8 168/10 168/10 168/15 168/16 169/5 169/7 188/22 189/7 210/20
**prescribed [1]** 160/16
**prescribes [1]** 193/16
**present [8]** 1/20 33/8 157/11 157/12 157/13 157/16 157/20 217/24
**presentation [2]** 151/18 205/10
**presented [19]** 4/10 19/6 19/18 93/4 100/25 101/7 103/2 123/4 123/7 150/19 155/22 157/14 157/20 157/22 157/23 182/3 222/19 222/21 223/16
**presenting [1]** 115/3
**presents [1]** 152/7
**presiding [1]** 18/25
**press [1]** 155/16
**pressure [1]** 76/24
**presume [2]** 46/12 46/13
**pretrial [1]** 17/22
**pretty [5]** 44/2 48/11 63/5 122/7 195/6
**prevail [1]** 19/18
**prevent [7]** 13/17 19/25 25/23 28/5 43/6 54/22 120/8
**preventative [2]** 211/8 211/11
**prevented [1]** 67/16
**previous [5]** 71/9 72/13 108/15 109/9 118/19
**previously [2]** 7/5 210/14
**price [2]** 191/10 215/10
**prices [1]** 99/11
**primary [1]** 165/25
**principles [1]** 150/11
**printed [2]** 106/12 107/1
**prior [18]** 42/13 43/21 43/23 43/24 73/23 108/8 163/11 199/11 202/12 203/12 203/15 206/15 207/23 207/23 210/4 211/2 212/12 214/12
**private [2]** 20/11 60/2 60/10 88/2
**privately [1]** 119/1
**Prix [9]** 161/4 161/4 161/16 161/18 186/20 186/21 186/23 200/7 200/11
**probably [18]** 16/8 23/8 30/18 43/18 50/14 68/5 80/5 98/16 100/6 126/10 126/16 127/24 132/12 133/14 194/21 221/4 221/18 225/4
**problem [16]** 17/7 27/16

**32/8 59/9 84/4 110/9 125/17 168/13 170/22 172/18 172/22 173/5 176/12 198/13 200/2 221/5
**problematic [2]** 16/12 211/24
**problems [21]** 27/16 49/23 49/24 50/1 88/20 111/8 120/21 122/22 126/1 166/9 166/12 166/15 167/14 170/7 171/3 173/3 173/8 176/9 176/12 177/25 180/17
**procedure [1]** 157/1
**proceed [2]** 218/17 223/11
**proceeding [1]** 45/12
**proceedings [9]** 1/11 41/25 47/25 48/2 94/8 135/15 149/15 218/15 227/16
**process [12]** 4/4 20/2 20/5 21/12 22/21 23/3 93/17 130/25 130/25 134/3 136/18 222/24
**produced [4]** 4/17 8/24 12/15 13/1 15/5 15/10 15/20 15/25 16/1 154/7
**professional [1]** 29/19
**professionally [3]** 43/1 43/2 44/20
**professor [4]** 30/17 31/15 56/7 56/24
**proffered [2]** 6/13 6/19
**proficiency [1]** 105/23
**profit [1]** 62/19
**program [3]** 34/25 77/18 91/10
**programs [1]** 165/22
**progress [1]** 188/6
**prohibit [1]** 13/6
**prohibition [1]** 12/20
**promised [1]** 156/4
**prompt [2]** 23/25 24/3
**pronounce [1]** 18/11
**proof [3]** 44/9 68/25 157/18
**proper [1]** 5/14
**properly [2]** 6/5 108/16
**property [6]** 46/1 46/5 46/7 51/11 98/12 98/15
**proposed [1]** 217/25
**prosecuting [1]** 33/8
**prospect [4]** 200/11 200/13 200/20 207/25
**prospective [2]** 7/9 93/22
**protective [1]** 12/5
**prove [12]** 19/12 33/13 33/14 33/18 36/7 38/25 39/5 150/23 153/19 154/15 157/7 158/23
**proved [4]** 16/21 154/2 154/10 154/20
**proven [2]** 5/25 154/18

WITNESS NAME index - proves - relied

**P**

proves [1] 151/5
provide [5] 14/4 20/18
108/3 150/16 170/6
providing [2] 10/1 216/2
province [1] 10/24
proving [2] 153/18
154/13
pry [1] 20/7
publicly [2] 187/11
202/19
Publix [1] 69/16
pull [3] 199/7 200/5
201/9
punitive [1] 16/25
punitives [1] 16/16
purchase [10] 58/11
83/16 125/4 125/20
126/16 127/23 167/1
168/20 212/4 215/10
purchased [9] 24/22
109/23 109/25 127/25
128/18 159/20 184/19
184/21 206/16
purchaser [1] 125/14
purchases [6] 58/9
58/19 125/3 125/8 126/1
164/22
purchasing [1] 83/19
purpose [6] 20/8 152/21
152/22 152/23 160/23
189/18
purposes [5] 4/13 6/16
12/11 12/18 14/22
push [1] 127/2
pushing [1] 215/3
put [23] 11/10 11/14
63/6 75/17 101/16
109/13 123/14 132/20
153/21 163/9 176/11
183/20 185/14 185/21
190/8 191/20 191/25
192/17 192/22 193/9
201/6 211/7 212/8
puts [5] 163/12 163/21
176/17 179/24 181/14
putting [2] 62/7 101/13

**Q**

qualified [3] 137/24
156/5 196/21
qualifies [1] 63/18
quality [2] 120/11
207/24
quarantine [2] 192/2
194/5
quarantined [1] 213/7
quarter [2] 160/10
166/21
quashed [1] 12/8
Quest [1] 77/19
question [33] 6/15 6/18
16/14 16/21 17/4 20/10
24/12 24/12 24/13 24/17
28/11 107/8 118/15
118/16 132/11 132/15

134/20 151/25 152/2
152/7 152/9 152/12
152/13 152/14 152/15
168/23 174/19 206/4
206/8 208/17 216/13
216/15 225/23
questioned [1] 125/2
questioning [2] 93/22
126/8
questions [46] 16/6 16/7
16/15 20/15 23/4 23/5
23/6 23/8 23/11 23/19
24/20 26/19 26/20 79/22
92/12 93/24 94/23 94/24
104/11 104/18 104/19
107/12 109/9 113/10
115/7 115/15 115/16
116/18 121/10 121/11
121/12 121/14 124/23
127/7 129/6 129/17
129/19 132/23 133/1
151/22 157/12 166/23
168/22 168/24 168/25
176/8
quick [3] 11/6 113/5
134/20
quickly [5] 25/20 62/2
158/3 221/21 222/12
quite [9] 111/12 113/3
116/13 198/23 202/21
203/18 210/7 211/6
225/10
Quixote [1] 105/17
quote [1] 207/1

**R**

race [11] 57/11 57/15
58/16 82/6 83/19 102/11
102/11 103/11 122/18
123/22 160/9
raced [1] 213/3
racers [1] 122/14
races [4] 57/4 82/10
101/17 160/10
racing [20] 56/13 57/7
57/8 57/12 58/5 58/6
82/13 88/19 88/19 90/4
90/5 90/11 101/14
102/15 102/15 121/24
122/8 131/25 132/3
160/10
radiology [1] 68/4
rails [4] 186/21 186/22
201/11 207/15
rain [1] 151/2
rained [1] 151/1
raise [2] 22/24 137/15
raised [8] 3/9 5/20 26/23
37/23 138/7 139/4
140/13 204/4
raising [2] 63/16 137/20
ranch [2] 97/24 163/5
Randolph [5] 2/2 20/25
21/3 104/15 158/9
range [1] 185/9
rate [2] 68/1 216/2

rate-making [1] 68/1
rather [6] 17/3 23/19
88/1 158/4 210/3 224/17
ratified [1] 183/13
ratify [1] 183/9
Raton [3] 33/24 42/13
48/18
rays [1] 128/10 189/16
reach [10] 32/17 39/14
54/9 68/18 85/9 133/14
136/22 136/23 152/24
214/23
reached [2] 35/21 42/24
reaction [4] 101/20
102/1 130/2 130/18
reactions [3] 86/4 86/18
101/21
read [14] 83/19 105/4
105/10 105/12 105/15
105/17 106/10 106/17
107/4 111/5 149/20
150/6 155/15 164/23
reading [6] 106/9
106/12 111/1 120/12
151/15 222/9
ready [15] 70/7 71/10
94/10 94/12 135/17
141/11 141/12 142/11
146/10 146/25 149/17
149/19 163/5 218/17
225/10
real [5] 16/14 43/3 84/15
85/8 188/5
really [37] 5/15 27/21
40/6 42/1 46/20 47/20
49/2 50/5 66/6 77/21
78/21 80/8 82/7 102/19
105/6 105/17 106/3
107/5 110/17 118/18
125/9 127/16 128/1
130/10 130/23 132/12
133/13 135/8 137/7
169/13 192/10 194/25
197/8 199/18 202/3
203/2 203/24
realtime [2] 195/8
227/15
reason [32] 11/21 13/19
24/4 34/13 38/10 40/11
43/9 47/17 56/18 63/2
68/12 74/18 79/3 84/17
86/9 91/8 138/23 158/18
162/5 162/6 162/9
168/10 168/11 170/24
171/18 171/21 179/8
195/2 195/14 199/14
207/10 212/11
reasonable [6] 33/9
33/10 33/14 33/18 36/8
38/25
reasonableness [1]
153/9
reasons [5] 10/18 29/25
30/25 37/6 73/7
rebut [1] 157/21
rebuttal [1] 157/20

recall [3] 33/5 127/12
137/13
receive [3] 132/14 152/6
152/12
received [2] 152/10
154/6
receiving [1] 168/2
recent [5] 73/25 74/4
76/8 129/1 203/10
recently [5] 60/6 115/22
136/15
recess [11] 93/15 94/7
119/24 135/14 149/14
217/13 218/14 220/4
221/18 221/24 226/9
recheck [2] 211/20
211/23
rechecked [1] 189/16
recognize [2] 116/23
116/24
recollection [1] 123/11
recommendation [3]
210/25 211/1 211/4
recommendations [1]
210/15
record [13] 3/20 6/6
13/8 23/23 24/5 186/4
186/24 203/1 209/13
209/21 209/24 210/3
227/16
records [39] 4/21 6/12
6/13 6/22 7/1 7/11 7/13
7/19 7/22 8/1 8/5 8/10
8/12 8/16 8/18 8/20 8/21
8/23 9/2 9/10 9/12 9/14
9/15 9/23 9/25 10/6 10/8
12/12 14/4 15/2 15/8
15/18 15/19 48/2 72/15
166/23 167/16 169/18
169/21
records-keeping [1]
48/2
recruiter [1] 85/25
REDMAN [89] 2/11
6/15 7/19 11/11 11/20
13/9 15/20 15/24 19/13
21/20 21/21 21/24 117/2
117/2 159/6 159/20
159/21 159/24 160/19
161/2 161/20 162/17
162/19 162/25 163/4
163/5 163/8 163/10
163/20 163/24 164/4
164/22 164/25 165/2
166/10 166/16 166/20
166/20 166/22 167/4
167/6 167/19 167/23
168/3 168/5 168/18
168/24 169/17 169/21
170/3 170/6 170/10
170/24 174/9 174/13
174/18 175/1 175/6
175/15 175/22 175/25
176/3 176/10 178/25
179/5 179/10 179/12
182/13 182/21 183/3

183/8 183/12 187/12
189/24 190/25 197/21
204/10 204/11 206/5
206/16 208/17 211/14
212/7 215/4 216/14
219/1 219/24 220/17
222/25
Redman's [5] 167/9
207/23 211/14 211/17
220/1
refer [1] 7/21
reference [5] 15/21 33/6
48/23 49/4 131/16
referencing [1] 10/4
referring [2] 7/19
158/14
refers [1] 8/10
refrain [1] 14/24
refund [2] 128/12
215/20
refusal [1] 195/14
refuses [1] 195/15
refutes [2] 5/1 5/4
regard [2] 36/20 43/8
regarded [2] 171/9
214/7
regarding [12] 6/11 7/11
7/19 109/4 110/25
127/15 127/23 145/21
155/17 173/22 202/25
217/25
regardless [2] 154/5
154/6
regards [1] 202/17
regent [1] 165/19
regents [2] 165/16
165/17
Registered [1] 227/14
registry [1] 75/17
regular [3] 17/2 96/11
97/19
regularly [3] 96/13
99/20 99/21
regurgitate [1] 9/17
rehabilitate [1] 179/15
rehabilitates [1] 179/21
reiterated [1] 208/8
related [7] 45/10 57/2
57/7 99/17 154/22
155/17 215/15
relates [1] 163/18
relating [2] 9/2 127/20
relations [1] 63/15
relationship [7] 6/16
6/20 42/15 43/12 43/25
107/23 109/9
relationships [2] 5/25
107/9
relatively [2] 188/18
189/2
relatives [1] 107/9
relay [1] 191/5
release [1] 13/21
relevance [1] 203/11
reliance [1] 8/4
relied [7] 8/1 9/9 9/14

**R**

**relied... [4]** 15/15 187/24 189/4 210/14
**relies [1]** 8/10
**religious [2]** 131/16 131/19
**religiously [1]** 86/4
**rely [10]** 6/22 9/6 9/8 9/10 9/18 9/19 9/25 35/11 156/21 210/17
**relying [3]** 6/25 8/17 151/20
**remarks [3]** 151/17 151/19 205/19
**remember [21]** 23/18 23/25 30/19 30/21 32/6 33/9 36/6 36/10 36/11 39/2 40/6 47/23 80/8 107/18 125/6 132/10 156/7 161/8 178/3 179/17 206/25
**remembered [1]** 35/12
**remembers [2]** 209/2 209/6
**remind [2]** 148/4 222/2
**remiss [1]** 64/4
**render [1]** 74/18
**rendered [1]** 35/16
**renowned [2]** 188/23 197/12
**rent [1]** 75/2
**reorganize [1]** 79/11
**repair [2]** 75/4 75/12
**replaced [1]** 80/13
**report [1]** 6/24
**reported [1]** 155/16
**reporter [9]** 1/17 1/18 3/5 23/21 24/15 218/20 222/5 227/14 227/15
**reporter's [2]** 3/19 92/13
**reporting [1]** 189/9
**reports [5]** 7/1 7/3 77/25 215/1 222/4
**represent [7]** 21/5 40/23 40/24 48/23 104/16 158/10 158/25
**representation [1]** 45/5
**representative [3]** 27/13 29/2 29/7
**represented [5]** 43/3 45/2 136/14 214/12 215/10
**representing [3]** 21/15 22/6 205/16
**represents [3]** 41/2 41/21 41/21
**request [3]** 9/22 11/20 16/17
**requested [1]** 211/13
**requesting [1]** 224/13
**required [5]** 4/3 154/19 192/2 208/24 209/16
**requirement [1]** 4/7
**reraising [1]** 6/10
**research [6]** 92/25 93/3

119/20 148/6 155/17 222/4
**resenting [1]** 138/17
**resentment [1]** 80/23
**reside [3]** 42/12 62/15 67/23
**resided [1]** 30/15
**resident [1]** 97/25
**resolution [2]** 214/23 215/14
**resolve [11]** 26/6 76/15 215/6 215/7 215/16 216/10 223/4 223/8 223/9 223/13 224/3
**resolved [5]** 46/9 54/19 60/15 66/15 179/14
**resolving [1]** 216/19
**resource [1]** 77/25
**resources [2]** 31/7 31/9
**respect [12]** 9/21 20/17 125/4 125/8 143/18 158/21 161/21 196/10 219/1 222/24 224/12 225/7
**respected [1]** 171/12
**respectfully [1]** 11/19
**respond [1]** 180/17
**respondeat [5]** 5/10 5/12 5/13 5/15 5/17
**responsibilities [2]** 48/24 61/16
**responsibility [4]** 19/4 25/5 26/7 64/6
**responsible [4]** 6/1 32/4 63/16 63/21
**rest [4]** 147/12 157/15 204/1 221/3
**restate [1]** 125/18
**restaurants [1]** 148/25
**restrictions [1]** 16/7
**result [8]** 25/7 32/13 60/17 184/19 186/13 186/16 193/10 215/4
**results [4]** 188/3 188/4 197/9 199/25
**return [3]** 180/9 180/13 214/21
**revenue [1]** 85/23
**review [5]** 8/16 10/7 14/6 167/15 218/10
**reviewed [2]** 7/22 169/18
**rid [1]** 139/9
**ridden [4]** 96/7 97/19 207/5 212/10
**ride [9]** 64/22 64/23 66/16 67/17 99/19 181/20 184/23 187/15 187/20
**rider [13]** 187/7 192/10 192/11 194/25 197/12 207/9 208/1 208/11 209/15 209/18 209/18 213/11 213/21
**riders [2]** 194/23 206/15
**rides [4]** 99/21 164/1

164/7 210/11
**riding [8]** 65/1 66/19 96/21 97/18 164/4 164/9 164/17 214/3
**right [202]** 3/5 8/9 8/14 8/24 9/6 11/25 12/9 14/9 15/21 17/15 17/24 18/8 18/17 22/12 22/24 23/16 23/21 27/18 28/4 28/17 28/23 29/12 30/1 30/5 30/8 30/12 31/11 31/17 31/23 32/6 32/15 32/16 32/25 33/5 34/22 35/18 37/7 37/16 37/20 38/11 39/13 40/16 40/19 40/21 40/23 43/10 43/18 44/5 44/19 44/23 45/11 45/14 46/22 47/1 49/7 49/14 50/9 50/17 50/21 51/22 52/2 52/6 52/13 52/22 53/22 55/23 56/19 56/23 58/21 58/22 59/19 60/11 60/24 61/6 61/11 61/21 63/5 63/12 63/22 63/24 64/5 64/8 65/15 67/4 68/16 69/6 69/8 69/11 71/25 72/6 72/11 72/16 73/16 74/8 75/14 75/22 76/18 79/14 79/21 80/17 84/8 84/19 84/25 85/17 86/6 86/10 86/19 87/16 88/12 88/22 89/3 89/9 89/19 90/1 92/11 93/20 94/4 95/15 96/6 96/10 96/23 97/1 97/17 99/14 101/10 101/12 103/8 104/8 104/10 111/23 111/25 114/8 116/19 118/23 120/5 120/13 121/7 121/9 122/17 123/24 124/17 124/22 129/15 129/25 130/19 132/7 134/1 134/8 138/2 138/4 140/9 141/1 141/20 142/12 143/24 145/18 145/22 147/20 149/6 149/10 149/21 159/12 163/19 166/25 175/8 175/15 178/8 178/18 180/5 181/5 181/5 184/21 185/4 185/16 185/22 188/19 188/24 190/8 193/9 195/7 195/22 196/23 197/25 198/3 198/13 199/7 199/20 201/6 203/21 216/5 217/19 217/20 218/23 219/13 219/19 221/10 222/11 222/13 224/15 224/18
**right-hand [1]** 185/16
**rights [1]** 104/4
**ring [4]** 187/17 193/1 193/9 212/25
**Rio [1]** 177/1

**ripped [1]** 124/1
**rise [2]** 22/22 147/24
**rising [1]** 207/25
**risk [1]** 190/2
**risks [1]** 212/11
**Rita [6]** 118/12 162/1 162/1 182/6 182/6 182/10
**Riviera [1]** 90/23
**RMR [2]** 1/17 227/21
**roads [1]** 78/4
**robbery [1]** 40/5
**Robert [1]** 73/21
**rode [12]** 78/24 81/19 96/10 96/12 96/12 178/14 194/23 198/1 206/15 206/19 207/22 208/21
**role [4]** 63/5 63/16 151/20 216/20
**Romania [1]** 106/4
**Romanian [1]** 106/4
**room [6]** 148/17 148/18 156/9 156/14 217/15 222/11
**rough [1]** 81/5
**roughly [2]** 209/3 212/14
**row [2]** 24/9 26/13
**rude [2]** 93/9 93/12
**rule [3]** 4/2 222/20 223/17
**ruled [4]** 5/14 74/25 75/7 75/16
**rules [5]** 23/3 92/16 152/5 152/8 195/17
**ruling [4]** 5/7 7/6 12/7 217/25
**rulings [2]** 6/11 16/18
**run [9]** 11/21 26/20 38/18 98/21 101/17 139/11 139/13 196/18 196/20
**running [2]** 49/12 59/17
**runs [2]** 76/23 77/18
**rushed [1]** 191/14

**S**

**sacrifice [1]** 26/8
**sacrifices [1]** 26/5
**sadness [1]** 130/18
**safe [1]** 170/22
**safety [1]** 226/3
**sale [28]** 10/15 10/23 24/21 25/8 125/5 125/20 159/18 159/22 160/1 172/1 172/2 175/22 176/2 176/2 176/5 176/7 176/8 176/9 176/11 176/13 187/12 210/13 211/3 214/12 215/15 215/21 215/22 215/25
**sale's [2]** 176/3 176/4
**sales [4]** 84/23 125/3 125/8 126/1
**same [15]** 3/17 5/1 18/5

24/15 61/5 63/4 101/5 104/4 117/21 121/2 186/14 197/9 201/4 204/24 207/19
**Sarah [2]** 2/14 21/24
**Saratoga [1]** 90/9
**sat [21]** 29/21 34/3 34/7 37/2 38/5 42/21 44/5 47/14 51/8 56/9 62/21 68/5 69/20 72/7 73/3 84/14 86/1 86/25 88/17 91/3 116/4
**satisfied [1]** 45/18
**Saturday [1]** 115/22
**save [1]** 211/18
**saves [1]** 225/16
**saw [18]** 9/16 79/24 105/11 150/20 150/24 152/1 152/3 174/4 187/25 187/25 201/5 201/25 202/6 202/20 203/17 203/20 204/2 210/8
**say [33]** 4/24 6/25 9/14 10/6 13/9 15/13 15/24 23/22 24/3 28/19 39/8 47/3 53/2 53/11 57/5 64/8 85/3 89/11 92/22 93/8 97/6 100/21 103/17 106/1 108/7 108/14 108/25 109/17 109/22 111/22 119/2 119/3 119/14 123/10 126/6 126/12 131/17 132/12 132/15 135/7 139/7 148/19 150/24 156/7 156/15 171/15 174/22 176/8 182/8 196/6 198/20 203/11 220/18
**saying [14]** 13/9 13/16 15/14 23/20 23/25 83/10 102/6 110/24 112/1 112/9 114/11 126/17 158/23 170/13
**says [16]** 4/5 5/2 13/11 99/24 135/8 153/1 153/2 153/2 171/18 178/20 181/22 181/25 187/8 187/11 188/24 193/14
**scales [2]** 153/23 153/24
**scene [3]** 38/6 38/20 80/7
**scenes [2]** 223/8 225/4
**schedule [2]** 79/10 213/6
**scheduled [1]** 68/15
**scholarship [1]** 63/17
**school [16]** 27/3 30/10 47/9 53/12 53/15 53/15 59/5 73/24 88/11 90/25 95/7 95/17 105/3 106/20 138/12 161/6
**science [1]** 31/16
**Screciu [4]** 69/11 69/13 105/21 105/22
**screen [3]** 111/5 169/7 177/9

Case 9:15-cv-81229-KAM   Document 287   Entered on FLSD Docket 10/04/2017   Page 250 of
257
[WITNESSNAME]                                                    Index: screens..slightly

**S**

**screens [1]** 111/2
**search [2]** 155/14 174/3
**seat [15]** 14/10 14/16 17/16 114/5 120/5 120/6 121/22 129/24 134/7 147/4 147/5 147/19 156/13 156/18 222/14
**seated [19]** 3/3 18/20 22/11 23/1 23/21 93/19 94/9 94/18 115/10 120/3 135/16 146/24 149/6 149/16 150/2 217/19 218/16 221/13 222/17
**seats [4]** 30/20 32/5 33/1 217/16
**second [13]** 3/18 24/9 34/7 112/25 113/2 113/6 113/12 120/17 134/7 151/22 170/11 193/21 214/14
**seconds [1]** 141/13
**secret [1]** 211/16
**secretary [6]** 70/3 70/6 70/14 70/15 70/18 70/22
**secretary's [1]** 70/22
**section [2]** 14/11 168/21
**seeing [2]** 164/16 178/5
**seek [1]** 5/12
**seeking [1]** 140/15
**seem [1]** 110/17
**seemed [2]** 121/25 137/1
**seems [3]** 108/5 110/16 112/9
**seen [6]** 12/24 65/11 66/8 82/19 83/18 207/6
**sees [2]** 156/4 196/5
**selected [8]** 19/4 27/14 59/7 74/11 93/5 112/21 148/11 210/19
**selection [4]** 14/10 134/2 184/15 205/15
**Selena [1]** 214/11
**self [1]** 91/2
**self-employed [1]** 91/2
**Selina [3]** 117/8 178/7 196/5
**sell [7]** 37/17 64/17 181/9 181/24 187/12 189/24 206/6
**seller [4]** 125/14 168/23 210/23 215/21
**seller's [3]** 168/21 168/21 206/5
**Sellers [2]** 73/18 73/21
**selling [5]** 58/15 99/7 131/5 159/25 162/21
**send [7]** 70/7 71/23 121/21 127/10 129/21 147/22 197/20
**sending [2]** 212/24 212/25
**sends [4]** 166/24 167/23 168/18 180/6
**senior [1]** 63/14
**sense [7]** 122/17 207/2

210/6 210/10 220/9 220/15 221/18
**sent [9]** 11/9 34/10 42/2 42/3 169/20 177/13 190/16 190/21 190/25
**separate [3]** 18/4 124/19 132/22
**separately [4]** 58/22 69/7 86/6 86/17
**September [2]** 63/21 163/6
**series [1]** 168/22
**serious [6]** 66/24 166/14 197/25 198/23 198/23 199/10
**serve [9]** 56/18 71/18 79/4 110/25 112/21 127/2 147/21 149/2 150/4
**service [5]** 21/22 72/4 79/5 108/3 222/13
**services [7]** 59/16 78/15 84/13 88/13 171/14 216/1 216/6
**serving [2]** 147/1 154/21
**session [3]** 25/14 25/15 53/7
**set [2]** 12/22 35/9
**setback [1]** 221/1
**sets [1]** 225/1
**settled [11]** 40/5 40/6 42/3 45/13 46/10 54/20 69/23 72/8 114/20 114/21 114/24
**seven [16]** 25/21 26/4 30/16 43/18 62/16 143/10 190/4 190/5 200/10 200/13 200/23 201/1 212/19 212/23 213/12 213/20
**seven-year-old [2]** 200/10 200/13
**Seventeen [1]** 145/5
**seventh [2]** 186/15 200/21
**several [5]** 81/16 82/18 206/14 210/9 213/9
**severe [2]** 184/21 185/13
**severely [2]** 181/17 198/11
**SFranklinUSDC [1]** 1/19
**shaking [1]** 193/1
**Shannon [1]** 33/23
**Shappel [2]** 107/20 107/21
**Shappell [5]** 77/5 77/7 99/24 107/22 139/25
**share [4]** 72/4 156/8 158/11 165/7
**she'll [11]** 147/25 148/18 182/11 182/18 182/21 207/24 208/3 208/6 219/5 220/8 221/4
**she's [32]** 38/3 47/20 47/21 48/1 48/2 53/3

85/2 175/19 99/25 120/17 121/14 138/17 140/20 141/4 162/20 167/5 167/24 171/7 171/11 171/16 175/10 178/7 178/8 179/18 181/13 181/14 182/14 182/15 182/16 189/24 205/8 220/10
**sheet [1]** 23/6
**Shell [1]** 50/7
**shipped [5]** 190/14 190/19 191/7 194/3 194/6
**shipping [2]** 177/13 177/20
**ships [1]** 193/10
**shop [2]** 38/1 38/13
**Shore [1]** 2/6
**short [3]** 115/15 196/5 203/24
**shortly [7]** 19/12 19/14 19/17 133/11 186/1 200/23 217/2
**should [36]** 5/15 6/3 10/16 10/20 10/22 12/7 13/18 19/18 19/20 46/12 46/17 46/24 55/22 56/16 66/15 72/3 89/10 91/8 95/1 101/16 109/22 112/3 113/15 132/12 134/23 136/24 153/17 155/4 156/12 156/21 159/16 190/16 190/21 197/3 209/18 224/15
**shoulders [2]** 23/20 24/2
**shouldn't [12]** 8/15 31/1 55/11 55/12 84/17 104/3 104/6 135/7 151/19 154/25 155/13 171/18
**show [113]** 57/15 57/24 63/5 64/12 65/2 65/3 78/25 82/12 90/8 97/4 97/6 97/7 122/15 130/9 147/5 148/8 148/16 148/18 157/9 158/12 162/4 163/11 163/22 165/11 165/16 166/14 166/19 166/22 167/3 167/6 167/12 167/18 167/25 168/4 169/3 169/4 169/24 170/5 170/17 170/20 171/11 172/6 172/9 172/10 172/13 172/17 172/19 173/1 173/5 173/21 173/24 174/2 174/8 174/25 175/14 176/23 176/25 177/4 178/2 178/9 178/14 178/16 178/21 179/11 179/16 179/20 179/23 181/2 181/7 181/10 181/12 183/11 184/18 184/25 186/3 186/5 186/17 186/21 188/16 190/10

192/4 192/9 192/17 192/20 193/21 194/11 194/14 194/19 199/9 200/4 200/6 201/3 202/22 203/1 203/12 204/1 204/12 204/25 208/12 209/13 209/20 209/24 210/3 210/18 211/3 211/6 211/10 211/12 213/6 213/15 213/19 215/8 216/8
**show-type [1]** 122/15
**showed [3]** 3/14 173/25 215/1
**showground [1]** 160/13
**showgrounds [1]** 214/8
**showing [9]** 15/10 33/2 79/2 87/17 102/18 202/6 208/22 213/2 214/13
**shown [10]** 36/14 36/15 82/15 82/15 103/11 136/24 191/10 192/18 196/2 213/10
**showring [2]** 190/17 190/22
**shows [5]** 82/13 98/10 99/25 100/1 100/2
**shrug [1]** 24/2
**shrugging [1]** 23/20
**Shutts [2]** 2/17 2/20
**Siamon [1]** 199/19
**sibling [1]** 61/5
**sic [7]** 117/9 172/11 173/24 188/24 196/22 199/19 208/17
**side [18]** 17/17 22/11 46/19 90/12 113/1 113/3 113/6 113/12 126/10 126/13 127/3 129/1 131/2 141/9 153/24 157/2 163/16 184/16
**side's [1]** 151/18
**sidebar [1]** 28/8
**sides [9]** 14/12 17/19 41/2 41/17 54/23 131/4 131/10 141/12 153/23
**sidewalk [1]** 46/8
**sign [2]** 13/20 218/10
**signature [1]** 13/13
**signed [3]** 176/3 176/4 176/5
**significant [2]** 186/2 193/23
**silver [1]** 171/10
**similar [1]** 127/21
**similarly [1]** 104/1
**Simile [7]** 88/6 88/7 88/10 117/12 136/11 140/23 141/7
**Simon [12]** 118/5 118/5 160/2 172/3 187/3 209/12 209/20 210/8 210/15 211/12 211/16 212/3
**simple [3]** 206/3 206/3 206/9

**simply [3]** 7/20 151/4 213/4
**since [9]** 69/13 72/13 72/17 96/19 105/3 105/5 165/13 165/14 204/6
**single [3]** 24/7 91/1 164/7
**sinus [2]** 110/15 110/16
**sinuses [1]** 184/7
**sir [56]** 26/16 26/18 28/11 29/12 29/14 29/16 30/1 30/12 42/10 43/10 47/1 47/6 47/18 48/13 48/16 49/7 50/20 50/22 52/12 56/19 58/23 58/24 59/2 59/3 59/13 60/20 60/23 62/1 62/11 73/18 74/19 77/4 85/19 86/10 86/19 86/20 88/4 88/8 88/22 90/18 92/9 97/21 97/22 98/5 98/8 100/3 101/9 108/11 108/13 113/25 117/11 117/13 120/6 121/19 121/22 127/8
**sister [4]** 61/9 61/12 61/17 152/2
**sit [24]** 23/12 29/25 30/18 31/1 34/13 38/10 40/11 41/24 43/9 47/25 63/3 73/7 76/10 78/21 84/18 86/9 89/19 89/22 91/8 92/10 115/13 134/23 135/7 147/5
**sitting [14]** 43/7 68/12 74/13 88/20 89/5 89/13 111/22 116/1 116/1 131/1 159/21 159/22 169/25 205/22
**situation [4]** 46/13 58/22 115/5 132/8
**situations [1]** 101/17
**six [21]** 14/16 25/13 25/21 26/4 48/23 69/20 74/9 79/15 86/14 105/3 144/7 146/1 146/1 193/11 212/6 212/14 212/16 212/19 212/23 212/25 220/7
**six-day [1]** 48/23
**Sixteen [1]** 144/23
**size [1]** 17/3
**slash [1]** 5/10
**sleep [1]** 197/4
**sleepy [1]** 76/21
**slide [22]** 185/15 185/21 185/25 186/12 186/17 188/9 189/6 189/9 190/10 192/22 192/23 195/21 196/4 196/13 198/15 198/18 199/5 199/17 199/22 200/5 201/9 201/19
**slides [1]** 202/1
**slight [2]** 28/12 193/4
**slightly [1]** 193/2

**S**

**slow [4]** 22/14 22/17 218/20 218/22
**slumlord [2]** 74/22 75/8
**small [5]** 12/4 37/18 59/6 61/3 171/21
**smelled [1]** 150/20
**Smeryage [4]** 2/20 22/5 205/14 227/8
**Smith [10]** 67/21 67/23 103/8 109/19 109/20 119/7 127/10 127/11 129/10 129/20
**smooth [1]** 10/4
**smoothly [1]** 53/17
**snack [3]** 148/21 148/22 219/3
**social [3]** 77/9 77/14 155/11
**soda [1]** 148/22
**software [5]** 42/19 49/10 49/12 50/6 50/7
**sold [6]** 65/23 166/10 187/1 203/15 208/17 216/14
**sole [1]** 165/14
**solely [4]** 4/6 4/8 12/18 63/21
**solid [1]** 200/7
**somebody [6]** 46/5 75/10 121/24 122/1 174/21 187/5
**somebody's [2]** 4/23 13/4
**someone [15]** 13/7 32/7 32/13 35/20 52/23 61/10 61/22 78/10 79/24 118/14 124/1 135/6 150/20 171/9 172/3
**someone's [3]** 12/13 33/7 150/21
**something [40]** 12/12 12/17 13/8 13/15 15/15 15/25 16/16 19/24 45/5 45/8 55/9 66/22 67/2 76/14 77/15 78/11 80/7 92/22 96/12 101/19 102/5 105/12 113/14 116/20 126/9 126/16 126/18 126/20 127/21 132/2 148/20 148/23 148/25 151/24 177/20 183/9 198/23 211/5 222/6 224/22
**sometimes [15]** 22/17 28/14 28/15 28/16 41/20 41/21 52/11 112/25 152/17 158/20 205/22 209/24 209/25 219/1 219/9
**somewhat [2]** 62/25 212/13
**son [25]** 40/2 42/20 68/4 77/23 78/6 91/1 109/22 127/25 164/12 164/13 170/21 171/17 172/7

172/8 172/16 178/4 180/6 180/7 180/15 184/23 187/14 187/19 195/8 210/10 213/25
**son's [2]** 127/24 128/16
**sons [2]** 88/23 95/17
**soon [4]** 127/9 187/8 199/20 215/3
**sooner [3]** 158/4 223/19 224/21
**sore [5]** 169/15 169/15 188/17 188/17 188/25
**sorry [28]** 3/19 3/21 26/24 27/5 32/1 38/11 54/6 74/1 91/25 95/14 104/24 105/21 106/17 107/12 107/16 108/11 114/4 117/10 121/5 135/23 138/10 139/23 139/24 143/24 145/12 146/1 146/24 191/16
**sort [10]** 49/6 50/7 62/13 63/8 78/25 79/2 82/16 102/4 103/5 104/22
**Sorte [7]** 62/13 62/15 99/25 101/25 140/12 140/23 141/5
**sorts [1]** 77/20
**sought [1]** 12/22
**sound [13]** 71/20 166/7 166/8 169/8 169/23 193/15 196/8 205/25 206/1 210/24 211/24 213/18 214/10
**sounded [2]** 44/6 122/1
**soundness [4]** 166/6 169/8 169/13 196/10
**Sounds [1]** 134/9
**source [1]** 156/2
**sources [2]** 101/1 101/8
**South [2]** 2/6 115/23
**Southeast [2]** 43/25 217/5
**SOUTHERN [1]** 1/1
**Spanish [22]** 1/20 1/21 22/10 104/20 105/1 105/10 105/11 105/15 105/17 105/18 105/24 105/25 106/1 106/9 106/13 106/17 106/17 106/19 106/20 106/25 107/5 159/2
**Spanish-speaking [1]** 22/10
**speak [34]** 8/22 16/25 22/16 23/13 23/16 23/18 24/6 25/24 28/12 29/12 50/15 66/13 104/20 106/1 106/2 106/6 106/7 106/17 107/4 110/21 118/25 119/5 119/6 119/6 119/7 119/8 119/9 119/11 120/12 131/7 133/16 133/22 137/19 165/23
**speakers [1]** 91/11

speaking [12] 21/10 22/10 23/5 23/9 24/2 24/14 26/11 68/24 103/19 119/15 120/14 218/23
**special [2]** 156/1 216/25
**specialist [2]** 165/14 165/15
**specialized [2]** 59/16 100/14
**specialty [2]** 165/12 176/24
**specific [2]** 125/6 160/25
**specifically [6]** 7/12 8/9 65/17 99/13 101/23 102/16
**specifics [1]** 210/4
**specifies [1]** 8/12
**spectator [1]** 79/1
**spelled [1]** 117/20
**spelling [1]** 117/21
**spend [3]** 67/11 129/3 223/15
**spent [8]** 127/25 128/10 129/2 183/20 183/21 200/7 208/19 216/1
**Spero [2]** 56/3 108/12
**spoke [1]** 28/7
**spoken [2]** 56/13 96/8
**sponsorship [2]** 56/6 113/21
**sport [12]** 56/5 56/11 56/14 56/17 56/25 113/21 113/22 122/11 160/8 160/23 208/7 208/10
**sports [4]** 56/20 57/2 113/17 113/19
**spouse [2]** 42/17 88/14
**sprinkler [1]** 73/2
**Spruce [8]** 194/10 194/11 195/3 195/6 197/2 199/11 214/6 217/5
**squad [3]** 184/11 187/20 192/14
**stable [1]** 136/16
**stables [3]** 67/2 67/11 67/12
**staff [1]** 49/11
**stand [7]** 4/24 7/2 24/6 24/10 138/9 220/22 220/22
**standard [2]** 149/20 215/25
**Stanley [1]** 84/22
**Starosta [1]** 1/21 3/25
**start [30]** 11/20 24/14 24/17 26/11 26/12 29/4 62/9 86/24 87/4 133/14 134/2 134/4 141/11 142/12 146/11 156/14 156/16 158/20 166/4 191/3 199/21 203/9 219/17 220/18 220/19 221/3 221/19 222/11

224/4 224/9
**started [9]** 60/6 61/25 62/6 116/7 139/4 149/3 219/13 222/24 224/19
**starting [7]** 53/13 87/8 87/17 128/21 205/18 209/19 221/16
**starts [1]** 205/25
**state [6]** 29/6 36/7 38/25 77/25 78/14 159/16
**statement [16]** 7/16 7/20 7/24 12/10 14/25 15/3 15/22 17/22 112/21 144/19 144/19 157/3 157/5 168/21 168/21 173/19
**statements [11]** 6/14 6/17 10/9 149/8 151/13 151/14 157/10 158/5 173/11 173/12 227/5
**STATES [8]** 1/1 1/13 104/7 126/15 165/17 182/16 194/4 194/8
**stating [1]** 204/7
**statistical [1]** 67/25
**stay [5]** 17/9 38/16 56/8 114/5 148/8
**stay-at-home [2]** 38/16 56/8
**staying [1]** 51/17
**Steel [2]** 7/13 7/19
**Steele [3]** 8/12 8/22 8/22
**Steele's [2]** 9/23 10/5
**stemmed [1]** 69/22
**Stenglein [3]** 48/14 48/17 137/12
**stenographer [1]** 61/19
**stenographic [1]** 223/22
**step [2]** 50/3 217/15
**Stephen [4]** 1/17 227/14 227/20 227/21
**stepson [1]** 73/2
**Steve [2]** 48/17 56/11
**sticking [1]** 5/7
**still [11]** 40/2 121/4 127/1 129/2 167/10 179/15 191/14 205/7 212/10 212/16 215/5
**stop [9]** 163/15 171/19 194/18 194/25 195/18 207/6 207/10 213/14 220/4
**stoppage [1]** 204/25
**stopped [24]** 74/5 162/9 163/10 164/19 171/18 173/17 178/4 178/15 178/16 179/12 181/17 191/18 195/19 199/2 201/17 201/22 202/15 203/23 208/5 208/15 209/13 213/13 213/23 214/13
**stopper [16]** 161/23 162/2 162/6 171/20 194/22 194/23 195/12 199/10 206/6 206/23

206/24 207/2 208/18 209/8 209/8 216/14
**stopping [36]** 61/4 162/5 162/8 162/12 162/15 162/18 162/23 163/11 163/17 163/19 163/20 164/18 165/25 166/1 171/2 173/8 173/16 174/1 174/4 176/12 176/19 177/8 177/22 178/1 178/20 179/8 181/11 185/12 185/20 186/11 195/17 196/19 207/1 208/6 208/14 209/3
**stoppings [1]** 194/22
**stops [19]** 162/6 163/13 163/21 163/23 164/7 164/10 164/14 171/17 171/20 176/18 180/1 181/16 204/16 204/20 207/4 207/7 207/9 208/3 209/6
**stories [7]** 58/8 58/10 58/13 58/18 122/10 122/24 123/8
**story [8]** 113/1 113/3 113/6 113/12 184/16 185/1 205/25 212/17
**straight [2]** 205/24 212/24
**Stream [1]** 90/9
**streamline [1]** 25/19
**street [3]** 1/18 148/24 149/1
**stress [1]** 211/7
**stressed [1]** 101/21
**stride [3]** 207/12 207/13 209/16
**strike [2]** 144/10 145/19
**strikes [9]** 14/18 14/19 134/3 135/20 135/22 135/24 137/8 141/9 144/11
**striking [1]** 152/18
**strong [11]** 78/21 86/4 101/19 101/21 126/16 126/23 126/24 130/1 130/4 185/18 208/1
**strongly [2]** 126/10 205/7
**struggle [1]** 102/5
**studding [1]** 123/21
**studied [1]** 35/2
**studies [2]** 35/6 35/13
**study [1]** 34/23
**studying [1]** 34/20
**stuff [15]** 45/10 51/20 57/4 58/9 111/1 111/2 123/20 123/21 126/8 126/19 128/11 167/22 171/1 171/1 183/21
**subject [7]** 4/25 10/15 10/23 93/1 148/12 198/21 208/14
**submission [1]** 13/12

**S**

submit [1] 218/9
subpoenas [3] 12/5 12/7 218/1
subsection [1] 4/2
substantive [1] 14/23
successful [3] 124/7 208/11 210/11
successfully [5] 154/18 160/15 164/17 207/18 210/7
such [4] 155/11 165/22 180/22 199/25
sue [5] 75/9 75/10 114/12 115/1 180/16
sued [26] 40/25 41/13 41/21 42/3 43/4 43/5 45/3 45/4 46/1 46/2 46/12 46/13 54/22 59/8 60/12 60/18 74/12 74/19 74/20 74/21 75/1 78/10 78/13 79/23 88/18 91/19 92/8
suffer [1] 212/6
suffered [2] 169/17 184/21
sufficient [1] 134/13
suggest [2] 6/19 193/3
suggested [1] 125/13
suggestion [2] 218/19 220/5
suggests [1] 151/25
suing [7] 24/21 40/24 41/21 44/23 75/3 75/4 114/16
suit [4] 44/20 80/10 159/23 180/6
Suite [7] 2/3 2/6 2/9 2/12 2/15 2/18 2/21
sum [4] 112/6 132/14 132/21 216/8
summarizing [1] 203/24
summary [1] 5/20
summer [1] 52/5
summers [1] 66/22
Sunday [1] 11/9 67/3
super [2] 79/1 113/21
superior [5] 5/10 5/12 5/13 5/15 5/17
support [5] 4/13 5/8 12/16 84/23 175/21
supported [1] 216/16
supposed [7] 49/2 86/23 87/4 98/21 130/13 157/6 169/14
sure [34] 7/23 10/4 14/7 14/17 14/22 16/3 18/10 53/16 61/9 71/19 76/19 77/3 77/21 88/3 89/25 95/11 99/9 107/11 117/23 118/17 124/21 138/25 139/11 140/14 141/14 145/25 146/10 155/2 158/22 190/1 211/21 218/11 222/7 224/3
surgeries [1] 128/14
surgery [1] 68/15
surroundings [1] 192/15
surveys [2] 77/25 78/2
Susana [1] 1/21
suspend [2] 11/22 219/24
suspensory [3] 184/22 198/3 198/24
sustain [2] 152/11 152/13
sustains [1] 197/24
Suzanna [1] 3/25
swear [2] 22/23 147/25
switch [1] 192/24
switched [3] 30/20 32/4 32/5
switching [1] 33/1
sworn [6] 22/21 22/25 146/7 147/23 148/1 150/10
syndicate [1] 123/19
syndicating [1] 57/10
SYQUIA [90] 1/6 2/17 11/7 11/11 11/23 18/14 18/15 19/14 22/2 22/6 117/3 118/18 159/6 159/22 159/25 162/25 163/1 163/3 163/7 163/13 163/24 164/1 164/4 164/9 164/19 166/16 167/20 168/19 168/23 169/3 170/24 172/5 172/11 172/13 173/2 173/6 173/11 173/21 174/23 175/9 175/14 176/5 178/20 179/13 180/5 180/12 180/16 180/17 180/20 181/7 181/22 183/2 183/3 183/11 183/12 187/7 187/11 190/15 190/20 197/21 198/10 204/13 205/16 205/17 206/4 208/18 208/21 209/1 209/2 209/7 209/9 209/11 209/20 210/1 210/17 214/2 214/11 214/21 214/23 215/5 215/8 215/13 215/19 216/1 216/9 216/13 216/20 216/23 220/22 223/1
Syquia's [6] 159/22 172/14 175/16 181/5 209/5 221/6
system [6] 26/4 49/20 60/18 75/5 81/1 81/3
systems [2] 49/12 85/24

**T**

table [3] 14/12 17/18 159/21
tabs [1] 61/4
tail [1] 128/7
tails [1] 17/10
take [55] 20/12 25/25
26/18 50/21 51/16 53/16 59/11 60/1 61/12 63/3 67/10 67/10 70/6 70/15 70/17 70/20 71/1 71/2 71/15 76/13 76/14 76/17 76/18 76/20 89/9 92/13 93/15 119/24 134/1 146/18 147/4 148/3 153/3 156/6 156/8 156/13 156/20 156/21 172/11 178/22 178/25 179/2 181/8 181/11 182/4 190/8 197/20 198/17 205/7 207/22 212/11 215/4 217/13 220/7 221/22
taken [14] 25/8 62/2 94/7 97/18 102/21 135/14 149/14 189/16 211/22 212/21 215/2 215/14 218/14 226/9
takes [5] 25/21 125/21 175/24 176/16 176/16 178/2 178/5 192/12
taking [10] 23/22 51/19 52/3 67/12 116/2 116/11 139/3 156/10 177/3 214/2
talent [1] 207/25
talk [30] 3/13 7/9 11/4 28/9 28/17 58/21 58/24 69/6 86/5 86/17 86/19 101/23 108/21 122/11 127/12 133/13 134/15 149/7 154/21 154/25 155/19 155/20 162/12 167/1 207/11 207/13 208/3 209/5 216/5 223/3
talked [8] 11/7 11/15 125/19 127/21 138/7 150/8 165/4 182/6
talking [18] 10/5 15/3 83/15 83/16 110/18 114/3 125/6 126/19 145/14 155/8 160/21 162/20 199/23 201/1 201/10 202/3 219/23 219/25
talks [1] 172/6
teach [4] 56/11 56/14 56/23 113/22
teacher [1] 91/9
teaching [2] 31/18 113/24
team [4] 177/2 192/9 192/10 192/14
teams [1] 87/23
technician [7] 27/4 27/5 27/8 68/2 68/3 78/7 184/12
technology [3] 48/19 49/9 155/7
Ted [3] 118/12 163/16 165/4
television [1] 130/9
tell [46] 9/13 22/21
26/20 28/1 28/4 43/10 49/7 51/22 63/12 65/17 68/13 70/9 83/10 84/19 86/5 92/20 104/25 120/9 123/19 130/3 133/15 133/21 148/10 154/22 162/1 165/4 165/21 165/24 165/25 171/25 172/1 173/2 173/16 173/16 174/23 180/22 182/17 184/24 190/15 190/20 191/6 197/21 206/2 209/7 219/6 219/10
telling [6] 7/25 36/6 170/15 177/24 182/11 182/22
tells [3] 180/7 180/7 198/13
Temperament [1] 67/18
tempted [1] 156/15
Ten [2] 86/12 134/16
Ten's [2] 134/18 138/1
tenant [2] 43/4 46/1
tend [3] 24/2 46/18 219/9
tender [1] 13/25
term [4] 33/10 39/2 166/6 166/6
terms [9] 58/15 113/13 126/25 129/12 151/20 157/1 176/15 194/14 203/24
Terri [1] 39/23
terrible [1] 131/13
test [5] 172/20 172/24 187/15 187/20 210/11
testified [3] 136/14 153/5 210/14
testifies [4] 165/10 167/8 174/18 204/12
testify [32] 9/11 45/11 89/20 159/1 159/5 159/8 159/9 160/4 162/4 165/7 167/7 167/14 169/20 171/8 176/18 177/9 177/12 206/17 206/23 206/24 207/3 207/5 207/8 207/16 207/20 207/24 208/2 208/6 208/21 209/9 210/22 213/1
testifying [7] 153/6 159/2 177/24 181/4 208/19 220/1 223/24
testimony [57] 4/10 4/1 4/19 4/19 5/5 12/13 13/4 109/5 110/5 110/11 111/10 111/11 123/3 150/20 152/25 152/25 153/3 153/9 153/10 154/4 155/22 156/22 156/24 158/15 161/11 161/13 161/17 162/7 162/24 163/14 168/9 168/11 168/14 168/19
170/23 170/25 171/16 171/19 172/23 175/6 175/8 177/5 178/24 179/7 182/19 183/14 189/1 197/1 198/21 203/25 207/21 209/11 210/18 212/21 214/16 219/6 221/20
testimony's [1] 4/9
testing [2] 172/14 177/14
text [9] 3/16 4/22 4/25 105/11 105/18 106/12 107/1 126/19 155/10
thank [141] 11/3 11/17 12/2 13/22 13/23 13/25 14/8 16/4 16/13 17/14 18/8 18/16 18/21 18/23 19/1 20/24 21/6 21/11 21/15 21/21 21/25 22/3 22/6 22/7 26/17 27/9 28/10 29/14 29/15 30/12 33/21 36/22 37/20 39/21 42/8 47/1 47/7 48/13 50/22 50/23 55/23 55/24 72/18 72/19 73/16 77/4 84/8 85/17 85/18 86/19 88/4 88/5 90/18 92/10 92/11 93/17 94/3 94/6 94/19 96/4 97/17 99/14 101/10 101/24 103/7 103/25 104/14 104/16 106/15 106/17 107/7 109/14 110/8 110/20 111/7 112/10 112/12 112/14 113/16 114/7 115/7 115/8 115/9 115/14 116/19 118/23 120/1 121/19 121/20 121/22 127/8 129/5 129/9 129/16 129/20 129/23 133/10 133/25 135/11 135/12 135/13 142/10 144/21 145/9 146/16 146/20 147/1 147/8 147/16 147/17 147/20 149/4 149/12 149/13 150/3 158/8 182/24 183/17 184/2 184/4 184/14 196/9 205/10 205/11 205/12 217/10 217/11 217/17 218/12 218/13 221/14 222/13 225/18 225/19 226/1 226/2 226/5
thanked [1] 36/12
thanks [4] 94/5 112/17 199/18 216/21
that's [94] 4/10 5/6 5/14 6/5 6/18 7/6 10/2 10/10 10/15 10/23 13/15 13/16 13/23 15/7 15/25 15/25 16/23 17/1 19/5 24/4 25/9 29/10 30/21 46/4 46/15 55/3 55/15 55/17

257

**T**

**that's... [66]** 62/2 67/18 74/14 75/24 78/8 89/23 90/16 98/1 100/3 100/11 101/6 101/18 103/1 103/5 104/23 104/24 107/23 108/1 108/17 114/14 114/18 115/21 118/6 118/22 120/13 123/3 129/15 137/5 137/20 144/7 146/5 148/22 159/15 159/19 161/14 162/4 162/6 163/22 164/7 164/8 173/18 176/14 177/4 177/21 179/16 180/24 182/21 186/2 186/10 186/10 186/11 186/11 187/16 191/11 192/2 193/20 195/14 197/5 199/3 199/19 212/21 215/24 216/24 219/4 221/25 225/2
**the 24th [2]** 189/21 189/23
**the 7th [1]** 196/1
**the 9th [1]** 193/7
**themes [2]** 205/21 207/19
**themselves [3]** 20/21 98/20 151/19
**theory [2]** 5/18 6/4
**therapist [3]** 77/10 79/5 99/24
**there's [63]** 4/6 4/10 4/21 4/25 5/3 6/16 12/12 12/17 13/8 18/2 18/2 19/23 23/6 34/13 38/9 40/10 43/9 47/16 49/20 50/2 50/6 55/2 55/8 55/14 70/10 70/25 73/6 74/18 84/17 86/9 96/11 102/7 103/5 111/1 111/15 113/2 116/20 117/18 125/17 125/25 132/3 138/19 138/23 148/22 158/17 160/1 161/10 161/23 164/7 165/17 168/20 172/22 180/4 183/25 192/2 193/16 194/5 194/16 195/2 196/17 196/24 204/15 219/11
**therefore [2]** 24/25 60/3
**they'll [7]** 19/14 111/5 157/7 157/12 157/12 177/17 218/2
**they're [30]** 4/7 7/2 13/5 22/19 53/13 70/5 78/3 82/4 93/9 93/10 93/10 93/12 93/12 98/21 100/16 100/21 113/4 130/13 132/18 132/19 135/9 144/15 144/24 148/11 156/23 188/4 188/4 197/18 204/24

**they've [5]** 25/3 82/14 82/15 107/17 188/12
**thing [20]** 9/10 11/6 13/17 18/10 68/13 70/3 70/8 76/19 78/25 79/2 122/19 126/6 147/23 161/1 165/25 175/8 204/14 211/20 221/19 224/17
**thing's [1]** 120/17
**things [46]** 8/1 24/3 31/17 34/23 35/4 49/19 63/25 71/16 77/20 78/4 78/4 78/18 82/19 84/23 101/17 103/11 105/19 118/25 123/12 125/3 129/13 130/12 149/11 150/8 151/11 153/5 159/18 162/10 166/5 166/7 173/10 173/15 175/9 177/18 179/14 180/11 182/23 182/25 183/6 189/13 193/5 205/24 208/8 220/8 220/23 223/17
**think [99]** 3/17 4/12 6/2 6/15 6/18 6/21 11/9 12/6 13/18 16/2 17/22 30/25 35/14 37/6 40/5 41/16 46/12 46/17 46/24 50/17 55/9 66/8 66/14 78/1 80/5 80/16 86/8 89/4 89/23 90/3 90/14 93/11 93/12 97/3 97/8 97/14 99/23 100/18 100/19 101/16 103/4 103/13 103/16 110/14 110/15 114/11 116/17 117/4 118/6 122/9 123/1 123/5 123/6 123/18 124/3 124/14 126/18 127/1 130/19 132/16 134/12 135/6 135/9 136/13 136/19 136/20 136/22 136/23 137/7 138/22 139/11 139/13 139/16 139/17 140/7 141/1 147/12 148/15 149/9 151/9 160/6 165/8 171/10 179/15 181/25 183/24 218/8 219/18 220/10 220/15 220/19 221/18 221/21 221/24 223/2 223/3 224/24 225/10 225/21
**thinking [10]** 3/10 126/20 128/22 131/1 132/15 172/8 188/4 220/6 221/2 221/16
**thinks [5]** 128/17 152/8 183/22 208/14 209/6
**third [6]** 40/2 148/21 170/12 182/2 196/2 218/1
**third-party [2]** 182/2

218/1 257

**Thirty [1]** 91/13
**Thirty-one [1]** 91/13
**thorn [1]** 129/1
**thoroughbred [13]** 56/13 57/11 58/5 58/6 58/12 97/24 121/24 122/8 122/14 122/18 124/18 124/19 126/2
**thoroughbred-type [1]** 124/19
**thoroughbreds [2]** 122/23 125/21
**those [57]** 3/11 5/7 8/2 8/4 8/18 9/12 12/7 12/12 15/21 15/23 16/7 16/9 16/18 42/24 42/24 44/15 59/19 61/12 71/16 83/5 83/10 83/17 92/12 94/24 98/3 98/7 98/9 98/18 101/16 112/20 115/7 119/8 119/19 119/24 122/10 125/24 141/8 153/16 161/15 164/21 164/21 170/15 173/11 173/12 175/20 185/9 198/25 202/18 204/17 207/19 209/2 209/5 211/21 212/16 223/24 223/25 224/19
**though [9]** 5/14 6/4 36/5 70/18 96/24 130/7 151/1 191/13 214/23
**thought [9]** 16/20 18/3 113/10 123/11 131/15 131/16 181/23 181/24 198/22
**thousands [1]** 177/1
**three [33]** 11/14 14/18 14/19 40/1 42/18 51/6 52/18 53/4 63/20 71/22 81/18 86/11 100/6 113/21 141/8 141/9 142/18 145/19 145/25 170/8 186/3 188/2 188/12 188/13 193/21 194/9 194/20 194/21 195/13 199/12 204/2 204/15 204/16
**through [33]** 15/14 17/24 20/2 20/5 23/3 23/7 25/14 78/5 92/12 94/24 101/14 119/4 130/24 131/1 132/15 134/2 134/3 134/24 135/20 157/1 163/16 166/22 166/23 168/6 174/2 178/21 185/1 187/7 189/13 193/6 193/12 199/13 209/10
**throughout [2]** 61/4 212/21
**thrown [2]** 136/15 136/25
**Thursday [7]** 25/15 68/15 71/8 71/14 71/17

**189/17 197/13
**thus [1]** 93/1
**ticket [2]** 87/15 87/22
**tidbit [1]** 171/21
**ties [1]** 49/6
**timeframe [1]** 204/24
**timely [3]** 4/17 8/17 15/5
**times [17]** 5/21 22/14 56/15 78/19 82/18 100/6 164/2 164/19 194/21 200/25 206/18 207/5 208/24 209/1 209/3 209/25 210/9
**Timing [1]** 87/6
**Timpanaro [8]** 118/11 118/13 162/1 182/6 182/6 182/10 182/14 183/22
**Tino [1]** 200/17
**tip [1]** 153/24
**tire [2]** 219/1 220/12
**title [2]** 47/20 63/14
**today [14]** 22/3 79/7 95/3 110/15 110/16 111/23 139/12 147/9 180/17 189/16 205/20 213/16 222/1 223/13
**together [6]** 95/7 106/5 175/17 191/1 206/20 208/23
**told [23]** 3/9 13/9 38/12 54/6 109/25 123/14 128/17 166/17 169/25 170/18 175/9 181/10 198/9 198/10 201/13 201/24 204/9 204/9 204/13 209/12 210/2 211/17 215/23
**Toluca [3]** 193/11 193/12 194/4
**tomorrow [14]** 27/12 28/19 86/24 87/5 87/9 120/18 133/14 205/18 220/8 220/16 220/23 222/10 222/14 226/8
**tonight [2]** 50/14 221/3
**too [18]** 16/6 20/11 71/20 72/4 75/15 89/7 89/23 97/9 127/15 127/24 139/9 163/8 174/12 177/18 207/20 215/3 215/3 220/2
**took [17]** 96/21 97/3 105/2 106/19 106/19 108/16 160/20 180/23 181/2 182/20 189/8 190/24 190/25 191/11 192/1 221/15 223/21
**tool [1]** 78/7
**tools [1]** 78/8
**top [2]** 49/1 197/12
**torts [2]** 34/23 35/2
**total [1]** 200/23
**totally [1]** 11/22
**touch [1]** 19/25
**tough [2]** 123/10 130/23

**toward [1]** 220/12
**towards [6]** 102/2 126/10 128/13 131/9 133/7 133/9
**town [2]** 138/15 138/16
**track [3]** 24/16 82/7 97/9
**Tractor [1]** 73/11
**traffic [4]** 47/10 48/7 48/9 51/9
**train [2]** 103/10 195/8
**trained [4]** 103/11 163/4 172/7 206/21
**trainer [7]** 172/4 181/4 187/3 187/23 192/11 192/11 210/15
**training [11]** 83/20 97/25 98/11 98/17 103/23 181/13 197/4 202/6 208/20 213/24 216/1
**trains [2]** 163/1 179/21
**transaction [4]** 25/6 174/7 206/5 209/10
**transactions [2]** 58/25 123/13
**transcript [2]** 1/11 227/16
**transcription [1]** 223/23
**transcripts [1]** 222/22
**translating [1]** 22/12
**translation [3]** 126/8 126/15 126/19
**transmit [1]** 218/3
**transported [2]** 59/24 116/3
**transporting [2]** 61/7 115/20
**travel [2]** 91/18 213/6
**travels [1]** 191/21
**treasury [1]** 43/14
**treat [2]** 102/3 107/25
**treated [8]** 76/3 80/22 128/5 132/19 177/7 177/7 177/11 177/23
**treatment [17]** 9/4 63/17 63/18 67/8 120/20 120/21 120/24 121/1 121/3 121/4 130/3 169/21 188/25 189/11 189/18 211/8 211/10
**treatments [1]** 168/2
**trembling [1]** 193/2
**trial [42]** 1/11 4/10 6/10 12/6 19/6 21/4 25/13 40/5 40/7 42/22 48/23 104/4 112/3 114/19 114/23 116/23 118/19 118/21 136/17 144/25 148/3 150/8 150/11 150/13 151/11 151/16 153/12 155/5 156/6 157/2 157/9 159/4 167/8 170/2 175/17 205/23 208/19 212/22 217/3 217/7 217/7 224/11

Case 9:15-cv-81229-KAM   Document 287   Entered on FLSD Docket 10/04/2017   Page 254 of
257
{WITNESSNAME}                                                                Index: trials..visit

**T**

trials [1] 144/17
tried [1] 172/17
tries [1] 41/9
tromping [1] 78/5
trotters [1] 82/4
trouble [3] 28/13 74/2 106/12
troubling [1] 207/1
truck [4] 68/4 191/25 194/3 194/9
trucked [4] 192/6 213/7 213/9 214/5
trucking [3] 73/25 74/3 74/5
trucks [1] 27/6
true [19] 13/7 26/9 33/16 33/16 39/7 39/7 55/5 55/16 55/18 128/23 144/19 144/19 151/24 153/21 153/21 154/9 154/19 173/12 173/19
truly [1] 206/17
trusted [5] 170/23 170/24 200/1 210/15 212/2
truth [2] 22/21 128/17
truth's [1] 14/22
truthful [3] 20/16 20/17 25/5
truthfully [1] 183/4
try [28] 18/10 22/16 23/16 23/24 24/11 24/13 24/16 25/19 63/10 89/25 110/20 112/18 132/4 132/5 147/24 158/3 172/16 179/14 205/18 214/21 218/4 218/20 218/21 218/22 219/15 224/10 224/12 224/20
trying [8] 20/8 24/4 31/25 32/13 34/13 75/12 169/11 202/18
tube [1] 193/6
Tuesday [2] 25/17 25/17
Turkey [3] 26/23 26/25 27/1
turn [5] 14/11 17/17 17/17 104/10 124/7
turned [4] 75/19 81/3 123/22 128/9
turnpike [1] 29/9
turns [2] 128/14 146/19
TV [3] 111/2 111/5 165/22
Twelve [1] 144/2
Twentieth [1] 186/19
Twenty [1] 142/4
Twenty-one [1] 142/4
twice [4] 83/7 172/17 195/15 195/18
Twist [1] 208/5
Twitter [1] 155/12
two [63] 14/17 17/1 22/10 27/10 27/11 27/11 33/24 34/3 35/15 40/1

**U**

42/21 44/5 44/16 47/11 47/21 49/19 49/22 51/6 52/15 53/5 62/7 62/8 66/10 66/11 68/2 72/14 77/23 80/15 85/24 88/15 88/23 92/14 109/9 116/16 118/8 121/3 139/17 141/13 142/13 144/11 144/22 145/23 145/25 163/24 163/25 164/1 164/2 176/2 179/24 184/20 184/21 188/13 191/25 194/6 194/9 197/24 203/12 207/20 210/11 213/4 216/2 220/11 225/1
two-time [1] 179/24
two-year [2] 164/1 164/2
two-year-old [1] 85/24
type [44] 9/7 9/10 9/24 31/5 31/20 37/10 37/14 37/16 40/20 43/19 46/2 48/7 57/18 58/2 59/13 60/12 66/2 66/9 73/8 73/12 78/22 82/10 82/22 82/25 83/5 87/8 87/13 87/21 98/4 98/19 100/2 102/18 108/3 108/4 110/9 110/22 122/15 124/19 124/20 166/9 195/11 204/5 211/7 211/10
types [1] 83/9

**U**

U.S [3] 54/4 177/2 177/2
Ugarte [2] 1/20 3/24
uh [8] 23/20 23/21 24/3 24/3 34/22 36/9 41/10 91/23
uh-huh [6] 23/20 24/3 34/22 36/9 41/10 91/23
Ulibarri [14] 117/4 176/21 176/21 176/22 176/23 177/2 177/8 177/22 192/24 193/13 193/14 193/18 193/23 194/2
ultimately [3] 170/20 181/14 183/25
umbrellas [1] 150/25
unable [3] 108/19 111/14 112/7
unbiased [2] 108/24 111/18
uncle [10] 56/11 56/18 57/9 57/23 121/24 122/4 122/10 123/13 125/7 125/20
uncle's [1] 58/4
unclear [1] 15/21
under [6] 4/2 6/3 81/7 187/4 197/10 215/2
undergo [2] 103/20 211/7

**V**

undergone [1] 165/3
undergrad [1] 113/23
understand [20] 3/15 6/5 14/21 15/9 20/5 20/14 22/13 22/13 36/13 38/24 39/4 72/7 93/11 93/14 106/25 144/6 158/23 198/16 217/3 220/21
understanding [10] 22/18 24/19 28/13 83/21 100/14 114/13 120/11 202/11 217/9 221/6
understood [4] 57/16 144/16 189/22 221/8
undertake [1] 64/6
underway [1] 51/4
underwriting [2] 12/23 15/8
undisclosed [1] 199/10
unduly [1] 20/7
unemployed [2] 37/1 37/8
unfair [1] 130/15
unfairly [1] 132/20
Unfortunately [1] 200/1
unintentionally [1] 148/14
Union [2] 43/22 43/23
UNITED [8] 1/1 1/13 104/6 126/15 165/17 182/15 194/4 194/7
University [5] 28/22 34/1 56/7 69/18 113/23
unknown [1] 168/25
unless [4] 4/6 135/6 152/3 154/3
unmarried [2] 84/14 85/5
until [14] 5/20 9/24 67/3 75/5 119/14 134/7 134/25 155/1 155/5 156/8 189/21 191/10 220/8 220/15
unusual [1] 198/4
unusually [2] 207/12 209/15
up-and-coming [1] 184/17
updated [1] 218/6
upon [41] 6/22 6/25 8/1 8/4 8/10 8/16 8/17 9/6 9/8 9/9 9/11 9/12 9/14 9/15 9/18 9/19 9/25 19/25 23/8 24/1 24/21 27/18 35/12 41/6 41/14 45/4 50/12 61/12 64/5 66/12 72/13 82/22 83/24 99/3 100/23 101/7 123/8 128/16 132/17 151/20 167/15
upset [1] 102/23
us [44] 9/13 11/9 19/20 20/12 20/16 20/17 21/5 21/12 21/21 22/18 25/24 25/25 26/20 28/6 42/2

**V**

42/3 43/5 50/18 76/17 86/5 93/24 101/20 104/25 107/23 116/24 120/9 127/17 129/5 130/4 134/10 134/24 138/17 146/14 147/9 147/16 173/2 173/5 198/17 198/22 205/20 207/22 223/11 223/25 225/7
used [19] 4/8 4/12 4/13 4/14 4/19 5/1 5/4 5/8 12/13 12/14 12/16 13/5 13/14 57/18 66/16 105/6 105/20 108/9 161/6
uses [1] 155/25
using [5] 12/11 22/9 23/15 107/25 172/3
usually [4] 52/15 53/3 76/23
utilizable [1] 14/22

**V**

vacation [1] 96/12
Valley [2] 2/3 2/9
value [9] 83/9 99/2 100/17 100/19 111/11 123/18 182/11 185/9 208/10
values [2] 111/12 111/12
various [7] 58/8 58/12 78/4 78/18 161/14 161/24 163/14
vaulting [2] 161/7 161/8
venire [6] 18/18 22/25 93/18 94/16 120/2 146/22
venue [1] 194/12
verbalize [2] 23/19 23/24
verbiage [1] 105/19
verbs [1] 105/20
verdict [8] 32/17 35/16 39/14 54/9 68/18 85/10 152/24 156/3
versus [2] 44/10 68/25
very [77] 4/5 13/3 16/10 19/3 19/8 20/8 21/11 24/18 25/9 25/9 26/6 53/20 56/12 62/25 65/9 66/5 66/21 66/23 66/23 79/11 79/13 80/25 83/17 83/18 93/17 102/3 102/4 102/12 102/21 105/25 106/20 107/5 110/8 110/20 111/19 112/10 115/15 124/6 126/23 126/24 129/10 135/2 146/20 162/12 163/8 163/12 171/9 171/11 183/17 184/2 184/22 185/8 185/11 185/18 185/20 186/15 187/4 187/7 187/8 187/18 192/16 192/20 196/14 197/18 197/24 199/18

**V**

202/25 205/23 205/24 206/2 207/10 209/16 210/11 214/3 214/3 214/3 216/24
vet [13] 109/25 128/3 128/3 128/7 128/8 128/12 128/12 128/13 168/22 178/10 188/24 211/14 211/17
veterinarian [31] 7/11 7/12 107/17 107/24 108/3 108/9 108/15 108/15 108/20 108/25 109/3 109/12 109/24 110/5 117/4 117/6 117/8 163/16 165/5 165/18 176/19 176/20 177/2 177/3 177/22 177/23 178/7 178/8 188/10 196/3 210/19
veterinarians [10] 6/14 101/11 101/12 107/10 108/8 109/18 169/22 188/11 199/12 210/21
veterinary [19] 4/21 6/12 6/22 6/25 7/22 8/4 8/10 8/16 9/2 9/15 66/3 109/5 165/3 165/12 165/13 165/15 167/15 176/24 214/25
vets [2] 193/22 214/9
via [7] 159/8 159/9 171/8 171/16 174/5 181/4 223/24
vicarious [3] 5/11 5/15 6/3
video [41] 158/15 159/8 159/9 160/5 160/6 164/11 168/9 171/8 171/16 173/1 173/25 174/5 176/21 177/9 178/5 181/4 181/13 181/18 190/13 191/18 194/14 196/7 197/20 198/19 199/2 201/12 201/17 201/20 201/22 202/5 202/10 202/15 202/16 202/24 203/23 204/6 204/23 204/25 205/5 222/25 223/24
videos [14] 110/11 158/16 164/3 164/6 164/8 164/16 164/18 173/23 173/25 174/3 174/4 202/18 204/16 210/2
view [4] 46/13 102/9 103/13 111/18
views [16] 19/24 29/23 30/23 37/4 38/8 40/9 43/7 49/4 62/23 68/10 69/7 73/4 87/2 91/5 101/16 148/13
Village [2] 2/4 2/10
vision [1] 110/25
visit [1] 155/16

**V**

**visiting [2]** 21/1 21/4
**visits [1]** 128/13
**visual [3]** 111/3 111/9 158/14
**Vivo [1]** 200/21
**Vlahos [24]** 7/11 7/17 7/21 8/7 8/21 9/24 10/7 118/11 118/12 163/16 165/4 165/8 165/11 165/21 165/23 166/15 167/14 167/23 168/9 169/16 169/20 169/22 170/15 179/7
**voice [2]** 17/10 184/7
**void [1]** 10/23
**voir [5]** 16/5 16/5 16/15 16/24 227/3
**VOLUME [1]** 1/10
**volunteering [1]** 40/2
**Vorst [115]** 10/8 24/22 159/13 159/20 159/22 159/24 160/7 160/8 160/22 161/2 161/17 161/21 162/12 162/17 163/9 164/3 164/22 165/24 166/8 166/8 166/9 166/20 167/13 168/2 168/6 169/5 169/8 169/16 170/7 170/19 172/12 173/22 174/3 176/9 176/12 176/16 177/4 178/11 182/11 183/2 183/15 184/19 185/3 185/11 185/17 185/22 186/20 187/9 187/15 187/15 187/16 187/20 187/24 188/14 188/24 189/3 189/21 189/23 191/22 192/5 192/8 192/14 192/25 193/10 193/18 193/22 193/24 194/1 194/6 194/19 194/23 195/9 195/18 196/2 196/3 196/5 196/17 197/8 197/13 197/19 197/20 197/24 199/9 199/18 200/3 200/24 201/4 201/5 201/7 201/10 201/21 202/3 202/11 203/14 205/1 205/6 206/15 206/18 206/19 206/23 207/1 207/6 207/24 208/14 209/13 209/14 209/15 209/23 210/8 210/20 211/21 213/9 213/13 214/2 214/13
**Vorst's [9]** 183/3 186/3 186/6 186/24 190/4 191/21 207/9 207/13 211/1

**W**

**Wachovia [1]** 43/22

**wait [9]** 24/11 24/13 24/16 113/6 119/10 119/25 134/24 220/15 224/20
**waitering [1]** 89/2
**waiting [2]** 194/17 218/2
**walk [2]** 93/8 148/24
**Walker [1]** 42/12
**walking [1]** 150/24
**wall [1]** 26/13
**Walt [1]** 31/6
**want [70]** 3/11 7/18 10/3 17/15 17/16 18/10 18/23 19/1 20/11 28/7 33/6 51/16 65/17 92/11 92/21 107/11 107/11 112/10 116/22 119/2 121/13 135/8 138/17 139/11 147/8 148/15 148/20 148/23 150/6 155/2 155/7 156/13 156/17 158/11 158/18 158/19 158/19 158/22 165/7 170/21 170/22 171/15 171/25 172/1 178/21 179/5 179/12 180/9 181/20 182/4 184/2 184/24 193/17 197/21 198/10 201/23 203/5 204/8 212/11 212/18 214/18 216/18 216/22 217/3 220/7 220/14 220/18 220/24 222/2 224/10
**wanted [18]** 3/8 3/16 4/23 7/23 10/25 16/3 98/1 109/8 109/13 113/18 116/20 118/25 120/9 127/12 170/21 171/21 206/11 210/5
**wants [1]** 215/24
**warranted [2]** 17/5 112/8
**wasn't [23]** 4/17 5/20 5/20 10/4 10/5 37/18 66/23 79/1 80/15 81/24 95/11 129/3 133/9 169/23 170/19 170/22 185/12 191/14 201/4 201/7 213/17 215/19 215/21
**waste [4]** 220/6 220/14 220/24 224/25
**watch [6]** 98/9 130/8 130/9 164/3 164/8 215/3
**watched [1]** 210/8
**watching [3]** 111/2 159/9 171/16
**water [3]** 50/15 81/7 193/5
**Watt [4]** 117/8 178/7 196/5 214/11
**ways [2]** 132/22 156/1
**we'd [3]** 26/21 141/2 204/25
**we'll [61]** 11/1 11/25

13/25 14/16 20/12 22/16 23/11 25/25 26/9 28/9 28/17 29/12 50/21 58/21 58/24 69/6 86/5 86/17 86/19 93/16 94/4 101/23 119/10 119/15 119/17 119/18 119/24 119/25 121/19 127/8 133/11 134/2 134/3 134/4 134/7 137/9 141/2 145/3 146/6 146/7 146/7 146/8 146/11 146/12 149/3 149/4 149/10 149/11 158/5 171/22 175/17 196/4 217/14 217/20 220/23 222/11 222/13 222/14 225/17 226/7
**we're [57]** 4/15 12/25 14/10 19/17 20/2 20/6 20/7 24/14 25/10 25/19 26/7 26/12 53/7 71/14 92/12 92/17 119/4 126/14 126/17 126/19 133/14 136/19 136/22 136/23 138/18 139/13 142/11 144/13 145/1 145/14 145/25 146/25 147/21 147/22 148/2 150/5 158/4 159/19 170/14 180/20 187/11 189/16 198/13 199/9 199/14 201/1 202/1 205/11 205/22 216/5 220/6 220/25 221/17 221/24 225/3 225/10 225/13
**we've [3]** 95/21 150/8 218/1
**wealth [1]** 43/21
**wearing [1]** 22/13
**websites [1]** 155/11
**Wednesday [10]** 11/13 11/24 12/11 25/17 25/18 68/14 216/23 217/5 220/23 221/6
**week [14]** 25/15 25/16 25/16 52/15 63/6 70/5 70/7 71/9 147/12 147/13 147/14 158/3 225/5 225/5
**week's [1]** 53/14
**weekend [6]** 10/19 11/9 196/1 214/13 214/14 222/23
**weeklong [1]** 214/6
**weeks [14]** 62/7 62/8 116/16 139/17 190/4 190/5 212/6 212/14 212/16 212/19 212/24 212/23 213/12 213/20
**weigh [1]** 84/1
**weighing [1]** 134/12
**weight [3]** 151/9 156/24 216/16
**welcome [11]** 18/23 42/9

73/17 94/17 109/15 121/22 127/11 129/22 146/23 150/1 221/12
**welfare [2]** 78/15 102/2
**well [80]** 7/25 8/24 9/6 11/1 12/9 15/4 27/18 46/2 46/6 47/7 48/12 50/13 51/22 55/2 61/4 61/18 62/6 62/19 63/10 67/2 68/16 71/21 71/25 80/13 81/15 83/13 83/17 89/15 90/1 98/15 102/3 104/10 105/16 106/2 120/12 122/12 123/16 126/10 133/24 135/7 137/7 137/16 137/20 138/24 139/5 146/17 146/20 160/19 161/9 163/4 163/15 171/9 171/11 172/18 173/15 173/18 174/1 175/7 177/7 177/11 185/11 185/20 189/14 192/21 193/9 196/25 197/16 197/19 202/12 203/18 211/21 211/23 214/13 216/1 219/14 223/13 224/2 225/9 225/12 225/15
**Wellington [26]** 2/7 21/9 62/25 64/9 64/15 65/3 69/17 82/18 97/25 100/1 159/17 159/19 172/5 172/10 172/14 178/9 181/2 181/5 181/7 185/4 186/14 188/1 192/1 199/16 202/22 213/7
**Wells [6]** 2/2 2/8 42/15 43/11 45/1 114/11
**went [19]** 11/15 30/10 34/9 40/7 65/4 65/5 80/3 95/7 95/17 96/12 97/8 99/9 114/23 125/4 172/10 172/16 179/18 199/13 207/15
**weren't [6]** 7/5 11/10 52/6 66/20 129/13 140/14
**West [18]** 1/7 1/19 2/13 2/16 2/19 2/22 21/9 29/8 29/9 30/15 59/2 59/4 88/10 97/20 101/5 115/17 139/2 139/6
**Westlake [2]** 2/4 2/10
**wet [2]** 150/24 150/25
**what's [28]** 13/1 22/12 22/16 23/23 24/5 24/16 33/14 45/15 52/13 77/2 106/8 123/7 142/13 148/12 153/18 157/2 157/15 157/20 160/7 168/6 170/1 171/20 189/12 194/1 196/15 196/16 218/7 225/6
**whatever [12]** 11/21 59/18 60/2 74/17 76/18

82/17 93/3 108/25 128/22 146/19 151/9 195/14
**whatevers [1]** 82/17
**whenever [1]** 189/24
**where [47]** 26/24 28/21 32/13 34/4 35/19 44/20 45/25 60/25 62/8 63/16 65/10 66/8 66/17 72/7 75/13 77/24 78/3 82/13 82/16 86/11 101/14 101/17 108/8 109/23 110/10 123/25 128/17 138/17 144/6 148/16 171/16 171/17 172/15 178/25 185/19 187/17 188/19 192/7 193/7 194/2 204/16 204/18 206/25 209/22 210/8 210/12 216/11
**whether [32]** 3/11 6/16 10/22 12/7 15/21 19/8 19/10 19/22 19/23 20/19 33/7 35/20 55/5 55/21 63/18 123/22 151/7 154/2 156/21 160/15 161/18 161/18 162/8 162/8 162/9 173/18 175/19 176/14 180/25 183/24 208/17 216/13
**while [9]** 48/25 92/17 153/6 154/21 164/3 164/4 191/1 192/24 202/21
**who's [19]** 23/12 23/21 25/12 52/3 52/23 104/5 104/5 119/16 120/23 122/14 139/3 147/1 159/6 159/20 171/9 181/3 187/5 188/23 192/13
**whole [13]** 44/3 49/16 130/25 132/8 182/17 187/20 191/10 192/9 192/13 192/14 201/23 204/4 214/8
**whom [2]** 58/10 209/10
**whose [3]** 19/10 99/19 117/14
**why [44]** 8/15 10/3 22/13 22/18 26/18 30/25 34/13 56/18 84/17 86/9 97/22 108/17 114/4 120/5 126/12 126/15 130/3 134/1 136/24 137/20 159/12 159/15 159/19 162/12 162/14 163/15 163/18 165/24 167/11 175/7 176/19 177/21 177/25 187/12 189/22 191/11 198/22 199/8 201/2 201/24 202/3 203/25 208/14 209/6
**wife [11]** 27/10 47/11 48/20 56/8 74/8 85/24

**W**

**wife... [5]** 112/24 121/2 121/3 130/6 172/15
**willing [1]** 11/22
**willingness [6]** 19/1 94/20 147/9 147/21 149/2 150/4
**win [1]** 213/2
**winner [1]** 179/24
**winning [1]** 209/24
**winter [10]** 185/4 185/11 185/17 185/23 186/10 197/9 202/12 203/15 204/2 210/7
**wire [3]** 166/25 175/3 175/4
**wires [1]** 167/4
**wish [2]** 147/17 156/6
**within [2]** 60/7 160/16
**without [10]** 111/5 138/25 160/24 162/5 167/21 172/17 196/18 196/19 208/18 218/9
**witness [32]** 4/12 4/16 4/22 5/2 11/7 11/21 17/19 17/23 18/4 78/14 78/19 80/20 80/22 150/24 151/1 152/1 152/3 152/4 152/11 153/1 153/1 153/2 153/7 153/8 161/25 208/19 217/13 221/17 221/19 221/22 221/23 223/16
**witness' [9]** 4/18 4/19 153/3 153/4 153/6 153/6 153/9 153/10 153/13
**witnessed [1]** 203/14
**witnesses [24]** 6/23 17/20 89/20 116/22 118/7 123/7 154/24 156/7 156/11 157/11 157/12 157/13 157/15 157/17 157/19 159/5 159/7 161/24 162/2 171/6 212/18 212/22 223/6 224/1
**witnesses' [1]** 151/23
**wives [1]** 109/11
**woman [4]** 32/3 34/5 171/7 181/3
**won [2]** 80/9 171/10
**won't [9]** 25/18 71/16 76/6 89/15 128/12 147/15 159/8 160/3 208/16
**wonderful [1]** 205/6
**wondering [1]** 118/16
**woods [1]** 78/5
**words [4]** 120/11 155/25 173/7 200/17
**work [83]** 11/25 21/19 21/24 30/5 31/5 31/8 35/10 37/10 37/12 38/1 38/13 38/15 40/16 40/17 42/15 42/18 45/10 48/6

48/8 48/20 48/25 49/15 50/11 50/13 51/23 51/25 52/7 52/8 52/11 52/17 53/8 53/22 53/25 56/6 62/8 62/17 62/19 63/4 63/24 69/14 70/19 73/8 73/12 74/8 77/9 77/10 77/12 77/14 77/19 79/6 79/9 79/12 79/14 87/4 87/13 87/18 87/21 88/16 90/25 91/10 92/19 98/21 99/17 116/15 126/24 134/24 135/12 169/9 174/7 174/8 174/11 179/13 179/15 209/18 224/6 224/7 224/8 224/21 225/13
**work-related [1]** 45/10
**worked [17]** 31/2 31/4 34/16 37/8 40/12 56/12 62/1 72/17 77/14 78/14 78/15 97/23 113/20 174/8 176/25 182/16 215/14
**workers' [1]** 68/1
**working [12]** 21/6 27/6 52/2 72/12 79/20 99/7 140/3 174/12 174/13 178/10 223/8 224/9
**works [18]** 27/12 29/2 47/12 51/4 53/4 69/16 73/1 73/2 77/17 77/17 77/21 77/24 78/7 85/25 88/14 91/2 91/2 187/3
**world [13]** 21/10 31/6 62/24 64/9 66/13 122/9 165/17 188/23 194/12 194/14 197/12 206/11 214/8
**worried [3]** 11/15 138/13 141/5
**worth [14]** 25/1 29/18 51/2 67/23 72/23 100/21 122/18 168/13 181/23 181/23 182/1 182/20 183/23 200/25
**wouldn't [14]** 24/7 36/3 55/15 56/18 97/10 106/11 108/14 115/4 119/1 171/3 171/3 181/19 198/6 198/7
**wrap [2]** 212/9 212/23
**written [2]** 7/15 107/1
**wrong [5]** 95/14 195/1 211/5 214/24 215/13
**wrote [1]** 91/17

**X**

**x-rays [2]** 128/10 189/16
**Xalapa [4]** 191/12 192/7 192/17 192/21

**Y**

**Yasmin [1]** 62/15
**yeah [22]** 16/24 28/3 28/14 29/3 34/3 35/5 35/14 36/11 48/12 64/2

67/1 76/6 80/5 83/4 90/5 125/19 125/23 141/2 146/15 191/3 191/9 219/7
**year [22]** 29/18 37/25 59/12 80/7 83/7 85/24 86/22 87/4 88/11 88/13 97/4 100/8 164/1 164/2 170/9 170/12 170/12 186/3 188/2 200/10 200/13 206/20
**years [75]** 27/11 30/4 30/16 30/19 31/10 31/24 33/24 33/24 34/4 34/8 35/1 36/25 37/3 38/24 38/5 39/24 40/21 42/13 42/17 43/18 43/22 47/8 48/10 48/18 49/11 51/3 51/8 53/6 53/21 56/4 56/22 59/5 62/16 67/24 68/5 69/20 72/14 72/24 73/23 74/8 77/8 77/11 77/15 78/6 78/12 78/15 78/18 80/8 81/6 84/12 85/2 86/14 87/23 88/10 88/12 88/13 90/24 91/13 105/3 106/6 114/1 117/17 121/3 125/25 163/24 163/25 170/8 182/15 194/21 200/7 203/12 206/14 210/16 216/2 217/1
**Yep [1]** 142/5
**yes [197]** 7/10 8/11 9/1 9/5 10/13 12/3 15/6 18/13 24/1 26/15 27/2 27/24 28/3 28/10 28/20 28/25 29/8 29/11 31/13 32/18 33/4 33/11 34/16 34/25 35/22 36/17 36/21 37/9 38/19 39/1 39/3 39/9 39/12 40/14 41/3 41/5 41/8 41/11 41/19 41/23 44/7 44/11 44/14 44/25 45/2 45/10 45/16 45/19 45/20 45/24 46/4 47/4 48/11 48/15 50/20 51/24 52/1 52/8 52/12 52/21 52/24 53/11 54/10 54/18 55/22 55/22 56/1 57/13 58/17 58/20 58/23 64/7 64/16 64/19 64/23 65/12 65/14 68/20 69/5 70/24 72/2 72/5 73/21 74/4 74/15 74/17 75/11 78/14 79/17 80/1 81/13 81/21 82/3 83/20 83/23 86/16 87/12 90/2 90/17 90/20 91/21 91/24 91/25 94/11 94/13 94/14 95/9 95/11 95/16 96/15 96/16 96/21 96/22 97/21 100/3 100/4 100/22 101/9 101/9 101/22 102/8 103/23 103/24 104/21 105/22 106/18 106/23

107/10 108/1 108/11 108/13 109/1 109/6 109/18 109/21 110/12 110/24 112/1 112/9 113/15 113/15 114/21 115/18 116/9 116/21 117/11 117/13 117/13 117/16 118/8 118/17 120/15 120/25 121/6 122/20 128/20 129/15 131/8 131/11 131/18 133/17 135/18 137/21 138/22 140/21 141/16 141/24 142/1 142/3 142/7 143/25 144/1 145/15 146/3 149/18 149/22 149/23 180/23 184/9 190/18 190/23 191/15 191/16 191/17 196/12 198/20 201/14 202/14 203/17 203/19 206/25 217/23 218/18 218/24 220/18 224/5 224/23
**yesterday [1]** 224/18
**yet [5]** 172/22 186/13 196/2 213/5 225/11
**York [4]** 63/22 64/13 118/1 204/18
**Yoshida [2]** 2/8 21/14
**you'd [6]** 44/12 52/7 55/19 77/1 105/12 108/23
**you'll [100]** 4/5 22/8 36/18 111/1 111/2 113/12 134/12 141/8 151/14 156/19 157/23 158/13 159/2 160/4 162/22 163/7 164/8 166/15 167/22 168/11 171/4 171/12 171/23 172/22 172/25 173/18 174/4 174/23 175/10 175/12 175/19 175/20 176/10 176/13 176/15 177/9 177/16 177/16 177/22 178/5 180/18 180/24 181/13 181/18 181/22 182/1 182/7 182/19 183/1 183/4 183/13 183/21 183/24 185/16 185/21 186/8 186/17 186/20 186/24 187/7 188/9 189/1 189/6 189/14 189/15 189/24 190/10 192/22 194/13 194/23 195/12 196/16 196/23 197/6 197/11 197/23 198/5 198/8 199/22 200/5 201/9 204/6 204/16 205/4 205/17 207/3 207/8 207/11 207/10 208/13 210/22 210/25 211/15 212/1 212/14 212/22 214/16 215/19

216/17
**you're [86]** 7/25 17/9 20/17 23/15 33/16 35/8 37/7 39/11 42/9 44/13 50/10 50/11 52/2 52/18 52/22 57/7 59/24 61/6 61/7 61/12 63/24 69/4 70/22 71/14 71/17 73/17 76/16 92/7 92/20 93/5 101/5 102/14 104/25 105/10 109/15 110/18 119/14 127/2 131/6 147/14 154/23 158/16 159/9 162/13 164/11 164/16 165/19 166/5 166/7 166/11 171/6 173/10 173/14 174/6 174/17 176/1 176/2 176/5 177/18 180/4 180/11 183/6 183/18 187/22 188/11 188/16 188/21 190/3 190/5 190/6 191/23 197/1 198/12 199/11 206/10 206/12 206/14 206/16 207/19 212/17 221/25 224/9 224/13
**you've [26]** 15/15 44/2 48/8 58/18 60/11 65/10 65/10 66/8 66/8 82/21 82/24 83/2 86/15 99/25 100/13 113/24 127/1 128/23 133/4 147/11 148/11 150/10 155/2 205/21 206/7 225/1
**young [2]** 51/6 51/16
**younger [4]** 66/17 78/6 105/2 105/16
**youngest [2]** 27/12 42/20
**yourself [6]** 26/21 40/17 59/19 73/20 81/12 99/16
**yourselves [3]** 17/16 92/18 134/15

**Z**

**ZENDEJAS [158]** 1/3 18/12 18/12 19/11 21/5 21/15 22/9 24/21 33/13 104/2 104/16 111/21 112/4 112/5 112/19 117/1 128/22 132/14 158/10 158/25 159/5 159/20 159/24 160/3 160/20 161/21 161/25 164/12 164/13 164/22 164/24 165/7 166/10 166/13 166/17 166/19 166/24 167/4 167/18 167/20 167/21 168/1 168/5 168/12 168/18 169/10 169/20 169/24 170/17 170/20 171/5 171/13 171/24 172/3 172/6 172/15 172/25

## Z

**ZENDEJAS... [101]**
173/12 174/13 175/1
175/5 175/15 175/24
176/1 176/6 176/10
176/11 176/16 176/18
176/20 177/6 177/11
177/19 178/2 178/10
178/19 179/3 179/13
179/17 180/2 180/7
180/13 180/14 180/18
180/19 180/22 182/3
182/3 182/7 182/12
182/20 183/2 183/8
183/19 183/20 184/1
184/20 184/21 186/5
187/1 187/4 187/6
187/14 187/19 187/23
188/10 188/13 189/4
189/10 189/11 189/20
190/7 190/11 191/6
191/23 192/20 192/25
193/10 196/3 197/2
197/6 197/17 198/9
198/13 199/14 199/18
199/23 200/3 200/5
200/18 201/10 203/16
204/8 204/8 204/10
205/8 206/6 208/18
210/5 210/13 210/19
211/17 211/18 212/2
212/6 213/23 214/1
214/5 214/16 214/18
215/8 215/9 215/11
215/12 215/15 215/17
216/4 216/14

**Zendejas' [8]**  164/12
167/10 167/25 180/6
184/23 195/8 210/10
215/3

**zero [3]**  196/17 196/17
196/23

**Zinmeister [3]**  29/16
29/17 147/6